## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| J.H., by and through his mother and next friend, N.H.; I.B., by and through his parents and next friends, A.B. and I.B., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs-Petitioners,<br><br>  -against-<br><br>JOHN BEL EDWARDS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF LOUISIANA; THE LOUISIANA OFFICE OF JUVENILE JUSTICE; EDWARD DUSTIN BICKHAM, IN HIS OFFICIAL CAPACITY AS INTERIM DEPUTY SECRETARY OF THE LOUISIANA OFFICE OF JUVENILE JUSTICE; JAMES WOODS, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE ACADIANA CENTER FOR YOUTH; SHANNON MATTHEWS, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE BRIDGE CITY CENTER FOR YOUTH; SHAWN HERBERT, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT MONROE; and RODNEY WARD, IN HIS OFFICIAL CAPACITY AS THE DEPUTY DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT COLUMBIA,<br><br>          Defendants-Respondents. | CIVIL ACTION NO.<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS

1

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................ 6

PARTIES ................................................................................................................... 6

FACTUAL ALLEGATIONS ..................................................................................... 9

    I.     COVID-19 Is a Serious and Deadly Global Pandemic That Threatens the
          Lives of Louisiana Citizens and Its Incarcerated Children ................................. 9

          a.     COVID-19 Is Particularly Severe in Louisiana ..................................... 15
          b.     Incarcerated People Are Especially Vulnerable to COVID-19 .............. 16
          c.     Placement in an OJJ Facility during the COVID-19 Pandemic
                Creates Risk of Serious Emotional and Psychological Harm ................. 20
          d.     Releasing As Many Children As Possible Will Protect Those
                Children—and the Surrounding Communities—From Substantial
                Risk of Serious Harm ............................................................................ 22

    II.    OJJ's Insufficient Response to COVID-19 Places the Putative Class at a
          Substantial Risk of Serious Harm ..................................................................... 23

          a.     Defendants-Respondents Have Either Sought to Obscure Their
                COVID-19 Policies From Plaintiffs-Petitioners, Parents, the
                Public, and Advocacy Groups—or Have Failed to Devise a
                Comprehensive Plan .............................................................................. 24
          b.     OJJ's Policies are Inadequate to Care for COVID-19 Positive
                Children or to Prevent the Spread of COVID-19 .................................... 27
          c.     OJJ's Policies Place Children at a Substantial Risk of Serious
                Long-Term Mental, Developmental and Emotional Harm ..................... 30

CLASS ACTION ALLEGATIONS ........................................................................ 32

    I.     The Plaintiff Class ............................................................................................. 33
    II.    Rule 23(a) Factors ............................................................................................ 33

          a.     Numerosity—Fed. R. Civ. P. 23(a)(1) ................................................... 33
          b.     Commonality—Fed. R. Civ. P. 23(a)(2) ................................................ 34
          c.     Typicality—Fed. R. Civ. P. 23(a)(3) ..................................................... 35
          d.     Adequacy—Fed. R. Civ. P. 23(a)(4) ..................................................... 36

    III.   Rule 23(b)(2) .................................................................................................... 36
    IV.   Rule 23(b)(1)(A) ............................................................................................... 37

CLAIMS FOR RELIEF .......................................................................................... 37

    I.     42 U.S.C. § 1983 Unlawful Conditions of Confinement and Deprivation of
          Due Process (Fourteenth Amendment) .............................................................. 37
    II.    42 U.S.C. § 1983 Unlawful Conditions of Confinement (Eighth
          Amendment) ..................................................................................................... 39

PRAYER FOR RELIEF .......................................................................................... 40

On information and belief,

## INTRODUCTION

1.      Plaintiffs-Petitioners are children who have been adjudicated delinquent and are currently confined in one of four secure care facilities operated by the Louisiana Office of Juvenile Justice ("OJJ").  These facilities are: Acadiana Center for Youth in Bunkie; Bridge City Center for Youth; Swanson Center for Youth Columbia; and Swanson Center for Youth Monroe.[1] Plaintiffs-Petitioners bring this action on behalf of themselves and all other children similarly situated, as well as those children who may in the future be subject to confinement in one of the four OJJ facilities throughout the duration of the Coronavirus Disease 19 ("COVID-19") pandemic.   Plaintiffs-Petitioners seek declaratory and injunctive relief for Defendants-Respondents to comply with basic constitutional guarantees against cruel and unusual punishment and due process of law, including an order requiring Defendants-Respondents to (i) release class members who meet the criteria set forth herein for presumptive release; (ii) adopt procedures to determine, on an ongoing basis while the pandemic persists, whether confinement is appropriate for any other children remaining in, or facing, confinement in OJJ facilities; (iii) implement remedial measures to ensure the physical safety as well as social and psychological well-being of children remaining in OJJ facilities; and (iv) provide class members in custody the treatment and rehabilitation services required by statute and the United States Constitution.  Such relief is necessary to protect the physical and emotional safety and well-being of the class members from the unprecedented effects of COVID-19.

2.      COVID-19 is a deadly global pandemic caused by a novel coronavirus that has infected over 4 million people and killed more than 298,000 people worldwide in just five

---

[1] State of Louisiana, Office of Juvenile Justice, *Youth in Secure Care Facilities*, https://ojj.la.gov/serving-youth-families/youth-in-secure-care-facilities/ (last visited May 14, 2020).

months.[2]  As of May 14, 2020, more than 1.38 million people in the United States have tested

positive for COVID-19, and more than 84,000 have died from the illness.[3]  Both the number of

confirmed cases and the number of deaths continue to rise daily.[4]  Louisiana is among the hardest

hit states in the United States, with approximately 32,000 confirmed cases and over 2,300 deaths

to date.[5]  It has become increasingly clear that children and young adults are fully susceptible to

COVID-19.  While the full effects of the disease on children are not fully known, recent reports

suggest that children may be vulnerable to life-threatening complications both during and *after*

the infection itself appears to have resolved.[6]  And, while children may not always develop

symptoms, they unquestionably play a role in the transmission and spread of COVID-19.[7]

     3.     Recent scientific projections suggest the crisis will only worsen.  As of May 4,

2020, the Institute for Health Metrics and Evaluation at the University of Washington's School

of Medicine is predicting over 147,000 COVID-19-related fatalities in the United States by

August 2020, up from a previous prediction of 72,000.[8]  Factoring in the scientists' margin of

error, the new United States fatality prediction over the next couple months ranges from 95,000

to 243,000.[9]

---

[2] Coronavirus Resource Center, JOHNS HOPKINS UNIVERSITY, https://coronavirus.jhu.edu/map.html (last visited May 14, 2020).

[3] *Id.*

[4] *Id.*

[5] Louisiana Department of Health, *Louisiana Department of Health Updates for 4/22/2020*, http://ldh.la.gov/index.cfm/newsroom/detail/5557, (last visited May 14, 2020).

[6] *See, e.g.*, Joseph Goldstein, *15 Children Are Hospitalized With Mysterious Illness Possibly Tied to COVID-19*, N.Y. TIMES (May 5, 2020), https://www.nytimes.com/2020/05/05/nyregion/children-Kawasaki-syndrome-coronavirus.html; Ex. 1, Graves Decl. ¶ 7.

[7] CDC, *Morbidity and Mortality Weekly Report* (Apr. 10, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6914e4.htm.

[8] Alice Miranda Ollstein & Caitlin Oprysko, *Models shift to predict dramatically more U.S. deaths as states relax social distancing*, POLITICO (May 4, 2020), https://www.politico.com/news/2020/05/04/cdc-daily-deaths-coronavirus-234377.

[9] *Id.*

4.      While Louisiana has encouraged people in most communities to practice social isolation and heightened hygiene measures to protect themselves from COVID-19, it is impossible for individuals who are incarcerated to adhere to such protective measures. Incarcerated individuals live in close and crowded quarters, have limited access to soap or other sanitizing agents, and are unable to take basic steps to clean their own living surroundings.

5.      Correctional facilities, including juvenile correctional facilities such as OJJ's four secure facilities, are among the top "hotspots" for coronavirus transmission in the country.[10] Indeed, as of May 14, 2020, 28 of the incarcerated children and 41 staff working in those four secure care facilities have tested positive for COVID-19.[11]  These numbers surely are just the tip of the iceberg, as OJJ has tested only 29 children—producing a positive test rate of 97%.  The low rate of testing and extraordinarily high rate of infection portends a dire picture going forward in the absence of appropriate physical distancing and other necessary protective measures in the four OJJ secure care facilities.

6.      On March 23, 2020, the CDC issued Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities ("CDC Guidance").[12]  The CDC Guidance provides, among other things, that correctional and detention facilities should coordinate closely with their local public health departments, facilitate social distancing wherever possible, and restrict transfer to and from other facilities or jurisdictions unless necessary. Individuals with COVID-19 must be carefully monitored and transferred to the nearest hospital

---

[10] C.J. Ciaramella, *8 of the 10 Biggest U.S. Coronavirus Hotspots are Prisons and Jails*, REASON (April 29, 2020), https://reason.com/2020/04/29/8-of-the-top-10-biggest-u-s-coronavirus-hotspots-are-prisons-and-jails/.

[11] State of Louisiana, Office of Juvenile Justice, *OJJ COVID-19 Information*, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 14, 2020).

[12] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("CDC Guidance").

if their physical health deteriorates or if their condition worsens.[13]  The American Academy of Pediatrics has urged that facilities release all children who can be safely cared for in the community and restrict new admissions to correctional settings.[14]  This guidance echoes similar calls by medical and correctional experts for a sharp reduction in the number of incarcerated children to mitigate the devastating effects of this pandemic on children, staff, and communities.[15]

7.    OJJ has not significantly reduced the population of confined children[16] and has failed to implement an updated pandemic policy or a remedial plan that complies with CDC Guidance with respect to the four OJJ secure care facilities.  Despite a high-risk environment and a 97% positive test rate among children who have been tested, OJJ has failed to test all children in their custody, failed to facilitate social distancing, failed to restrict transfer among facilities, failed to carefully monitor those who have tested positive, and failed to provide for the basic hygiene of confined children.  These failures show that OJJ has ignored the recommended CDC guidelines and thus knowingly placed the lives and health of these children at substantial risk of serious irreparable harm, including death, as well as jeopardized the health and safety of secure care facility staff members, their families, and their communities.  OJJ has simply relied heavily

---

[13] *Id.*

[14] *Responding to the Needs of Youth Involved With the Justice System During the COVID-19 Pandemic*, AM. ACAD. PEDIATRICS (May 6, 2020), https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/responding-to-the-needs-of-youth-involved-with-the-justice-system--during-the-covid-19-pandemic/.

[15] National Governors Association, *Memorandum re: COVID-19 Responses in the Juvenile Justice System* (March 30, 2020), https://www.nga.org/wp-content/uploads/2020/04/Memorandum_COVID-19-Responses-in-the-Juvenile-Justice-System.pdf; Council of Juvenile Justice Administrators, *COVID-19 Practice, Policy & Emergency Protocols in State Juvenile Facilities* (May 2020), http://cjja.net/wp-content/uploads/2020/05/COVID-19-Issue-Brief-.pdf; Physicians for Criminal Justice Reform, *Memorandum re: COVID-19 Risks for Detained and Incarcerated Youth* (March 22, 2020), https://njdc.info/wp-content/uploads/PFCJR-Statement.pdf; Youth Correctional Leaders for Justice, *Recommendations for Youth Justice Systems During the COVID-19 Emergency,* https://yclj.org/covid19statement; *see also* U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, *Emergency Planning for Juvenile Justice Residential Facilities*, 32 (Oct. 2011), https://www.ncjrs.gov/pdffiles1/ojjdp/234936.pdf.

[16] Ex. 2, Schiraldi, et al. Decl. ¶¶ 21–24.

4

on dorm lockdown and solitary confinement as a "safety" measure, placing Plaintiff-Petitioners at a high risk of lasting psychological damage.

8.      In addition to failing to adopt CDC-recommended safety measures, Defendants-Respondents are also confining children without the rehabilitative services to which they are entitled under federal and state law.  The Louisiana Constitution explicitly provides that children in OJJ custody are confined for the purpose of receiving "rehabilitation and individual treatment," and requires the State in its role as "parens patriae," to manage the welfare of juveniles in State custody.[17]  While OJJ's failure to meet the required safety guidelines itself imperils children's lives, the cessation of all (or nearly all) educational, counseling, recreational and mental health services in light of the pandemic also endangers the physical and emotional wellbeing of Plaintiffs-Petitioners, and strips the state of its express legal justification for their continued confinement.

9.      Defendants-Respondents' virtually non-existent (and in any event wholly inadequate) COVID-19 response constitutes deliberate indifference to the substantial risk of dire physical and emotional harm threatening the Plaintiffs-Petitioners and all class members currently in OJJ custody.  Accordingly, Plaintiffs-Petitioners, on behalf of themselves and the putative class they are endeavoring to represent, seek declaratory and injunctive relief, and petition the Court for a writ of habeas corpus, against all Defendants-Respondents to prevent the continued violation of their constitutional rights.

---

[17] Pursuant to Louisiana Constitution Article V, § 19, the nature of the Louisiana juvenile justice system is manifested in a non-criminal "focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody." *In re C.B.*, 708 So. 2d 391, 397 (La. 1998).

## JURISDICTION AND VENUE

10.     Plaintiffs-Petitioners bring this putative class action pursuant to 22 U.S.C. § 2241, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201, 2202, for relief from both detention and conditions of confinement that violate the Eighth and Fourteenth Amendments.

11.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 1343(a) (civil rights jurisdiction), and 28 U.S.C. § 1331 (federal question jurisdiction).

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted in this complaint substantially occurred in this judicial district.

13.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

14.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

15.     Plaintiff J.H. is a minor currently confined at Acadiana Center for Youth who was previously confined at Bridge City Center for Youth.  J.H. brings this lawsuit through his mother and next friend, N.H., who is an adult resident of the state of Louisiana.  N.H. brings this action on J.H.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2).  N.H. is dedicated to the best interests of J.H. and will advocate for those best interests in this action.  J.H. and N.H. are concerned about J.H.'s health and well-being.[18]

16.     Plaintiff-Petitioner I.B. is a minor currently confined at Acadiana Center for Youth.  I.B. brings this lawsuit through his parents and next friends, A.B. and I.B., who are adult

---

[18] Ex. 3, N.H. Decl. ¶ 4.

residents of the state of Louisiana.  A.B. and I.B bring this action on I.B.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2).  A.B. and I.B. are dedicated to the best interests of I.B. and will advocate for those best interests in this action.

17.     Defendant John Bel Edwards is the Governor of Louisiana ("Governor Edwards"). Governor Edwards has the responsibility to "support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed," pursuant to the Louisiana Constitution, Article IV, § 5.  Further, he is entrusted with the authority to act in times of emergency, pursuant to Louisiana R.S. § 29.724(D)(1), and has the ultimate authority for ensuring that all executive agencies, including OJJ and the Louisiana Department of Health ("LDH"), function in compliance with state and federal laws.  Governor Edwards spearheads Louisiana's decision making regarding COVID-19 and OJJ policies, including those regarding the appropriateness of OJJ's COVID-19 mitigation plan within facilities.  Governor Edwards has failed to fulfill his duty to oversee the Secretary of Health and ensure that LDH is providing sufficient guidance to OJJ.  Governor Edwards has the power, but to date has failed, to ensure that OJJ and the LDH implement adequate policies and procedures to protect Plaintiffs-Petitioners and the putative class from the harms of COVID-19.  He can be served at 900 N. 3rd Street #4, Baton Rouge, LA 70802.

18.     Defendant OJJ is responsible for all children adjudicated delinquent and assigned to their care by the court system, either for supervision or custody in residential placement or its secure care facilities.  OJJ can be served at 7919 Independence Blvd., State Police Headquarters, First Floor, Baton Rouge, LA 70806.

19.     Defendant Edward Dustin Bickham is the Interim Deputy Secretary of OJJ.  The Deputy Secretary is appointed by Governor Edwards, serves as the agency head of OJJ, and is

responsible for all OJJ operations.  He can be served at 7919 Independence Blvd., State Police Headquarters, First Floor, Baton Rouge, LA 70806.

20.    Defendant James Woods is the Director of the Acadiana Center for Youth.  In this capacity, he is responsible for the operation of the Acadiana Center for Youth, where Plaintiffs-Petitioners are detained, and has immediate physical custody of Plaintiffs-Petitioners.  He can be served at 1536 Bordelon Road, Bunkie, LA 71322.

21.    Defendant Shannon Matthews is the Director of the Bridge City Center for Youth. In this capacity, she is responsible for the operation of the Bridge City Center for Youth, where Plaintiffs-Petitioners are detained, and has immediate physical custody of Plaintiffs-Petitioners. She can be served at 3225 River Road, Bridge City, LA 70094.

22.    Defendant Shawn Herbert is the Director of the Swanson Center for Youth at Monroe.  In this capacity, she is responsible for the operation of the Swanson Center for Youth at Monroe, where Plaintiffs-Petitioners are detained, and has immediate physical custody of Plaintiffs-Petitioners.  Defendant Herbert is also the Director of the Swanson Center for Youth at Columbia.  In this capacity, she is responsible for the operation of the Swanson Center for Youth at Columbia, where Plaintiffs-Petitioners are detained, and has immediate physical custody of Plaintiffs-Petitioners.  She can be served at 4701 South Grand St., Monroe, LA 71202, or 132 Hwy 850, Columbia, LA 71418.

23.    Defendant Rodney Ward is the Deputy Director of the Swanson Center for Youth at Columbia.  In this capacity, he is responsible for the operation of the Swanson Center for Youth at Columbia, where Plaintiffs-Petitioners are detained, and has immediate physical custody of Plaintiffs-Petitioners.  He can be served at 132 Hwy 850, Columbia, LA 71418.

## FACTUAL ALLEGATIONS

I.    **COVID-19 Is a Serious and Deadly Global Pandemic That Threatens the Lives of Louisiana Citizens and Its Incarcerated Children**

24.    COVID-19 is a highly contagious virus for which there is no current vaccine and no proven, effective therapies.[19]

25.    COVID-19 is an acute respiratory syndrome that can cause pneumonia, acute respiratory distress syndrome, respiratory failure, heart failure, sepsis, and other potentially fatal conditions.[20] Lab testing and imaging is required to appropriately evaluate and provide treatment to patients with COVID-19.  One-fifth of all confirmed cases cause serious illness, including respiratory damage that requires hospitalization and mechanical ventilation and can permanently damage the lungs and other organs of those lucky enough to survive.[21]

26.    Treatment for severe cases of COVID-19 includes respiratory isolation, oxygen, and mechanical ventilation.[22] Symptoms can range from fever, cough, chest pain, and headache to loss of smell, abdominal pain, rash, diarrhea, aches, and vomiting.[23] However, medical experts are quickly learning about this new disease, and new symptoms "from the brain to the toes"

---

[19] Ex. 4, Vassallo Decl. ¶¶ 2, 3.
[20] Fei Zhou et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: A Retrospective Cohort Study*, 395 LANCET 1054 (Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.
[21] "While about 80% of cases manifest as a mild illness (i.e. non-pneumonia or mild pneumonia), approximately 20% progress to a more severe illness, with 6% requiring specialist medical care, including mechanical ventilation." *Preparedness, Prevention and Control Of COVID-19 In Prisons and Other Places Of Detention: Interim Guidance*, WORLD HEALTH ORGANIZATION, 10 (Mar. 15, 2020), http://www.euro.who.int/en/health-topics/health-determinants/prisons-and-health/publications/2020/preparedness,-prevention-and-control-of-covid-19-in-prisons-and-other-places-of-detention,-15-march-2020.
[22] Ex. 4, Vassallo Decl. ¶ 16.
[23] Steven Johnson & Dana Gottlieb, *Breaking News: Update on Evaluation and Management for COVID-19 Patients*, EMERGENCY MEDICINE NEWS (March 31, 2020), https://journals.lww.com/em-news/blog/breakingnews/pages/post.aspx?PostID=508.

continue to emerge.[24]  Screening for cough or fever is not sufficient to exclude the possibility of infection from COVID-19.[25]  Even testing is not entirely reliable; fifteen percent of patients who are tested for COVID-19 have a false negative.[26]  Symptoms can rapidly worsen, with people who appear to have mild cases quickly developing severe symptoms that require medical intervention and life-saving measures immediately upon arrival at the hospital.[27]

27.    There are no reliable tests that can predict the course of a COVID-19 patient's illness.[28]  Some patients have adequate oxygen saturation for days and then deteriorate.[29]  There are no signs or symptoms that can be used to predict clinical deterioration.[30]  It is therefore critical that patients who test positive or likely positive (known as persons under investigation) for COVID-19 or who have been exposed and show symptoms be within easy transportable distance of hospitals in the event that more critical care is necessary.[31]  Importantly, COVID-19 patients are not always aware of the lack of oxygen in their bodies and can be on the edge of death without gasping for breath or feeling the need for oxygen.[32]

28.    COVID-19 is especially concerning—and dangerously contagious—because a high percentage of infected individuals are asymptomatic.  The CDC advises people to "[r]emember that some people without symptoms may be able to spread [the] virus," that "[k]eeping distance from others is especially important for people who are at higher risk of getting

---

[24] Lenny Bernstein & Ariana Eunjung Cha, *Doctors keep discovering new ways the coronavirus attacks the body*, THE WASHINGTON POST (May 10, 2020), https://www.washingtonpost.com/health/2020/05/10/coronavirus-attacks-body-symptoms/?arc404=true.
[25] Ex. 4, Vassallo Decl. ¶ 8.
[26] *Id.* ¶ 7.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

very sick," and that "[y]ou could spread COVID-19 to others even if you do not feel sick."[33]  The Director of the CDC has warned that as many as 25% of individuals infected with COVID-19 may be symptom-free.[34]  With limited testing performed on asymptomatic patients, authorities cannot confirm or rule out the presence of COVID-19 in an individual.[35]

29.    Severe COVID-19 patients can suffer acute respiratory distress syndrome ("ARDS").  When a patient has ARDS, the lungs fill with fluid, and the patient becomes extremely difficult to oxygenate.  The only way to manage ARDS is to put the patient on a ventilator.  The mortality rate for ARDS is 40%.[36]  COVID-19 patients can develop ARDS very quickly, and the severity and sensation of ARDS for COVID-19 patients is similar to drowning.[37]

30.    COVID-19 is highly transmissible.  Recent estimates by the CDC suggest that, in community settings, each infected person transmits the virus to 5.7 other persons on average.[38] Only the influenza pandemic of 1918 is known to have higher infectivity among pandemics.[39] COVID-19 is transmitted by respiratory droplets that can survive in the air for up to three hours— and on surfaces such as plastic and stainless steel for two to three days.[40]  The virus can also be

---

[33] CDC, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 14, 2020) ("How to Protect Yourself, CDC").
[34] Ex. 4, Vassallo Decl. ¶ 15.
[35] *Id.*
[36] Tai Pham & Gordon D. Rubenfeld, *The Epidemiology of Acute Respiratory Distress Syndrome*, 195 AM. J. RESPIRATORY & CRITICAL CARE MED. 860 (Apr. 1, 2017), https://www.atsjournals.org/doi/pdf/10.1164/rccm.201609-1773CP.
[37] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19—Even in His Young Patients*, PROPUBLICA (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.
[38] Steven Sanche et al., *High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronavirus 2*, CDC, EMERGING INFECTIOUS DISEASES (Apr. 7, 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.
[39] Ex. 4, Vassallo Decl. ¶ 3.
[40] National Institutes of Health, *New Coronavirus Stable for Hours on Surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.

transmitted through saliva, fecal matter, or discharge from the nose.[41]  The incubation period is believed to be 2 to 14 days, which is particularly concerning for transmission rates given that so many people are asymptomatic yet infectious.[42]

31.    The rapid spread of COVID-19 has created an unprecedented, worldwide health emergency.  The World Health Organization ("WHO") declared COVID-19 a worldwide pandemic on March 11, 2020.[43]  Governor Edwards declared "a statewide public health emergency" in Louisiana that same day.[44]  On March 13, 2020, President Trump declared a national emergency.[45]

32.    The number of confirmed cases of COVID-19 in the United States is rising rapidly.  As of May 14, 2020, more than 1.38 million confirmed cases in the United States have been reported, and more than 84,000 deaths.  Both the number of confirmed cases (which undoubtedly is under-reported given that less than 1% of the entire population has been tested) and the number of deaths continue to rise substantially on a daily basis.[46]  The United States has the highest number of reported cases of any country in the world.  The CDC projects that without swift and effective public health interventions, over 200 million people in the United States could

---

[41] Ex. 5, Yukich Decl. ¶ 4.
[42] Ex. 4, Vassallo Decl. ¶ 3.
[43] Tedros Adhanom Ghebreyesus, *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[44] Louisiana Proclamation No. 25 JBE 2020 (Mar. 11, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/25-JBE-2020-Public-Health-Emergency-COVID-19.pdf.
[45] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[46] *Coronavirus disease (COVID-19) Situation Dashboard*, WORLD HEALTH ORGANIZATION, https://who.sprinklr.com/region/amro/country/us (last visited May 14, 2020).

ultimately become infected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths.[47]

33.    Many studies have shown that there is an increased risk for serious complications in patients infected with COVID-19 who also suffer from co-morbidities, including common health problems that afflict class members here, such as, asthma, hypertension, obesity, diabetes, and human immunodeficiency virus ("HIV") infection.[48]

34.    Although advanced age and underlying illnesses or chronic medical conditions increase the risk of serious effects of COVID-19, the disease does not spare the young.  Due to the novel nature of COVID-19, the full effects of the disease on children are not yet known. However, reports show that children can suffer—and have suffered—these serious complications, including hospital admission, admission to an intensive care unit, invasive ventilation, and death.[49]  Moreover, recent evidence suggests that COVID-19 positive children may be vulnerable to pediatric multisystem inflammatory syndrome, which can lead to toxic shock.[50]  These serious complications can occur even *after* the infection itself appears to have resolved.[51]  Screening by age and prior medical history alone is not sufficient to determine who

---

[47] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, N.Y. TIMES (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.
[48] Wei-jie Guan et al., *Comorbidity and its Impact on 1590 Patients with Covid-19 in China: A Nationwide Analysis*, EUROPEAN RESPIRATORY J. (Mar. 26, 2020), https://doi.org/10.1183/13993003.00547-2020; *see also* Committee on Adolescence, *Health Care for Children and Adolescents in the Juvenile Correctional Care System*, AM. ACAD. PEDIATRICS (Apr. 2001), https://pediatrics.aappublications.org/content/107/4/799.
[49] Ex. 1, Graves Decl. ¶ 6.
[50] Pam Belluck, *A New Coronavirus Threat to Children*, N.Y. TIMES (May 11, 2020), https://www.nytimes.com/2020/05/06/health/kawasaki-disease-covid-coronavirus-children.html.
[51] *Id.*

may develop serious complications and need medical intervention.  Long term effects of COVID-19 on a person's (including a child's) health remain unknown.[52]

35.    In a virtual press conference held on March 20, 2020, WHO Director General Tedros Adhanom Ghebreyesus warned that younger people are not spared from contagion, and worldwide make up a "significant proportion" of patients requiring hospitalization, sometimes for weeks and sometimes resulting in their deaths.[53]  The largest study of pediatric COVID-19 patients to date shows that approximately 6% of infected children and 11% of infected infants have had severe or critical cases,[54] and data in the United States shows a growing number of pediatric cases requiring intensive care.[55]  These cases have included children who suffered from respiratory failure, shock, encephalopathy, heart failure, coagulation dysfunction, acute kidney injury, and life-threatening organ dysfunction.[56]  There is no doubt that children constitute a small but tragic percentage of COVID-19 deaths.[57]   Recent research suggests that children are

---

[52] Joseph Goldstein, *15 Children are Hospitalized with Mysterious Illness Possibly Tied to Covid-19*, N.Y. TIMES (May 5, 2020), https://www.nytimes.com/2020/05/05/nyregion/children-Kawasaki-syndrome-coronavirus.html?referringSource=articleShare.

[53] Stephanie Nebehay, *WHO Message to Youth on Coronavirus: 'You Are Not Invincible'*, REUTERS (Mar. 20, 2020, 11:29 A.M.), https://www.reuters.com/article/us-health-coronavirus-who-idUSKBN21733O.

[54] *See* Yuanyuan Dong et al., *Epidemiology of COVID-19 Among Children in China*, AM. ACAD. PEDIATRICS (Apr. 2020), https://pediatrics.aappublications.org/content/early/2020/03/16/peds.2020-0702.1.

[55] Virtual Pediatric System, LLC, *COVID-19 Data: North American Pediatric ICUs* (Mar. 31, 2020), https://covid19.myvps.org/.

[56] *See* Dong, *Epidemiology of COVID-19 Among Children in China*.

[57] Taryn Luna et al., *L.A. County Reports First Death of A Possible Coronavirus Patient Under 18 as COVID-19 Cases Top 660*, L.A. TIMES (Mar. 24, 2020), https://www.latimes.com/california/story/2020-03-24/california-coronavirus-cases-surge-to-2-200-the-worst-is-yet-to-come; Jennifer Millman, "*It Attacks Everyone:" NYC Loses 1st Child to Virus as State Deaths Eclipse 1,300; NJ Cases Soar*, NBC NEW YORK (Mar. 30, 2020), https://www.nbcnewyork.com/news/local/nyc-virus-deaths-leap-from-0-to-776-in-15-days-emergency-hospital-help-arrives-monday/2350357/; CDC, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19)—United States, Feb. 12–Mar. 16, 2020*, MORBIDITY & MORTALITY WEEKLY REP. (Mar. 26, 2020), cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm; Erika Edwards, *5-Year-Old Is First Child Death from COVID-19-Related Inflammatory Syndrome Reported in U.S.*, NBC NEWS (May 8, 2020), https://www.nbcnews.com/health/kids-health/boy-5-dies-covid-19-linked-inflammatory-syndrome-n1203076.

susceptible to serious neurological side effects, which is particularly alarming at this stage of their development when the brain is in its formative period of development.[58]

36.    Compared with past outbreaks of communicable diseases, the COVID-19 pandemic is of nearly unprecedented magnitude.[59]  Reliance on prior infectious disease protocols is insufficient to respond to this novel and deadly disease.[60]

### a.    COVID-19 Is Particularly Severe in Louisiana

37.    Louisiana is experiencing one of the worst COVID-19 outbreaks in the world.  As of May 14, 2020, Louisiana had 33,489 confirmed cases of COVID-19, with at least 2,351 deaths; 7.0% of persons diagnosed with COVID-19 in Louisiana have died.[61]  The overall mortality rate in the United States from the disease is 2.3%.[62]

38.    Confirmed COVID-19 cases in Louisiana grew by 67.8% in the two weeks after the first diagnosis on March 9, 2020—the highest growth rate in the United States.[63]

---

[58] George Citroner, *What We Know About the Long-Term Effects of COVID-19*, HEALTHLINE (Apr. 21, 2020), https://www.healthline.com/health-news/what-we-know-about-the-long-term-effects-of-covid-19#COVID-19-might-affect-the-brain-stem.

[59] *United States v. Martin*, No. 19-cv-140-13, ---F. Supp. 3d ----, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020).

[60] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[61] Louisiana Department of Health, *Louisiana Coronavirus (COVID-19) Information*, http://ldh.la.gov/coronavirus/ (last visited May 14, 2020).

[62] Kenneth McIntosh, *Coronavirus Disease 2019 (COVID-19): Epidemiology, Virology, Clinical Features, Diagnosis, and Prevention*, UPTODATE (Apr. 2020), https://www.uptodate.com/contents/coronavirus-disease-2019-covid-19-epidemiology-virology-clinical-features-diagnosis-and-prevention.

[63] Adam Daigle, *Coronavirus Cases Grew Faster in Louisiana than Anywhere Else in the World: UL Study*, ACADIANA ADVOCATE (Mar. 24, 2020), https://www.theadvocate.com/acadiana/news/coronavirus/article_94494420-6d4b-11ea-ac42-ff7dd722c084.html.

39.    When the first United States cases emerged, New Orleans quickly became a coronavirus epicenter.[64]  As of early April, Louisiana, Michigan, and New York accounted for more than half the country's deaths.[65]

**b.    Incarcerated People Are Especially Vulnerable to COVID-19**

40.    Crowded correctional facilities are known to be a breeding ground for infectious respiratory illness.[66]  Prisons now account for seven of the top ten coronavirus clusters in the United States.[67]  It is not possible to isolate incarcerated people from the outside world, nor is it possible to isolate them from one another.  Social distancing practices are impossible with individuals living in close quarters, sharing bathroom and dining facilities, common living or recreational areas and, in many instances, sleeping two or more to a room or cell.  Correctional facilities are also not closed environments.  Staff enter and leave the facilities on a daily basis, typically interacting regularly with both COVID-19 positive individuals and those who are healthy.  Without daily testing, there is no way to ensure that staff are not carriers; a significant percentage of carriers are asymptomatic, or are presenting with lesser-known symptoms that will escape detection in simple screenings for temperatures or coughs.[68]  When the COVID-19 virus is introduced to a prison, staff and incarcerated people alike are at heightened risk of contracting

---

[64] Erika Edwards, *Why New Orleans Is Quickly Becoming a Coronavirus Epicenter in the U.S.*, NBC NEWS (Mar. 26, 2020), https://www.nbcnews.com/health/health-news/why-new-orleans-quickly-becoming-epicenter-u-s-n1169376.

[65] Jenni Fink, *U.S. Coronavirus Hotspot Updates: The Latest on COVID-19 Cases in New York, Detroit, New Orleans*, NEWSWEEK (Apr. 6, 2020), https://www.newsweek.com/us-coronavirus-hotspot-updates-latest-covid-19-cases-new-york-detroit-new-orleans-1496318.

[66] Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. TIMES (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

[67] The most vivid example is the Marion Correctional Institution in Marion, Ohio, which currently has 2,349 cases among inmates and staff members, the highest outbreak numbers in the country.  *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES (May 14, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[68] Ex.4, Vassallo Decl. ¶ 8.

16

the virus and, in turn, spreading the virus to others with whom they live or come into contact in their own homes, neighborhoods, and communities.[69]

41.    In addition to the inherent risk of greater spread in congregate living facilities, correctional facilities magnify that risk through their failure to maintain sanitary environments. People share toilets, sinks, and showers and often have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items.  Because COVID-19 can survive on surfaces such as plastic and stainless steel for two to three days,[70] the CDC advises all people—and particularly those at higher risk of severe illness—to "[w]ash [their] hands often with soap and water" or, "[i]f soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol," "[a]void close contact with people who are sick," "[p]ut distance between yourself and other people," and to "[c]over your mouth and nose with a cloth face cover when around others."[71]  For correctional facilities, the CDC recommends using EPA-registered disinfectants effective in eliminating COVID-19.[72]  The CDC also advises a 14-day medical quarantine for those known to who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease.[73]

42.    Louisiana's secure care facilities have already become, and risk further becoming, hotbeds of contagion during this pandemic.  As of May 14, 2020, OJJ asserts on its website that 28 children have tested positive for COVID-19, in addition to 4 other cases reported to media, and that 41 staff have tested positive for COVID-19.[74]  Children in secure care facilities are unable

---

[69] *Id.* ¶ 11.
[70] *As Coronavirus Spreads, Many Questions and Some Answers*,
https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.
[71] How to Protect Yourself and Others, CDC.
[72] CDC Guidance.
[73] *Id.*
[74] State of Louisiana, Office of Juvenile Justice, *OJJ COVID-19 Information*, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 14, 2020).

to protect themselves by taking the necessary measures to mitigate the risk of exposure, putting them at heightened risk of COVID-19 infection. Children live, sleep, eat, and spend the full day in close contact with each other as well as with staff members.[75]

43.     For example, the four OJJ secure care facilities have dormitory-style living, with up to 12 children sleeping and living in one room. In at least one facility that is typical of all facilities, beds are typically nailed to the floor and arranged in a cubicle style with low walls separating each sleeping area. Each child is provided with a small desk and chair in the sleeping area. In the Bridge City Center for Youth, the beds are approximately six feet apart, which might suggest appropriate social distancing overnight, but the children cannot remain in their bed for 24 hours per day and the staff cannot remain adequate social distance from the children while adequately performing their jobs.[76]

44.     Significant deficiencies with respect to sanitation in the four OJJ secure care facilities heighten the risks still further. Many of these recommended preventative measures are unavailable to people who are incarcerated and share toilets, sinks, and showers and with limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. The CDC instructs that individuals should wash their hands for 20 seconds regularly, and after sneezing, coughing, blowing their nose, eating or preparing food, before taking medication, and after touching garbage.[77] The CDC also instructs that staff should clean and disinfect commonly touched surfaces and shared equipment several times a day.[78] In the four OJJ secure care facilities, children share toilets, sinks, and showers, without disinfection between each use. Children have reported that they are responsible for disinfecting, and not all children have been provided

---

[75] Ex. 6, L.P. Decl. ¶ 9, Ex. 7, B.B. Decl. ¶ 6, Ex. 3, N.H. Decl. ¶ 4.
[76] Ex. 8, Holt Decl. ¶ 7.
[77] CDC Guidance.
[78] *Id.*

cleaning materials.[79]   A staff member recently stated that "[t]here's been no apparent deep cleaning in areas where infected youth [have been] housed."[80]   He described the facility as "filthy" in general, and he said staff were expected to store and microwave their lunches in the staff bathrooms.[81]  This lack of access to proper sanitation, combined with shared bathrooms and sinks and regular close contact with other children and staff, creates an intolerably high risk of infectious spread and the dire consequences that follow from the virus.

45.    Additionally, children in correctional facilities are particularly likely to have pre-existing conditions making them medically vulnerable to COVID-19, including asthma, hypertension, obesity, diabetes, and the HIV infection,[82] with asthma being one of the most commonly diagnosed illnesses among children in correctional facilities.[83]

46.    Recognizing this inherent risk of greater spread in congregate living facilities, in an effort to stop the spread of COVID-19, the Supreme Courts of Hawaii,[84] New Jersey,[85]

---

[79] Ex. 3, N.H. Decl. ¶ 4; Ex. 9, A.B. Decl. ¶ 12.

[80] *"There was no control," says Bridge City youth prison guard about riot*, WDSU NEWS, (Apr. 24, 2020), https://www.wdsu.com/article/there-was-no-control-says-bridge-city-youth-prison-guard-on-riot/32259043.

[81] *Id.*

[82] *Comorbidity and its impact on 1590 patients with Covid-19 in China: A Nationwide Analysis*, EUROPEAN RESPIRATORY JOURNAL, (March 26, 2020), https://doi.org/10.1183/13993003.00547-2020; Comm. on Adolescence, *Health Care for Children and Adolescents in the Juvenile Correctional Care System*, 107 PEDIATRICS 799 (2001), https://bit.ly/2UxTW5y.

[83] Comm. on Adolescence, *Health Care for Children and Adolescents in the Juvenile Correctional Care System*; Nicole Wetsman, *To Reduce Long-Term Health Gaps, a Push for Early Intervention in Juvenile Detention*, JUV. JUST. INFO EXCHANGE, (July 30, 2018), https://bit.ly/2Jq7Os7.

[84] Yoohyun Jung, *Special Master Appointed To Recommend On COVID-19 Jail Releases*, HONOLULU CIVIL BEAT (Apr. 2, 2020), https://www.civilbeat.org/2020/04/special-master-appointed-to-decide-on-covid-19-jail-releases/.

[85] Consent Order at 4, *In the Matter of the Request to Commute or Suspend County Jail Sentences*, No. 084230 (N.J. Mar. 22, 2020), https://bit.ly/3aJOim8.  The order provided a mechanism for prosecutors, within 24 to 48 hours, to object to the release of specific prisoners who "would pose a significant risk to the safety of the inmate or the public," with such objections to be considered by judges or special masters appointed by the Supreme Court.

Massachusetts,[86] Montana,[87] South Carolina,[88] and Washington[89] have all issued orders to reduce adult jail populations.  In an effort to prevent new admissions to county jails, the chief judge of Maine's trial courts, with the approval of the chief justice of the Maine Supreme Court, vacated all outstanding warrants for unpaid fines, restitution, fees, and failures to appear.[90]  The chief justice of the Louisiana Supreme Court recently issued guidance to those judges with jurisdiction over juvenile defendants, urging these judges to review their dockets and to release children who are medically vulnerable or who have a non-violent adjudication.[91]  Across the country, officials in more than 60 state and local jurisdictions have acted to sharply reduce prison populations.[92]

c. **Placement in an OJJ Facility during the COVID-19 Pandemic Creates Risk of Serious Emotional and Psychological Harm**

47.    Placement in a juvenile correctional facility creates serious physical and mental health risks for children under any circumstances.  The risk of exposure and contagion caused by the COVID-19 pandemic exacerbates these harms, putting young people at serious risk of lasting physical harm, emotional trauma, and other health problems.

---

[86] Comm. for Public Counsel Services, Associate Justice Gaziano of the Assoc. Justice of the Supreme Judicial Ct. of Mass. (Apr. 3, 2020), https://www.mass.gov/files/documents/2020/04/03/12926.pdf.
[87] Letter from Mike McGrath, Chief Justice, Mont. Supreme Ct., to Montana Cts. of Limited Jurisdiction Judges (Mar. 20, 2020), https://bit.ly/3aAv4iX.
[88] Memorandum from Donald W. Beatty, Chief Justice of S.C. Supreme Ct., to Magistrates, Municipal Judges, & Summary Ct. Staff (Mar. 16, 2020), https://bit.ly/3dJ69LY.
[89] Am. Order, *In the Matter of Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency*, No. 25700-B-607 (Wash. Mar. 20, 2020), https://bit.ly/3DHyoU.
[90] Judy Harrison, *Maine courts vacate warrants for unpaid fines and fees*, WGME NEWS (Mar. 17, 2020), https://wgme.com/news/coronavirus/maine-courts-vacate-warrants-for-unpaid-fines-and-fees.
[91] Letter from Bernette Joshua Johnson, Chief Justice of the Supreme Ct. of the State of Louisiana to Cts. of Limited Jurisdiction Judges (Apr. 6, 2020), https://www.lasc.org/COVID19/2020-04-06-LASC-ChiefLetterReJuvenileDefendants.pdf.
[92] *Responses to the COVID-19 pandemic*, PRISON POLICY INITIATIVE (May 13, 2020), https://www.prisonpolicy.org/virus/virusresponse.html.

48.    To respond to the physical health risks of harm, OJJ has adopted widespread use of isolation for the purpose of preventing infection.  Isolation is punishment in form and effect, and it can exacerbate underlying trauma disorders.[93]

49.    Additionally, as facilities try to limit personal contact and increase physical distancing, educational programming, counseling and other therapeutic services and recreation are substantially limited if not entirely eliminated.[94]  As staff fall ill or are themselves subject to quarantine, programming will be further hampered and the state-mandated staffing ratios needed for basic safety and well-being will be jeopardized.[95]

50.    Cutting off education and treatment is particularly devastating to teenagers. During adolescence, the brain reaches what is referred to as the "second period of heightened malleability."[96]  As a result, children are uniquely responsive to environmental changes—and uniquely susceptible to harm from adverse experiences.[97]  If there is "[a] lack of stimulation or aberrant stimulation" for children during this period, the results can lead to "lasting effects on physical and mental health in adulthood."[98]  Children especially need positive social interactions to help them "develop a healthy functioning adult social identity"[99] and build their social skills,[100]

---

[93] *See* Elizabeth S. Barnert et al., *How Does Incarcerating Young People Affect Their Adult Health Outcomes?* 29 PEDIATRICS 1 (2017), https://bit.ly/2xyL8mJ; Ex. 2, Schiraldi et al. Decl. ¶ 21.
[94] Ex. 7, B.B. Decl. ¶ 9, Ex. 9, A.B. Decl. ¶ 17, Ex. 3, N.H. Decl. ¶ 10.
[95] Ex. 8, Holt Decl. ¶ 6.
[96] Delia Fuhrmann et al., *Adolescence as a Sensitive Period of Brain Development*, 19 TRENDS COGNITIVE SCI. 558, 559 (2015), https://www.ncbi.nlm.nih.gov/pubmed/26419496.
[97] Nancy Raitano Lee, Drexel Univ. Dep't of Psychology, *Presentation for the Juvenile Law Center: Neuroplasticity and the Teen Brain: Implications for the Use of Solitary Confinement with Juveniles* (2016).
[98] Fuhrmann et al., *Adolescence as a Sensitive Period of Brain Development*, at 561.
[99] Anthony Giannetti, *The Solitary Confinement of Juveniles in Adult Jails and Prisons: A Cruel and Unusual Punishment*, 30 BUFF. PUB. INTEREST L.J. 31, 47 (2012), https://bit.ly/2xzXxqy.
[100] Sarah-Jayne Blakemore & Kathryn L. Mills, *Is Adolescence a Sensitive Period for Sociocultural Processing?*, 65 ANN. REV. PSYCHOL. 187, 199 (2014), https://bit.ly/2R0My04.

so that they can successfully "reintegrate into the broader community upon release" from confinement.[101]

51.    These developmental risks are even greater for young people in state custody. Children in the juvenile justice system have high rates of underlying mental health illnesses,[102] making them particularly vulnerable to suffering from the stress and fears associated with the COVID-19 outbreak and the fears that they have for the health of their own families.[103]  For example, the children detained in "horrific conditions" in Louisiana during Hurricane Katrina reported "substantial and enduring" psychological impact long after conditions improved.[104]

52.    The WHO has cautioned that children (and teens in particular) are at heightened risk of trauma from the stress of the pandemic, facing increased risk of future delinquency as a result, and has instructed parents to support and reassure their children, maintain routines, and facilitate connections with friends and family.[105]  Children in facilities are deprived of this necessary attention and support.  In facilities struggling to ensure social distancing, these problems are further intensified.

      **d.    Releasing As Many Children As Possible Will Protect Those Children—and the Surrounding Communities—From Substantial Risk of Serious Harm**

---

[101] Sandra Simkins et al., *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 J.L. & POL'Y 241, 256 (2012), https://bit.ly/2WX7KrH.
[102] Matthew C. Aalsma et al., *Preventative Care Use Among Justice-Involved and Non-Justice Involved Youth*, AM. ACAD. OF PEDIATRICS (2017),
https://pediatrics.aappublications.org/content/pediatrics/140/5/e20171107.full.pdf.
[103] Managing Anxiety & Stress, CTRS. FOR DISEASE CONTROL AND PREVENTION,
https://cdc.gov/coronavirus/2019-ncov/prepare/managing-stress-anxiety.html.
[104] *Treated Like Trash: Juvenile Detention in New Orleans Before, During, and After Hurricane Katrina*, JUVENILE JUSTICE PROJECT OF LOUISIANA, https://www.njjn.org/uploads/digital-library/resource_342.pdf; Adam Nossiter, *Teenage Prisoners Describe Hurricane Horrors*, N.Y. TIMES (May 10, 2006), https://www.nytimes.com/2006/05/10/us/10prison.html.
[105] *Addressing Human Rights as Key to the COVID-19 Response*, WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/healthy-parenting.

53.    Under these unprecedented circumstances, returning as many children safely to their homes as possible is the best (and indeed potentially only) way to protect the children from this devastating scenario and is in both the children's and the public's best interest.[106]

54.    Medical professionals have called on state governors, courts, and departments of corrections to "[i]mmediately release youth in detention and correctional facilities who can safely return to the home of their families and/or caretakers, with community-based supports and supervision, in order to alleviate potential exposure to COVID-19."[107]

55.    Jurisdictions around the country and around the world have heeded the call and begun to do so.[108]  These examples are reflective of a national trend to reduce the numbers of children in custody,[109] with substantial reductions nationwide since the onset of the pandemic.[110]

## II.    OJJ's Insufficient Response to COVID-19 Places the Putative Class at a Substantial Risk of Serious Harm

56.    Despite the grave dangers posed by COVID-19 to the children under their care, Defendants-Respondents, acting under color of law, have failed to take the necessary steps to

---

[106] Ex. 1, Graves Decl. ¶ 10.
[107] Letter from Physicians for Criminal Justice Reform, to State Governors, State and Local Juvenile Detention and Correctional Departments, and Juvenile Court Judges and Magistrates at 1 (Mar. 22, 2020), https://bit.ly/3az51sz.
[108] In Maryland, for instance, in response to an order from the state Supreme Court to reduce reliance on institutional placements during the COVID-19 crisis, state officials have released approximately 200 children from state juvenile detention facilities over health concerns due to the coronavirus pandemic. Luke Broadwater, *Maryland Releases About 200 Juveniles From Detention Centers Amid Coronavirus Pandemic*, BALTIMORE SUN (April 27, 2020), https://www.baltimoresun.com/coronavirus/bs-md-pol-juvenile-release-coronavirus-20200427-4mjlk5pawnbpnafusvm7a7b7g4-story.html.  The release amounts to a nearly one-third reduction of the state's detained juvenile population. *Id.*  Likewise, in Clayton County, Georgia, the juvenile court issued an order strictly limiting detention during the pandemic, leading to a 90% reduction in the juvenile detention population.  Amended Order on Court Operations During Declaration of Judicial Emergency, Juvenile Court of Clayton County, Georgia (April 6, 2020), https://www.claytoncountyga.gov/Home/ShowDocument?id=12300.
[109] *Following the Action*, YOUTH CORRECTIONAL LEADERS FOR JUSTICE (last accessed May 14, 2020), https://yclj.org/covid19-resources.
[110] *At Onset of the COVID-19 Pandemic, Dramatic and Rapid Reductions in Youth Detention*, ANNIE E. CASEY FOUNDATION (April 23, 2020), https://www.aecf.org/blog/at-onset-of-the-covid-19-pandemic-dramatic-and-rapid-reductions-in-youth-de/.

preserve the physical safety and mental health of the class members, have affirmatively placed the class members at substantial risk of serious harm, and deprived them of their rights to reasonably safe living conditions and to rehabilitative treatment.

>     a.    **Defendants-Respondents Have Either Sought to Obscure Their COVID-19 Policies From Plaintiffs-Petitioners, Parents, the Public, and Advocacy Groups—or Have Failed to Devise a Comprehensive Plan**

57.    OJJ has not updated its policies, procedures, and practices, including but not limited to its flu and pandemic plan, since the onset of COVID-19, despite many warnings from outside agencies that doing so was necessary to prevent infection and spread of COVID-19 within facilities.

58.    On April 3, 2020, and May 28, 2020, organizations that advocate for the rights of children held in the four OJJ secure care facilities sent letters to Governor Edwards urging him to adopt evidence-based and proactive plans for the prevention and management of COVID-19 in the four OJJ secure care facilities.  The letters included thirteen specific recommendations and numerous resources to assist Governor Edwards in the development of these plans.[111]  Governor Edwards never responded, and none of the recommendations were implemented.

59.    The records show that OJJ circulated information internally identifying certain areas within each secure care facility that have been identified for potential COVID-19 "isolation."  This preliminary information provides no insight into how Defendants-Respondents implemented quarantine procedures, and conflicts with reporting suggesting that OJJ has designated its Swanson Center for Youth Monroe facility for COVID-19 positive children.[112]

---

[111] Ex. 10, Letter from Youth Correctional Leaders for Justice to Governor Edwards (Apr. 28, 2020), and Letter from Louisiana Center for Children's Rights to Governor Edwards (Apr. 3, 2020).
[112] Associated Press, *Riots, Escapes and Pepper Spray: Virus Hits Juvenile Centers*, 4WWL.COM (May 3, 2020, 5:03 PM), wwltv.com/article/news/health/coronavirus/riots-escapes-and-pepper-spray-virus-hits-juvenile-centers/289-e52aa1ea-5680-47eb-a8c5-4c62af60cd4e.

60.     According to parents and family members of detained children, OJJ has not provided information about OJJ's plans for the prevention and management of COVID-19 in the four OJJ secure care facilities.  Parents and family members have repeatedly demanded such information, but nothing has been provided in response to these requests.[113]  Parents and advocates have reported that it is difficult to contact anyone at the four OJJ secure care facilities and sometimes impossible to even figure out who is in charge.[114]  Accordingly, parents and family members understandably have expressed very serious concerns about the health and welfare of their incarcerated children.

61.     OJJ has provided varying—and often conflicting—information to detained children across the four OJJ secure care facilities.[115]  OJJ's lack of transparency and failure to implement uniform procedures has caused confusion and has sparked fear among the children.  For example, reports claim that OJJ is transporting COVID-19 positive children to one facility.  Other reports suggest that COVID-19 positive children are isolated, but remain at their respective facility.  At least one child who tested positive, however, remained in his regular dormitory, and OJJ did not attempt to implement any quarantine procedures.

62.     OJJ has published "COVID-19 Information" on its website purporting to provide "updated" information about the numbers of COVID-19 positive children and staff, but that information raises troubling questions about what is actually happening at the four OJJ secure care facilities.  For example, as of May 14, 2020, OJJ asserts on its website that 28 children have tested positive for COVID-19, in addition to 4 other cases reported to media, and that 28 of these

---

[113] *See, e.g.*, Ex. 9, A.B. Decl. ¶¶ 6, 13, 15; Ex. 11, D.B. Decl. ¶¶ 8, 12.
[114] *See, e.g.*, Ex. 9, A.B. Decl. ¶ 6; Ex. 6, L.P. Decl. ¶ 6.
[115] *See generally* Ex. 9, A.B. Decl.; Ex. 3, N.H. Decl.; Ex. 7, B.B. Decl.; Ex. 11, D.B. Decl.; Ex. 6, L.P. Decl.; Ex. 12, S.W. Decl.; Ex. 13, W.H. Decl.

children have recovered.[116]  The reported number of children who have tested positive has remained completely static since at least April 21, 2020, a fact which is both at odds with everything known about how COVID-19 spreads and with the rest of the world's experience with it.[117]  Some reports suggest that OJJ had actually tested *only* 29 children, which would explain why the number of children testing positive remains static.  Notably, these reported test results demonstrate a 97% positivity rate.  Equally troubling, as of May 14, 2020, OJJ asserts on its website that 41 staff have tested positive for COVID-19 and that 16 of these have recovered. These figures have increased periodically since April 17, 2020.  Current statistics demonstrate that the four OJJ secure care facilities have among the highest percentage of COVID-19 positive staff members compared to juvenile detention facilities across the country.

63.    Despite the high prevalence of the disease at the four OJJ secure care facilities, OJJ has provided no information about its testing policies,[118] including when and how often tests are administered or if tests are administered to asymptomatic staff and children.  Indeed, it appears that OJJ has sought to obscure its testing procedures from children, their parents, and the public. According to the American Heart Association, COVID-19 testing leads to quick identification of cases, quick treatment for those people and immediate quarantine to prevent spread.  Early testing

---

[116] On information and belief, there are an additional four positive COVID-19 children who are being held in OJJ's non-secure custody.

[117] Internet Archive, *OJJ COVID-19 Information* (April 21, 2020), https://web.archive.org/web/20200422143617/https://ojj.la.gov/ojj-covid-19-information/.

[118] Certain facilities are providing universal testing to combat the spread of COVID-19.  For example, in early May New Jersey began testing all of its correctional officers and all of its inmates detained across the state.  Blake Nelson, *All N.J Prisoners Will Be Tested For Coronavirus Beginning Next Week, Murphy Says*, NJ.COM (May 1, 2020), https://www.nj.com/coronavirus/2020/04/mass-coronavirus-testing-in-nj-prisons-should-begin-next-week-murphy-says.html.

also helps to identify everyone who came into contact with infected people so they too can be quickly treated.[119]

64.     OJJ also has issued no formal guidance about any procedures for returning those children who allegedly have recovered to their respective dormitories, nor is there any information on the OJJ website about how OJJ determines whether and when a child has "recovered."

65.     Moreover, although OJJ's website provides that "[t]he Office of Juvenile Justice is working closely with its medical provider, Wellpath and guidance from the Louisiana Office of Public Health to determine the most appropriate treatment for each youth who may fall ill in its facilities during this crisis,"[120] parents and the public are completely in the dark as to what remedial measures OJJ has taken or intends to take as result.

66.     In short, there is no evidence that OJJ has developed policies, procedures, or a comprehensive COVID-19 remedial plan, and there is no evidence that any such plans have been disclosed to the children's parents or the public.

### b.    OJJ's Policies are Inadequate to Care for COVID-19 Positive Children or to Prevent the Spread of COVID-19

67.     Defendant Governor Edwards has failed to assert his authority over the Secretaries of either OJJ or LDH to ensure Louisiana's incarcerated children's access to appropriate precautions to stop the spread of COVID-19, assure appropriate quarantine practices, and assure appropriate medical isolation practices.  The lack of appropriate oversight, policies, and practices

---

[119] Dr. Eduardo Sanchez, *COVID-19 Science: Why Testing is So Important*, AMERICAN HEART ASSOCIATION (April 2, 2020), https://www.heart.org/en/news/2020/04/02/covid-19-science-why-testing-is-so-important.
[120] State of Louisiana, Office of Juvenile Justice, *OJJ COVID-19 Information*, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 14, 2020).

by Defendants-Respondents has resulted in children with confirmed COVID-19 cases not getting the care recommended by the CDC.

68.    While the CDC guidance recommends "medical isolation of confirmed or suspected COVID-19 cases,"[121] the four OJJ secure care facilities have implemented conflicting procedures for its COVID-19 positive staff and children.  One child who tested positive spent the time he was ill by himself in a stifling room previously used for disciplinary solitary confinement without air conditioning.  According to the child's mother, while he was in isolation, he was unable to bathe or brush his teeth.

69.    On information and belief, OJJ has designated its Swanson Center for Youth Monroe facility for COVID-19 positive children.  This designation requires OJJ to transport children to Swanson Center for Youth Monroe and back again to their original facility upon recovery, increasing travel and exacerbating the risk of transmission and defying CDC guidance around need for transfer for medical purposes only.[122]

70.    To the extent OJJ is caring for COVID-19 positive children in its infirmaries, these areas are not equipped to care for more than three to four children each.[123]  The infirmaries in each of the four OJJ secure care facilities maintain only three or four beds and there are only one or two nurses on duty at any given time.[124]

71.    It is particularly important that confined children receive adequate instruction and reinforcement in the form of mandatory policies and training concerning sanitizing, hand-washing, and face coverings.  Without such policies and instruction, children, especially those who suffer from mental illnesses or cognitive disabilities, may not comprehend the significance

---

[121] CDC Guidance.
[122] Associated Press, *Riots, Escapes and Pepper Spray: Virus Hits Juvenile Centers*.
[123] Ex. 8, Holt Decl. ¶ 4.
[124] *Id.*

of these procedures in preventing the spread within the four OJJ secure care facilities and within the broader community.  Indeed, many of the children in the four OJJ secure care facilities may lack impulse control and have difficulty retaining their focus, leading to ineffective hygiene practices.[125]

72.    The CDC recommends wearing face coverings where social distancing measures are difficult to maintain, especially in areas of significant community-based transmission.[126] Some children report that OJJ has circulated some face masks to the children, but OJJ has failed to promulgate a uniform policy requiring that all staff and children wear masks.[127]  Other children report that some staff wear masks, but that masks have not been made available for the children.[128]

73.    OJJ's furlough programs—which provide for authorized temporary release from the grounds of a secure facility for the purposes of aiding in the children's rehabilitation and re-entry[129]—could facilitate physical distancing at the facility by easing capacity, but have been halted during the pandemic.  As recently as mid-March, children in OJJ's custody were home on furlough.  OJJ's furlough policy is intended to assist children in maintaining family and community relations while incarcerated in OJJ's four secure are facilities, and OJJ determines, based on a detailed list of criteria,  which children qualify for various types of furloughs.[130]  One category of children eligible for furlough include those who qualify as a "low to moderate" risk on the Structured Assessment of Violence Risk in Youth ("SAVRY") scale.  But children who are deemed "high" risk on the SAVRY scale may also qualify if they meet other criteria, like

---

[125] *Id.* ¶ 8.
[126] CDC, *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission* (April 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.
[127] *See, e.g.*, Ex. 9, A.B. Decl. ¶ 12; Ex. 3, N.H. Decl. ¶ 4; Ex. 6, L.P. Decl. ¶ 9.
[128] *Id.*
[129] OJJ, *Youth Services Policy* (July 11, 2018), https://ojj.la.gov/wp-content/uploads/2018/07/C.4.1.pdf.
[130] *Id.*

"making progress on identified treatment needs."[131]   However, OJJ has now refused to release children eligible for furlough in recent months.   OJJ has also refused to evaluate furlough eligibility despite many children becoming eligible for release.

   c.   **OJJ's Policies Place Children at a Substantial Risk of Serious Long-Term Mental, Developmental and Emotional Harm**

   74.   In an attempt at physical distancing, the four OJJ secure care facilities have implemented isolation procedures for children who have contracted COVID-19, which, as described above, can lead to long-term psychological harm for children.[132]

   75.   On information and belief, the Swanson Center for Youth Columbia implemented a revised daily schedule as of April 21, 2020, mandating the children spend 23 hours each day in their dormitory.   Approximately five hours each day are devoted to "quiet time (journaling)" in the dormitory.   Other children have reported spending 23 hours in their dormitory for the past seven weeks.[133]

   76.   Regular schooling and developmental programs have been severely curtailed. According to some children, certain dormitories have received several hard-copy worksheet packets.   However, officials have not collected the completed packets and children have not received any feedback on their work nor received any update about the status of their future educational programming.   One child who receives special education services completed the packets he received in just a few minutes, leaving very little structured time during the remaining isolation period.   This child also had not been receiving any of his usual speech and language special education services.

---

[131] *Id.*
[132] *See* Blakemore& Mills, *Is Adolescence a Sensitive Period for Sociocultural Processing?*
[133]   *See e.g.,* Ex. 6, L.P. Decl. ¶ 9; Ex. 13, W.H. Decl. ¶ 7.

77.    Even before the pandemic, OJJ was already severely understaffed at the four OJJ secure care facilities.[134]  Due to high turnover and sick leave before the pandemic, OJJ's "relief factor" was 2.1, which means that for every staff member assigned to a scheduled shift, OJJ required approximately two employees to be available to cover that shift.[135]  Since March, these numbers have become even more troubling.  The number of staff who have contracted COVID-19 has continued to rise.[136]  On information and belief, due to staff shortages, probation officers have filled in.  According to one probation officer whose normal duties for OJJ include probation and parole, OJJ was forced to supplement staff at three of the four facilities with "community-based staff" who are not properly trained to attend to the children's needs at the secure care facilities, which has led to the use of inappropriate and excessive disciplinary measures such as disciplinary lockdown and pepper spray.[137]  Staff shortages combined with these dire conditions have also resulted in desperate runaway attempts, including most recently at Swanson Center for Youth Monroe.[138]  Children who reenter the facilities after runaway attempts pose a risk of having been exposed to COVID-19 while outside the secure care facility and transmitting to children and staff.

78.    As additional staff fall ill or become subject to quarantine, programming will be further curtailed and mandated staffing ratios needed for basic safety and learning will continue to be jeopardized.

---

[134] Ex. 8, Holt Decl. ¶ 6.
[135] *Id.*
[136] *See* State of Louisiana, Office of Juvenile Justice, *OJJ COVID-19 Information*, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 14, 2020).
[137] Emily Lane & Greg LaRose, *"There Was No Control," Says Bridge City Youth Prison Guard About Riot*, WDSU NEWS (April 24, 2020 10:25 AM), https://www.wdsu.com/article/there-was-no-control-says-bridge-city-youth-prison-guard-on-riot/32259043.
[138] *Inmates Escape Swanson Youth Center, 2 Still On The Run*, KNOE NEWS (May 9, 2020 10:42 PM), https://www.knoe.com/content/news/Inmates-escape-Swanson-Youth-Center-2-still-on-the-run-570347141.html.

79.     Experts advise that children can best weather the emotional storm of the pandemic by spending time with family and receiving regular and consistent emotional reassurance and support.[139]  Regular familial contact mitigates anxiety levels for both children and their families. Children in juvenile justice settings, and especially those subjected to stringent physical distancing rules, will be deprived of this support.  The four OJJ secure care facilities have halted regular family and attorney visits.  One family member called the facility repeatedly attempting to speak to someone about her child, but did not get a formal update until three days later.

80.     Children have reported that there are no procedures for non-COVID-19 healthcare.  For example, one child who suffers from recurring ear infections was not permitted to seek care in the infirmary.[140]  Other children have not been provided with mental health care during this time.[141]

81.     Parents of the children incarcerated in the four OJJ secure care facilities have expressed serious concern for their children's health and wellbeing amid the pandemic.  These concerns have been aggravated by OJJ's lack of accountability and transparency.[142]

## CLASS ACTION ALLEGATIONS

82.     Named Plaintiffs bring this action on behalf of themselves and all others similarly situated, or who may be so situated in the future, to assert the claims alleged in this Complaint on a common basis.

83.     A class action is a superior means, and the only practicable means, by which named Plaintiffs-Petitioners and unknown Class Members can challenge Defendants-Respondents' unconstitutional COVID-19 response.

---

[139] Ex. 8, Holt Decl. ¶ 10.
[140] Ex. 13, W.H. Decl. ¶ 4.
[141] Ex. 6, L.P. Decl. ¶ 6; Ex. 3, N.H. Decl. ¶ 8.
[142] Ex. 8, Holt Decl. ¶ 11.

84.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) or 23(b)(1)(A) of the Federal Rules of Civil Procedure.

**I.      The Plaintiff Class**

85.     Plaintiffs-Petitioners propose a declaratory and injunctive class defined as: All children who are, or will in the future be, confined at Acadiana Center for Youth in Bunkie; Bridge City Center for Youth; Swanson Center for Youth Columbia; and Swanson Center for Youth Monroe (the "Plaintiff Class").  Plaintiffs-Petitioners seek declaratory and injunctive relief to terminate the ongoing course of conduct on the part of Defendants-Respondents that is creating a substantial risk of serious harm (including death) to class members and is depriving or will deprive class members of their constitutional rights, and to enjoin the policies and practices adopted and implemented by Defendants-Respondents that result or will result in the deprivation of those rights.

**II.     Rule 23(a) Factors**

86.     The proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

**a.      Numerosity—Fed. R. Civ. P. 23(a)(1)**

87.     The class is so numerous that joinder of all members is impracticable.  As of April 19, 2020, there were approximately 220 children incarcerated in the four OJJ secure care facilities.  Defendants-Respondents' policies and practices put everyone in OJJ's custody at risk of contracting and dying of COVID-19 and of receiving inadequate care while in custody.

88.     The currently incarcerated Plaintiff Class members are identifiable using records maintained in the ordinary course of business by OJJ.

89.     Furthermore, joinder is impracticable because the Plaintiff Class also includes unidentifiable future members.

b.      **Commonality—Fed. R. Civ. P. 23(a)(2)**

90.     All members of the proposed Plaintiff Class are or will be subject to the same systemic unconstitutional policies, practices, acts, and omissions on the part of Defendants-Respondents described in this Complaint, and all are or will be at risk of adverse impacts on their physical and mental health resulting therefrom.

91.     There are questions of law and fact common to the members of the class.

92.     Such common questions of law include, but are not limited to:

- Whether Plaintiffs-Petitioners, and the putative class they seek to represent, are experiencing or will experience conditions of confinement that are so seriously deficient in providing for their basic needs as to constitute punishment, abuse, and neglect rather than rehabilitation and treatment;

- Whether Plaintiffs-Petitioners, and the putative class they seek to represent, face a substantial risk of serious harm under OJJ's COVID-19 response plan (or lack thereof);

- Whether Plaintiffs-Petitioners, and the putative class they seek to represent, face a substantial risk of serious harm due to the COVID-19 pandemic; and

- Whether OJJ's COVID-19 response plan (or lack thereof) amounts to deliberate indifference to Plaintiffs-Petitioners' right and the right of the putative class members they seek to represent to be free from cruel and unusual punishment.

93.     Such common questions of fact include, but are not limited to:

34

- Whether Defendants-Respondents are aware or should have known of the substantial risk of serious harm Plaintiffs-Petitioners face under OJJ's lack of an adequate COVID-19 response plan;

- Whether Defendants-Respondents have taken reasonable measures to abate the substantial risk of serious harm caused by the COVID-19 pandemic for the individuals who are within their custody;

- Whether Defendants-Respondents have promulgated adequate policies to protect against the harms of COVID-19;

- Whether Defendants-Respondents have ensured that OJJ's secure care facilities have sufficient oversight, staffing, and resources to protect people from COVID-19;

- Whether OJJ's COVID-19 response plan (or lack thereof) is consistent with CDC guidelines; and

- Whether Defendants-Respondents have ensured that the conditions in OJJ's juvenile secure care facilities are adequate to accomplish the rehabilitative and treatment purposes of Plaintiffs-Petitioners' confinement.

94.     Defendants-Respondents are expected to raise common defenses to these claims, including denying that the conditions of confinement constitute punishment or that they are deliberately indifferent and denying that their actions violate the law.

c.     **Typicality—Fed. R. Civ. P. 23(a)(3)**

95.     Plaintiffs-Petitioners' claims are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct, and their claims are based on the same theory of law as the class's claims.  Named Plaintiffs-Petitioners are all subjected to

the inadequate policies and practices of Defendants-Respondents.  Named Plaintiffs-Petitioners and the proposed class they seek to represent have suffered or will suffer injuries or face a substantial risk of serious harm (including death) and will continue to be in this position due to Defendants-Respondents' unlawful and unconstitutional policies and practices.

### d.      Adequacy—Fed. R. Civ. P. 23(a)(4)

96.    Named Plaintiffs-Petitioners are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims.  They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

97.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights.

98.    Plaintiffs-Petitioners are represented by attorneys from the Promise of Justice Initiative, Law Office of John Adcock, Juvenile Law Center and O'Melveny & Myers LLP, all of whom who have experience in litigating complex civil rights matters related to incarcerated children and prisoners' rights in federal court and extensive knowledge of both the details of Louisiana's juvenile justice process and the relevant constitutional and statutory law.

99.    Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

### III.    Rule 23(b)(2)

100.    Class action status is appropriate because Defendants-Respondents have acted or will act in the same unconstitutional manner with respect to all putative Class Members by enforcing the same set of policies and practices that expose Plaintiffs-Petitioners and the putative

Class Members to a substantial risk of serious harm and result in the deprivation of Plaintiffs-Petitioners' and the putative Class Members' constitutional rights.

IV.    **Rule 23(b)(1)(A)**

101.    Class action status is appropriate because Defendants-Respondents have acted or will act in the same unconstitutional manner with respect to all putative Class Members by enforcing the same set of policies and practices that expose Plaintiffs-Petitioners and the putative Class Members to a substantial risk of serious harm and result in the deprivation of Plaintiffs-Petitioners' and the putative Class Members' constitutional rights. There is therefore a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

102.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants-Respondents from exposing Plaintiffs-Petitioners and the putative Class members to a substantial risk of serious harm and depriving them of their constitutional rights in the manner described in this Complaint. Because the putative Class challenges Defendants-Respondents' policies and practices as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(1)(a) certification is appropriate and necessary.

103.    Injunctive relief compelling Defendants-Respondents to respect Plaintiffs-Petitioners' constitutional rights will similarly impact all the parties. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

I.    **42 U.S.C. § 1983 Unlawful Conditions of Confinement and Deprivation of Due Process (Fourteenth Amendment)**

104.    Plaintiffs-Petitioners repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

105.    The conditions of Plaintiffs-Petitioners' confinement violate their substantive due process rights arising from the Fourteenth Amendment, as described in this Complaint.

106.    Named Plaintiffs-Petitioners and the putative class they seek to represent face a substantial risk of serious harm (including death) from the policies, actions and inactions of Defendants-Respondents in response the COVID-19 pandemic.

107.    Defendants-Respondents have failed to take reasonable measures to abate that risk for children incarcerated in the four OJJ secure care facilities.

108.    As a result, Plaintiffs-Petitioners have been deprived and continue to be deprived by the Defendants-Respondents of their rights under the Fourteenth Amendment to reasonably safe living conditions and to rehabilitative treatment.

109.    Plaintiffs-Petitioners are held in OJJ custody for purposes and in furtherance of rehabilitation and treatment, not for retribution or punishment.[143]

110.    The conditions of Plaintiffs-Petitioners' confinement are so seriously deficient in providing for their basic needs as to constitute punishment rather than rehabilitation or treatment, in violation of their right to substantive due process arising from the Fourteenth Amendment.

111.    Defendants-Respondents have drastically reduced or suspended the rehabilitative and treatment programs to which Plaintiffs-Petitioners are entitled upon their adjudication and commitment to OJJ custody, including therapeutic services, education, social activities, and recreation.

112.    As a result, Plaintiffs-Petitioners have been deprived and continue to be deprived of their rights under the Fourteenth Amendment to rehabilitation and treatment services.

---

[143] *See supra* n.17.

113.    Plaintiffs-Petitioners and the putative Class Members have no plain, adequate, or complete remedy at law to address any of the constitutional violations described herein.

114.    Plaintiffs-Petitioners, on their own behalf and on behalf of the putative Class Members, seek injunctive and declaratory relief against all Defendants-Respondents to prevent the continued violation of their constitutional rights as detailed herein.

**II.    42 U.S.C. § 1983 Unlawful Conditions of Confinement (Eighth Amendment)**

115.    Plaintiffs-Petitioners repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

116.    The conditions of Plaintiffs-Petitioners' confinement violate their right to be free from cruel and unusual punishment arising from the Eighth Amendment, as described in this Complaint.

117.    The COVID-19 pandemic creates a substantial risk of serious harm (including death) to Plaintiffs-Petitioners from the policies, actions and inactions of Defendants-Respondents in response the COVID-19 pandemic—a risk of which Defendants-Respondents are well aware—and the Eighth Amendment requires that Defendants-Respondents take reasonable measures to abate that risk for the individuals who are within the State's custody.

118.    Defendants-Respondents have failed to take reasonable measures to abate that risk for children incarcerated in the four OJJ secure care facilities.

119.    Defendants-Respondents knew or should have known of the substantial risk of harm that COVID-19 poses to Plaintiffs-Petitioners, and further knew or should have known of the particular risks of severe illness and possible death that Plaintiffs-Petitioners face as a result of the inherently congregate and unclean living conditions of incarceration.  Despite this knowledge, Defendants-Respondents have failed to take reasonable measures to mitigate these dangers.

120.    Plaintiffs-Petitioners and the putative Class Members have no plain, adequate, or complete remedy at law to address the constitutional violations described herein.

121.    Plaintiffs-Petitioners, on their own behalf and on behalf of the putative Class Members, seek injunctive and declaratory relief against all Defendants-Respondents to prevent the continued violation of their constitutional rights as detailed herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs-Petitioners, on behalf of themselves and the putative class they seek to represent, request that this Court enter judgment in their favor and against Defendants-Respondents and prescribe the following relief:

a)  Certification of this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) or 23(b)(1)(A), and appointing the undersigned as Class Counsel;

b)  Injunctive and declaratory relief ordering that Defendants-Respondents' policies and practices concerning COVID-19, in their totality, violate the Fourteenth Amendment to the United States Constitution;

c)  An order and judgment declaring that Defendants-Respondents' policies and practices concerning COVID-19, in their totality, violate the Eighth Amendment to the United States Constitution;

d)  An order and judgment declaring that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs-Petitioners, and the rights of the Plaintiff Class they seek to represent, under the Fourteenth Amendment to the United States Constitution;

e)  An order and judgment declaring that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs-Petitioners,

40

and the rights of the Plaintiff Class they seek to represent, under the Eighth Amendment to the United States Constitution;

f)  A preliminary injunction enjoining Defendants-Respondents, their subordinates, agents, employees, representatives, contractors, and all others acting or purporting to act in concert with them or on their behalf from subjecting Plaintiffs-Petitioners and the putative class members to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

g)  A preliminary injunction ordering Defendants-Respondents to immediately conduct a review of all children currently held in the four OJJ secure care facilities, and ordering their release if feasible.  The populations of children most likely to be released through this process should include those who meet the "presumptively eligible for release" standard, including (1) all class members who have contracted COVID-19; (2) all class members who have a pre-existing medical condition that the United States Centers for Disease Control ("CDC") has determined puts them at significantly higher risk of contracting COVID-19 and developing complications, including death; (3) all class members currently eligible for furloughs in accordance with OJJ's policies; and (4) all class members who can be safely returned to their communities, including children with 180 days or fewer remaining on their sentence;

h)  A preliminary injunction ordering Defendants-Respondents to develop and implement, within 48 hours, a plan to eliminate the substantial risk of serious harm that Plaintiffs-Petitioners and all members of the putative class, including, at a minimum:

41

- That Defendants-Respondents promulgate and implement adequate policies and procedures related to COVID-19 that comply with the CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.  These policies and procedures must ensure adequate staffing; resources; quality assurance; surveillance; auditing; data tracking; coordination with local, state, and federal health officials; education; clinical guidance; and training;

- That each COVID-19 patient in OJJ custody is evaluated by a medical professional;

- That Defendants-Respondents conduct testing for all children in the four OJJ secure care facilities, not only the few individuals who display obvious symptoms, on a regular basis and in accordance with CDC guidelines;

- That Defendants-Respondents eliminate or reduce to the greatest extent possible the transportation of children between the four OJJ secure care facilities;

- That Defendants-Respondents eliminate or reduce to the greatest extent possible the transportation of children from non-secure to secure facilities;

- That Defendants-Respondents assess and issue guidance to the relevant individuals at the four OJJ secure care facilities regarding the conditions of confinement in the four OJJ secure care facilities consistent with the CDC's social distancing guidelines;

- That Defendants-Respondents implement temperature checks and appropriate personal protective equipment for all individuals entering the four OJJ secure care facilities;

- That Defendants-Respondents suspend the use of solitary confinement and dorm confinement as a means of medical isolation;

- That Defendants-Respondents provide Plaintiffs-Petitioners with at least five hours per day of free and regular access to phones and video visitation with family and attorneys;

- That Defendants-Respondents provide Plaintiffs-Petitioners with online (or through other adaptive strategies) educational and therapeutic services and opportunities and physical activity and recreation;

- That Defendants-Respondents issue immediate guidance preventing staff from using inappropriate and excessive disciplinary measures, including pepper spray; and

i) A preliminary injunction ordering Defendants-Respondents to collect and publish, on an ongoing basis and separately for each secure care facility, the following information necessary to monitor Defendants-Respondents' efforts to remedy the unlawful acts, omissions, conditions, and practices described in this Complaint:

- The number of children tested and the number of children with positive test results for COVID-19 in each facility;

- The number of facility personnel tested and the number of facility personnel with positive test results for COVID-19 in each facility;

- The procedures used in the four OJJ secure care facilities for testing children and facility personnel;

- The number of children who have been considered for release under the process described in subsection (e) of this prayer for relief, and the disposition and basis for Defendants-Respondents' decision for each child reviewed, including whether the child was actually released; and

j) Retain jurisdiction of this case until Defendants-Respondents have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants-Respondents will continue to comply in the future absent continuing jurisdiction;

k) An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

l) Any other relief this Court deems proper.

Respectfully submitted this 14th day of May, 2020.

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
Nishi Kumar, La. Bar No. 37415
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Marsha Levick*
Jessica Feierman*
Karen U. Lindell*
JUVENILE LAW CENTER
1800 JFK Boulevard, Suite 1900A
Philadelphia, PA 19103
Telephone: (215) 625-0551
Email: mlevick@jlc.com


Stuart Sarnoff*
Lisa Pensabene*
Laura Aronsson*
Mariam Kamran*
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

Brandon Amash*
O'MELVENY & MYERS LLP
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Email: bamash@omm.com

44

Telephone: (212) 326-2000
Email: ssarnoff@omm.com

John Adcock
La. Bar No. 30372
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Telephone: (504) 233-3125
Email: jnadcock@gmail.com

Benjamin Singer*
Jason Yan*
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Email: bsinger@omm.com

David Lash*
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6000
Email: dlash@omm.com

*Attorneys for Plaintiffs*

*Pro hac vice* to be submitted