# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

J.H., by and through his mother and next friend, N.H.; I.B., by and through his parents and next friends, A.B. and I.B., on behalf of themselves and all others similarly situated,

                Plaintiffs-Petitioners,

    -against-

JOHN BEL EDWARDS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF LOUISIANA; THE LOUISIANA OFFICE OF JUVENILE JUSTICE; EDWARD DUSTIN BICKHAM, IN HIS OFFICIAL CAPACITY AS INTERIM DEPUTY SECRETARY OF THE LOUISIANA OFFICE OF JUVENILE JUSTICE; JAMES WOODS, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE ACADIANA CENTER FOR YOUTH; SHANNON MATTHEWS, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE BRIDGE CITY CENTER FOR YOUTH; SHAWN HERBERT, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT MONROE; and RODNEY WARD, IN HIS OFFICIAL CAPACITY AS THE DEPUTY DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT COLUMBIA,

                Defendants-Respondents.

CIVIL ACTION NO. 3:20-cv-00293-JWD-EWD

CLASS ACTION

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS-PETITIONERS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER[1]

---

[1] This Court granted Plaintiffs-Petitioners leave to file a reply memorandum in support of their Motion for TRO during the Telephone Status Conference held on May 20, 2020. *See* Dkt. 21 at 2.

## I.    Introduction

The evidence provided by Defendants confirms, rather than rebuts, the disturbing facts in

Plaintiffs' Motion for TRO, and the pressing need to protect Louisiana's detained children through

emergency injunctive relief. Specifically, Defendants' Opposition admits the following facts:

- OJJ has not administered any initial COVID-19 tests to children in its secure care facilities since April 12;[2]
- OJJ has tested only 30 children total;[3]
- Of the 30 children OJJ has tested for COVID-19, 28 tested positive initially—93%;[4]
- OJJ does not administer COVID-19 tests to any children who do not outwardly display specific symptoms;[5] and
- All furloughs have been postponed since March 16.[6]

Additionally:

- As of May 26, 48 OJJ staff members have tested positive—at least eight more than when Plaintiffs filed their Motion for TRO on May 15;[7]
- Seventeen children currently in OJJ's secure care facilities have been identified as 'Chronic Care' as of May 22;[8]
- The facilities are still not providing adequate educational and rehabilitative programming;[9]
- The children are still confined indoors for excessively long periods of time;[10]
- Parents are still unable to speak to their children regularly, and OJJ is still refusing to share information with them regarding the facilities' COVID-19 policies;[11] and
- Louisiana now has at least 17 confirmed cases of the serious pediatric condition, now called multisystem inflammatory syndrome in children ('MIS-C') or pediatric inflammatory multi-system syndrome ('PIMS'), that is linked to COVID-19.[12]

---

[2] List of Youth Tested for COVID-19, Dkt. 25-3 at 34-35.

[3] *Id.*

[4] *Id.*

[5] *See* Defs.' Opp'n to TRO at 5 ('Youth who are not exhibiting symptoms of COVID-19 are not tested for the disease.').

[6] *See* Defs.' Opp'n to TRO at 5 ('Beginning March 16, 2020, all off-site programming was suspended, and furloughs were postponed.').

[7] OJJ COVID-19 Information, La. Office of Juvenile Justice, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 26, 2020); Pls.' Memo. in Support of TRO, Dkt. 7-1 at 10.

[8] Ex. 1, OJJ Chronic Care List.

[9] Ex. 2, J.P. Decl. at ¶ 8.

[10] *Id.*

[11] *Id.* at ¶¶ 7, 9.

[12] Ex. 3, Maraynes Decl. at ¶ 8; *see also* Emily Woodruff, *There are 11 Louisiana cases of the pediatric inflammatory condition that's linked to coronavirus*, NOLA.COM (May 22, 2020 at 12:57 PM), https://www.nola.com/news/coronavirus/article_cc495d86-9c55-11ea-bf78-87380aa2aa98.html.

Defendants continue to ignore the dire threat that COVID-19 poses to the children in their care, and they continue to maintain increasingly unsafe and non-rehabilitative conditions of confinement that violate Plaintiffs' constitutional rights. As this untenable situation worsens each day, Plaintiffs respectfully request that this Court grant their Motion for Temporary Restraining Order.[13]

## II.     Plaintiffs Have Satisfied the Exhaustion Requirement of the Prison Litigation Reform Act (PLRA)

Defendants claim (1) that Plaintiff must file Administrative Remedy Procedure ('ARP') grievances themselves, rather than have them filed by a parent or an attorney; and (2) that Plaintiffs must use the non-emergency grievance procedure if their emergency grievance is not responded to within the 48-hour or 5-day timeline.[14] Neither of these arguments has merit. To comply with the PLRA, the grievance must 'reasonably indicate a problem' and give officials 'fair notice' of the problem at issue.[15] Defendants' reliance on *Gates v. Cook* is misplaced. In that case, the Court concluded that the prisoner was *not* required to use the regular grievance process after completing an emergency request.[16] Moreover, in cases involving juveniles confined to secure care facilities, courts have interpreted grievance procedures generously to avoid findings of non-exhaustion.[17]

---

[13] Plaintiffs' Motion for TRO seeks an order immediately enjoining Defendants from (1) continuing to confine all children who are currently within 180 days of their release dates; (2) continuing to confine children who are presumptively eligible for release, including all children who are eligible for furlough under OJJ's criteria as well as those who have contracted the disease and those who are medically vulnerable; (3) failing to test children for COVID-19; (4) using Behavioral Intervention Rooms for any child who tests positive for COVID-19 or displays symptoms of the disease; (5) confining children to their dormitories for lengthy periods of time; (6) using pepper spray on children; and (7) continuing the suspension of structured educational and rehabilitative programming in OJJ facilities. Plaintiffs also ask that this Court order Defendants to develop, within 48 hours, an effective COVID-19 response plan governing the state's four children's detention centers that fully conforms to CDC guidelines. *See* Pls.' Mot. for TRO, Dkt. 7.

[14] A legislative audit from 2018 found that OJJ did not address 19% of youth grievances within the appropriate timelines. Performance Audit Services, Oversight of Safety in Secure Care Facilities, (June 6, 2018), https://www.lla.la.gov/PublicReports.nsf/64DF5EBB49AE4404862582A40078718D/$FILE/000194C2.pdf.

[15] *Johnson v. Johnson*, 385 F.3d 503, 518–19 (5th Cir. 2004).

[16] *Gates v. Cook*, 376 F.3d 323, 331–32 (5th Cir. 2004).

[17] *See Lewis v.\* Gagne*, 281 F.Supp.2d 429, 433-35 (N.D.N.Y. 2003) (holding that a mother had made sufficient 'reasonable efforts' to exhaust, without explicitly commenting on the juvenile's own status); *see also Troy D. v. Mickens*, 806 F.Supp.2d 758, 768-69 (D.N.J. 2011) (holding ombudsman procedure was exhausted by an attorney's letter to juvenile institution superintendent); *Moore v. Louisiana Dept. of Public Safety and Corrections*, 2002 WL

Counsel for Plaintiffs filed Third-Party emergency grievances on behalf of I.B. and J.H. on May 8 and 9, respectively, via email to the relevant facility directors.[18] State law and the OJJ Administrative Remedy Procedure expressly encompass Third-Party ARPs, and Third-Party ARPs by attorneys in particular.[19] Counsel sent the emergency grievances according to instructions she received over the phone from the facilities.[20] Counsel did not receive a response to either grievance within 48 hours or 5 business days,[21] as laid out in the ARP policies and procedures, thereby exhausting the emergency grievance process or, alternatively, establishing that it is unavailable.

The only deficiency Defendants allege as to these otherwise legally and factually sufficient emergency grievances is that OJJ staff incorrectly instructed Counsel on whom to direct the grievances. The facility directors could have simply sent the grievances to the unnamed ARP coordinators,[22] but doing so would have been pointless per internal policy, because in the case of a grievance 'which alleges substantial risk of imminent personal injury or cause serious or irreparable harm,' the ARP Coordinator 'shall immediately forward' the grievance or the relevant portion of the grievance to upper management, including *the facility directors* themselves.[23] Defendants' Opposition indicates that the emergency grievances should have been rejected— though, of note, no notice of rejection has been sent to Counsel for Plaintiffs. Under state law and

1791996, *4 (E.D.La., Aug. 5, 2002) (declining to enforce 30-day time limit; declaring 30-day delay in filing complaint 'not unreasonable' given that the plaintiff was a juvenile in state custody).

[18] Ex. 4, Kumar Decl. at ¶¶ 3, 6; Ex. 5, J.H. Emergency Grievance.
[19] La. Admin. Code tit. 22 § 713; Office of Juvenile Justice, Administrative Remedy Procedure B.5.3 at VII.F.4, VII.I (July 31, 2018), *available at* https://ojj.la.gov/wp-content/uploads/2019/08/B.5.3.pdf. That Counsel represented J.H.'s mother and I.B.'s parents, and had not entered into a client retainer agreement with minor children, which is an unenforceable contract under state law, is of no issue here. A completed Third-Party Acknowledgment/Approval Form that was included is what is required for a non-parent or guardian to file an ARP on a child's behalf.
[20] Ex. 4, Kumar Decl. at ¶¶ 2-3, 5-6.
[21] *Id.* at ¶ 7.
[22] Furthermore, an official giving wrong information on the ARP procedure can make that process 'unavailable.' *See Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010).
[23] Office of Juvenile Justice, Administrative Remedy Procedure B.5.3 at VII.I (July 31, 2018), *available at* https://ojj.la.gov/wp-content/uploads/2019/08/B.5.3.pdf

OJJ policy, rejection of an ARP is sufficient for exhaustion.[24] In any event, given that Defendants assert failure to exhaust based upon misinformation *they themselves* supplied, and upon which Plaintiffs *reasonably relied*, that defense should be equitably estopped.[25]

Relevant though not necessary to establish compliance under the PLRA, I.B. also attempted to file an emergency grievance through the procedures outlined in OJJ policy, though it was construed by OJJ staff as five separate, non-emergent ARPs.[26] Furthermore, N.H. filed an emergency grievance on J.H.'s behalf using the procedures outlined in OJJ policy.[27] OJJ failed to respond to these grievances as well, as required, within 48 hours or 5 calendar days, indicating administrative remedies are not currently 'available.'[28] Moreover, they failed to communicate whether these grievances had been considered and been rejected as emergent and were instead being treated as non-emergent, and would be replied to within 30 days of filing per OJJ policy.

---

[24] *Id.* at VII.H ('If a youth's ARP is rejected…he may seek judicial review of the decision within 30 calendar days following receipt of the decision.').

[25] *See Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir. 2004) (holding that PLRA's exhaustion requirement is subject to equitable estoppel); *Wright v. Hollingsworth,* 260 F.3d 357, 358 n.2 (5th Cir. 2001); *Wendell v. Asher,* 162 F.3d 887, 890 (5th Cir. 1998) (stating that the amended PLRA statute imposes an exhaustion 'requirement, rather like a statute of limitations, that may be subject to certain defenses such as waiver, estoppel, or equitable tolling'); *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir. 2002) (noting that the Fifth Circuit's application of estoppel to PLRA exhaustion was 'persuasive.'). The applicable elements of equitable estoppel are set forth in *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) ('(1) the plaintiff must know the facts of the defendant's [] conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury.').

[26] Dkt. 25 at Exhibit E-3 at 1-5.

[27] Office of Juvenile Justice, Administrative Remedy Procedure B.5.3 at VII.I (July 31, 2018), *available at* https://ojj.la.gov/wp-content/uploads/2019/08/B.5.3.pdf.

[28] *See Valentine v. Collier*, -- U.S. --, 2020 WL 2497541, *1 (May 14, 2020) ('I caution in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed.'). A legislative audit from 2018 found that OJJ did not address 19% of youth grievances within the appropriate timelines. Oversight of Safety in Secure Care Facilities, Office of Juvenile Justice (June 6, 2018), https://www.lla.la.gov/PublicReports.nsf/64DF5EBB49AE4404862582A40078718D/$FILE/000194C2.pdf.

The risk of COVID-19 is indeed an emergency situation, and the normal 51-day window for exhaustion is untenable. OJJ has not responded to a single emergency grievance request, which could be rejected and put through the non-emergent grievance request process if necessary.

## III.     Defendants Are Violating Plaintiffs' Constitutional Rights

### A.     Plaintiffs' Conditions of Confinement Are Subject to the Liability Standards of the Due Process Clause of the Fourteenth Amendment

Unlike adults who are in prison, Plaintiffs' claims regarding the conditions of their confinement are subject to the liability standards of the Due Process Clause of the Fourteenth Amendment, not the Eighth.[29] While the Supreme Court has never explicitly stated which standard applies in juvenile justice facilities, the Court has made clear that the Eighth Amendment 'was designed to protect those convicted of crimes'[30] and is therefore not the appropriate standard for reviewing the disciplining of students in schools[31] or the conditions of confinement for other categories of individuals involuntarily committed for non-punitive reasons, such as mental health treatment.[32] Various federal appellate and district courts have concluded that when '[t]he chief objects of [a juvenile justice system] are educational and reformatory,' the 'system is noncriminal and nonpenal,' and 'the fourteenth amendment applies to conditions of confinement.'[33]

---

[29] Defendants concede this. *See* Defs.' Opp'n to TRO at 22 n.19 ('To the extent Plaintiffs are attempting to make a 'conditions of confinement' allegations, the liability test for such claims is whether 'a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective.'').

[30] *Ingraham v. Wright*, 430 U.S. 651, 664 (1977).

[31] *Id.*

[32] *Youngberg v. Romeo*, 457 U.S. 307, 325 (1982).

[33] *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987); *see also H.C. v. Jarrard*, 786 F.2d 1080, 1085 (11th Cir. 1986); *Santana v. Collazo*, 714 F.2d 1172, 1180 (1st Cir. 1983) ('[B]ecause the state has no legitimate interest to punishment, the conditions of juvenile confinement, like those of confinement of the mentally ill, are subject to more exacting scrutiny than conditions imposed on convicted criminals.'); *Milonas v. Williams*, 691 F.2d 931, 942 n.10 (10th Cir. 1982) ('Any institutional rules that amount to punishment of those involuntarily confined prior to an adjudication of guilt of criminal wrongdoing are violative of the due process clause per se.'); *A.J. ex rel. L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995) ('[W]e conclude that, as a general matter, the due process standard applied to juvenile pretrial detainees should be more liberally construed than that applied to adult detainees.'); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1152 (D. Haw. 2006) (holding that the Fourteenth Amendment governs the constitutionality of conditions for youths 'are adjudicated delinquent and have not been convicted of a crime.').

Under the Louisiana Constitution, the sole purpose of OJJ custody is to provide 'rehabilitation and individual treatment,' not to punish.[34] Thus, 'there is no need here, as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional.'[35] Although the Fifth Circuit has not yet decided whether the Fourteenth Amendment standard applies to conditions of confinement cases involving the rights of youth in OJJ custody, courts around the country have acknowledged that 'when a state incarcerates juveniles for the purpose of treatment or rehabilitation,' as Louisiana does, 'due process requires that the conditions of confinement be reasonably related to that purpose.'[36] Indeed, some courts have found that youth in the juvenile justice system have a 'right under the [Fourteenth] Amendment due process clause to rehabilitative treatment' even in the absence of a statutory basis.[37] Thus, in light of Louisiana's express requirement that Plaintiffs be held in OJJ custody solely for rehabilitation and individual

---

[34] Pursuant to Louisiana Constitution Article V, § 19, the nature of the juvenile justice system is a non-criminal 'focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody.' *In re C.B.*, 708 So. 2d 391, 397 (La. 1998). Defendants' argument that Plaintiffs' references to the Louisiana Constitution are irrelevant because there are no state law claims in this case misunderstands federal constitutional law; rights created by state law trigger protections under the U.S. Constitution. *See, e.g.*, *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that where state law creates a 'legitimate claim of entitlement,' that entitlement is protected by procedural due process rights under the U.S. Constitution).

[35] *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015).

[36] *Alexander S. v. Boyd*, 876 F. Supp. 773, 796 n.43 (D.S.C. 1995) ('[This theory] finds support in the Supreme Court's pronouncement in *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), that 'due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.''); *see also Morgan v. Sproat*, 432 F. Supp. 1130, 1135 (S.D. Miss. 1977) ('First, where, as in Mississippi, the purpose of incarcerating juveniles in a state training school is treatment and rehabilitation, due process requires that the conditions and programs at the school must be reasonably related to that purpose.'); *State ex rel. S.D.*, 832 So. 2d 415, 433 ((La. App. 4 Cir. 2002) (same).

[37] *Nelson v. Heyne*, 491 F.2d 352, 360, 360 n.12 (7th Cir. 1974) ('Since we have today determined that the federal Constitution affords juveniles a right to treatment, any interpretation of [state law] which would find no such right to exist would itself be unconstitutional.'); *see also Pena v. N.Y. State Div. for Youth*, 419 F. Supp. 203, 207 (S.D.N.Y. 1976) ('[T]his court finds that the detention of a youth under a juvenile justice system *absent provision for the rehabilitative treatment of such youth* is a violation of due process rights guaranteed under the Fourteenth Amendment.') (emphasis in original); *Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1364 (D.R.I. 1972) ('[D]ue process in the juvenile justice system requires that the post-adjudicative stage of institutionalization further this goal of rehabilitation.').

6

treatment services, Plaintiffs' claims are subject to the liability standards of the Fourteenth Amendment.

Under this standard, the subjective deliberate indifference test advanced by Defendants is not the proper inquiry. In its applications of the Fourteenth Amendment to other nonpunitive custodial settings, the U.S. Supreme Court has declined to adopt the subjective deliberate indifference test, instead modifying the standard based upon the purpose of the confinement and the corresponding duties owed to individuals in custody.[38] Further, the Supreme Court has made clear that constitutional standards must take into account the heightened protection owed to adolescents.[39] Thus, conditions of confinement that conflict with OJJ's duty to provide Plaintiffs with rehabilitation and individual treatment services—as required under the Louisiana Constitution[40]—violate Plaintiffs' Fourteenth Amendment rights even if they do not rise to the level of cruel and unusual punishment under the Eighth Amendment.[41]

Defendants' reliance on the Fifth Circuit's holdings in *Hare* and *Alderson* to argue that the appropriate standard is deliberate indifference is misplaced. First, those cases involved 'episodic

---

[38] *See Youngberg*, 457 U.S. at 323 (concluding that involuntarily committed mental health patients are entitled to greater protections than convicted prisoners and imposing liability under the Fourteenth Amendment when conditions amount to a 'substantial departure from accepted professional judgment, practice, or standards'); *see also Kingsley*, 135 S. Ct. at 2473 (rejecting application of the subjective deliberate indifference standard to a pretrial detainee in the excessive force context).

[39] *See Roper v. Simmons,* 543 U.S. 551 (2005) (holding the death penalty unconstitutional as applied to adolescents because, as a class, youth are less culpable, more impulsive, and more susceptible to change); *see also Graham v. Florida,* 560 U.S. 48 (2010) (holding certain life without parole sentences unconstitutional as applied to youth because of these same characteristic and noting that the distinctions are based not only in developmental research, but also in recent studies of the adolescent brain); *JDB v. North Carolina,* 564 U.S. 261 (2011) (requiring a more protective standard in the context of juvenile interrogations).

[40] *See supra*, note 34. Additionally, because Louisiana law grants Plaintiffs a right to rehabilitative services, procedural due process guarantees that Plaintiffs cannot be deprived of such services absent notice and a hearing. *Bd. of Regents*, 408 U.S. at 577 (holding that where state law creates a 'legitimate claim of entitlement,' that entitlement is protected by procedural due process rights).

[41] While some courts have held that children confined in juvenile justice facilities are protected by the Eighth Amendment in addition to the Fourteenth, the Fourteenth Amendment standard is 'more protective,' and its Due Process Clause 'implicitly incorporates the cruel and unusual punishments clause standards as a constitutional minimum.' *Gary H.*, 831 F.2d at 1432.

acts or omissions,'[42] while this is a case about conditions of confinement.[43] Second, this case is about children in the juvenile justice system, not adults in jail, which, as described above, necessitates a more protective standard.

Defendants' reliance on *Morales v. Turman* in their attempt to reject a juvenile-specific standard is similarly inapt. *Morales* concluded that the unconstitutional conditions in question could be remedied under the Eighth Amendment and that there was therefore no need for the Court to decide whether the Fourteenth Amendment standard also applied.[44] Also, the decision predated the Supreme Court's holding in *Youngberg* that the Fourteenth Amendment standard applies to questions regarding the conditions of confinement for people who are involuntarily committed for non-punitive reasons,[45] and the case arose out of Texas, where—unlike in Louisiana[46]—there was no clear state law right to rehabilitation.[47] Post-*Youngberg*, and given the non-punitive purpose of the Louisiana juvenile justice system, one would expect the Fifth Circuit to join the majority of Circuits Courts and protect Louisiana's detained children under the Fourteenth Amendment.[48]

---

[42] *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017).

[43] *Hare*, 74 F.3d at 644 ('Constitutional attacks on general conditions, practices, rules, or restrictions of pretrial confinement are referred to as jail condition cases.').

[44] *Morales v. Turman*, 562 F.2d 993, 998-99 (5th Cir. 1977).

[45] *Youngberg*, 457 U.S. at 325.

[46] *See supra*, note 34.

[47] *Morales*, 562 F.2d at 999.

[48] The Fifth Circuit cases interpreting the Supreme Court's holding in *DeShaney v. Winnebago C'nty Dept. Soc. Servs.*, 489 U.S. 189 (1989) also indicate that the Fourteenth Amendment is the proper standard. In *DeShaney*, the Supreme Court declined to recognize a constitutional duty to protect against harm caused by a private actor to a child who was not in state custody. *Id.* at 195-97. Nonetheless, the Court acknowledged that certain 'special relationships' created or assumed by the State with respect to particular individuals could give rise to an affirmative duty to provide adequate protection under the Fourteenth Amendment. *Id.* at 197-98. The Supreme Court identified incarceration and involuntary institutionalization as two circumstances when such a relationship—and corresponding duty to protect— exists, and the Fifth Circuit has explicitly 'extended the special relationship exception to the placement of children in foster care.' *Doe v. Covington C'nty Sch. Dist.*, 675 F.3d 849, 856 (5th Cir. 2012) (en banc). Children in OJJ custody have been confined against their will and are wholly dependent upon the state for their basic needs, and thus are similarly entitled to care and protection under the substantive due process protections of the Fourteenth Amendment. *See id.* ('[T]he state assumes a constitutional duty to care for children under state supervision because 'the state's duty to provide services stems from the limitation which the state has placed on the individual's ability to act on his own behalf.'' (quoting *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir.1990)).

**B.**    **OJJ's COVID-19 Response Is Objectively Unreasonable and Has Rendered the Conditions of Confinement Unsafe and Punitive, Rather than Rehabilitative**

Defendants concede that, at most, Plaintiffs' claims regarding the conditions of their confinement are subject to a standard that asks whether OJJ's COVID-19 policies are rationally related to legitimate governmental objectives.[49] As described above, in cases about a state's rehabilitative juvenile justice system, this means that policies must be rationally related to the rehabilitative goals of the system. Plaintiffs are entitled to relief because OJJ's actions in response to the COVID-19 pandemic are objectively unreasonable under any standard—making children significantly *less* safe, and the conditions of their confinement more dangerous, by directly contradicting CDC and other professional guidance. OJJ's restrictive and dangerous actions therefore serve no legitimate purpose and constitute punishment rather than rehabilitation.[50]

Refusing to release or furlough children serves no legitimate purpose and exposes children to an increased risk of infection and transmission.[51] Defendants' argument that they cannot use furlough because they cannot conduct home inspections is unconvincing. It does not account for the youth who have already been approved for furloughs prior to the pandemic, nor does it account for the possibility of alternative approaches to home visits that have been recognized around the country during the pandemic.[52] OJJ has the power at least to reinstate its policy to recommend

---

[49] *See* Defs.' Opp'n to TRO at 22 n.19 ('To the extent Plaintiffs are attempting to make a 'conditions of confinement' allegations, the liability test for such claims is whether 'a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective.''); *see also Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

[50] *Bell*, 441 U.S. at 539.

[51] While Defendants claim that suspending the furlough program was an effort to reduce transfers, per CDC guidance, this argument is disingenuous, as many children have been transferred between OJJ facilities in the time since the furlough program was suspended. *See, e.g.*, Decl. of N.H., Dkt. 1-4 at ¶ 3; Decl. of L.P., Dkt. 1-7 at ¶ 3; Decl. of B.B., Dkt. 1-8 at ¶ 3; Ex. 2, J.P. Decl. at ¶ 6; Ex. 6, D.W. Decl. at ¶ 3-4.

[52] *See, e.g.*, States Modify Home Visiting Services in Response to COVID-19, (April 2, 2020), *available at* https://www.zerotothree.org/resources/3315-states-modify-home-visiting-services-in-response-to-covid-19.

youth for furlough,[53] and Defendants' affiant Shawn Herbert has admitted that '[i]n exceptional circumstances, an extended furlough can be recommended.'[54] Releasing detained or incarcerated individuals is widely recognized as a necessary measure to reduce the number of people housed together in congregate environments, thus facilitating social distancing, reducing the strain on medical systems near such populations, and saving lives.[55] According to Glenn Holt, former Deputy Assistant Secretary of OJJ, 'OJJ already knows who is furlough-eligible because it is discussed at every quarterly staffing meeting. They also already know who is eligible for early release and could have put into place a process to file motions to modify using specific criteria (such as SAVRY, offense, programming, etc.). In a matter of days, they could have had a prioritized list and started transferring kids home to keep both kids and staff safer.'[56] 'There is no question that requiring children to remain detained in congregate care facilities is more dangerous than the travel required to release children to their homes.'[57] And reducing the OJJ secure care

---

[53] Defendants' argument that OJJ does not have unilateral authority to release children is largely irrelevant. First, furloughs alone would significantly decrease the strain on OJJ's facilities. Although a furlough has to be approved by a judge, OJJ is not even attempting to seek such approval. OJJ could, for example, put a child on furlough until his release date 90 days in the future. The child would still be in OJJ custody and could easily be returned to the facility if there were a problem, and if OJJ focused on children who are near release and could be furloughed until their disposition terminates, there would be no need for the children to return to the facility afterward. Second, the consent of district attorneys is not required for modification; they can object, but their affirmative authorization is not required, and the possibility of objection does not prevent OJJ from seeking modification. *See* La. Ch.C. Art. 910 and 911. Finally, Defendant Governor Edwards has the power to release individuals during a state of emergency under La. R.S. § 29:722. *See* Letters to Governor Edwards, Dkt. 1-11 at 7-8.

[54] Herbert Decl., Dkt. 25-5 at 4, ¶ 17.

[55] Responses to the COVID-19 pandemic, *Prison Policy Initiative*, https://www.prisonpolicy.org/virus/virusresponse.html (last visited May 26, 2020) ('Massachusetts jails in [certain] counties have reduced their populations by around 20%. County jails in Colorado and Florida are reporting population decreases by over 30% in the past few months. On May 19th, a federal judge ordered the federal Bureau of Prisons to 'expedite the release' of 837 people. . . . Since March 10th, the Cuyahoga County [Cleveland, Ohio] jail has released about 900 people, reducing its population by more than 30%. . . . The Northwestern Regional Adult Detention Center in Virginia has reduced the jail population by about 20% from the daily average of the past 5 years.').

[56] Ex. 7, Supp. Holt Decl. at ¶ 10.

[57] Graves Decl., Dkt. 1-2 at ¶ 10; *see also* Ex. 8, Franco-Paredes Decl. at ¶ 25 ('[A]llowing these young individuals to reside with their parents or guardians would provide them with a safer living environment during this severe pandemic.'); Ex. 3, Maraynes Decl. at ¶ 12 ('If children were home with their parents, their parents would by definition constantly monitor their child for symptoms.').

population would also help maintain the required staff-to-youth ratio in the facilities, avoiding the need to bring in probation and parole officers, whose dangerous tactics have no place in OJJ's rehabilitative facilities. Defendants failed to release even those children they identified as having 'underlying medical conditions at increased risk of contracting COVID-19' due to unnamed 'subsequent disciplinary incidents.'[58] Defendants have proved themselves to be more concerned with discipline and rigidly enforcing their policies than with adapting to save children's lives.

Failing to administer COVID-19 tests to children living in a congregate environment, where positive cases have already been confirmed, serves no legitimate purpose and unconscionably exposes children to an increased risk of infection and transmission,[59] especially since new cases among OJJ staff have been confirmed as recently as May 26.[60] Defendants admit that '[t]he overwhelming majority of people who contract COVID-19 experience no symptoms of the disease or only mild symptoms' and that '[t]his is especially true with younger populations.'[61] COVID-19 patients can also present with lesser-known symptoms that will escape detection by simply screening for temperatures or coughs.[62] Defendants claim that their practice of not testing children who do not display specific symptoms is in line with CDC guidance, but that claim is

---

[58] Defs.' Opp'n to TRO at 8.

[59] OJJ's failure to test children creates an unconstitutional 'increased risk of infection.' Courts have deemed the first prong of the Eighth Amendment's test—an objective element, like the Fourteenth Amendment test—satisfied where the plaintiff has identified a factor responsible for either increasing the risk of contraction or the severity of infection. *See, e.g.*, *Owens v. Trimble*, No. 1:11-cv-01540-LJO-MJS (PC), 2012 U.S. Dist. LEXIS 73292, at *6 (E.D. Cal. May 24, 2012) ('An increased risk of infection may rise to a serious medical need and satisfy the first prong of the Eighth Amendment analysis.'); *see also Plata v. Brown*, No. C01-1351 TEH, 2013 U.S. Dist. LEXIS 90669, at *37 n.10 (N.D. Cal. June 24, 2013) (finding that certain medically groups are at an increased risk of harm from Valley Fever infection and should therefore be excluded from certain prisons).

[60] OJJ COVID-19 Information, La. Office of Juvenile Justice, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 26, 2020) (listing 48 confirmed cases among staff); *see also* Ex. 8, Franco-Paredes Decl. at ¶ 20 ('[W]hen viral tests are conducted among all or most of detainees, these outbreaks are in fact much more extensive.').

[61] Defs.' Opp'n to TRO at 7.

[62] Vassallo Decl., Dkt. 1-5 at ¶ 8; *see also* Ex. 3, Maraynes Decl. at ¶¶ 4, 9 (symptoms of COVID-19 and/or PIMS in children can also include rashes, conjunctivitis, red lips and tongue, gastrointestinal symptoms, chest pain, enlarged lymph nodes, low blood pressure, and rapid heart rate).

based on a single CDC guidance document that has not been updated since March 23 and ignores more recent guidelines.[63] As of May 3, over three weeks ago, the CDC had published guidelines for testing clarifying that, while people *with* symptoms are 'high priority' for testing, people *without* symptoms are also a priority when there has been 'known exposure to an individual who has tested positive' or 'the occurrence of . . . transmission within a specific setting/facility.'[64] The CDC further states, 'Another population in which to *prioritize testing of* minimally symptomatic and *even asymptomatic persons* are *long-term care facility residents*, *especially in facilities where one or more other residents have been diagnosed* with symptomatic or asymptomatic COVID-19.'[65] This more up-to-date CDC guidance plainly indicates that OJJ's secure care facilities, where the children are long-term residents and where other residents have been diagnosed with COVID-19, are populations in which to prioritize testing of minimally symptomatic and asymptomatic persons. Indeed, recent instances of mass testing in Louisiana have revealed that many cases of COVID-19 among people who are incarcerated are asymptomatic.[66] Without knowing how many children have the disease, OJJ cannot implement proper isolation protocol, contact tracing and

---

[63] *See* CDC, 'Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities' (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

[64] CDC, Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited May 26, 2020).

[65] *Id.* (emphases added).

[66] *See, e.g.*, WDSU Digital Team, *Majority of COVID-19 cases in Louisiana prisons that mass test are asymptomatic*, WDSU NEWS (May 22, 2020), https://www.wdsu.com/article/majority-of-covid-19-cases-in-louisiana-prisons-that-mass-test-are-asymptomatic/32634504 ('Louisiana's prison system this week began 'mass testing' at a second state correctional facility. The results show two-thirds of inmates who contracted COVID-19 between two prison facilities the agency considers 'hot spots' tested positive without showing symptoms.'); Janet McConnaughey, *Most women in 1 Louisiana prison dorm have COVID-19*, ASSOCIATED PRESS (May 6, 2020) https://apnews.com/f31d0a19272193a0f461eb96e5c3d23d (155 incarcerated women who displayed *no symptoms* were tested at Elayn Hunt Correctional Center, and an incredible 117—over 75%—tested positive.).

containment, or appropriate medical monitoring.[67] For these reasons, in part, federal courts are recognizing the importance of mass testing in prisons.[68]

Using a Behavioral Intervention ('BI') Room as a medical isolation room also serves no legitimate purpose and unnecessarily exposes children to serious trauma. These rooms are not designed to house sick or recovering children for days at a time; they are 'only intended to be used for very short periods of time for children whose behavior is out of control and pose an imminent harm to others.'[69] Using BI Rooms for medical isolation is equivalent to using solitary confinement for medical isolation, a widely-condemned practice.[70] When Plaintiff-Petitioner I.B. was put in a BI Room after he tested positive for COVID-19, he reported that it was dirty and had no air conditioning.[71] He had no access to running water for two or three days, was unable to bathe or brush his teeth during that time, and received no medical attention.[72] As Glenn Holt states, 'There

---

[67] Ex. 3, Maraynes Decl. at ¶ 10 ('Once a child starts demonstrating symptoms of shock, the current guidelines would be to get three fluid boluses and antibiotics into the patient within the first hour.').

[68] *See, e.g.*, *United States v. Pabon*, No. 17-165-1, 2020 U.S. Dist. LEXIS 78245, at *9 (E.D. Pa. May 4, 2020) ('Correctional facilities that have made the decision to undertake mass testing have discovered dramatically higher numbers of infected inmates than previously imagined. . . . Without mass testing . . . the Court may be getting a false picture.'); *see also United States v. Salley*, No. 19-688, 2020 U.S. Dist. LEXIS 87373, at *17-18 (E.D. Pa. Apr. 28, 2020) ('Mass testing recently undertaken in state jails and prisons reveals the rapid and insidious spread of COVID-19, particularly among asymptomatic incarcerated people.'); *United States v. Mattingley*, No. 6:15-cr-00005, 2020 U.S. Dist. LEXIS 85935, at *9 n.6 (W.D. Va. May 14, 2020) ('[T]he Court [cannot] ignore evidence tending to show that testing may be insufficient in many BOP facilities, either to provide an accurate representation of current cases or to ensure inmate safety in the event of an outbreak.'); *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 87607, at *3 (N.D. Ohio May 19, 2020) (noting 'the obvious need for rapid implementation of mass testing'); *Barbecho v. Decker*, No. 20-cv-2821 (AJN), 2020 U.S. Dist. LEXIS 86350, at *15 (S.D.N.Y. May 15, 2020) ('[P]risons conducting aggressive testing are finding that infection is spreading quickly.') (internal quotation marks omitted).

[69] Ex. 7, Supp. Holt Decl. at ¶ 19 ('OJJ policy requires they be removed from these cells as soon as their behavior no longer poses a threat to others.').

[70] *See generally* David Cloud, Dallas Augustine, Cyrus Ahalt, & Brie Williams, AMEND, The Ethical Use of Medical Isolation – Not Solitary Confinement – to Reduce COVID-19 Transmission in Correctional Settings (Apr. 9, 2020), *available at* https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

[71] A.B. Decl., Dkt. 1-10 at ¶ 8 ('After my son tested positive for COVID-19, they put him in a dirty room at Cypress with no air conditioning. He was in there without water for 2-3 days. There were other children with him who had tested positive for COVID.'); *see also* Holt Decl., Dkt. 1-9 at ¶ 13 ('The Cypress disciplinary wing at the Swanson Center for Youth at Monroe was shut down in 2005 and turned into a short-term crisis intervention unit. They are currently using it for suicide watch as well as reconstituted it as disciplinary lockdown unit.').

[72] A.B. Decl., Dkt. 1-10 at ¶¶ 8, 9, 11.

is no reason that [OJJ] should be putting any children in the BI cells. Those cells are punitive and problematic for children's mental well-being (especially if used for prolonged periods of time). . . . The BI cells should not be part of any medical isolation plan, particularly for kids who are recovering from COVID-19.'[73] Defendants' Opposition does not address the relief Plaintiffs seek regarding the use of BI Rooms for medical isolation. That silence speaks volumes.

While structured education and rehabilitative programming must be adapted to the pandemic, the severe restrictions Defendants put in place serve no legitimate purpose and prevent rehabilitation, the sole purpose of OJJ custody.[74] Defendants admit that children are confined to their dorms 'at all times.'[75] Defendants' vague references to 'worksheets,' 'online assignments,' and 'access to . . . software' are hardly evidence of adequate programming.[76] Rehabilitation services are meant to be individualized, with progressive goals and benchmarks.[77] While it is true that education systems everywhere are being forced to adapt, programming takes on a heightened level of importance when children are trapped in their dorms with nothing to occupy their time. Moreover, the express *purpose* of Plaintiffs' confinement is rehabilitation; therefore, in light of

---

[73] Ex. 7, Supp. Holt Decl. at ¶ 19. OJJ has estimated that approximately 44% of children in secure care have serious mental illness. Oversight of Rehabilitation and Treatment in Secure Care Facilities, Office of Juvenile Justice (June 13, 2018), https://www.lla.la.gov/PublicReports.nsf/64DF5EBB49AE4404862582A40078718D/ $FILE/000194C2.pdf.

[74] 'Rehabilitation requires meeting the needs of kids identified in their individual assessments to the best of your ability.' Ex. 7, Supp. Holt Decl. at ¶ 16.

[75] Defs.' Opp'n to TRO at 10.

[76] *Id.* at 28.

[77] OJJ employs the 'LA MOD' program for every child in its custody, which focuses on individualized services and goal-setting, group and circle work, and family involvement. There are four progressive levels that a child can achieve through the program, most of which depend on group development. OJJ has provided no evidence that any child has been able to move up in levels since the lockdowns began two months ago, which is evidence that the current programming is insufficient to constitute rehabilitation. YS Policy No. B.2.7, *available at* https://ojj.la.gov/wp-content/uploads/2017/09/A.2.7-1.pdf. Even before the pandemic, OJJ had been critiqued by the Louisiana Legislative Auditor for, among other things (1) not having a formalized, evidence-based curriculum and not offering an array of evidence-based programs for the approximately 65% of children housed in general population dorms, and (2) not consistently documenting group therapy sessions and not collecting program participation and completion data for children in specialized treatment programs or vocational programs. Oversight of Rehabilitation and Treatment in Secure Care Facilities, Office of Juvenile Justice (June 13, 2018), https://www.lla.la.gov/PublicReports.nsf/64DF5EBB49AE4404862582A40078718D/ $FILE/000194C2.pdf.

Defendants' concession that rehabilitative services are currently necessarily limited, there is no justification for Plaintiffs' continued detention.

In short, none of the OJJ actions targeted by Plaintiffs' TRO request are rationally related to legitimate governmental purposes;[78] all frustrate the governmental objectives of health, safety, and pandemic control by exposing children to increased and unnecessary risks of harm and trauma.

**C.    Even under the Eighth Amendment Standard, Defendants Are Violating Plaintiff-Petitioners' Rights Because the Subjective Element of the Deliberate Indifference Test Is Satisfied**

Even under the Eighth Amendment standard, which requires an additional element of subjective intent, the evidence demonstrates that Defendants are violating Plaintiffs' constitutional rights because they are—and have been—aware that they are creating unsafe conditions and have failed to remedy those defects.[79] The Eighth Amendment standard for children is more protective than the standard for adults.[80] Conditions may amount to an unconstitutional risk of harm for youth when they would be constitutional for adults; similarly, Defendants have an obligation to be aware of risks to youth when they would have no such obligation for adults. The dire risks of COVID-19, and the recommended means of mitigating those risks, are 'obvious,'[81] and there is now a high

---

[78] Pepper spraying children also serves no legitimate purpose, exposes children to serious physical harm, and inflicts unnecessary trauma. Defendants incorrectly assert that the April 27 memorandum from Interim Deputy Secretary Bickham 'prohibited the carrying of chemical/pepper spray within OJJ's secure care facilities.' Defs.' Opp'n to TRO at 13. The memorandum expressly carves out an exception to the prohibition: 'unless given specific directives from the Regional Director for a specific incident.' Memorandum from E. Dustin Bickham to OJJ Staff (Apr. 27, 2020), Dkt. 7-4. '[E]xposure even to minimal concentrations [of pepper spray]. . . would predispose [children] to nasopharyngeal mucosa irritation that could facilitate novel coronavirus infection and . . . may lead to more severe clinical manifestations of COVID-19.' Ex. 8, Franco-Paredes Decl. at ¶ 23.

[79] *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also, e.g., Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1250 (M.D. Ala. 2017) ('To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.').

[80] *See See Roper v. Simmons,* 543 U.S. 551 (2005)  (holding the death penalty violates the Eighth Amendment for children even though it is constitutional for adults because, as a class, youth are less culpable, more impulsive, and more susceptible to change); *Graham v. Florida,* 560 U.S. 48 (2010) (holding certain life without parole sentences unconstitutional as applied to youth even when constitutional for adults for the same reasons).

[81] '[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004); *see also Cameron v. Bouchard*, 20-cv-10949, Dkt. 93 at 51 (E.D. Mich. May 21, 2020) (finding that the subjective component of deliberate indifference was satisfied because

level of public awareness that patients can be asymptomatic and that mass testing is necessary to fully identify the prevalence of infection, particularly after an outbreak has been identified in a congregate care setting.[82] Moreover, Defendants have expressly been put on notice that their response is both inadequate and dangerous. Advocates sent letters to Governor Edwards regarding the prevention and management of COVID-19 in OJJ's secure care facilities—he never responded, and none of those recommendations have been implemented.[83] Additionally, parents have been contacting Defendants frequently with desperate concerns about their children's well-being.[84]

Moreover, 'correctional officials have an affirmative obligation to protect inmates from infectious disease.'[85] The Fifth Circuit has repeatedly recognized that, even in normal times, unreasonably subjecting detained people to infectious disease constitutes deliberate indifference.[86] The evidence indisputably establishes that Defendants' COVID-19 response is egregiously unsound and poses increasingly grave, unconstitutional dangers to the children in OJJ custody.

## IV.    Plaintiffs Will Suffer Irreparable Injury Absent Emergency Relief

Defendants' argument that Plaintiffs are not suffering irreparable harm ignores the most relevant case law. In the context of infectious disease, it would not matter, for the purposes of

---

'the danger COVID-19 poses . . . is practically common knowledge. . . . the CDC's guidance on how to curb the spread of coronavirus . . . has been the topic of extensive national and local media coverage. . . . [and] Defendants took an immediate and proactive response to the COVID-19 pandemic to curb an outbreak').

[82] *See supra*, note 68.

[83] *See* Letters to Governor Edwards, Dkt. 1-11.

[84] *See, e.g.*, A.B. Decl., Dkt. 1-10 at ¶ 6 ('[I] told [my son's case worker's supervisor] that I was worried that my son was in danger. . . . I told him I was worried that the boy who used the phone after my son had gotten the virus from him. . . . I told him they should test everybody in the facility.').

[85] *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996).

[86] *See, e.g.*, *Gomez v. Warner*, 39 F.3d 320 (5th Cir. 1994) (per curiam) (prisoner alleged deliberate indifference by prison officials where the prison's razor-swapping program created the mere 'risk' of 'possible spread' in the transmission of deadly 'infectious diseases such as HIV, AIDS, and hepatitis.'); *Johnson v. Epps*, 479 F. App'x 583, 589-92 (5th Cir. 2012) (allegations that inmate was exposed to 'serious, communicable diseases' and that prison officials were aware of the risk and did nothing to prevent it were sufficient to state a claim for violation of Eighth Amendment rights); *Gates v. Collier*, 501 F.2d 1291, 1300-03 (5th Cir. 1974) (affirming district court's holding that allowing '[s]ome inmates with serious contagious diseases . . . to mingle with the general prison population,' alongside maintaining a host of other unsanitary and inhumane conditions, 'constitute[d] cruel and unusual punishment').

irreparable harm, if not a single child in OJJ custody had yet contracted COVID-19. The Eighth

Amendment 'require[s] a remedy' where jailors knowingly expose their charges to a risk of

contracting serious infectious diseases, even if 'it was not alleged that the likely harm would occur

immediately and even though the possible infection might not affect all of those exposed.'[87] Here,

28 children have already tested positive, and it is highly likely that many more are asymptomatic.

Additionally, independent of the health risks of COVID-19, every day that children are

confined in OJJ custody without sufficient programming to provide rehabilitative services

contravenes the purpose of their detention and violates their Fourteenth Amendment rights.

## V.    Defendants Will Not Be Harmed by the Relief Sought, and the Public Interest Will Be Served

Despite Defendants' suggestions to the contrary, the requested relief would actually lessen

the burden on OJJ and better protect its staff. Furloughs or releases would mean fewer children to

care for, which would help maintain an appropriate staff ratio without an over-reliance on

probation and parole officers who are not appropriately trained to work with children in OJJ

facilities. Providing appropriate structured programming would also not overly burden

Defendants. Other juvenile justice facilities have adapted their curricula to a virtual setting,[88] just

as schools and universities in the outside community have been forced to do. Finally, OJJ already

has as many as 150 COVID-19 tests and would not be unduly burdened by administrating those

tests to children—or by requesting additional tests. Identifying all positive cases among the

children would allow the facilities to implement appropriate releases, isolations, and quarantines

and reduce the risk of transmission to other children and to staff. OJJ cannot simply ignore the

---

[87] *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

[88] *See, e.g.*, Ex. 7, Supp. Holt Decl. at ¶ 8 ('During this pandemic, we are able to maintain educational services in Arkansas because we use online schooling called Virtual Arkansas. This allows the children to continue to receive individualized educational services and allows those who are on-track to continue to progress timely towards getting their high school diploma or GED, while maintaining social distancing.').

possibility of rampant infection by refusing to test in order to keep the number of confirmed cases artificially low. This reckless tactic audaciously contravenes the public interest.

Moreover, as Defendants acknowledge, '[t]he first two [TRO] factors are most critical.'[89] Because Plaintiffs are likely to succeed on the merits and suffering irreparable, ongoing injury that threatens their lives, emergency relief is warranted.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that this Court grant their motion for temporary restraining order.[90]

Respectfully submitted this 27th day of May, 2020.

*/s/ Mercedes Montagnes*

Mercedes Montagnes, La. Bar No. 33287
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy**
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Marsha Levick, *pro hac vice*
Jessica Feierman*
Karen U. Lindell*
JUVENILE LAW CENTER
1800 JFK Boulevard, Suite 1900A
Philadelphia, PA 19103
Telephone: (215) 625-0551
Email: mlevick@jlc.com

Stuart Sarnoff, *pro hac vice*
Lisa Pensabene**
Laura Aronsson, *pro hac vice*
Mariam Kamran, *pro hac vice*
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Email: ssarnoff@omm.com

Brandon Amash, *pro hac vice*
O'MELVENY & MYERS LLP
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Email: bamash@omm.com

John Adcock

Benjamin Singer, *pro hac vice*

---

[89] Defs.' Opp'n to TRO at 14 (citing *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016)).
[90] If the Court believes that the factual findings and recommendations of an epidemiology expert with extensive experience evaluating correctional facilities stricken by COVID-19 would be helpful, Dr. Franco-Paredes is available and willing to do a site inspection of any or all of the OJJ facilities. Ex. 8, Franco-Paredes Decl. at ¶ 26.

La. Bar No. 30372
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Telephone: (504) 233-3125
Email: jnadcock@gmail.com

David Lash, *pro hac vice*
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6000
Email: dlash@omm.com

Jason Yan, *pro hac vice*
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Email: bsinger@omm.com

*Attorneys for Plaintiffs*

*Pro hac vice* pending
**Pro hac vice* to be submitted

## CERTIFICATE OF SERVICE

I, Nishi Kumar, an attorney, hereby certify that on May 27, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system.

I further certify that I, or another one of Plaintiffs' attorneys, will promptly electronically serve a copy of the same, along with all other pleadings and papers filed in the action to date to the General Counsel for the Louisiana Office of Juvenile Justice, the General Counsel for the Louisiana Governor, and the Louisiana Department of Justice Director of Litigation via email.

/s/ *Nishi Kumar*
Nishi Kumar, La. Bar No. 37415

20