# SUPPLEMENTAL DECLARATION OF GLENN HOLT

I, Glenn Holt, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I have 26 years of experience in senior level public administration and policy in the juvenile and criminal justice fields. I have worked for the government at the state, county/parish, and city level. I worked for the Louisiana Office of Juvenile Justice in its previous iteration from 2005 to 2009. I was the Director of the Swanson Center for Youth in Monroe from 2005 to 2007 and a Deputy Assistant Secretary of OJJ from 2007 to 2009. I then worked for the City of New Orleans from 2010 to 2016. I went back to work at OJJ in 2016 and was a Deputy Assistant Secretary/Assistant Secretary/Regional Director from 2016 to 2019. I am currently the Deputy Director for the Arkansas Division of Youth Services. I have also worked as a Treatment Manager for the Iowa Department of Corrections and the Director of the Polk County Juvenile Detention Center. I have been certified as a juvenile justice expert before courts in Louisiana. I have testified on behalf of the Iowa Department of Corrections in federal court.

2. I have first-hand knowledge of policy-making procedures at OJJ and the pandemic policy in particular. At OJJ, I have worked with facility directors to institute the Missouri model[1] that was mandated under a federal consent decree. I was responsible for writing policy and procedure at both the facility level and at the OJJ level. When I was Assistant Secretary, I drafted and approved policies and procedures and made edits to existing policies as necessary, including the emergency operations plan and the pandemic policy. I was the point of contact for the Department of Homeland Security. After the last major flu outbreak, I wrote the facility and agency policy for how we would respond to the next type of pandemic outbreak. It has been updated since, but I have reviewed the most recent version dated December 11, 2019,[2] and very little has changed from the version I drafted. In Arkansas, we updated our pandemic policy using the interim guidance specific to correctional facilities from the Centers for Disease Control ("CDC")[3] as well as guidance from the Arkansas Department of Health. We mandated that the companies we contract with that directly run the juvenile facilities update their policies in accordance with our updated policy. It does not appear that OJJ has updated its policies to implement the CDC guidance. For example, the facilities should be asking all staff and children a set of diagnostic questions about general health, including cough, fever, and other COVID-related symptoms on a daily basis. OJJ should be getting reports on all testing numbers from each facility. Any staff that has a temperature of 100 degrees or more should be denied entrance to the facility. If anyone has

---

[1] The Annie E. Casey Foundation, The Missouri Model: Reinventing the Practice of Rehabilitating Youthful Offenders, (Jan. 1, 2010), https://www.aecf.org/resources/the-missouri-model/
[2] Office of Juvenile Justice, Influenza Preparedness, Response and Recovery A.1.13, (December 11, 2019), *available at* https://ojj.la.gov/wp-content/uploads/2020/01/A.1.13.pdf.
[3] CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

traveled within the last 14 days, they should be denied entrance to the facility. If anyone has had contract with anyone with COVID or who has been suspected to have COVID, they should be denied entrance to the facility. It is OJJ's job to keep all staff and children across all its facilities safe. According to their written policy, OJJ does not require any of these measures.

3. Within the facilities, there should be twice daily temperature checks and general questions (cough, any other symptoms) for every child. If symptomatic at all, the facility should be in contact with the Department of Health and set up a medical assessment. If at all possible, every child that has come into contact with another child or staff member that tests COVID positive should be tested because we know that many people are asymptomatic carriers.[4] I would also test all staff who had been on the unit where the infected person was within the last 2-4 days. In Arkansas, for example, we had a child in a mental health hospital where a youth later tested positive (along with six others). Even though the child in our custody had been transferred out of the hospital 8 days earlier and was at a group home and had no symptoms, we managed to get him tested.

4. None of the four secure care facilities in Louisiana is designed to handle more than three or four children in the infirmary. The infirmaries are all bare minimum, open bay, with three or four beds and staff need to be inside to supervise. Swanson and ACY each have one negative pressure room but you can only put one patient there. There are only one or two nurses (a mix of RNs and LPNs) per shift at each facility. There is not enough PPE to manage an outbreak in any of the facilities based on the nature of COVID, even if they had were stockpiled according to the pandemic policy.

5. For any youth that are at risk because of underlying medical conditions – including hypertension, severe obesity, asthma[5] – in accordance with CDC guidelines I would increase medical surveillance (i.e. take their blood pressure every couple of hours) and make sure their medical management was in place in the instance they test positive for COVID. I would arrange necessary transport to the appropriate hospital for higher level care of treatment if it became necessary.

6. Per its pandemic policy, OJJ should have started with the assumption that the facilities will not be fully staffed and will lose approximately 30-40% of staff due to illness or illness in their family.[6] Because of high turnover and use of sick leave, OJJ's relief factor is almost 2:1, meaning for every guard assigned to a scheduled shift you need approximately two employees available to cover that shift. OJJ was already severely understaffed at all four

---

[4] CDC, "Clinical Presentation in Children," https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html (last visited May 7, 2020).

[5] CDC, "At Risk for Severe Illness," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 7, 2020).

[6] Office of Juvenile Justice, Influenza Preparedness, Response and Recovery A.1.13, (December 11, 2019), available at https://ojj.la.gov/wp-content/uploads/2020/01/A.1.13.pdf.

facilities prior to the COVID outbreak.[7] Under normal circumstances, there are two staff per dorm. Staff take children to and from wherever they need to go, including to and from the infirmary and to and from the social worker.

7. It would be highly difficult to ensure social distancing within the dorms if they are used for quarantine or isolation. For example, in the dorms on the second floor of Bridge City Center for Youth, the beds are six feet apart. Therefore, for effective social distancing, you must ensure that the children stay on their beds at all times. The bathrooms are shared and would need to be individually sanitized between uses. It is impossible for staff to stay six feet away from the children and perform their jobs, putting both the staff and children at risk.

8. During this pandemic, we are able to maintain educational services in Arkansas because we use online schooling called Virtual Arkansas. This allows the children to continue to receive individualized educational services and allows those who are on-track to continue to progress timely towards getting their high school diploma or GED, while maintaining social distancing. OJJ should make every effort to keep schedules and programming as normal as possible amidst the pandemic and in compliance with CDC guidelines. Instead, OJJ shut down all their schooling and programming. Children have poor impulse control and get bored very easily. Levels of horseplay become higher and could turn into fights, especially if staff are also bored. You can breed lazy practices and high incidents of physical altercations between kids that is driven more by boredom than anything else. If possible, I would only isolate the dorms that need to be quarantined or isolated and let the other dorms run as normal – you want to maintain normalcy as much as possible with increased sanitation practices. If programming and school are not being provided, there is really no point of holding the children in the facilities.[8]

9. OJJ's first and continued response should have been to shrink the campuses as much as possible to protect children and staff. They should look at getting anyone within 30-45 days of release out early, look at doing furloughs (that are available for up to 30 days),[9] and identify anyone with an upcoming court review. If they had shrunk the size of the campuses, they could have lessened the likelihood of having COVID positive patients in those facilities

---

[7] Performance Audit Services, Oversight of Safety in Secure Care Facilities ("Safety Audit") (June 6, 2018), https://www.lla.la.gov/PublicReports.nsf/64DF5EBB49AE4404862582A40078718D/$FILE/000194C2.pdf ("Staffing challenges, such as high turnover, make it difficult for OJJ to maintain required staff to youth ratios, which affects the overall safety of the facilities.").

[8] Office of Juvenile Justice, "Secure Care Handbook for Parents," (Sept. 13, 2017), *available at* https://ojj.la.gov/wp-content/uploads/2017/09/SecureCareHandbookforParents_13September2017.pdf ("Youth in secure care receive a variety of treatment and rehabilitative services designed to help them learn to make better choices, provide life skills and prepare them for release. OJJ's goal is to help your son learn the life skills needed to become a law-abiding, productive citizen.").

[9] Office of Juvenile Justice, Furlough Process C.4.1, (July 11, 2017), *available at* https://ojj.la.gov/wp-content/uploads/2018/07/C.4.1.pdf

at all. Now that COVID is inside the facilities, shrinking the campuses minimizes the potential spread and the impact on operations. The Governor could instruct OJJ to effect widespread releases in a rational way. Any child who is furlough eligible should be furloughed after making sure the home they would go to does not pose a COVID risk to the child (which can be assessed virtually). If they test every child before they came back to the facility, no home evaluation is necessary. I would also prioritize furloughing any children that are at risk medically if they got COVID – including kids with a history of asthma or who are obese. There are adolescents who have died and their condition can turn very quickly. They need a higher level of medical care than can be provided at any of the facilities. Acadiana is in Bunkie and very far from any advanced life support facility – almost an hour. Swanson Center in Columbia is at least twenty or thirty minutes from a hospital. Shrinking the campus through early releases and furloughs ensures the health of any children and the staff that remain.

10. It is extremely important that family members and children in facilities have high levels of frequent contact right now, preferably visual contact. This manages the level of anxiety and fear on both ends.[10] Children should be allowed to have multiple phone calls a week and it should be switched over to a non-paid phone system. Case managers have direct lines that children can use to reach their family members as well. OJJ should make sure family members and children could have face-to-face video visitation as much as possible. Video conference capabilities already exists at all the facilities and at all the regional offices. OJJ can assist parents in setting up Zoom calls for any parents that have that capability. In Arkansas, we upped installation of TV monitors so that we could use Zoom for visitation and said children and parents can get as many phone calls as they want. I want parents to have connection to their child.

11. Information-sharing and transparency is key during a pandemic and should be built into OJJ's COVID response. Facility directors need to have the authority to answer direct questions from family members about their children and their medical status and what is happening at the facility, subject to any operational concerns. Facility directors should be accessible to parents. We have a responsibility and duty to be transparent with family members during this time and help them maintain their connection to their children.

12. OJJ's response to COVID-19 has put the children in their custody at risk of serious medical complications, including death. One of the most troubling responses is the level of force that is being used by officers – specifically probation officers – against children. For example, the

---

[10] Office of Juvenile Justice, "Secure Care Handbook for Parents," (Sept. 13, 2017), available at https://ojj.la.gov/wp-content/uploads/2017/09/SecureCareHandbookforParents_13September2017.pdf ("Support and visitation by family members are very important to your son's well-being. Your visits can motivate and inspire him to participate in programming and meet the goals of his treatment plan, which may result in an earlier release date. You can make a difference for your son. Your visits show that you care and that he has not been forgotten. While visiting, you will be able to meet with staff to discuss your son.").

4

use of pepper spray was immediately removed from the juvenile facilities and the future use of pepper spray prohibited back in 2003 and 2004 and has been prohibited ever since. It is not present in the OJJ disciplinary policy for facilities and there are no guidelines on its use.[11] Pepper spray is being used against children in response to horseplay and fights[12] – it is the first thing that the probation officers that are filling in for regular OJJ staff are using. The probation officers were authorized to carry pepper spray into the facilities by OJJ in an internal memo on March 17, 2020. They have never worked in a facility unless ordered to work in a facility. They have been given no training on how that role is different from supervising people in the community. The use of pepper spray under these circumstances could be lethal. It irritates the wet, mucus things in your body[13] – the wettest being the lungs. If a child who is pepper sprayed is COVID positive and hasn't been tested, you are inhibiting their ability to breath and could kill them. OJJ knows this has become a problem because in another internal memo dated April 27, the Interim Secretary said officers could no longer bring pepper spray into the facilities but that its use is still permitted if needed. Per the threat force continuum, probation officers can also use pressure points and handcuffs. OJJ has no lethal use of force policy for when they can pull their weapons or pepper spray and when it would be appropriate to discharge those weapons. Probation officers are trained to use a higher level of force than the usual OJJ staff. They are going into facilities with access to deadly weapons that they have no policy on how to use in those facilities. Instead of figuring out how to prevent an incident like the riot at Bridge City from happening again, the probation officers are using potentially harmful reactive measures inside the facilities that staff are usually prohibited from using.

13. OJJ uses Safe Crisis Management[14] and the first step is to recognize escalation of activities that could lead to a bad outcome, and then redirect the child in a non-tactical way and then guide with physical hand techniques that restrain movement. Restraint is only to be used when necessary to prevent the imminent threat of physical harm to the child (such as self-mutilation) or to others. You have to get approval verbally from shift supervisor before you move up to a higher level on the use of force continuum.[15] None of the facilities, besides Acadiana, are built for room confinement. The Cypress disciplinary wing at the Swanson Center for Youth at Monroe was shut down in 2005 and turned into a short-term crisis intervention unit. They are currently using it for suicide watch as well as reconstituted it as disciplinary lockdown unit. After the riot, OJJ moved children from Bridge City to Swanson

---

[11] Office of Juvenile Justice, Use of Interventions – Secure Care C.2.6, (August 13, 2018), available at https://ojj.la.gov/wp-content/uploads/2019/08/C.2.6.pdf
[12] "Riots, escapes and pepper spray: Virus hits juvenile centers," 4WWL, (May 3, 2020), available at https://www.wwltv.com/article/news/health/coronavirus/riots-escapes-and-pepper-spray-virus-hits-juvenile-centers/289-e52aa1ea-5680-47eb-a8c5-4c62af60cd4e
[13] National Capital Poison Center, "How Dangerous is Pepper Spray," https://www.poison.org/articles/how-dangerous-is-pepper-spray-201 (last visited May 7, 2020).
[14] Office of Juvenile Justice, Use of Interventions – Secure Care C.2.6, (August 13, 2018), available at https://ojj.la.gov/wp-content/uploads/2019/08/C.2.6.pdf
[15] Office of Juvenile Justice, Use of Interventions – Secure Care C.2.6, (August 13, 2018), available at https://ojj.la.gov/wp-content/uploads/2019/08/C.2.6.pdf

   in a bus in order to lock them down without considering the transfer of infection between the two facilities and community spread, in accordance with CDC guidelines. The CDC guidelines say transport should only happen if necessary for medical isolation and quarantine, not for disciplinary purposes.[16] If I absolutely had to transfer children in the Arkansas facilities right now in order to ensure their safety and well-being, I would make sure that none of the children were COVID-positive before transferring.

14. I have reviewed internal OJJ guidance, including the "Emergency Plan COVID19" dated March 2020, the "Coronavirus Quarantine and Isolation Instructions" circulated on March 23, 2020, and the "Updated Isolation Instructions" circulated on March 31, 2020. None of them impact my opinion as to the insufficiency of OJJ's response and the risk that it poses to kids who are confined in the facilities. First of all, there is still no information that they have released or furloughed kids to shrink the campuses in an effort to keep both the children and staff.[17] That should have been their number one response and top priority. That was one of the first conversations we had in Arkansas. OJJ already knows who is furlough-eligible because it is discussed at every quarterly staffing meeting.[18] They also already know who is eligible for early release[19] and could have put into place a process to file motions to modify using specific criteria (such as SAVRY, offense, programming, etc.). In a matter of days, they could have had a prioritized list and started transferring kids home to keep both kids and staff safer.

15. None of their guidance adequately address sanitation, which is crucial to prevent against cross-contamination.[20] It is good that they have signs reminding kids to wash their hands, but there is nothing to ensure the living areas are clean. I have walked through each of these facilities and things have frequently appeared dirty and unsanitary. If staff wasn't doing a good job of maintaining them before and making sure the living areas sanitary, I assure you they aren't doing it now without proper guidance and oversight. For example, usually the kids shower two at a time (in separate stalls), that should be changed to one at a time and the bathrooms and all surfaces would need to be completely sanitized before the next group of kids comes in. Staff would either need to do the disinfecting or be directed to give the kids cleaning products and instruct them to wipe everything down thoroughly after they finish.

---

[16] CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[17] With one exception – the Updated Isolation Instructions indicate that one single child was "on furlough for quarantine because of COVID symptoms."
[18] Office of Juvenile Justice, Youth Classification System and Treatment Procedures B.2.2, (April 8, 2019), available at https://ojj.la.gov/wp-content/uploads/2019/08/C.2.6.pdf
[19] Office of Juvenile Justice, Youth Classification System and Treatment Procedures B.2.2, (April 8, 2019), available at https://ojj.la.gov/wp-content/uploads/2019/08/C.2.6.pdf
[20] CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

16. The March 23, 2020 guidance confirmed that the "Quarantine Youth" are remaining in their dorms "at all times" with the exception of some limited outdoor recreation time. Rehabilitation requires meeting the needs of kids identified in their individual assessments to the best of your ability. It includes mental health care, group therapy, individual therapy, tailored education, and interventional programs such as "Thinking for a Change," "Healthy Masculinity," and "Anger Management-Cage Your Rage."[21] OJJ uses an overall behavioral management program called LAMOD, tailored to youth in Louisiana, where kids work their way up through phases of: (1) Orientation; (2) Emerging—Self Awareness; (3) Adaptation—Applying Skills; and (4) Transformation—Role Model and Leadership. The program depends on youth and staff small-group interaction, with family and peer involvement.[22] If kids aren't able to move up the stages, they aren't getting the rehabilitation that they need as per OJJ's own theory of change. OJJ is not providing educational services and programming at a level that is sufficient to provide the children with any rehabilitation, and I wouldn't be surprised if some of the kids started to backslide in the progress that they had made as a result.[23] Initially, OJJ continued running in-person school, but that was shut down by at least March 23, 2020, when everyone went into dorm lockdown. Nothing suggests that they are using remote education, like we are in Arkansas. They are not trying to provide any teletherapy or remote group programming. OJJ is required to provide education and rehabilitative services. The agency's top priority to the children should have been to maintain as much normalcy, education, and programming as safely as possible under the circumstances.

17. Based on my extensive first-hand knowledge of the four secure care facilities, the Updated Isolation Instructions circulated on March 31, 2020, do not provide for the safety and well-being of children that are being held in those facilities. First of all, the instructions do not even reference or provide guidance for use of the Cypress disciplinary wing at Swanson Monroe, which we know is being used for disciplinary lockdown as well as medical isolation for kids who tested positive for COVID-19. The instructions contemplate using three of the four Holly units and have up to 12 children per unit – those who tested negative in A, those who are awaiting test results in C, and those who are positive in D. To date, there is only 1 out of the 29 kids who were tested that tested negative – so it is more accurate that they are holding kids who have not been tested but that they are presuming to be negative in A. The Holly units have separate entrances and exits, but their ventilation systems are shared. The units themselves are just open bays and would not allow for 12 children to have adequate social distance during any recreation. The plan also contemplates using the Mimosa unit,

---

[21] Office of Juvenile Justice, "Treatment Services," https://ojj.la.gov/serving-youth-families/youth-in-secure-care-facilities/treatment-services/ (last visited May 24, 2020).
[22] Office of Juvenile Justice, LAMOD Staff Manual, 4th ed. (2017), available at https://ojj.la.gov/wp-content/uploads/2017/09/A.2.7-1.pdf ("LAMOD is the catalyst that drives the therapeutic process in Louisiana's secure care facilities. LAMOD is a youth-centered treatment philosophy upon which the culture is in OJJ secure care facilities is built, and in which staff provides a learning environment for the youth to grow and develop.").
[23] Office of Juvenile Justice, "Educational Services," https://ojj.la.gov/serving-youth-families/youth-in-secure-care-facilities/educational-services/ (last visited May 24, 2020).

which was previously shut down and all the beds were removed. The instructions say that Mimosa is a "fully functional dorm," but as of July or August of 2019, that unit was not at all functional, did not have a fence, and needed work on the HVAC system. The only way to put 24 cots in Mimosa that are six feet apart would be to have beds upstairs and downstairs, which would leave no room for recreation.

18. Acadiana Center for Youth has 6 dorms but is only operating 3 of them. If you spread the kids across the additional dorms (which would allow them to better practice social-distancing), you would need additional staff. The instructions do not contemplate using those empty dorms as-needed for medical isolation or quarantine and instead have kids awaiting test results in the infirmary. That means that any kids who get hurt or need medical attention can't go to the infirmary without the risk of COVID-19 exposure.

19. Bridge City Center for Youth has designated the "BI" (Behavioral Intervention Rooms) for children who "tested negative for COVID/7 days if symptom free." First of all, there is no justification for why kids who have tested negative need to be isolated from other children who are presumed negative. Furthermore, there is no reason that they should be putting any children in the BI cells for medical isolation purposes. Those cells are punitive and problematic for children's mental well-being (especially if used for prolonged periods of time) and are only intended to be used for very short periods of time for children whose behavior is out of control and they pose an imminent harm to others. OJJ policy requires they be removed from these cells as soon as their behavior no longer poses a threat to others.[24] The notes indicate that maybe these are being used as a type of "step-down" unit for kids who previously tested positive for COVID-19 and are now testing negative or not showing symptoms. The BI cells should not be part of any medical isolation plan, particularly for kids who are recovering from COVID-19, and children who are testing negative (on the assumption that they will even be doing testing) should be returned to their dorm. The chapel has been designated for up to 40 kids who would need to be quarantined if they leave the facility and come back but it does not have the capacity for 40 kids to practice social distancing and also have recreation space. There are no showers or toilets in the chapel itself.

20. I have reviewed on several occasions the two reports issued by the Louisiana Legislative Auditor after their most recent audit of the OJJ secure care facilities – the Oversight of Rehabilitation and Treatment in Secure Care Report[25] and the Oversight of Safety in Secure

---

[24] Office of Juvenile Justice, Behavior Intervention Rooms B.2.21 (May 31, 2019), https://ojj.la.gov/wp-content/uploads/2019/06/B.2.21.pdf ("Staff shall never use a BI room for discipline, punishment, administrative convenience, retaliation, staffing shortages, or reasons other than a temporary response to behavior that threatens immediate harm to the youth or others.").
[25] Performance Audit Services, Oversight of Rehabilitation and Treatment in Secure Care Facilities ("Rehabilitation Audit"), (June 13, 2018), https://lla.la.gov/PublicReports.nsf/71C88F049AA3563A862582AB0075C861/$FILE/00019598.pdf

8

   Care Facilities Report.[26] There are multiple findings in those audits that exacerbate the risk to the safety and well-being of children in secure care due to OJJ's COVID-19 response. OJJ staff, which included myself at the time, were provided with the Legislative Auditor's findings and recommendations and were asked to respond. I have addressed just a few examples of those findings.

21. First, OJJ consistently has issues with staffing practices such as staff-to-youth ratios and turnover rates, which directly impact staff ability to monitor youth, maintain safety, and provide quality interactions. The Legislative Auditor found that Bridge City had a turnover rate of 62.3% and Swanson Monroe and Swanson Columbia had a turnover rate of 30.6%.[27] High rates of staff turnover can destabilize a facility, contributing to misbehavior and violence. Bridge City has seen frequent turnover in Juvenile Justice Specialist Positions, as well as facility director and other management positions.[28] Because of difficulties with recruitment and retention, the Secure Care facilities are not always compliant with the staffing ratios required by the federal Prison Rape Elimination Act (1:8 staff to youth during waking hours and 1:16 staff to youth during sleeping hours).[29] The high turnover rates and inadequate staff-to-youth ratios have been exacerbated during COVID-19, particularly since at least 41 staff members have tested positive for COVID-19.[30] Rather than fill in these staffing shortages with probation and parole officers who are not trained to work with youth in secure care facilities, OJJ should have identified and moved to release and furlough as many youth as possible so that less staff are needed in the facilities to maintain adequate staff-to-youth ratios.

22. Second, OJJ has been on notice of the need to reduce the use of room confinement, solitary confinement, isolation, and seclusion, which is currently being employed across all four of the facilities in their COVID-19 quarantine and isolation instructions. Room confinement is defined as any time a youth is physically or socially isolated from other youth.[31] Nationally, juvenile justice agencies have been moving away from using room confinement, and 10 states have banned punitive solitary confinement. Research has shown that putting youth in confinement has negative public safety consequences, does not reduce violence, and may actually increase recidivism. It has also shown that facilities that use minimal room confinement are safer and have healthier staff to youth relationships, which lead to reduced recidivism rates.[32] Swanson-Monroe has restarted housing children in the individual cells in the previously-closed Cypress unit for both disciplinary and medical purposes. Bridge City is bafflingly using its Behavior Intervention rooms to confine children who have tested

---

[26] Performance Audit Services, Oversight of Safety in Secure Care Facilities ("Safety Audit"), (June 6, 2018), https://www.lla.la.gov/PublicReports.nsf/64DF5EBB49AE4404862582A40078718D/$FILE/000194C2.pdf
[27] Safety Audit at 4-7.
[28] Safety Audit at 4-5.
[29] Safety Audit at 6.
[30] Office of Juvenile Justice, OJJ COVID-19 Information, https://ojj.la.gov/ojj-covid-19-information/ (last visited May 25, 2020).
[31] Safety Audit at 14.
[32] Safety Audit at 14.

negative. The Legislative Auditor found that OJJ does not collect room confinement information in a way that is easily aggregated and analyzed, and that the room confinement paperwork is not always been completed accurately and honestly[33] which is particularly problematic in light of their quarantine and isolation instructions to use those rooms for purposes other than temporary behavioral intervention.

23. OJJ's COVID-19 response includes 23-hour a day dorm isolation and suspension of educational and rehabilitative services and programming. This is problematic for the rehabilitation of all children, and specifically so for the approximately 44% of children that OJJ has estimated have serious mental illnesses.[34] Even before the suspension of services, the Legislative Auditor found that at least 65% of children in the facilities were housed in general population dorms and were not being provided with individualized, evidence-based services.[35] "Programs and services are considered evidence based when they have demonstrated effectiveness through scientific research and evaluation. Both research and field experience show that implementing evidence-based programs and services with fidelity correlates to reduced recidivism and improved outcomes for youth. National best practices recommend that juvenile justice agencies fund services shown to reduce recidivism. Best practices also state that youth should participate in life skills programs that use an established curriculum and that staff implement the curriculum consistently.[36] The Legislative Auditor found that the group therapy sessions that were provided to the kids before COVID-19 did not have a standard structure, that there was no requirement that the services be evidence-based, that some staff were not prepared and chose the topic once the group started, and that some topics seemed unrelated to treatment.[37] Furthermore, OJJ does not consistently document group therapy sessions for all dorms, preventing OJJ from monitoring what services the kids are receiving and how consistently they are receiving them.[38] Even before COVID-19, data showed that on average the kids were only being provided with a group therapy session on 44% of the days they were in secure care.[39] OJJ also does not collect adequate documentation on the therapy sessions.[40] This lack of evidence-based services and standardized group therapy, as well as the lack of documentation, is particularly problematic in light of COVID-19 when these unstructured group therapy sessions are hypothetically the ONLY method of rehabilitation that OJJ may claim they are still offering ad-hoc.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

Signature:

---

[33] Safety Audit at 15.
[34] Rehabilitation Audit at 9.
[35] Rehabilitation Audit at 11.
[36] Rehabilitation Audit at 12.
[37] Rehabilitation Audit at 12.
[38] Rehabilitation Audit at 13.
[39] Rehabilitation Audit at 13.
[40] Rehabilitation Audit at 13.

<u>/s/ Glenn Holt</u>

May 26., 2020