# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| J.H., by and through his mother and next friend, N.H.; I.B., by and through his parents and next friends, A.B. and I.B., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs-Petitioners,<br><br>-against-<br><br>JOHN BEL EDWARDS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF LOUISIANA; THE LOUISIANA OFFICE OF JUVENILE JUSTICE; EDWARD DUSTIN BICKHAM, IN HIS OFFICIAL CAPACITY AS INTERIM DEPUTY SECRETARY OF THE LOUISIANA OFFICE OF JUVENILE JUSTICE; JAMES WOODS, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE ACADIANA CENTER FOR YOUTH; SHANNON MATTHEWS, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE BRIDGE CITY CENTER FOR YOUTH; SHAWN HERBERT, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT MONROE; and RODNEY WARD, IN HIS OFFICIAL CAPACITY AS THE DEPUTY DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT COLUMBIA,<br><br>Defendants-Respondents. | CIVIL ACTION NO. 3:20-cv-00293-JWD-EWD<br><br>CLASS ACTION |

## THE LOUISIANA OFFICE OF JUVENILE JUSTICE DEFENDANTS'[1] RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

---

[1] Filed on behalf of Defendants-Respondents The Louisiana Office of Juvenile Justice ("OJJ"), Edward Dustin Bickham, James Woods, Shannon Matthews, Shawn Herbert, and Rodney Ward (collectively "Defendants").

The procedures of The Louisiana Office of Juvenile Justice ("OJJ") are working effectively to reduce and eliminate the risk of COVID-19 within OJJ's secure care facilities. Only 28 of the individuals in OJJ's secure care facilities (the "Youth") have been diagnosed with COVID-19. All 28 Youth have recovered. Currently, there are no confirmed or suspected cases of COVID-19 among the Youth in any of OJJ's secure care facilities. There is no emergency condition within OJJ's secure care facility. Plaintiffs' Emergency Motion for Temporary Restraining Order Seeking Immediate Furlough (Doc. No. 7, the "Motion") – offering little to no proof of Plaintiffs' claims beyond unsworn declarations of hearsay and speculation[2] – is unfounded and should be denied.

Plaintiffs' Motion is due to be dismissed for any one, and certainly all, of the following reasons:

- Plaintiffs are not likely to succeed on the merits of their claims on multiple grounds:

    o Plaintiffs failed to exhaust administrative remedies before filing suit as required by the Prison Litigation Reform Act;

    o Plaintiffs' invocation of the relaxed "objectively unreasonable" liability standard is misplaced;

    o Plaintiffs do not (and cannot) demonstrate Defendants acted with deliberate indifference in response to the COVID-19 pandemic; and

---

[2] Hearsay can be considered in a preliminary injunction motion; however, once received, "the question of how much weight an affidavit will be given is left to the trial court's discretion and the quality of the affidavit will have a significant effect on this determination." 11A Wright & Miller, *Fed. Practice & Procedure* § 2949 (3d ed. 2016). As such, "when the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction." *Id.* The Fifth Circuit and its district courts "have shown appropriate reluctance to issue such orders where [as here] the moving party substantiates his side of a factual dispute" with only hearsay or speculation. *Marshall Durbin Farms, Inc. v. National Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971) (reversing trial court's order granting injunction) (cited in *Fed. Practice & Procedure* § 2949, *supra*).

While Plaintiffs' evidence at this stage may not be required to demonstrate entitlement to summary judgment, Plaintiffs must still present a prima facie case based upon standards of substantive law to demonstrate entitlement to injunctive relief. *See Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). This, Plaintiffs have failed to do.

- o Plaintiffs cannot succeed on their claims for alleged deprivation of education and rehabilitation services because those claims are not legally or factually cognizable;

- Plaintiffs fail to establish a substantial threat of irreparable injury if the injunction is denied;

- The certain and immediate harm to Defendants if the injunction is granted outweighs Plaintiffs' speculation of potential injury if the injunction is denied; and

- The public interest is served if the Motion is denied.

## FACTUAL BACKGROUND

### A. OJJ's prevention and treatment program has been effective.

Beginning with the end in mind—OJJ's rapid, thoughtful, and evolving response to COVID-19 (described in detail below) is working. OJJ has had a total of only 28 confirmed COVID-19 cases at its secure care facilities. All 28 of the Youth who tested positive fully recovered without need for hospitalization and without any symptoms beyond mild fever. There are currently no Youth within OJJ's secure care facilities with a confirmed or suspected case of COVID-19. Affidavit of Denise Dandridge, attached as Exhibit A, at ¶¶ 31, 41–43.

The first suspected case of COVID-19 within OJJ's secure care facilities was identified on March 20, 2020; that Youth tested negative for COVID-19. The first confirmed case within OJJ's secure care facilities occurred on March 22, 2020. The timeline of confirmed cases is as follows:

| Date | March | | | | | | | | | | April | | | | | | | | | | | |
|------|----|----|----|----|----|----|----|----|----|----|---|---|---|---|---|---|---|---|---|----|----|----|
|      | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| No.  | 1  | 1  | 0  | 1  | 1  | 0  | 0  | 0  | 5  | 0  | 5 | 2 | 1 | 0 | 0 | 7 | 0 | 1 | 2 | 0  | 0  | 1  |

Exhibit A-8. No new case of COVID-19 has been identified since April 12, 2020, and no Youth has complained of COVID-like symptoms since April 12, 2020. Exhibit A, ¶¶ 38, 43.

### B. OJJ employed a timely and adaptive response appropriate for the evolving nature of the COVID-19 pandemic.

OJJ's response to the COVID-19 global pandemic has been swift, deliberate, and effective, allowing the agency to continue to fulfill its mission to protect the public by providing safe and

effective individualized services to youth, who will become productive, law-abiding citizens.[3] "COVID-19 is a new disease, caused by a novel (or new) coronavirus that has not previously been seen in humans."[4] Since its emergence in late 2019, the world has grappled with the effects of the pandemic while science has fought to understand the disease. As the world, this nation, and this state responded to the pandemic much has been learned, and as a result, the response to the pandemic—including the methods of treatment and prevention—has been an evolving process.

OJJ's understanding and response to COVID-19 has been similar to the experience of the world at large. In consultation with the Louisiana Office of Public Health, the Louisiana Department of Education, and private-practice medical professionals and following the United States Center for Disease Control ("CDC") Guidelines, OJJ developed an appropriately adaptive set of procedures and protocols to prevent, control, and eliminate the risk of COVID-19 within its secure care facilities. *See generally* Exhibit A; Exhibit B.

Louisiana's first presumptive case of COVID-19 was announced on March 9, 2020, but OJJ's preparation for potential COVID-19 infections began before then. OJJ began conducting regular department-wide meetings to address COVID-19 education, preparedness, and facility needs by no later than March 2, 2020—a full week before the first presumptive case was reported in Louisiana. Exhibit A, ¶¶ 10–11.

In preparation for the potential effects of the coronavirus entering OJJ facilities, "Emergency Plan – COVID-19" was implemented in early March 2020. *See* Exhibit G. OJJ began educating the Youth and staff about best practices for the prevention of COVID-19 and how to

---

[3] OJJ, Message from the Deputy Secretary, *available at https://ojj.la.gov/about-ojj/message-from-the-deputy-secretary/* (last visited May 23, 2020).
[4] CDC, Coronavirus Disease 2019 (COVID-19), Frequently Asked Questions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#:~:text=In%20COVID%2D19%2C,%2D respiratory%20tract%20illnesses (last visited May 23, 2020).

identify symptoms of the disease. Exhibits A-1, A-2. OJJ conducted an evaluation of its food and personal protective equipment to ensure that it had at least two months' worth of supplies. Exhibit A, ¶ 14, Exhibit G, pp. 2–3. OJJ developed a staffing plan to create contingency strategies to maintain adequate staffing levels in the event that OJJ staff were affected by the pandemic. Exhibit A-2; Exhibit G. The COVID Plan included lists of backup staff with availability calendars and a contingency plan to account for up to 40% absence of regularly-scheduled staff. *See* Exhibit A-2. OJJ also contacted its contract service providers to ensure they had plans in place to provide uninterrupted services during the potential pandemic. Exhibit A, ¶ 15.

**C.     OJJ exceeded CDC Guidelines for testing and monitoring of Youth and staff.**

OJJ implemented a COVID-19 monitoring protocol for the Youth on March 14, 2020. The initial protocol provided that all Youth who potentially had been exposed to COVID-19 would receive temperature checks twice daily. Exhibit A, ¶¶ 24, 28; Exhibit A-7. Beginning on March 14, 2020, OJJ began temperature testing all Youth who were quarantined due to exposure or suspected exposure to COVID-19 twice daily. *Id.* ¶¶ 24, 28.

Any Youth with a temperature exceeding 100.4°F or complaints of cough, shortness of breath, tiredness, nasal congestion, runny nose, sore throat, diarrhea, or body aches/pain is sent to the infirmary. The Youth is administered a flu test and a strep test. Those tests are processed at the secure care facility; results are obtained within minutes. If both the flu and strep tests are negative, the Youth is then tested for COVID-19. Following the COVID-19 test, the Youth is placed in medical isolation according to the protocol discussed below. Exhibit A, ¶¶ 50–51,59.

Youth who are not exhibiting symptoms of COVID-19 are not tested for the disease. This is consistent with CDC Guidelines. *See* Exhibit A-11, Center for Disease Control, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and

Detention Facilities ("CDC Guidelines") at 22 (regarding "Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms"); Exhibit A, ¶ 52.

Plaintiffs contend in their TRO Motion that OJJ "stopped testing children altogether weeks ago." Pls.' TRO Br. (Doc. 7-1) at 1. This is incorrect. OJJ continues to maintain the same testing protocol that it implemented throughout the COVID-19 response:  Monitor the Youth and test those who are exhibiting symptoms consistent with COVID-19.[5]

For staff and visitors, OJJ limits non-essential visitation and began screening all persons entering the secure care facilities effective March 12, 2020. The protocols restrict the categories of individuals allowed to enter the facilities. Only OJJ staff, emergency visitors, and contractors working on repairs vital to the safety of the facility are allowed to enter. *See* Exhibit A, ¶ 23; Exhibit A-6. This is consistent with CDC Guidelines. *See* Exhibit A-11 at 14 ("Restrict non-essential vendors, volunteers, and tours from entering the facility.").

All staff and essential visitors are also screened prior to admission into the secure care facilities. The screening process is applied to all persons before entering the facility and includes a temperature check. Anyone with a fever (or refusing to have their temperature taken) is prohibited from entering the facility. Exhibit A-6. On March 13, 2020, Wellpath (OJJ's health services contractor) deployed a Coronavirus Supplemental Screening form for use with all visitors at the secure care facilities. *See* Exhibit A, n. 12. This too is consistent with CDC Guidelines. *See* Exhibit A-11 at 13 ("Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry.").

---

[5] For this reason, it is also disingenuous for Plaintiffs' to contend that OJJ's testing is suggestive of a 97% infection rate. *See* Pls.' TRO Br. (Doc. 7-1) at 1. OJJ's testing revealed only that 97% of Youth with symptoms of COVID -19 were positive for COVID-19.

**D.    OJJ recommended confinement modifications for certain qualifying Youth with pre-existing conditions.**

The overwhelming majority of people who contract COVID-19 experience no symptoms of the disease or only mild symptoms.[6] This is especially true with younger populations.[7] The risk of experiencing severe symptoms from a COVID-19 infection resides largely with elderly populations.[8] The worldwide experience with COVID-19 suggests that young people who experience more than mild symptoms of COVID-19 typically have one or more underlying pre-existing medical conditions.[9]

Based on this information, OJJ conducted an individual review of case files to identify any Youth with underlying pre-existing medical conditions creating a greater risk for a more severe reaction to COVID-19. Affidavit of Edward Dustin Bickham, attached as Exhibit B, ¶ 19–22. OJJ maintains a list, known as the Chronic Care List, which includes and identifies all Youth in OJJ's secure care facilities who have chronic, pre-existing medical conditions. OJJ reviewed the Chronic Care List to identify all Youth eligible for status changes using eligibility criteria based upon their case file and public safety concerns. *Id*. OJJ also utilized appropriate medical criteria to identify

---

[6] World Health Organization, Situational Report (Mar. 6, 2020) (noting 80% of those with COVID-19 had no symptoms or mild symptoms), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_4#:~:text=For%20COVID%2D19%2C,infections%2C%20requiring%20ventilation (last visited May 26, 2020).

[7] *See* CDC, Frequently Asked Questions ("While some children and infants have been sick with COVID-19, adults make up most of the known cases to date."), *available at* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#COVID-19-and-Children (last visited May 23, 2020).

[8] *See* CDC, Laboratory-Confirmed COVID-19-Associated Hospitalizations (cumulative hospitalization rates for minors age 5 to 17 years old is 1.7/100,000 and for people age 18 to 29 years old is 17.8/100,000; hospitalization rate for all ages is 67.9/100,000; for people age 50 to 64 is 105.9/100,000 and for people age 65 and over is 214.4/100,000), *available at* https://gis.cdc.gov/grasp/COVIDNet/ COVID19_3.html (last visited May 24, 2020).

[9] *See* CDC, Frequently Asked Questions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#COVID-19-and-Children (last visited May 23, 2020) (among cases for minors where more severe symptoms were noted, majority of such minors had "chronic lung disease (including asthma), heart disease, and conditions that weaken the immune system").

individuals with underlying medical conditions at increased risk of contracting COVID-19. Several Youth were identified for potential confinement status change, applying both eligibility and medical criteria. However, some identified Youth were disqualified due to subsequent disciplinary incidents. Of the remaining eligible Youth, individual circumstances were considered to recommend status changes. *Id*.

**E.    OJJ suspended contact visitation to reduce the risk of community transfer.**

Beginning on March 16, 2020, OJJ suspended all in-person/contact visitation. Attorney visitation was to occur by telephone. OJJ made arrangements to increase the number of free phone calls that the Youth could place in a week, and staff was instructed to encourage the Youth to make additional phone calls to stay connected with their families. Additionally, OJJ deployed equipment for video visitation beginning April 16, 2020. *See* Affidavit of Shawn Herbert, attached as Exhibit C, ¶¶ 12–15; Exhibit C-1.

The decision to suspend contact visitation and move to a virtual (i.e., telephonic or video) visitation is consistent with CDC Guidelines. *See* Exhibit A-11 at 13 ("Promote non-contact visits: Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors[;] Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons[; and] Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors." "Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.").

**F.    OJJ suspended the furlough program to reduce the risk of community transfer.**

As part of its programming, OJJ coordinates with the Juvenile Courts to maintain a furlough program. The program is implemented through a robust set of protocols. Under the

furlough program, Youth who meet certain predetermined criteria are deemed eligible for furlough recommendation. A furlough will not be recommended unless the Youth can be released to an adequate home environment. Accordingly, before a furlough can be recommended, parole and probation officers are required to conduct a "home study" with the Youth's family to assess the home conditions for the Youth while on furlough; the "home study" includes an in-person visit by the parole and probation officer and an in-person interview with the family. Exhibit C, ¶ 16; Exhibit C-2.

When a Youth meets the eligibility requirements and the results of the home study indicate that the furlough can be successfully implemented, OJJ submits a recommendation to the Juvenile Court in which the Youth was adjudicated delinquent. The district attorney and the court have the opportunity to review and object to the recommendation. If the district attorney objects to the furlough recommendation, the furlough is not granted, and a contradictory hearing is conducted regarding the recommendation. It is then within the Juvenile Court's discretion to approve or reject the recommendation. If the court objects to the furlough recommendation, the furlough is not granted, and no hearing is conducted. OJJ does not have the statutory authority to release any Youth on furlough without first giving the district attorney and the court notice of the recommendation and receiving a response of "objection" or "no objection" from the district attorney and court. *Id*. When granted, furloughs typically range in length from 8 hours to 14 days. Exhibit C, ¶ 17.

Beginning March 16, 2020, all off-site programming was suspended, and furloughs were postponed. Exhibit C-1. This measure was taken in order to minimize the amount of contact the Youth and staff had with members of the community who may be carriers of COVID-19, which could then be introduced and spread throughout the facilities. Exhibit A, ¶¶ 23, Exhibit C-1.

9

The suspension of the furlough program is consistent with CDC Guidelines. *See* Exhibit A-11 at 14 ("Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.").[10]

## G.    OJJ implemented quarantine and medical isolation plans to promote social distancing and avoid cross-contamination within its secure care facilities.

On March 22, 2020, Governor John Bell Edwards issued the initial statewide stay at home order. Proclamation No. JBE-2020-33 (March 22, 2020).[11] The following day, the OJJ implemented a multifaceted quarantine and medical isolation program at each of its facilities. Exhibit A, ¶ 46; Exhibit A-5.

First, all quarantined Youth are to remain in the dorms at all times. All educational, counseling, and other rehabilitative services are to be provided to the Youths in their dorms. Additionally, meals and medications are provided to the Youths in the dorms. Exhibit A, ¶ 28. The plan calls for the Youths to be allowed outdoor recreational time, but is organized in such a fashion so that there is no comingling of dorms. Exhibit A, ¶ 53. Essentially, the Youths are to do what the rest of the State's citizens are instructed to do—stay inside their residences and maintain social distancing when outdoors.

Second, each facility designated separate quarantine zones for any Youth who has left campus and returned but who is not exhibiting any symptoms of COVID-19. *See* Exhibit A-10.

---

[10] Youth also have the right to petition the Juvenile Courts for modification of their sentence. OJJ is aware of 24 Youth who have filed motions for modification with the courts. Of those, four motions were granted, seven motions were denied, and the remaining 13 are pending. Notably, named Plaintiff I.B. was one of the Youths who moved to have his sentence modified. The Juvenile Court denied the motion; I.B. appealed the denial to the Court of Appeals for the Fourth Circuit. The Court of Appeals affirmed the Juvenile Court's denial.  *See* Exhibit B, ¶ 30.

[11] Available at https://gov.louisiana.gov/assets/Proclamations/2020/modified/33-JBE-2020-Public-Health-Emergency-COVID.pdf.

Any Youth who fits in this category is quarantined at a location separate from the dorms for 14 days. *See* Exhibit A-5; Exhibit A-10. If the Youth does not develop COVID-like symptoms during that time period, he is then returned to his dorm. *Id.* This is consistent with CDC Guidelines. *See* Exhibit A-11 at 14 ("If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population….").

Third, each facility has separate locations designated for various categories of medical isolation. If a Youth exhibits COVID-like symptoms, he is removed from his dorm and sent to the infirmary for testing described above. After testing, the Youth is placed in one of two different medical isolation rooms: (1) exhibiting symptoms and awaiting COVID-19 test results; or (2) tested positive for COVID-19. If a Youth exhibits symptoms of COVID-19 but tested negative for the disease, he remains in medical isolation until he is symptom-free for seven days. Exhibit A-5; Exhibit A-10.

The OJJ protocols for discharge following a positive COVID-19 test evolved over time based on evolving guidelines from federal and state authorities. The CDC Guidelines suggested that a patient was deemed to have recovered, and could thus be discharged from isolation and returned to general population, after he was fever-free for 72 hours without the use of fever-reducing medications, exhibited no other symptoms, and was at least seven days past the onset of symptoms or the positive test. An individual who tested positive without symptoms was deemed recovered after seven days following a positive test, as long as the individual failed to develop further symptoms. Exhibit A, ¶¶ 32–36; Exhibit A-11 at p. 17.

Out of an abundance of caution, OJJ has taken steps that exceeded CDC Guidelines. All COVID-19 positive Youth in OJJ secure facilities are placed in medical isolation for 14 days after

11

the onset of symptoms and are not discharged from isolation until they are symptom- and fever-free for over 72 hours. *See* Exhibit A-8; Exhibit A-12.

On April 23, 2020, OJJ received guidance from the Louisiana Department of Health regarding retesting of COVID-19-positive Youth throughout isolation. According to this guidance, Youth are to be tested seven days after the onset of symptoms if they are symptom- and fever-free. If this test is positive, the test is to be performed again three days later. Upon receiving a negative test result, another test is to be performed 24 hours later. When a Youth receives a second negative test, he may be discharged from isolation and returned to general population. Exhibit A, ¶ 33; Exhibit A-12. OJJ followed the Department of Health's guidance and immediately implemented the recommended discharge procedure. Exhibit A, ¶ 36; Exhibit A-13.

Staff providing security for medically isolated Youth are provided full PPE, including gowns or coveralls, gloves, and eyewear. *See* Exhibit A, ¶ 61; Exhibit C, ¶ 42 (also stating PPE has been made available to all staff and Youth throughout OJJ's pandemic response). These staff members continue to be screened upon arrival for each shift and are encouraged to practice good hand hygiene, cough etiquette, and cleaning practices. Exhibit A, ¶ 61; Exhibit A-5. This is also consistent with CDC Guidelines. *See* Exhibit A-11 at 12, 16.

**H.    OJJ adapted its educational and rehabilitation services to comply with social distancing guidelines.**

As part of its rehabilitative and educational programming, OJJ's secure care facilities provide in-person schooling for the Youth. Exhibit D, ¶ 7. On March 13, 2020, Governor Edwards issued a proclamation closing all Louisiana public schools until April 13, 2020; that proclamation was then extended through the end of the academic school year. Exhibit D, ¶ 6. However, the OJJ school continued in-person education through March 27, 2020—two weeks longer than their counterparts in the Louisiana public school system. Exhibit D, ¶ 8.

Beginning on March 30, 2020, OJJ implemented a distance learning plan for continued learning through the pandemic. The distance learning plan was developed pursuant to the guidelines issued by the Louisiana Department of Education. The distance learning plan was updated weekly or biweekly to address concerns and improve implementation. Exhibit D, ¶¶ 9–13; Exhibit D-1; Exhibit D-2.

Throughout the COVID-19 pandemic, all mental health services continued. Some services were adapted to meet social distancing guidelines; specifically, group counseling sessions were limited to three Youth participants. All Youth scheduled to participate in group counseling still received group counseling; the groups were simply limited in size. Also, to the extent possible, mental health and counseling services were provided in the dorms, as opposed to non-dorm settings. Exhibit A, ¶¶ 64-66.

## I.    OJJ does not currently permit chemical spray in its secure care facilities.

As part of OJJ's planning in response to the COVID-19 pandemic, to address the potential need for substitute staffing, OJJ identified certain probation and parole officers as additional individuals who may be called upon to maintain appropriate staffing levels in the secure care facilities. Exhibit B-3. Probation and parole officers are trained and qualified in the use of chemical/pepper spray. *Id.*

On March 17, 2020, the then-Deputy Secretary James Bueche, Ph.D., issued a memo authorizing probation and parole officers covering posts within the secure care facilities to carry chemical/pepper spray. *See* Exhibit B, ¶ 36; Exhibit B-3. However, on April 27, 2020, the Interim Deputy Secretary, E. Dustin Bickham, J.D., rescinded the March 17th memo; this rescindment prohibited the carrying of chemical/pepper spray within OJJ's secure care facilities. *See* Exhibit B, ¶ 37; Exhibit B-4. ("Effective today, Probation and Parole staff will not be permitted to bring in chemical spray to any OJJ secure facilities while covering posts.").

## LAW AND ARGUMENT

Injunctive relief is "an extraordinary remedy" and requires the movant to "unequivocally show the need for its issuance." *Sacal-Micha v. Longoria*, --- F. Supp. 3d ----, 2020 WL 1518861, at *2 (E.D. La. March 27, 2020) (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997)). To demonstrate entitlement to injunctive relief in the form of a temporary restraining order, Plaintiffs must establish: "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest." *Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (citations omitted). The first two factors are most critical. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016). Failure to establish any element warrants denial of the motion. *Sacal-Micha*, 2020 WL 1518861, at *2 (citing *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003)).

In the context of injunctions against incarceration facilities, based on the Prison Litigation Reform Act, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm." *Id.* (citations omitted). Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration." *Id.* (citing, *inter alia*, *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976) (warning against judicial decisions regarding "the day-to-day functioning of state prisons and involve[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges")). Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the

chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state." *Id.* (citations omitted).

Plaintiffs fail to carry their burden to establish any of the four required elements.

**I.    Plaintiffs do not have a substantial likelihood of prevailing on the merits.[12]**

Generally, Plaintiffs' Complaint (Doc. 1) asserts claims pursuant to 42 U.S.C. § 1983 for "unlawful conditions of confinement and deprivation of due process." *See* Compl. (Doc. 1) at ¶¶ 104-121. More specifically, Plaintiffs contend that Defendants have failed to take reasonable measures to abate the "substantial risk of serious harm (including death)" presented by "the policies, actions, and inactions of [Defendants] in response to the COVID-19 pandemic." *Id.* at ¶ 106. This, Plaintiffs allege, amounts to deprivation of Plaintiffs' rights under the Fourteenth Amendment to "reasonably safe living conditions [and] rehabilitative treatment." *Id.* at ¶ 108. Further, Plaintiffs allege, it violates Plaintiffs' "right to be free from cruel and unusual punishment" under the Eighth Amendment. *Id.* at ¶ 116.

Plaintiffs have not established a substantial likelihood of prevailing on the merits for at least four reasons:

- Plaintiffs failed to exhaust administrative remedies before filing suit as required by the PLRA;

- Plaintiffs incorrectly rely on the relaxed "objectively unreasonable" standard of liability, but that standard does not apply to Plaintiffs' claims;

- Plaintiffs do not—and cannot—demonstrate Defendants were deliberately indifferent, as required by Section 1983; and

- Plaintiffs' claims regarding a deprivation of educational and rehabilitation services is neither legally cognizable, nor factually supported.

---

[12] The individual Defendants reserve all rights to assert the qualified immunity defense to which they are entitled. *See Brown v. Bolin*, 500 Fed App'x 309, 312 (5th Cir. 2012) (citing *Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010)). While not fully briefed herein, this is yet another ground that demonstrates Plaintiffs are not substantially likely to succeed on the merits as to those individual Defendants.

Because Plaintiffs fail to establish the first element required to obtain a temporary restraining order, their Motion should be denied.

### A.    Plaintiffs failed to exhaust their available administrative remedies before filing this action.

The federal Prison Litigation Reform Act ("PLRA") provides that "no action shall be brought under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[13],[14] Exhaustion is only complete when a plaintiff pursues all "available" administrative remedies, and when (1) the plaintiff has received a final administrative decision at the last step of the applicable procedure; or (2) the time limits for the prison's response at the last step of every available administrative remedy has expired, such that "there is no next step (save filing a lawsuit) to which the prisoner can advance." *See Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004); *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015). The PLRA also requires "proper" exhaustion; that is, the plaintiff must comply with "an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S.81, 90 (2006).

The PLRA establishes a mandatory exhaustion regime, forecloses judicial discretion, and prevents a court from excusing a failure to exhaust, even to take "special circumstances" into account. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) ("the PLRA's text suggests no limits on

---

[13] Because Plaintiffs are alleging violations of federal law in a federal district court, their complaint is subject to the procedural requirements of the PLRA. *Ferrington v. Louisiana Dep't of Corr.*, 315 F.3d 529, 532 (5th Cir. 2002).

[14] For purposes of the PLRA exhaustion requirement, "prisoner" is broadly defined and includes "any person … detained in any facility who is accused of . . . **or adjudicated delinquent for**, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h) (emphasis added); *see also Molina v. New York*, 697 F. Supp. 2d 276, 282 (N.D.N.Y. 2010) ("[t]his exhaustion requirement applies equally to juveniles confined in correctional facilities.") (citing 42 U.S.C. § 1997e(h)).

an inmate's obligation to exhaust."); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."). Moreover, "a prisoner must now exhaust administrative remedies even where the relief sought . . . cannot be granted by the administrative process." *Woodford*, 548 U.S. at 85. The only limit to § 1997e(a)'s mandate is that administrative remedies must be "available." *See Ross*, 136 S. Ct. at 1859-62.

### 1.    OJJ maintains a detailed administrative remedy procedure.

OJJ maintains an Administrative Remedy Procedure ("ARP") to efficiently process internal grievances, such as those addressed in Plaintiffs' complaint, based on its expertise in managing Youth detention facilities. *See* Affidavit of Revettea Woods, attached as Exhibit E, ¶ 3; *see also* Exhibit E-1. Under the ARP, a Youth must fully exhaust a two-step grievance process before seeking judicial review. *See* Exhibit E-1 at 1-14. A Youth first initiates the process by filing an ARP form, deemed filed upon "receipt" by an ARP Coordinator. *Id.* at 4. The ARP Coordinator screens the form and sends it to a facility director, who must respond within 30 days. *Id.* at 7-8. If the Youth is dissatisfied with the director's response, he has 15 days to seek review from the Deputy Secretary of Youth Services. *Id.* at 8-9. The Deputy Secretary must render a final decision within 21 days of receiving the request for review, and the entire process must be completed within 51 days of the original filing of the Youth's grievance form. *Id.* If the Youth is dissatisfied with the response, he may then seek judicial review. *Id.* at 9.

If the Youth's ARP form expresses a belief that he is at immediate risk of harm and that any delay in responding to the grievance would subject him to immediate personal injury or other serious irreparable harm, the ARP coordinator must "immediately forward the ARP" to the regional director, who must "provide an initial response within 48 hours and issue a final decision

within five[] calendar days." *Id.* at 9. The emergency grievance procedure does not render the standard two-step process unavailable to the Youth, nor does it prevent the Youth from seeking requested relief from the facility in Step 1, or review from the Deputy Secretary in Step 2. *See generally id.*; Exhibit E, ¶ 13.

### 2.    Neither of the named Plaintiffs exhausted the available ARP.

Plaintiff J.H. filed no grievances in connection with the COVID-19 pandemic or OJJ's COVID-19 response. *See* Exhibit E, ¶ 7.

Plaintiff I.B. filed five *pro se* standard ARPs on May 6, 2020; none of these ARPs have been fully prosecuted through Step 2. *See* Exhibit E, ¶ 8; *see also* Exhibit E-3 at 1-5. Additionally, a grievance form dated May 8, 2020 – captioned an "Emergency ARP" – was submitted via email (not filed under ARP procedures, as explained *infra*) by Plaintiffs' counsel Nishi Kumar on I.B.'s behalf.[15] *See* Exhibit E, ¶ 9, *see also* Exhibit E-4 at 1-2. The Emergency ARP stated on its face that counsel represented I.B.'s parents, not I.B. *See* Exhibit E-4 at 2.

This lawsuit was filed on May 14, 2020. *See* Doc. No. 1.

I.B.'s five *pro se* standard ARPs have not received a final decision at Step 2, and the period for the OJJ to respond to these ARPs had not expired when Plaintiffs filed suit. *See* Exhibit E, ¶ 8; *see also* Exhibit E-3. Thus, none of Plaintiff I.B.'s COVID-19-related standard ARP forms were fully exhausted before Plaintiffs filed this action.

The only question for this Court, then, is whether I.B.'s Emergency ARP effectively exhausted all available administrative remedies for the class. For the reasons discussed below, it did not.

---

[15] While the emergency ARP is dated May 8, 2020, the emergency ARP was not filed on May 8, 2020, as discussed *infra*.

First, under the express ARP policies and procedures, a grievance form is not filed until it is received by an ARP coordinator. *See* Exhibit E, ¶ 3; *see also* Exhibit E-1 at 4. Here, I.B.'s Emergency ARP was not properly filed by May 14, 2020 – the date Plaintiffs filed this action. Instead, counsel[16] emailed the form to facility interim director Shawn Herbert on May 8, 2020; counsel did not – and I.B. did not – submit the Emergency ARP to an ARP coordinator as expressly required by the ARP policy. *See* Exhibit E, ¶¶ 9-12; *see also* Exhibit E-4.[17] Therefore, I.B.'s Emergency ARP was never properly filed, and I.B. did not exhaust the Emergency ARP prior to the filing of this lawsuit. *See* Exhibit E, ¶ 12. *See also Flores v. Lappin*, 580 Fed. App'x 248, 249 (5th Cir. 2014) (discussing the court's "strict approach" to the PLRA exhaustion requirement: "mere substantial compliance with administrative remedy procedures does not satisfy exhaustion"; instead, one "must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself") (internal citations, quotations omitted).

Second, even if I.B. had properly filed his Emergency ARP form on May 8, 2020, he still failed to exhaust because OJJ's two-step grievance process remained available to I.B. notwithstanding his emergency grievance. *See* Exhibit E, ¶ 13. The PLRA is clear that a Youth must exhaust all "available" remedies prior to filing a claim under federal law. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). As the Supreme Court has emphasized, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Woodford*, 548 U.S. at 90

---

[16] Again, as explained above, counsel expressly represented I.B.'s parents, not I.B. *See* Exhibit E-3 at 2.

[17] At that time, OJJ had no record that counsel was authorized to represent I.B. *Id.* Counsel's email did not include any independent documentation to verify such legal representation. *Id.*

(explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits.").

OJJ's ARP does not except Youths from addressing grievances through the standard two-step process if they do not receive emergency relief where requested. *See generally* Exhibit E-1; *see* Exhibit E, ¶ 13. In other words, the ARP includes no provision for complete curtailment of the two-step grievance process, even where a Youth is denied emergency relief. *Id.* In fact, the ARP specifically states that a Youth may seek judicial review after the conclusion of Step 2 of its standard process but contains no such language in the emergency grievance provision. *See* Exhibit E-1 at 7-9. Thus, the ordinary grievance process remains "available" within the meaning of the PLRA even after an inmate has sought administrative relief under an emergency grievance. *See, i.e.*, *Brown v. Eardley*, 184 F. App'x 689, 691-92 (10th Cir. 2006) (holding administrative remedies were still available to inmate through standard grievance process even though warden did not respond to emergency grievances within the three days required under applicable regulations; *Brazell v. Ruh*, 2015 WL 2452410, at *3-4 (E.D. Ark. May 21, 2015) (same).

Here, a finding that I.B. fully exhausted available remedies would create a pervasive incentive for Youths to file frivolous "emergency" ARPs and then immediately file suit at the end of the five-day window, thereby circumventing OJJ's grievance procedure. *See Smith v. Asselmeier*, 2018 WL 3533346, at *3 (S.D. Ill. July 23, 2018), *aff'd*, 762 F. App'x 342 (7th Cir. 2019) ("If a prisoner could exhaust his administrative remedies by filing an emergency grievance instead of going through the standard protocols, then the entire regulatory structure would collapse."). It is clear from the express language of PLRA and applicable case law that Congress did not intend this result.

Accordingly, neither I.B. nor any other named Plaintiff has fully exhausted available administrative remedies. Nothing in the PLRA allows for a plaintiff to bypass the exhaustion requirement. The Supreme Court has consistently been clear that the PLRA's statutory exhaustion requirement does not make exceptions for "special circumstances," including COVID-19. *Ross*, 136 S. Ct. at 1856–57. For this reason alone, this Court should deny Plaintiffs' Motion.

B.    **The *Kingsley* "objectively unreasonable standard" does not apply.**

Plaintiffs argue Defendants are liable under the Fourteenth Amendment because Defendants' COVID-19 response has been "objectively unreasonable," a more relaxed standard adopted by the Supreme Court in *Kingsley* for excessive force cases involving pre-trial detainees. *See* Pls.' TRO Br. (Doc. 7-1) at 19 & n.128 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). Plaintiffs admit that the more stringent deliberate indifference standard has been applied by the Fifth Circuit in Eighth and Fourteenth Amendment cases, like *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). *Id*. at 19, n.128. But, because *Hare* precedes *Kingsley*, Plaintiffs assert the more relaxed "objectively unreasonable" standard should apply. *Id*.

Plaintiffs are incorrect—the Fifth Circuit has expressly rejected the *Kingsley* objectively unreasonable standard for cases not involving excessive force against pre-trial detainees. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017) (rejecting one dissenting judge's invitation to extend *Kingsley*). This Court has repeatedly recognized this holding. *See Guillory v. Louisiana Dep't of Health & Hosps.*, No. CV 16-787-JWD-RLB, 2018 WL 1404277, at *8 (M.D. La. Mar. 20, 2018) ("deliberate indifference standard remains a

subjective one as set out in *Hare* despite the intervening case of *Kingsley*").[18,19] *Alderson* and its progeny make clear that the deliberate indifference standard applies here.

### C.    Plaintiffs do not—and cannot—demonstrate deliberate indifference.

Liability under Section 1983, whether based on the Eighth or Fourteenth Amendment, requires that prison officials act with deliberate indifference to a substantial risk of serious harm. *See generally Gumns*, 2020 WL 2510248 (analyzing Section 1983 claims under Eighth and Fourteenth Amendments).[20] Deliberate indifference is "an extremely high standard to meet." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (citation omitted). Proof of negligence, or even gross negligence, is not enough. *Hare*, 74 F.3d at 645 (deliberate indifference must be a "step up" from "mere or even gross negligence," or otherwise the standard is rendered "meaningless"). Relevant to Plaintiffs' claims related to COVID-19, "the incidence of diseases or infections, standing alone, do not imply unconstitutional confinement conditions, since any densely populated

---

[18] *See Robertson v. Gautreaux*, No. CV 16-341-JJB-RLB, 2017 WL 690542, at *4 (M.D. La. Feb. 21, 2017), *aff'd in part*, 731 F. App'x 337 (5th Cir. 2018) ("Recently the Fifth Circuit reaffirmed the *Hare* holding in light of *Kingsley*. Accordingly, this Court applies a deliberate indifference standard to Plaintiff's claims."); *see also Joyner v. Grenada Cty., Miss.*, --- F. Supp.3d ----, 2020 WL 2298553, at *3 (N.D. Miss. May 7, 2020) (failure to protect case discussing *Alderson* to explain Fifth Circuit has considered and expressly rejected *Kingsley* beyond excessive force cases).

[19] Admittedly, Defendants are somewhat uncertain of Plaintiffs' precise argument as to the standard of liability. The *Hare* decision differentiated between constitutional challenges regarding "conditions of confinement" versus "episodic acts or omissions." *Hare*, 74 F.3d at 644-45. To the extent Plaintiffs are attempting to make a "conditions of confinement" allegations, the liability test for such claims is whether "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective." *Id.* at 651 (J. Dennis, concurring). If it is rationally related, then it is not unconstitutional "punishment." *Id.* (but applying the deliberate indifference standard to episodic acts at *id.* at 636). *See also Guillory v. La. Dep't of Health & Hosp.*, No. 16-787, 2018 WL 1404277, at *7-8 (M.D. La. March 20, 2018) (discussing *Hare* and distinguishing the liability standards). Here, all of Defendants' response measures to COVID-19 are clearly rationally related to the legitimate government goal of protecting the health and safety of the Youths. Thus, even if Plaintiffs are making a "conditions of confinement case" and the rational relationship test applies, which Plaintiffs have not (clearly) argued, Plaintiffs still fail to demonstrate any likelihood that Defendants are liable.

[20] *See also generally, i.e., Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) (discussing deliberate indifference in Eighth Amendment claim); *Estate of Pollard v. Hood County, Tex.*, 579 Fed. App'x 260 (5th Cir. 2014) (discussing deliberate indifference in Fourteenth Amendment claim).

residence may be subject to outbreaks." *Valentine*, 956 F.3d at 801 (citation omitted). Instead, deliberate indifference requires deprivation of "basic human needs." *Id.*

Courts apply a two-part analysis to determine whether a defendant has acted with deliberate indifference under Section 1983. *Id.* (citation omitted). First, the plaintiff must establish an "objectively intolerable risk of harm." *Id.* Second, the plaintiff must establish the defendant acted with subjective indifference; that is, the defendant: "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively dr[e]w the inference that the risk existed; and (3) disregarded the risk." *Id.* (citations and quotations omitted).

Plaintiffs' TRO Motion fails to establish either the objective or the subjective prong of the deliberate indifference standard.

### 1. OJJ's COVID-19 response does not create an "objectively intolerable risk of harm."

First, Plaintiffs fail to establish an "objectively intolerable risk of harm." *Id.* As explained in *Valentine*, it is undisputed that COVID-19, as with all infectious diseases, poses a risk of serious or even fatal harm to individuals housed in a detention facility. *Id.* For purposes of the objective prong of the deliberate indifference test, though, the question is not whether COVID-19 presents an objectively intolerable risk of harm. *Id.* Instead, the "legal question is whether the Eighth Amendment requires [Defendants] to do more to mitigate the risk of harm" beyond the many protective measures Defendants have already taken. *Id.*

In *Valentine*, prison inmates brought a class action challenging the sufficiency of preventive measures to prevent spread of COVID-19 in the prison facility. *See generally Valentine*, 956 F.3d 797. After reviewing the various efforts the facility had undertaken in compliance with CDC Guidelines, the district court nevertheless granted an injunction that required prison officials to implement more vigorous prevention efforts than those required by the CDC. *Id.* at 802. On

appeal, the Fifth Circuit disagreed, finding there is "no precedent holding that the CDC's recommendations are insufficient to satisfy the Eighth Amendment." *Id.* The *Valentine* court therefore held that Plaintiffs failed to identify an objectively intolerable risk of harm. *Id.* at 802-03. The same result is warranted here.

As stated above, Defendants have exceeded CDC Guidelines in an organized, comprehensive, and effective emergency response to COVID-19. *See* Sections A-H, *supra*. Defendants implemented an early response plan (*see* Section B), appropriately tested and monitored Youth with symptoms (*see* Section C), thoroughly screened visitors (*see* Section C), recommended confinement modifications for qualifying Youth with pre-existing conditions (*see* Section D), suspended contact visits and furlough programs to reduce community transfer (*see* Sections E, F), coordinated with the Louisiana Department of Health for testing efforts (*see* Section G), and provided all services to Youth even while instituting its quarantine and medical isolation program (*see* Section H). Defendants' response has been objectively effective. *See* Section A.

As in *Valentine*, Plaintiffs fail to establish that Defendants' response to the COVID-19 pandemic created an "objectively intolerable risk of harm."

> **2.     OJJ's rapid, well-reasoned, and evolving COVID-19 response demonstrates Defendants did not act with subjective deliberate indifference.**

Second, even if Plaintiffs could establish an objectively intolerable risk of harm (and they cannot), Plaintiffs fail to establish Defendants acted with subjective deliberate indifference to that risk, as required for Section 1983 liability.

In *Valentine*, the Fifth Circuit clarified that – to establish liability – defendants must have "general awareness of the dangers posed by COVID-19" <u>and</u> must "subjectively believe the measures they are taking are inadequate." *Valentine*, 956 F.3d at 802. The Fifth Circuit found

plaintiffs failed to meet this subjective prong where "the evidence shows that [the defendant facility] has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus." *Id.* Though a court may disagree with those measures, "mere disagreement with [the defendant facility's] medical decisions does not establish deliberate indifference." *Id.* at 803.

Here, Defendants have taken all of the measures discussed in Sections A through H, *supra*, exceeding CDC Guidelines. Plaintiffs present no evidence that Defendants acted with "knowing disregard for a serious risk of harm substantially certain to occur." *Gumns*, 2020 WL 2510248, at *7. Frankly, when the OJJ's comprehensive COVID-19 response plan and the efforts undertaken to implement the plan (as cataloged herein) are compared against the applicable legal standard of "deliberate indifference," it renders the whole Complaint, and the present request for TRO, absurd. Simply put, the OJJ has exhibited a cautious, adaptive, and comprehensive approach to protect the Youth within its care from this pandemic, as established by the attachments to this Response. There is no credible evidence to the contrary.

Because Plaintiffs cannot meet their burden under the objective or subjective prong of the deliberate indifference test, they cannot establish a substantial likelihood of success on the merits of their Section 1983 claim.

**D.    Plaintiffs' claim regarding a deprivation of educational and rehabilitative services is neither legally cognizable nor factually supported.**

Plaintiffs have also failed to show a substantial likelihood of success on the merits of their substantive due process claim involving OJJ's alleged denial of access to educational and rehabilitative programming.

As an initial matter, Plaintiffs' references to the Louisiana Constitution and the Supreme Court of Louisiana's opinion in *In re C.B.,* 708 So.2d 391 (La. 1998), have no bearing on this case.

25

Plaintiffs have not pled a claim for violations of state law or the Louisiana Constitution. *See generally* Compl. (Doc. 1). Instead, both of their claims sound under 42 U.S.C. § 1983 which, by its plain language, only provides a cause of action for rights that arise under the U.S. Constitution or other federal laws. *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) ("§ 1983 is only a remedy for violations of federal statutory and constitutional rights."). *In re C.B.* based its holding on the Due Process Clause of the Louisiana Constitution and expressly declined to address whether the alleged "constitutional infirmities would also be present at the federal level." *In re C.B.,* 708 So.2d at 395-400. Accordingly, Plaintiffs cannot base their action, which sounds entirely under Section 1983, on any rights established under state law in *In re C.B.*[21]

Even if the claim was legally cognizable – and it is not – Plaintiffs have failed to show that OJJ's temporary modifications to its educational and rehabilitative programming constitute a deprivation of constitutional rights.

First, there is no firmly established constitutional right to educational and rehabilitative programming. As Plaintiffs acknowledge, the Supreme Court has declined to address the appropriate federal standards by which to judge the conditions of a state juvenile detention facility, both generally and as applied to rehabilitative treatment. *See Ingraham v. Wright*, 430 U.S. 651, 669 n.37 (1977). In the Fifth Circuit's only case addressing the issue, the court vacated a district court's grant of an injunction in favor of a class of juvenile detainees, explaining that a "right to treatment for juvenile offenders has not been firmly established." *Morales v. Turman*, 562 F.2d

---

[21] In any event, the Fifth Circuit has noted that "[t]he Louisiana Constitution provides the same due process protections as that of the United States Constitution." *Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016). Moreover, *In re C.B.* dealt with a Louisiana statute that allowed juveniles to be housed in adult facilities and subjected to the same hard-labor requirements as adults. *In re C.B.*, 708 So.2d at 395-400. Plaintiffs have not been subjected to any such conditions, and as discussed below, they are receiving sufficient educational and rehabilitative programming on a socially distant basis as recommended by the Louisiana Department of Education and the CDC.

993, 997 (5th Cir. 1977). Indeed, the *Morales* Court was skeptical of such a right, characterizing it as "doubtful." *Id.* at 998. The court ultimately reasoned that "even if some form" of the right existed, the district court's injunction was excessively detailed, as a court "is not in a position to monitor day-by-day changes that affect rehabilitation programs." *Id.* at 999.[22]

Second, even in cases recognizing a constitutional right to rehabilitative programming, the challenged practices in those cases fall far below what common sense suggests as appropriate and woefully below the temporary modifications implemented by OJJ in response to COVID-19. For instance, in *Donnell C. v. Illinois State Board of Education*, 829 F. Supp. 1016 (N.D. Ill. 1993), the juvenile-detainee plaintiffs alleged that, for the entire length of their pretrial detention, (a) only 39% of those in need of special educational services were receiving them; (b) the plaintiffs were not being taught courses other than reading and math; (c) they did not have textbooks, workbooks, or other instructional materials; and (d) they were not given learning disability assessments and instruction. *Id.* at 1017-18. Based on these allegations, the court held that the plaintiffs' complaint stated a claim for violations of substantive due process. *Id.* at 1018. Similarly, a court has held that due process violations were present where detainees were placed in "cottages without regard to their age, prior social history, reason for confinement[,] or individual treatment needs, but solely on the basis of vacancies and the maintenance of a fixed black-white ratio in each cottage." *Morgan v. Sproat*, 432 F. Supp. 1130, 1141–43 (S.D. Miss. 1977). The court explained that this did "not

---

[22] Other courts that have addressed the existence and extent of juvenile detainees' constitutional rights to rehabilitative programming have held that no such right exists. *See, i.e.*, *Santana v. Collazo*, 714 F.2d 1172 (1st Cir. 1983). In *Santana*, the First Circuit expressly held that such a right did not exist. *Id.* at 1176–77. "[A]lthough rehabilitative training is no doubt desirable and sound as a matter of policy and, perhaps, of state law, [juvenile detainees] have no constitutional right to that rehabilitative training." *Id.* Even in courts that have embraced the right of juveniles to receive rehabilitative education and treatment, those courts specifically declined to draw a bright-line rule and instead offered "minimum acceptable standards of care and treatment" as guideposts. *See Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974).

allow the matching of students with compatible counseling and supervisory staff" and that it failed to provide a "reasonable opportunity to be rehabilitated." *Id.*

Here, Plaintiffs have failed to show a substantial likelihood of success on their claim that OJJ's temporary modifications to its educational and rehabilitative programming was rendered constitutionally deficient by its COVID-19 protocols. Aside from their general, hearsay assertions that social-distancing efforts have "substantially reduced or completely eliminated" OJJ's educational and rehabilitative services, which is not accurate,[23] Plaintiffs have failed to make any meaningful, specific allegations about how those services have become constitutionally insufficient.

Plaintiffs certainly have not shown the complete breakdown in educational programing as present in *Donnell* or the absolute failure to consider individualized needs as present in *Morgan* that gave rise to a finding of a constitutional deprivation. *See Donnell* 829 F. Supp. at 1017-18; *Morgan*, 432 F. Supp. at 1141–43.[24]

On the contrary, OJJ has made efforts to follow the guidelines it received from the Louisiana Department of Education ("LDOE") and has simply implemented the same social-distance learning procedures that have been used in schools across the state. *See* Exhibit D, ¶ 13. These distance learning efforts, based on recommendations from the LDOE, include providing the students with worksheets and online assignments, along with access to online classroom software. *Id.* ¶¶ 11,14. Further, OJJ is continually revising and updating its distance learning plan to address concerns and developments as the pandemic progresses. *Id.* ¶ 15; Exhibit D-3. The secure care facilities have also implemented procedures to ensure the Youths have access to the mental health

---

[23] *See* Section H, *supra*.
[24] Plaintiffs have also failed to show, or even suggest, that the COVID-19 protocols have resulted in Youth being subject to adult hard-labor requirements or have otherwise made the Youth's confinement indistinguishable from that of adult prisoners, as was the case in *In re C.B.* 708 So.2d at 395-400

services they require and that they are being provided with the recreation and entertainment materials that can reasonably be made available under the circumstances. Exhibit A, ¶¶ 63-66; Exhibit C, ¶¶ 30, 35.

As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d at 996. Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996. This consideration is especially critical during a rapidly evolving, unprecedent health pandemic.

For these reasons, Plaintiff's claims regarding a constitutional deprivation of educational and rehabilitative services are not substantially likely to succeed on the merits. Because Plaintiffs cannot establish the first element of injunctive relief, the Court should deny Plaintiffs' Motion.

## II. There is no substantial threat of irreparable injury to Plaintiffs if the injunction is denied.

"One seeking injunctive relief must demonstrate a real and immediate threat that he will be subject to the behavior which he seeks to enjoin. It is not sufficient for the plaintiff to *speculate* that he will be subject to injurious conduct if the practice is continued …." *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989) (citing *City of L.A. v. Lyons*, 461 U.S. 95 (1983)) (emphasis added). An injunction is not appropriate where the movant presents only the "mere fact that irreparable harm *may possibly* ensue if restraint is not imposed." *Standard Brands, Inc. v. Zumpe*, 264 F. Supp. 254, 267 (E.D. La. 1967) (emphasis added) (citations omitted). Indeed, "[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Id.* at 267-68.[25] Instead, and particularly concerning injunctions against the government,

---

[25] *See also Simon v. Southwest La. Elec. Membership Corp.*, 267 So.2d 757, 760 (La. App. 1972) ("[T]he applicant for injunction must show a reasonable probability that the acts sought to be enjoined will occur. It is not sufficient for plaintiff to simply state that he fears they will occur.").

"courts should not intervene [by granting injunctions] unless the need for equitable relief is clear, not remote or speculative." *Machete Prod., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015).

Another district court within the Fifth Circuit recently addressed the "irreparable injury" element in the context of a COVID-19 case filed by an incarcerated individual. *See Sacal-Micha v. Longoria*, --- F.3d ----, 2020 WL 1518861, at *5-6 (S.D. Tex. March 27, 2020). In that case, the plaintiff argued the irreparable injury element was met because the risk of death was significant; he argued there is a "high likelihood" that "many detainees … will contract COVID-19," and those with underlying medical conditions (like plaintiff) are even more "prone to the more serious aspects of the virus." *Id.* But the court found plaintiff "offers no evidence to support these propositions other than conclusions extrapolated from general information." *Id.* Further, accepting the plaintiff's argument "would logically require the release of all individuals currently detained" who were vulnerable to COVID-19. *Id.* As such, the court rightly rejected plaintiff's logic. *Id.* In denying plaintiff's motion for TRO, the court recognized the "extraordinary and unique public-health risk to society" presented by COVID-19, and admitted that despite the facility's best efforts, the "particularly vulnerable" plaintiff may be exposed to and even contract the virus. *Id.* Still, "the fact that [the defendant facility] may be unable to implement the measures that would be required to fully guarantee [plaintiff's] safety does not amount to a violation of his constitutional rights and does not warrant" the injunctive relief plaintiff seeks (including but not limited to release). *Id.*

Here, Plaintiffs' argument is akin to the *Sacal* plaintiff. Plaintiffs dedicate six pages of their Brief to present general information about the risks of COVID-19. *See* Pls.' TRO Br. (Doc. No. 7-1) at 3-9. While Plaintiffs' Brief goes on to allege claims more specific to Defendants' response, those claims are based on hearsay and speculation and are largely discredited by Defendants' sworn testimony. *See generally* Exhibits A–D. Plaintiffs here invite this Court to follow the same

logic offered in *Sacal*: if Defendants cannot prevent Plaintiffs from being exposed to COVID-19, then Plaintiffs' constitutional rights are violated and an injunction is warranted. The *Sacal* court rejected this reasoning. On the same grounds, this Court should do the same.

As Louisiana courts have held, "speculative injury" is not sufficient to establish irreparable harm for purposes of injunctive relief; the movant must present "more than an unfounded fear" of injury. *Dixie Brewing Co., Inc. v. U.S. Dep't of Vet. Affairs*, 952 F. Supp.2d 809, 813 (E.D. La. 2013) (citations and brackets omitted). An injunction requires that an irreparable injury "be both certain and great," "actual and not theoretical." *Id.* (citations, quotations, and brackets omitted). Here, Plaintiffs have shown no more than—at best—an unfounded fear or speculation of potential risk of contracting an illness from which the vast majority fully recover. Plaintiffs have failed to demonstrate a substantial threat of irreparable injury as required for injunctive relief.

## III. The certain and immediate harm to Defendants if the injunction is granted outweighs Plaintiffs' speculation of potential injury if the injunction is denied.

While Plaintiff fails to establish more than a mere speculation of potential injury if the injunction is denied, Defendants will suffer irreparable injury as a matter of law if the injunction is granted. *See Valentine*, 956 F.3d at 803. ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *Maryland v. King*, 567 U.S. 1301, (2012) (Roberts, C.J., in chambers)).

Here, as in *Valentine*, the State of Louisiana has "assigned the prerogatives" of juvenile detention policy to Defendants, and the Court's injunction would "prevent the State from effectuating the Legislature's choice and hence imposes irreparable injury." *Id.* Like the *Valentine* court explained, the Supreme Court "has repeatedly warned that it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Id.* (quotations omitted). As

such, like the *Valentine* defendants, Defendants will be irreparably harmed if the injunction is granted. *Id.*

As recognized in *Valentine*, in the midst of the COVID-19 pandemic, the harm to Defendants is "particularly acute" because an injunction would interfere with OJJ's "system-wide approach" to respond to the crisis. *Id.* Issuing an injunction here will threaten Defendants' "ability to continue to adjust its policies" by "lock[ing] in place a set of policies for a crisis that defies fixed approaches." *Id.* If Defendants are not free to respond to COVID-19 "without a permission slip from the district court, … [t]hat constitutes irreparable harm." *Id.*

Following the Fifth Circuit's well-reasoned analysis in *Valentine*, Plaintiffs' Motion for injunction should be denied.

## IV.   The public interest is served if the Motion is denied.

While Plaintiffs' Motion asserts it is "always" in the public interest to prevent the violation of constitutional rights, there are limits to this sweeping statement. *See* Pls.' TRO Br. (Doc. No. 7-1) at 23-24, § III.[26] Indeed, "when a state statute vests state officials with broad discretionary authority concerning [prison operations], the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration." *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at *21 (E.D. La. March 22, 2013) (referencing *Olim v. Wakinekona*, 461 U.S. 238, 249–50 (1983) and *Merit v. Lynn*, 848 F.Supp. 1266, 1267–68 (W.D. La. 1994)).

Louisiana courts have held it is "against the public interest to issue an injunction based solely on plaintiff's disagreement with the health care being provided" by "corrections officials who are presently charged with that obligation." *Hawkins v. Hawkins*, No. 3:11–cv–1325, 2012

---

[26] If there were no limits on this position, then the fourth factor would be a moot point, as it would always weigh in favor of a movant claiming deprivation of constitutional rights.

32

WL 601426, at *9 (W.D. La. Jan. 2, 2012) (where plaintiff inmate complained of denial of prompt and appropriate medical care and requested injunctive relief for same). Again, the Supreme Court "has continuously cautioned federal courts from assuming a greater role in decisions affecting prison administration." *Id.* (collecting cases); *see also Zantiz v. Seal*, No. 12-1580, 2013 WL 357069, at *4 (E.D. La. Jan. 29, 2013) ("To issue an injunction against this facility would limit those best equipped to make decisions about the proper procedures to maintain safety, and would therefore disserve the public interest in maintaining the safety of the prisoners and officers at the facility.") (where plaintiff inmate complained of, *inter alia*, inadequate medical care).

Therefore, Plaintiffs have failed to establish that the public interest will be served if the injunction is granted. The Court should deny the Motion for injunctive relief.

## CONCLUSION

As demonstrated here, Plaintiffs' Motion for Emergency Temporary Restraining Order is unwarranted and should be denied.

- Plaintiffs fail to establish a substantial likelihood of success on the merits for multiple reasons: (1) Plaintiffs failed to exhaust administrative remedies, (2) Plaintiffs cannot rely on a relaxed "objectively unreasonable" liability standard, (3) Plaintiffs do not—and cannot—establish Defendants were objectively or subjectively deliberately indifferent, and (4) Plaintiffs improperly assert a claim based on the Louisiana Constitution that is neither legally or factually actionable.

- Plaintiffs fail to establish they will suffer an irreparable injury if the injunction is not granted; their speculative fear of COVID-19 exposure does not amount to a violation of their constitutional rights.

- Plaintiffs ignore the certain and immediate harm to Defendants if an injunction is granted, as this would interrupt OJJ's ability to continue appropriately responding to this evolving health crisis.

- Plaintiffs' request for injunctive relief is inconsistent with the public interest, based on OJJ's duty under Louisiana law to oversee and administer juvenile justice.

For all of these reasons, the Court should deny Plaintiffs' Motion.

Dated: May 26, 2020

Respectfully submitted,

Defendants The Louisiana Office of Juvenile Justice, Edward Dustin Bickham, James Woods, Shannon Matthews, Shawn Herbert, and Rodney Ward


By:   *S/Allena McCain*
      Randal J. Robert (La. Bar No. 21840)
      Connell L/ Archey (La. Bar No. 20086)
      Allena W. McCain (La. Bar No.  38830)
      Butler Snow LLP
      City Plaza
      445 North Boulevard, Suite 300 (70802)
      P.O. Box 2997
      Baton Rouge, LA 70821
      randy.robert@butlersnow.com
      connell.archey@butlersnow.com
      allena.mccain@butlersnow.com
      Phone: 225-325-8735
      Fax: 225-343-0630

      Kyle V. Miller, *admitted pro hac vice*
      Lemuel E. Montgomery III, *admitted pro hac vice*
      Butler Snow LLP
      kyle.miller@butlersnow.com
      lem.montgomery@butlersnow.com
      1020 Highland Colony Parkway, Suite 1400
      Ridgeland, MS 39157
      Phone: 601-948-5711
      Fax: 601-985-4500

      *Defendants' Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I, Allena W. McCain, hereby certify that I have today served the foregoing Response to Plaintiffs' Motion for Emergency Temporary Restraining Order via the Court's electronic filing system, which provided notice to the following counsel of record:

ATTORNEYS FOR PLAINTIFFS:

Mercedes Montagnes
Nishi Kumar
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Marsha Levick
Jessica Feierman
Karen U. Lindell
JUVENILE LAW CENTER
1800 JFK Boulevard, Suite 1900A
Philadelphia, PA 19103
Telephone: (215) 625-0551
Email: mlevick@jlc.com

Stuart Sarnoff
Lisa Pensabene
Laura Aronsson
Mariam Kamran
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Email: ssarnoff@omm.com

Brandon Amash
O'MELVENY & MYERS LLP
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Email: bamash@omm.com

John Adcock
La. Bar No. 30372
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Telephone: (504) 233-3125
Email: jnadcock@gmail.com

Benjamin Singer
Jason Yan
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Email: bsinger@omm.com

David Lash
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6000
Email: dlash@omm.com

Dated: May 26, 2020

_S/Allena McCain_
ALLENA W. McCAIN

53128500.v2