# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

J.H., by and through his mother and next friend, N.H.; I.B., by and through his parents and next friends, A.B. and I.B., on behalf of themselves and all others similarly situated,

                Plaintiffs-Petitioners,

    -against-

JOHN BEL EDWARDS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF LOUISIANA; THE LOUISIANA OFFICE OF JUVENILE JUSTICE; EDWARD DUSTIN BICKHAM, IN HIS OFFICIAL CAPACITY AS INTERIM DEPUTY SECRETARY OF THE LOUISIANA OFFICE OF JUVENILE JUSTICE; JAMES WOODS, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE ACADIANA CENTER FOR YOUTH; SHANNON MATTHEWS, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE BRIDGE CITY CENTER FOR YOUTH; SHAWN HERBERT, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT MONROE; and RODNEY WARD, IN HIS OFFICIAL CAPACITY AS THE DEPUTY DIRECTOR OF THE SWANSON CENTER FOR YOUTH AT COLUMBIA,

                Defendants-Respondents.

CIVIL ACTION NO. 3:20-cv-00293-JWD-EWD

CLASS ACTION

**PLAINTIFFS-PETITIONERS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR TRO HEARING HELD JUNE 3-5, 2020**

## TABLE OF CONTENTS

I.     Introduction and Procedural History ................................................................ 1

II.    Parties to the TRO Hearing ........................................................................... 2

    A.     Plaintiffs ................................................................................................ 2

    B.     Defendants ............................................................................................. 3

    C.     Non-Parties to the TRO Hearing ......................................................... 5

        i.     Plaintiffs' Unrebutted Expert Witnesses ................................. 5

        ii.    Plaintiff Witnesses and Putative Class Members ..................... 8

III.   Proposed Substantive Findings of Fact .......................................................... 8

    A.     The COVID-19 Pandemic ..................................................................... 8

        i.     COVID-19 Symptoms and Pathology ...................................... 9

        ii.    COVID-19 Transmission ......................................................... 11

        iii.   Risks for Children ................................................................... 12

        iv.    COVID-19 Guidance .............................................................. 16

    B.     The Office of Juvenile Justice ............................................................. 18

        i.     Louisiana's Juvenile Justice System Is Strictly Rehabilitative ................ 18

        ii.    OJJ's Plenary Authority Regarding the Placement of Children in Its Custody ................................................................................ 19

            a.     OJJ's Secure Care Facilities ......................................... 19

            b.     OJJ's Authority to Place Children in Less Restrictive Settings .... 20

            c.     OJJ's Authority and Procedure for Release of Children from Secure Settings ........................................................... 20

            d.     OJJ's Furlough Program ............................................... 22

    C.     OJJ's COVID-19 Response ................................................................. 23

        i.     Chronology of OJJ's COVID-19 Response .............................. 24

        ii.    OJJ's COVID-19 Testing Policies .......................................... 27

          iii.      Solitary Confinement as Medical Isolation.................................. 30

          iv.      PPE, Cleaning, and Screening .................................................. 31

          v.       Staffing.................................................................................... 32

          vi.      Failure to Provide Complete and Accurate Information........................ 33

          vii.     Suspension of OJJ's Furlough Program and Family Visitation............... 35

          viii.    Reduction of Rehabilitative and Educational Programming ................... 36

   D.     The Spread of COVID-19 in OJJ's Secure Care Facilities.................................. 38

   E.     The Resumption of Programming on June 8 ....................................... 40

   F.     Expert Recommendations for COVID-19 Management in OJJ's Secure Care Facilities................................................................................................ 41

          i.       Universal Testing .................................................................... 42

          ii.      Depopulation........................................................................... 45

          iii.      Protecting the Medically Vulnerable ........................................ 48

          iv.      Virtual Programming .............................................................. 50

          v.       No Solitary Confinement as Medical Isolation......................... 51

          vi.      Oversight and Accountability .................................................. 52

   G.     Plaintiffs' Efforts to Exhaust Administrative Remedies............................ 53

IV.   Proposed Conclusions of Law ......................................................... 55

   A.     Plaintiffs Satisfied the Requirements of the Prison Litigation Reform Act.......... 55

   B.     Class-Wide Emergency Relief Is Appropriate..................................... 59

   C.     Named Plaintiffs Have Standing to Seek the Requested Relief ......................... 60

   D.     This Court's Authority to Order the Depopulation of OJJ's Secure Care Facilities................................................................................................ 62

          i.       Authority to Order Transfer Under 42 U.S.C. § 1983 ............... 63

          ii.      Authority to Order Release Under 28 U.S.C. § 2241 ............... 66

E.   The Resumption of Classes Does Not Moot Plaintiffs' Claims Related to the Reduction of Rehabilitative Programming ........................................................... 67

F.   The Applicable Legal Standard for Children in OJJ Confinement ...................... 70

G.   Plaintiffs Have Satisfied the Elements for Granting a TRO ................................ 72

      i.   Plaintiffs Are Likely to Succeed on the Merits ........................................ 73

            a.   Violation of Fourteenth Amendment Rights ................................ 73

                  1.   OJJ's Testing Policy for Children Is Not Reasonably related to Rehabilitation and Undermines Health and Safety ....... 73

                  2.   OJJ's Failure to Depopulate Is Not Reasonably related to Rehabilitation and Undermines Health and Safety ........... 75

                  3.   OJJ's Failure to Provide Adequate Programming Is Not Reasonably related to Rehabilitation ................................ 77

                  4.   OJJ's Additional Actions Related to Its Pandemic Response Are Not Reasonably related to Rehabilitation and Undermines Health and Safety ......................................... 77

            b.   Violation of Eighth Amendment Rights ...................................... 78

      ii.   Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief .......... 80

      iii.   Defendants Will Not Be Harmed by Issuance of Emergency Relief ........ 81

      iv.   Emergency Relief Will Serve the Public Interest .................................... 82

      v.   No Security Is Required Under Rule 65(c) .............................................. 82

V.   Proposed Order for Relief .............................................................................. 82

As ordered by this Court during the May 27, 2020, telephone conference (*See* Dkt. 35), Plaintiffs-Petitioners (hereafter, "Plaintiffs") respectfully propose the following Findings of Fact and Conclusions of Law relative to the hearing on Plaintiffs' Motion for TRO held on June 3, 4, and 5, 2020.

## I.    Introduction and Procedural History

1.      On May 14, Named Plaintiffs J.H. (by and through his mother and next friend, N.H.) and I.B. (by and through his parents and next friends, A.B. and I.B.) filed a class action complaint (Dkt. 1)—against Governor Edwards, the Louisiana Office of Juvenile Justice ("OJJ"), and various OJJ officials (hereafter, "Defendants")—on behalf of a putative class of all children who are, or who will in the future be, confined in any one of OJJ's four secure care facilities. Plaintiffs brought their claims under the Fourteenth and Eighth Amendments to the United States Constitution.

2.      On May 15, Plaintiffs filed an Emergency Motion for Temporary Restraining Order ("TRO") (Dkt. 7) seeking an order immediately enjoining Defendants from (1) continuing to confine all children who are currently within 180 days of their release dates; (2) continuing to confine children who are presumptively eligible for release, including all children who are eligible for furlough under OJJ's criteria; (3) failing to test children for COVID-19; (4) using "Behavioral Intervention Rooms" for any child who tests positive for COVID-19 or displays symptoms of the disease; (5) confining children to their dormitories for lengthy periods of time; (6) using pepper spray on children; and (7) continuing the suspension of structured educational and rehabilitative programming in OJJ facilities.

3.      On May 20, this Court held a telephonic status conference (*see* Dkt. 21) during which the Court set a hearing on Plaintiffs' Motion for TRO for June 3, 2020. The Court ordered

1

Defendants to file a response on or before May 26 and granted Plaintiffs leave to file a reply any time prior to the second scheduled status conference on May 27.

4.      On May 26, Defendants filed their Memorandum in Opposition to Plaintiffs' Motion for TRO (Dkt. 25-2), and on May 27, Plaintiffs filed their Reply Memorandum in Support of the Motion (Dkt. 31).

5.      On May 27, this Court held a second telephonic status conference (*see* Dkt. 35) during which the Parties discussed the upcoming TRO hearing and the Court set deadlines for pre-hearing filings from both Parties.

6.      On June 2, Plaintiffs filed a Motion to Certify a Class (Dkt. 60) of "[a]ll children who are, or will in the future be, confined at Acadiana Center for Youth in Bunkie; Bridge City Center for Youth; Swanson Center for Youth at Columbia; and Swanson Center for Youth Monroe" pursuant to Rule 23(a), (b)(2), and (b)(1)(A).

7.      On June 3, a hearing on Plaintiffs TRO commenced before this Court via Zoom Video Conferencing. The hearing continued through June 4 and concluded the morning of June 5. This Court ordered the Parties to provide simultaneous submissions of Proposed Findings of Fact and Conclusions of Law by close of business on June 10. The Court specifically requested that Plaintiffs address in their briefing the power of the Court to order OJJ to furlough or release a child from an OJJ facility.

## II.    Parties to the TRO Hearing

### A.    Plaintiffs

8.      Plaintiff J.H. is a minor currently confined at Acadiana Center for Youth who was previously confined at Bridge City Center for Youth. J.H. brings this lawsuit through his mother and next friend, N.H., who is an adult resident of the state of Louisiana. N.H. brings this action on J.H.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2). N.H. is dedicated to the best interests of J.H. and

will advocate for those best interests in this action. J.H. and N.H. are concerned about J.H.'s health and well-being.

9.      Plaintiff I.B. is a minor currently confined at Swanson Center for Youth at Monroe. I.B. brings this lawsuit through his parents and next friends, A.B. and I.B., who are adult residents of the state of Louisiana. A.B. and I.B bring this action on I.B.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2). A.B. and I.B. are dedicated to the best interests of I.B. and will advocate for those best interests in this action.

10.     Plaintiffs seek to represent a putative class of all children who are, or will in the future be, confined at Acadiana Center for Youth in Bunkie ("ACY"); Bridge City Center for Youth ("BCCY"); Swanson Center for Youth at Columbia ("SCY Columbia"); and Swanson Center for Youth Monroe ("SCY Monroe"). As of May 26, 2020, there were 61 children at ACY, 49 children at BCCY, 42 children at SCY Columbia, and 61 children at SCY Monroe.[1]

**B.      Defendants**

11.     Defendant John Bel Edwards is the Governor of Louisiana ("Governor Edwards"). Governor Edwards has the responsibility to "support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed," pursuant to the Louisiana Constitution, Article IV, § 5. Further, he is entrusted with the authority to act in times of emergency, pursuant to Louisiana R.S. § 29.724(D)(1), and has the ultimate authority for ensuring that all executive agencies, including OJJ, function in compliance with state and federal laws. Governor Edwards spearheads Louisiana's decision making regarding COVID-19 and OJJ policies, including those regarding the appropriateness of OJJ's COVID-19 mitigation plan within facilities. Governor Edwards has failed to fulfill his duty to oversee OJJ. Governor Edwards has

---

[1] Dkt. 51, Stipulated Facts at ¶ 53.

the power, but to date has failed, to ensure that OJJ implements adequate policies and procedures to protect Plaintiffs and the putative class from the harms of COVID-19.

12.    Defendant OJJ is responsible for all children adjudicated delinquent and assigned to their care by the court system, either for supervision or custody in residential placement or its secure care facilities.

13.    Defendant Edward Dustin Bickham is the Interim Deputy Secretary of OJJ. The Deputy Secretary is appointed by Governor Edwards, serves as the agency head of OJJ, and is responsible for all OJJ operations.

14.    Defendant James Woods is the Director of the ACY. In this capacity, he is responsible for the operation of the ACY, where Plaintiffs are detained, and has immediate physical custody of Plaintiffs.

15.    Defendant Cassandra Washington[2] is the Interim Director of the BCCY. In this capacity, she is responsible for the operation of the BCCY, where Plaintiffs are detained, and has immediate physical custody of Plaintiffs.

16.    Defendant Shawn Herbert is the Director of the SCY Monroe. In this capacity, she is responsible for the operation of the SCY Monroe, where Plaintiffs are detained, and has immediate physical custody of Plaintiffs. Defendant Herbert is also the Director of the SCY Columbia. In this capacity, she is responsible for the operation of the SCY Columbia, where Plaintiffs are detained, and has immediate physical custody of Plaintiffs.

---

[2] When Plaintiffs filed their Class Action Complaint on May 14, Shannon Matthews was named as Director of Bridge City Center for Youth. Ms. Matthews was sued in her official capacity as director, a position now held by Ms. Washington.

17.    Defendant Rodney Ward is the Deputy Director of the Swanson Center for Youth at Columbia. In this capacity, he is responsible for the operation of the Swanson Center for Youth at Columbia, where Plaintiffs are detained, and has immediate physical custody of Plaintiffs.

C.    **Non-Parties to the TRO Hearing**

i.    **Plaintiffs' Unrebutted Expert Witnesses**

18.    This Court accepted Dr. Megan Maraynes as an expert in Pediatric Emergency Medicine and the Treatment of Pediatric COVID-19.[3] Dr. Maraynes submitted a declaration in support of Plaintiffs' TRO Motion[4] and provided live testimony before this Court on June 3. Dr. Maraynes is the Section Head of the Pediatric Emergency Department at Ochsner Medical Center and has held that position for the past five years.[5] She is board certified in General Pediatrics and Pediatric Emergency Medicine.[6] She participated in the development and updating of testing guidelines for COVID-19 as well as the clinical care guidelines for the evaluation and management of patients with suspected Pediatric Multi-System Inflammatory Syndrome ("PIMS").[7] She is currently writing a forthcoming publication that is a descriptive study of COVID-19 in the pediatric population.[8]

19.    The Parties' stipulated to Dr. Carlos Franco-Paredes' expertise in the fields of Infectious Disease, Epidemiology, and COVID-19.[9] This Court additionally accepted Dr. Franco-Paredes as an expert in those three fields specifically with respect to prisons and correctional facilities.[10] Dr. Franco-Paredes submitted a declaration in support of Plaintiffs' TRO Motion[11] and

---

[3] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 120:4-16.
[4] Pls.' Ex. 17, Maraynes Decl.
[5] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 117:3-8, 18-20.
[6] *Id.* at 119:20-22.
[7] *Id.* at 118:20-119:7.
[8] *Id.* at 119:23-120:3.
[9] Franco-Paredes Expert Tender, June 3 Hearing Tr. Part 1 at 169:21-171:2.
[10] *Id.* at 182:11-16.
[11] Pls.' Ex. 16, Franco-Paredes Decl.

provided live testimony before this Court on June 3. Dr. Franco-Paredes is an Associate Professor of Medicine at the University of Colorado in the Department of Medicine, Division of Infectious Diseases and has authored a textbook on infectious diseases.[12] He also holds a public health degree in global health from the Rollins School of Public Health at Emory University with a concentration on the dynamics of infectious disease epidemics and pandemics.[13] He has participated in developing international guidelines for pandemic influenza preparedness and response as well as the World Health Organization global health action plan for developing seasonal and pandemic influenza vaccine.[14] Dr. Franco-Paredes also has more than twenty years of relevant clinical experience and has provided care to individuals in civil detention centers.[15] He also has experience providing direct-patient care to more than 70 COVID-19 patients.[16] Since the beginning of the COVID-19 pandemic, Dr. Franco-Paredes has served as a medical expert or independent court-appointed inspector in six cases related to COVID-19 in carceral settings.[17] Dr. Franco-Paredes has also written and published many relevant scientific publications on the topics of infectious diseases, pandemics, and epidemics, particularly in influenza.[18] His last six publications have focused on the COVID-19 topic, including an upcoming publication in the New England Journal of Medicine on the need for further COVID-19 testing to guide population management in jails and prisons.[19]

20.    The parties stipulated to Mr. Vincent Schiraldi's expertise in Juvenile Justice and Justice Policy, and he was admitted as an expert in those fields by this Court.[20] Mr. Schiraldi

---

[12] *Id.* at ¶¶ 1, 5.
[13] *Id.* at ¶ 1.
[14] *Id.*
[15] *Id.* at ¶¶ 1-2.
[16] *Id.* at ¶ 3.
[17] *Id.* at ¶ 4.
[18] *Id.* at ¶ 5.
[19] *Id.*
[20] Schiraldi Expert Tender, June 3 Hearing Tr. Part 2 at 76:22-77:17.

submitted a declaration in support of Plaintiffs' TRO Motion[21] and provided live testimony before this Court on June 3, June 4, and June 5. Mr. Schiraldi is the former Director of Washington, D.C.'s Department of Youth Rehabilitation Services ("DYRS").[22] As Director of DYRS, Mr. Schiraldi oversaw juvenile facilities very similar in layout and use of rehabilitative modeling to that of OJJ's secure care facilities.[23] Mr. Schiraldi was also the Commissioner of the New York City Department of Probation and was responsible for the active supervision of 30,000 adults and juveniles.[24] Mr. Schiraldi was also appointed by the New York City Mayor as a Senior Advisor to his Office of Criminal Justice, which involved specifically developing and promoting policies around youth in the system.[25] Mr. Schiraldi has also worked for the National Center on Institutions and Alternatives (NCIA), the Center on Juvenile and Criminal Justice (CJCJ), the Justice Policy Institute, and Harvard University's Program in Justice Policy and Management at the Kennedy School of Government.[26] He is or has formerly been a board or commission member of the National Academy of Sciences' Committee on Juvenile Justice Reform Implementation, the New York State Council of Probation Administrators, the Federal Advisory Commission on Juvenile Justice for the Office of Juvenile Justice and Delinquency Prevention, the Council of Juvenile Correctional Administrators, the Washington, D.C. Blue Ribbon Commission on Youth Safety and Juvenile Justice Reform, among others.[27]

---

[21] Pls.' Ex. 18, Schiraldi et al. Decl.
[22] *Id.* at 9.
[23] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 79:14-80:10.
[24] Pls.' Ex. 18, Schiraldi et al. Decl. at 10.
[25] *Id.*
[26] *Id.* at 9-10.
[27] *Id.* at 12.

### ii.    Plaintiff Witnesses and Putative Class Members

21.    D.M. is a putative class member who testified as a witness for Plaintiffs on June 3. He is currently detained at SCY Monroe and testified credibly about his experiences both before and during the COVID-19 pandemic.

22.    J.P. is the mother of D.M., a putative class member currently detained at SCY Monroe. J.P. testified as a witness for Plaintiffs on June 3. J.P. testified credibly about D.M.'s experiences both before and during the COVID-19 pandemic. J.P. also submitted a declaration in support of Plaintiffs' TRO Motion.[28]

23.    W.H. is the mother of H.C., a putative class member currently detained at BCCY. W.H. testified as a witness for Plaintiffs on June 3. W.H. testified credibly about H.C.'s experiences both before and during the COVID-19 pandemic. W.H. also submitted a declaration in support of Plaintiffs' TRO Motion.[29]

24.    Seven additional mothers of Named Plaintiffs and putative class members submitted declarations in support of Plaintiffs' TRO Motion describing their sons' experiences in OJJ's secure care facilities both before and during the COVID-19 pandemic.[30]

## III.    Proposed Substantive Findings of Fact

### A.    The COVID-19 Pandemic

25.    COVID-19 is caused by the novel coronavirus, SARS-CoV-2. The virus causes upper respiratory tract illness, among other conditions, and it first emerged in Wuhan, China, in

---

[28] Pls.' Ex. 9, J.P. Decl.
[29] Pls.' Ex. 7, W.H. Decl.
[30] Pls.' Ex. 1, N.H. Decl. (mother of J.H., a Named Plaintiff currently detained at ACY); Pls.' Ex. 2, L.P. Decl. (mother of a putative class member currently detained at ACY); Pls.' Ex. 3, B.B. Decl. (mother of J.B., a putative class member currently detained at ACY); Pls.' Ex. 4, A.B. Decl. (mother of I.B., a Named Plaintiff currently detained at SCY Monroe); Pls.' Ex. 5, D.B. Decl. (mother of a putative class member currently detained at BCCY); Pls.' Ex. 6, S.W. Decl. (mother of J.S., a putative class member currently detained at SCY Monroe); Pls.' Ex. 10, D.W. Decl. (mother of D.M.W., a putative class member currently detained at BCCY).

December 2019.[31] As of June 10, 2020, there are over 7.2 million confirmed cases worldwide, and nearly 415,000 deaths.[32] In the United States, there are over 1.9 million confirmed cases, and over 100,000 deaths. Of these totals, Louisiana accounts for over 44,000 confirmed cases, and nearly 2,900 deaths.[33] These numbers continue to rise, with 562 confirmed cases and 19 new deaths (since the previous day) reported in Louisiana as recently as June 9.[34] The first presumptive positive COVID-19 case in the state was identified on March 9, 2020.[35]

            i.       **COVID-19 Symptoms and Pathology**

26.      COVID-19 is an acute respiratory syndrome.[36] There is currently no vaccine for COVID-19.[37]

27.      The symptoms of COVID-19 are varied.[38] Common symptoms include cough, fever, and shortness of breath.[39] Additional symptoms of COVID-19 include chest pain, headache, loss of smell, abdominal pain, rash, diarrhea, aches, and vomiting.[40]

28.      The CDC lists the following as COVID-19 symptoms in children: Fever, cough, nasal congestion, sore throat, shortness of breath, fatigue, headache, poor appetite, nausea or vomiting, and diarrhea.[41] This list is not exhaustive. The symptoms of COVID-19 for the under-21 population are varied and can include "minor runny nose, dry cough, no cough at all, abdominal

---

[31] National Institute of Allergy and Infectious Disease (NIAID), Coronaviruses, https://www.niaid.nih.gov/diseases-conditions/coronaviruses (last visited June 10, 2020).
[32] Johns Hopkins University, COVID-19 Dashboard, https://coronavirus.jhu.edu/map.html (last visited June 10, 2020).
[33] Louisiana Department of Health, Louisiana Coronavirus (COVID-19) Information, http://ldh.la.gov/coronavirus/ (last visited June 10, 2020).
[34] Jeff Nowak, *Coronavirus in Louisiana, June 9: New cases jump by 562 across state, bucking recent trend*, NOLA.COM (June 9, 2020), https://www.nola.com/news/coronavirus/article_8d00fe16-aa6c-11ea-b805-4b8d0aded4ac.html?1591722064384&utm_medium=notification&utm_source=pushly&utm_campaign=desktop_push.
[35] Dkt. 51, Stipulated Facts at ¶ 15.
[36] *Id.* at ¶ 4.
[37] *Id.* at ¶ 9.
[38] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 120:18-21.
[39] Dkt. 51, Stipulated Facts at ¶ 4.
[40] *Id.*
[41] Pls.' Ex. 36, CDC Information for Pediatric Healthcare Providers on COVID-19.

pain, vomiting, diarrhea, fever, sore throat, fatigue, muscle aches . . . [b]asically any symptom you can think of could be COVID."[42]

29.    COVID-19 also can present completely asymptomatically.[43] In fact, the majority of infected individuals are asymptomatic or mildly symptomatic, and people without symptoms can spread the disease.[44]

30.    COVID-19 can present without a fever.[45] COVID-19 can present without a headache.[46] COVID-19 symptoms are not easily distinguishable from allergy symptoms—both can involve runny nose, red eyes, cough, and sore throat.[47]

31.    COVID-19 can cause pneumonia, respiratory failure, heart failure, sepsis, and death.[48]

32.    There is an increased risk of serious complications in patients infected with COVID-19 who also suffer from certain co-morbidities, including asthma, hypertension, diabetes, human immunodeficiency virus (HIV) infection, and other immunocompromising conditions.[49] Obesity is also a risk factor for developing a complicated clinical course.[50] The more complicated the clinical course, the more likely the patient is to sustain permanent damage or even death.

33.    There are no tests that can predict the course of a COVID-19 patient's illness.[51]

---

[42] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 120:21-25; *see also* Pls.' Ex. 17, Maraynes Decl. at ¶ 4.
[43] *Id.* at 120:21-22.
[44] Dkt. 51, Stipulated Facts at ¶ 6.
[45] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 121:3-5.
[46] *Id.* at 121:1-2.
[47] *Id.* at 121:6-9.
[48] Dkt. 51, Stipulated Facts at ¶ 4.
[49] *Id.* at ¶ 5.
[50] *Id.*
[51] *Id.* at ¶ 7.

### ii.    COVID-19 Transmission

34.    COVID-19 is highly transmissible.[52] Recent estimates indicate that each infected person transmits the virus to 5.7 other persons on average in community settings.[53] This is a highly infectious rate, second only to the influenza pandemic of 1918.[54]

35.    The virus spreads mainly from person-to-person, especially those who are in close contact with one another.[55] It is transmitted through "respiratory droplets produced when an infected person coughs, sneezes, or talks."[56] "These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs."[57] "Only a small amount of virus" is required to transmit the disease from one person to another.[58] It is also possible for the virus to live in the environment and be picked up from surfaces and transmitted through touching of the face.[59]

36.    Unlike influenza, which primarily is transmitted only by symptomatic patients, COVID-19 can be passed on by people who are asymptomatic.[60] This is particularly true in congregate living settings such as nursing homes and correctional facilities, where asymptomatic cases may be responsible for up to 80 percent of disease spread.[61]

37.    Preventative measures—like wearing masks, hand washing, social distancing, and testing—are essential for preventing transmission of the virus.[62]

---

[52] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 132:8; Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 34:23.

[53] Steven Sanche et al., CDC, *High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronavirus* 2, 26-7 EMERGING INFECTIOUS DISEASES (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.

[54] Pls.' Ex. 14, Vassallo Decl., at ¶ 3.

[55] CDC, How COVID-19 Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 10, 2020).

[56] *Id.*

[57] *Id.*

[58] Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 34:23-24.

[59] *Id.* at 35:2-7.

[60] Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 184:2-20.

[61] *Id.* at 184:13-20.

[62] Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 11:13–25.

38.    Correctional facilities have become epicenters of COVID-19 transmission in the United States.[63] High transmission rates in jails and prisons are likely because of limitations on social distancing.[64] The CDC has acknowledged that "not all [social distancing] strategies will be feasible in all facilities," but social distancing is only effective when it is practiced all the time.[65] Limited social distancing is "insufficient to stop [] outbreaks."[66] Even just one infected person could infect the majority of a facility.[67]

39.    Juvenile justice facilities in Louisiana have features that heighten the risk of contagion and disease outbreak, including dorm-style living arrangements; shared bathrooms, dining, and social areas; and general lack of cleanliness.[68] These dorm settings are concerning because they involve constant interaction among children and staff.[69] Visits to the infirmary for routine care provide another opportunity for transmission.[70] Adolescents' developmental characteristics contribute to the challenges of preventing outbreaks in a juvenile facility, as adolescents are less future-oriented, more inclined to engage in risky behavior, and are vulnerable to peer pressure, which can make it challenging to implement disease-control tactics like wearing masks or social distancing.[71]

### iii.    Risks for Children

40.    Children are at risk of serious harm to their health if they contract COVID-19.[72] Although the risk overall of a child developing a severe case of COVID-19 is relatively low, it is

---

[63] Pls.' Ex. 16, Franco-Paredes Decl. at ¶ 11.
[64] Pls.' Ex. 14, Vassallo Decl. at ¶ 10.
[65] Pls.' Ex. 13, Graves Decl., at ¶ 14. *See also* Pls.' Ex. 16, Franco-Paredes Decl. at ¶ 22.
[66] Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 63:4–8.
[67] Pls.' Ex. 13, Graves Decl. at ¶ 17.
[68] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 81:21-82:17.
[69] Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 188:11–21.
[70] Pls.' Ex. 17, Maraynes Decl. at ¶ 15.
[71] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 82:1-83:6.
[72] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 123:4-6.

a risk that "should be taken seriously."[73] A study out of the Montefiore Children's Hospital found that 28 percent of pediatric cases required intensive care.[74] At least two children in Louisiana have died after contracting COVID-19.[75]

41.     A pediatric COVID-19 course progresses differently in each individual, just as it does for adults. It can be asymptomatic. It can "run its course like a minor cold."[76] It could also cause "pretty significant respiratory complications," including "multi-focal pneumonia, hypoxia, [and] chest pains requiring hospitalization."[77] Children whose respiratory distress is severe enough to require intubation may encounter difficulty re-establishing normal lung function, and some may never re-establish normal lung function, leaving them with serious long-term issues.[78]

42.     To evaluate the seriousness of a pediatric case of COVID-19, medical providers need to perform diagnostic testing—including checking the child's vital signs and oxygen saturation levels, obtaining lab work, getting a chest x-ray, and maybe doing a chest CAT scan.[79]

43.     A child with COVID-19 can decompensate "quickly;" "any kind of respiratory complication can happen quickly."[80]

44.     Children with underlying immunodeficiency, who are on chronic steroids, or who have chronic inflammatory conditions—especially those affecting the lungs —are at higher risk of

---

[73] Pls.' Ex. 17, Maraynes Decl. at ¶ 7.
[74] Jerry Y. Chao et al., *Clinical Characteristics and Outcomes of Hospitalized and Critically Ill Children and Adolescents with Coronavirus Disease 2019 (COVID-19) at a Tertiary Care Medical Center in New York City*, JOURNAL OF PEDIATRICS at 5 (May 6, 2020), https://doi.org/10.1016/j.jpeds.2020.05.006.
[75] Dkt. 51, Stipulated Facts at ¶ 3.
[76] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 121:23-25.
[77] *Id.* at 121:24-122:2.
[78] *Id.* at 128:8-13.
[79] *Id.* at 122:11-21.
[80] *Id.* at 122:6-10.

serious harm to their health if they contract COVID-19.[81] Children with obesity and diabetes are also at risk.[82]

45.     Children who contract COVID-19 are also at risk of developing pediatric inflammatory multisystem syndrome ("PIMS," elsewhere referred to as MIS-C—multisystem inflammatory syndrome in children). The World Health Organization (WHO) has characterized PIMS as an "acute illness accompanied by a hyperinflammatory syndrome, leading to multiorgan failure and shock."[83] Cases have been reported in the United States, Italy, France, Switzerland, and the United Kingdom.[84]

46.     PIMS is thought to be a "toxic-shock-like system wide reaction related to a previous COVID infection" likely "within the previous four weeks."[85]

47.     The CDC has conservatively defined the parameters of PIMS as: (1) "[t]he patient is under the age of 21, with a fever, laboratory evidence of inflammation, and severe illness requiring hospitalization, with multisystem organ involvement (cardiac, renal respiratory, hematologic, gastrointestinal, dermatologic, or neurological;" (2) "[n]o other plausible diagnoses;" and (3) "[p]ositive COVID-19 test, or exposure to a confirmed case, within the four weeks prior to the onset of symptoms."[86] The CDC issued an emergency health alert regarding the syndrome on May 14, 2020.[87]

---

[81] *Id.* at 123:7-14.
[82] *Id.* at 123:14-16.
[83] World Health Organization, Scientific Brief: Multisystem inflammatory syndrome in children and adolescents temporally related to COVID-19 (May 15, 2020), https://www.who.int/newsroom/commentaries/detail/multisystem-inflammatory-syndrome-in-children-and-adolescents-with-covid-19.
[84] T.R. Hennon et al., COVID-19 associated Multisystem Inflammatory Syndrome in Children (MISC).
guidelines; a Western New York approach, Progress in Pediatric Cardiology (2020),
https://doi.org/10.1016/j.ppedcard.2020.101232
[85] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 127:1-3.
[86] Louisiana Department of Health, Louisiana Department of Health Warns About Multisystem Inflammatory System in Children (MIS-C), http://ldh.la.gov/index.cfm/newsroom/detail/5611 (last visited June 10, 2020).
[87] CDC, Multisystem Inflammatory Syndrome in Children (MIS-C) Associated with Coronavirus Disease 2019 (COVID-19), (May 14, 2020, 4:45 PM EST), https://emergency.cdc.gov/han/2020/han00432.asp.

48.    In New Orleans alone, the Ochsner emergency department has seen six or seven children presenting with PIMS, in addition to the eleven who have presented at Children's Hospital in New Orleans.[88]

49.    PIMS has multisystem symptoms, so the clinical diagnostic criteria checks for fever, conjunctivitis, red lips, gastrointestinal symptoms, red lips, and red tongue, low blood pressure, swelling or peeling of the hands or feet, and/or rapid heart rate.[89] Because it can show up as non-specific symptoms, it may be confused with other more benign conditions, including allergies, with fatal results.[90] In addition to the above-listed symptoms, patients test positive for the COVID-19 antigen (in the case of acute infection), COVID-19 antibodies (to indicate previous infection), or a potential COVID-19 exposure.[91] There is no way of knowing who is at risk of developing PIMS.[92]

50.    Treatment of PIMS patients requires a broad array of specialized cardiology and critical care services, including analysis of inflammatory markers, fluid resuscitation, antibiotics, and vasopressor support for patients facing heart failure.[93] Symptoms can rapidly progress to life-threatening shock, requiring immediate hospital treatment within the first hour.[94] Yet, despite the need for a rapid response with specialized treatment to avoid catastrophic consequences, there is no way of knowing when or whether a symptom as benign seeming as a rash will progress to

---

[88] Pls.' Ex. 17, Maraynes Decl. at ¶ 8; Emily Woodruff, *There are 11 Louisiana cases of the pediatric inflammatory condition that's linked to coronavirus*, NOLA.COM (May 22, 2020), https://www.nola.com/news/coronavirus/article_cc495d86-9c55-11ea-bf78-87380aa2aa98.html.
[89] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 127:4-10; *see also* Pls.' Ex. 17, Maraynes Decl. at ¶ 9.
[90] Pls.' Ex. 17, Maraynes Decl. at ¶ 9.
[91] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 127:6-10; Pls.' Ex. 17, Maraynes Decl. at ¶ 9.
[92] Pls.' Ex. 17, Maraynes Decl. at ¶ 9.
[93] *Id.* at ¶ 10.
[94] *Id.*

shock.[95] The one thing the health care provider can know in advance, with appropriate testing, is whether the child has been exposed or infected with COVID-19.

51.     Alarmingly, asymptomatic children are not safe from PIMS.[96] While it is clear that PIMS is related to, and associated with, COVID-19,[97] many children presenting with PIMS test negative for an active infection with COVID-19 but test positive for the antibody. That means that those children were asymptomatic carriers of COVID-19, not tested when they were infected.[98] In other words, seemingly healthy children who have been exposed to COVID-19 could be at high risk of developing—and potentially dying—from PIMS.[99]

52.     Because COVID-19 is a novel disease, long-term effects of COVID-19 on a child's future health remain unknown.[100]

### iv.     COVID-19 Guidance

53.     Throughout the pandemic, the Centers for Disease Control and Prevention ("CDC") has published periodic guidelines to assist governments, workplaces, agencies, and individuals in creating policies and implementing practices to mitigate the transmission of COVID-19.

54.     Early in the pandemic, on March 23, 2020, the CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."[101] The Interim Guidance attempted to address the "unique challenges" facing correctional facilities where detainees live and eat in close proximity with one another.[102] The Interim Guidance, which applies broadly to all correctional facilities, adult and children facilities

---

[95] *Id.*
[96] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 127:19-23.
[97] *Id.* at 127:11-15.
[98] *Id.* at 127:13-18.
[99] Pls.' Ex. 17, Maraynes Decl. at ¶ 11; Maraynes Testimony, June 3, 2020 Hearing Tr. Part 1 at 127:23-25.
[100] Dkt. 51, Stipulated Facts at ¶ 8.
[101] Pls.' Ex. 27.
[102] *Id.* at 2.

alike, notes that "[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."[103]

55.    Since March, the CDC has published a variety of different guidance documents and web pages. "Information for Pediatric Healthcare Providers" and "Groups at Higher Risk for Severe Illness" are CDC web resources.[104] The CDC website also contains resources on symptoms, testing, prevention, what to do if you are sick, people who need extra precautions, travel, and many more.[105] CDC Guidance documents include "Get Your Home Ready,"[106] "Caring for Yourself at Home,"[107] and many more. The web pages are updated as more information becomes available about the nature of the disease, and new guidance documents also continue to be published.[108] For example, on May 3, the CDC published updated guidelines for testing on its website.[109] The March 23 Interim Guidance has not been updated since its publication.

56.    The American Academy of Pediatrics ("AAP") also issued recommendations, noting that "[t]he COVID19 pandemic presents unique challenges to the health and well-being of youth involved with the justice system."[110] The AAP recommended, among other things, that facilities prepare and publish COVID-19 response plans, ensure that youth and families are notified of suspected and confirmed cases in a timely manner, and release youth who can be safely cared for in their home communities.[111]

---

[103] *Id.* at 1.
[104] Pls.' Exs. 36 and 37.
[105] *See generally* Coronavirus (COVID-19), CDC, https://www.cdc.gov/coronavirus/2019-ncov/index.html (last visited June 10, 2020).
[106] *Available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19_FAQ_HouseholdReady-H.pdf.
[107] *Available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/10Things.pdf.
[108] For example, "Information for Pediatric Healthcare Providers" contains a notation indicating that it was "Updated May 20, 2020." Pls.' Ex. 36; "CDC Activities and Initiatives Supporting the COVID-19 Response and the President's Plan for Opening America Up Again" was published on May 26, 2020. Pls.' Ex. 28.
[109] Pls.' Ex. 35.
[110] Pls.' Ex. 32.
[111] *Id.*

57.    Likewise, on March 22, Physicians for Criminal Justice Reform issued a memorandum to state governors and juvenile correction facilities, among others.[112] Physicians for Criminal Justice Reform recommended "[i]mmediately releas[ing] youth in detention and correctional facilities who can safely return to the home of their families and/or caretakers" and "establish[ing] and shar[ing] publicly a COVID-19 safety plan for all youth who remain in the facilities."[113]

### B.    The Office of Juvenile Justice

#### i.    Louisiana's Juvenile Justice System Is Strictly Rehabilitative

58.    Pursuant to Louisiana Constitution Article V, § 19, the nature of the juvenile justice system is a non-criminal "focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody."[114] OJJ's core purpose is to provide safe and effective individualized services to children. Custody is not punitive; it is a step in the total treatment process aimed at the rehabilitation of the child.[115]

59.    Under Louisiana law, a child who is adjudicated for a delinquent act and removed from the custody of his parents shall receive "care as nearly as possible equivalent to that which the parents should have given him."[116]

---

[112] Pls.' Ex. 33.
[113] *Id.*
[114] *In re C.B.*, 708 So. 2d 391, 397 (La. 1998) (emphasis added).
[115] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 32:17-33:9; *see also* La. Rev. Stat. § 15:906(B).
[116] La Ch. Code Article 801.

ii.    **OJJ's Plenary Authority Regarding the Placement of Children in Its Custody**

60.    OJJ has the authority to determine the appropriate placement for a child in its custody.[117] "[T]he legislature has bestowed upon [OJJ] the plenary power to make decisions with respect to those juveniles committed to its custody."[118]

61.    Louisiana law mandates that OJJ review each child periodically to ensure that he is placed in the "least restrictive" setting,[119] "preferably in his own home."[120] This means increasing opportunities for early release and "step down" from secure care, which is a priority for OJJ and a critical component of the agency's goals and strategies.[121]

62.    OJJ uses the Structured Assessment of Violence Risk in Youth (SAVRY) as a tool for evaluating which children may be good candidates for step down to a less restrictive setting, early release, or furlough.[122] The SAVRY uses a variety of factors to assess risk.[123] Neither adjudicated offense nor offense severity is among the thirty-plus factors.[124]

a.    **OJJ's Secure Care Facilities**

63.    OJJ's secure care facilities are the most restrictive settings for children who are adjudicated delinquent in Louisiana.

---

[117] La Ch. Code Article 908 ("Notwithstanding any other provisions of law to the contrary, the Department of Public Safety and Corrections, office of juvenile justice, shall have sole authority over the placement, care, treatment, or any other considerations deemed necessary from the resources that are available for children judicially committed to the department."); La. Rev. Stat. § 15:901(D)(1) ("Upon commitment to the Department of Public Safety and Corrections, *the department shall have sole custody of the child* and, except as provided for in Children's Code Article 897.1, *shall determine the child's placement*, care, and treatment, and the expenditures to be made therefor, through appropriate examinations, tests, or evaluations conducted under the supervision of the department.") (emphasis added).
[118] *State ex rel. C.M.*, 2014-0088 (La. App. 4 Cir 05/28/14), 141 So. 3d 921, 923.
[119] La. Rev. Stat. § 15:902.3; La Ch. Code Article 901.
[120] La Ch. Code Article 801.
[121] Pls.' Ex. 62, OJJ Strategic Plan at 12.
[122] Pls.' Ex. 57 at 698, Youth Services Policy C.4.1.VI (Standard Furlough); *id.* at 33, Youth Services Policy B.2.1 (Reassignment and Early Release); *id.* at 450-52, Youth Services Policy B.2.14.VI (Secure Care SAVRY).
[123] Pls.' Ex. 61, SAVRY Rating Form.
[124] *Id.*

64.     OJJ maintains four secure care facilities—ACY, BCCY, SCY Monroe, and SCY Columbia—detaining children who have been adjudicated delinquent.[125]

### b.     OJJ's Authority to Place Children in Less Restrictive Settings

65.     OJJ can step children down from secure care to a less restrictive setting without any court action, and even without notification.[126]

66.     OJJ has the authority to place children in their homes, under supervision.[127] Placement at home under supervision is distinct from early release; children whom OJJ has placed at home remain in OJJ custody.[128]

### c.     OJJ's Authority and Procedure for Release of Children from Secure Settings

67.     Unlike step down to a less restrictive setting, OJJ must petition a court to obtain a child's early release from OJJ custody, which requires a modification of disposition.[129]

68.     OJJ conducts regular reviews for all children, with the intention of identifying opportunities for step down as well as early release from custody, and begins developing release plans almost immediately after the child arrives at the facility.[130]

69.     If a change in disposition is sought, a motion to modify the child's disposition must be filed with the juvenile court. A motion to modify may be filed by any party to the case, including the child, the OJJ, the court, or the DA. The juvenile court judge maintains the authority to modify

---

[125] Dkt. 51, Stipulated Facts at ¶ 10.

[126] La Ch. Code Article 911. The only exception is children adjudicated under Article 897.1 of the Children's Code. OJJ recently used this plenary authority to step down approximately five children on its chronic care list. Bickham Testimony, June 4 Hearing Tr. Part 2 at 191:22-192:5.

[127] Louisiana law provides that "community placement services shall have authority and responsibilities for children adjudicated delinquent or in need of supervision, including…[t]o place children in the setting most appropriate to their needs." La. Rev. Stat. § 15:901(G)(1).

[128] Home confinement is referred to in the Children's Code as "custody." La Ch. Code Article 886(D). Furthermore, children on furlough are still in OJJ custody: "A temporary furlough as provided herein is not to be considered a release from commitment and does not affect the jurisdiction of the juvenile court or the authority of the department as to the children granted a temporary furlough." La. Rev. Stat. § 15:908.

[129] La Ch. Code Article 911.

[130] La. Rev. Stat. § 15:901(F); Pls.' Ex. 57 at 1541, Youth Services Policy B.2.18 (Reintegration Process).

the disposition of a child and release them from custody under supervision, or to terminate the disposition in its entirety.[131] If a motion to modify is filed, a contradictory hearing shall be held unless the District Attorney files an affidavit averring that he has no opposition to the motion.[132]

70.    There are some limited restrictions regarding modification of disposition for more serious offenses.[133] OJJ has a statutory responsibility to assist the court to evaluate the appropriateness of modification for these more serious offenses.[134]

71.    Children may be ineligible for modification due to the specifics of their plea agreements.[135]

72.    Children in OJJ custody who have been adjudicated for non-violent offenses are entitled to judicial review of their disposition after nine months and then every six months thereafter. At this hearing, there is a presumption of release "unless the court finds by clear and convincing evidence that the child's treatment cannot be accessed and completed in a less restrictive setting."[136]

73.    OJJ has the authority and responsibility to petition a court to change a child's disposition, and its recommendation carries significant weight with the court.[137] The law requires OJJ to "periodically" assess whether the child is in the "least restrictive placement most appropriate to their needs and consistent with the circumstances of the case and the protections of

---

[131] La. Ch. Code Article 909.
[132] La. Ch. Code Article 911.
[133] La. Ch. Code Article 897.1.
[134] *Id.*
[135] J.P. Testimony, June 3 Hearing Tr. Part 1 at 112:3-13.
[136] La. Ch. Code Article 898.
[137] "Except as provided for in Children's Code Article 897.1, *the Department of Public Safety and Corrections may recommend to the committing court the release of any juvenile committed to its care, who, in the opinion of the department, is ready to be returned to his own home, or to a substitute home*…. It is hereby declared to be the public policy of this state that *commitment of a juvenile to the care of the department is not punitive* nor is it in any way to be construed as a penal sentence, but as a step in the total treatment process toward rehabilitation of the juvenile and that, *therefore, the recommendations of the department should be given careful consideration by the court in determining what is to the best interest of the juvenile.*" La. Rev. Stat. § 15:906 (emphasis added).

21

the best interests of society and the safety of the public within the state."[138] While the details of the review process are left to the department to decide, having a regular review process is mandated and, furthermore, if the outcome of the process is that a less restrictive setting is appropriate, the department *must* file a motion to modify.[139]

74.     A disposition modification is entirely distinct from a furlough.[140] A child can be simultaneously ineligible for modification of disposition and eligible for furloughs.[141]

### d.     OJJ's Furlough Program

75.     OJJ's furlough program provides for authorized temporary release from the grounds of a secure care facility.[142] Although OJJ normally does not have authority to unilaterally authorize a furlough,[143] the criteria for and length of a furlough is entirely within the discretion of OJJ.[144]

76.     For a child to be granted a furlough, OJJ must send notice of the furlough recommendation, and the district attorney may object, which would trigger a contradictory hearing. The judge may then grant or deny the furlough at that hearing regardless of the objection of the district attorney. Even without district attorney objection, a judge could either deny the furlough

---

[138] La. Rev. Stat. § 15:902.3.

[139] La. Rev. Stat. § 15:902.3(E) ("If the recommendation includes placement in a less restrictive setting, the department shall file a motion with the court and serve a copy of the motion on the district attorney in accordance with Children's Code Article 911.").

[140] La. Rev. Stat. § 15:908 ("A temporary furlough as provided herein is not to be considered a release from commitment and does not affect the jurisdiction of the juvenile court or the authority of the department as to the children granted a temporary furlough.").

[141] Pls.' Ex. 57, Relevant OJJ Youth Service Policies at 698, Youth Services Policy C.4.1.VI (Standard Furlough). For example, D.M., has been denied modification for early release but has nevertheless been deemed furlough-eligible and granted repeated furloughs. D.M. Testimony, June 3 Hearing Tr. Part 1 at 83:25-84:10

[142] Pls.' Ex. 57, Relevant OJJ Youth Service Policies at 696, Youth Services Policy No. C.4.1 (Furlough Process).

[143] Since the normal furlough program has been suspended, at least one child has been furloughed home for quarantine without any indication that OJJ sought court or DA approval. Pls.' Ex. 53, Mar. 31 Memo from Denise Dandridge at 2.

[144] The Louisiana statute governing furloughs places no restrictions on eligibility criteria or duration of furloughs. La. Rev. Stat. § 15:908(A). Additionally, the law mentions no restrictions regarding children adjudicated under Article 897.1. OJJ's furlough policy draws this distinction; it is not statutory.

without a hearing, or set a hearing at which he may grant or deny the furlough. However, there is no requirement that either the district attorney or the judge affirm their lack of objection.

77.    The furlough process differs from the process for seeking a modification of disposition, which *requires* a contradictory hearing unless the district attorney files an affidavit averring that he does not oppose the motion. This suggests that, for furloughs, there is a presumption in favor of OJJ's recommendation.

78.    Only OJJ has the authority to initiate the furlough process. There is no mechanism for a child to petition the court for a furlough, or for a court t the to grant a furlough absent a recommendation from OJJ.

### C.    OJJ's COVID-19 Response

79.    Denise Dandridge, OJJ's Director of Health Services, spearheaded OJJ's COVID-19 response in early March in connection with then-Deputy Secretary Dr. James Bueche.[145] Despite being the person responsible for implementing OJJ's COVID-19 guidelines, Ms. Dandridge had not visited any of the facilities since late February—before the pandemic and before OJJ's guidelines were prepared in early March. In fact, Ms. Dandridge did not visit the facilities until May 19—five days after Plaintiffs filed this action on May 14.[146] Edward "Dusty" Bickham stepped in as OJJ's Interim Deputy Secretary on March 26—four days after OJJ's first positive COVID-19 test among the children and approximately two weeks after the World Health Organization declared COVID-19 a pandemic.[147] Mr. Bickham does not have any prior experience

---

[145] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 38:14-39:6.
[146] *Id.* at 39:24-40:1, 73:4-16.
[147] Bickham Testimony, June 5 Hearing Tr. at 34:11-15.

working within a juvenile secure care facility.[148] Since stepping in as Interim Director more than two months ago, Mr. Bickham has visited only two of OJJ's four secure care facilities.[149]

### i.    Chronology of OJJ's COVID-19 Response

80.    On or about March 14, 2020, OJJ was notified that a regular volunteer at BCCY had tested positive for COVID-19.[150] This volunteer had had contact with seven children.[151]

81.    In response to the exposure, Dr. Bueche implemented a monitoring program in which OJJ planned not to inform the seven children that they had been exposed to COVID-19.[152] In response to Dr. Bueche's email implementing the monitoring program, Dandridge wrote that the seven children would "only think they are being chosen to have their temps taken as a random precautionary measure."[153] In other words, *OJJ planned not to inform the children or their parents regarding the children's exposure to this deadly virus*, leaving them without the information to monitor their symptoms. Those children were not immediately quarantined.[154]

82.    The first child in OJJ's secure care facilities to be tested for COVID-19 was tested on March 20,[155] six days after OJJ learned of the exposure of seven children to a confirmed case. The child tested negative.[156]

83.    Dorm-wide quarantine of children exposed to the COVID-19-positive volunteer did not begin in the facilities until March 20,[157] six days after OJJ learned of the exposure.

---

[148] *Id.* at 27:17-23.
[149] *Id.* at 35:25-36:4.
[150] Dkt. 51, Stipulated Facts at ¶ 31.
[151] *Id.* at ¶ 32.
[152] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 41:20-23, 43:12-44:12; *see also* Pls.' Ex. 41, Dandridge Aff. at 32.
[153] Pls.' Ex. 41, Dandridge Aff. at 32.
[154] *Id.*
[155] *See* Pls.' Ex. 21, COVID-19 Test Results; *see also* Defs.' Ex. 45, Dandridge Aff. at ¶ 25 ("The first COVID-19 test of a youth in an OJJ secure care facility was performed on March 20, 2020.").
[156] *See* Pls.' Ex. 21, COVID-19 Test Results.
[157] Defs.' Ex. 45, Dandridge Aff. at ¶ 28.

84.    A child at ACY who was tested on March 22 was the first OJJ child to test positive.[158] No other children at ACY have been tested.[159]

85.    Ten children at BCCY tested positive between March 23 and April 1, and two children at BCCY have tested negative, one on March 20 and one on March 25.[160] One of the children who tested negative was furloughed home for quarantine.[161] No other children at BCCY have been tested.[162] Two of the positive cases, and one negative, were in the Pride dorm—no other children from Pride have been tested.[163] Three of the positive cases were in the Perseverance dorm—no other children from Perseverance have been tested.[164] One of the positive cases, and one negative, were in the Destiny dorm—no other children from Destiny have been tested.[165] One of the positive cases was in the Hope dorm—no other children from Hope have been tested.[166] Three of the positive cases were in the Harmony dorm—no other children from Harmony have been tested.[167]

86.    Five children at SCY Monroe tested positive between April 6 and April 12.[168] The five positives at SCY Monroe were housed in five *different* dorms.[169] No other children at SCY Monroe have been tested.[170]

---

[158] Dkt. 51, Stipulated Facts at ¶ 33.
[159] *See* Pls.' Ex. 21, COVID-19 Test Results.
[160] Dkt. 51, Stipulated Facts at ¶ 34.
[161] Pls.' Ex. 53, Mar. 31 Memo from Denise Dandridge at 2.
[162] *See* Pls.' Ex. 21, COVID-19 Test Results.
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] Dkt. 51, Stipulated Facts at ¶ 35.
[169] *See* Pls.' Ex. 21, COVID-19 Test Results.
[170] *Id.*

87.     Twelve children at SCY Columbia tested positive between March 30 and April 9.[171]

No other children at SCY Columbia have been tested.[172]

88.     On April 2, when there were approximately 16 confirmed COVID-19 positives among the children, Mr. Bickham prepared a "Depopulation Plan."[173] The Depopulation Plan provided for three proposed phases of depopulation. Phase one instructed facilities to "[i]dentify youth with medical issues that require chronic care for extended furlough or early release."[174] The facilities identified nine children as potential candidates.[175] Phase two instructed facilities to "[i]dentify youth with non-violent, non-sex offenses that meet eligibility for extended furlough or early release."[176] The facilities identified 11 children as potential candidates.[177] And phase three instructed facilities to "[i]dentify youth with violent, non-sex offenses that meet eligibility for furlough or early release," and the facilities identified 30 children as potential candidates.[178] Mr. Bickham implemented a portion of phase one of the Depopulation Plan, using OJJ's plenary power to step down or transfer home five of the approximately 17 children on the chronic care list.[179] At least as of the hearing date, however, Mr. Bickham had failed to implement the remainder of phase one, or any part of phase two or phase three of the Depopulation Plan,[180] In fact, Mr. Bickham has not provided any indication of the circumstances that he believes would trigger a need to implement phase two or phase three.

---

[171] Dkt. 51, Stipulated Facts at ¶ 36.
[172] *See* Pls.' Ex. 21, COVID-19 Test Results.
[173] Defs.' Ex. 15, Depopulation Plan; Bickham Testimony, June 5 Hearing Tr. at 46:19-21.
[174] *See* Defs.' Ex. 15, Depopulation Plan.
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] Pls.' Ex. 20, Chronic Care List; Bickham Testimony, June 4 Hearing Tr. Part 2 at 191:4-6.
[180] Bickham Testimony, June 4 Hearing Tr. Part 2 at 193:1-2.

### ii.    OJJ's COVID-19 Testing Policies

89.    OJJ's COVID-19 response includes a policy of testing children *only* when they are reporting symptoms; children in the secure care facilities who are not exhibiting symptoms are not being tested.[181] OJJ does not test its staff at all; it relies on the staff to self-report test results.[182]

90.    Children in OJJ's secure care facilities who are asymptomatic are not being tested for COVID-19, even if they have been potentially exposed to a confirmed COVID-19 patient, and even if other children in their dorm have tested positive. OJJ secure care facilities have dormitory style living, with up to 12 children sleeping in one large room.[183] Multiple children in the same dorms within OJJ facilities tested positive for COVID-19 within days of each other, yet OJJ continued to only test symptomatic children.[184]

91.    OJJ currently has no plans to test any children or staff members who are not displaying symptoms of COVID-19 and who have not already been tested.[185]

92.    Thirty children in OJJ's secure care facilities have been tested for COVID-19 as of June 1, 2020.[186] Of those thirty children, 28 tested positive.[187] These numbers are misleading (i.e., almost certainly vastly under-reported), however, since no child in OJJ's secure care facilities has been administered an initial test for COVID-19 since April 12.[188]

93.    Defendants' justification for their failure to test any children since April 12 is that no child has exhibited symptoms since that date. Yet, Defendants concede that COVID-19 symptoms include, among others, cough, headache, abdominal pain, rash, diarrhea, aches, and

---

[181] Dkt. 51, Stipulated Facts at ¶ 25.
[182] Bickham Testimony, June 5 Hearing Tr. at 41:11-13; *see also* Dandridge Testimony, June 4 Hearing Tr. Part 2 at 52:23-25.
[183] Dkt. 51, Stipulated Facts at ¶ 48.
[184] Pls.' Ex. 21, COVID-19 Test Results; Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 30:10-14.
[185] Dkt. 51, Stipulated Facts at ¶ 27.
[186] *Id.* at ¶ 22.
[187] *Id.*
[188] *See* Pls.' Ex. 21, COVID-19 Test Results; *see also* Dandridge Testimony, June 4 Hearing Tr. Part 2 at 52:5-9.

vomiting[189]—all common and non-specific symptoms. Defendants' justification rests on the assertion that every one of the more than 200 children in OJJ's secure care facilities has been entirely without medical symptoms since April 12—no coughs, no headaches, no abdominal pains, no rashes, no diarrhea, no muscle aches, no vomiting since April 12. Dr. Maraynes testified that it would be "surprising" if in fact no child had complained of symptoms in that time and that she "doubt[s]" that no child has had symptoms.[190] Dr. Franco-Paredes similarly testified that it was "hard to believe" that no children had had symptoms since April 12.[191]

94.    Indeed, Defendants admitted that they rely on the children to self-report symptoms to OJJ staff, or to "put in a sick call."[192] But, according to D.M., OJJ staff never instructed the children to report any symptoms characteristic of COVID-19.[193] And, the children may not accurately report whether they are experiencing symptoms, particularly if they are worried that they may be placed in isolation if they report symptoms.[194] D.M. testified that he at one time developed a sore throat and headaches, but he never reported his symptoms to anyone.[195] Defendants' witness Shawn Herbert testified that she once observed a child who appeared not to be feeling well but did not initially admit he was not feeling well until Ms. Herbert pressed him.[196] OJJ has no procedure to monitor symptoms. Unlike OJJ's practices for staff, regular temperature checks for the children are not part of OJJ's ordinary practice during the pandemic.[197]

95.    Even for children who display mild symptoms, OJJ is reluctant to administer tests. D.M. testified that he is aware of three children confined at Swanson-Monroe—D.W., A.C., and

---

[189] Dkt. 51, Stipulated Facts at ¶ 4.
[190] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 132:17-20, 159:4-9.
[191] Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 44:15-20.
[192] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 64:21-65:3.
[193] D.M. Testimony, June 3 Hearing Tr. Part 1 at 73:9-12.
[194] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 27:25-28:9.
[195] D.M. Testimony, June 3 Hearing Tr. Part 1 at 54:17-19.
[196] Herbert Testimony, June 4 Hearing Tr. Part 2 at 115:15-24.
[197] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 168:2-10.

J.C.—who reported cold-like symptoms to OJJ staff in SCY Monroe's infirmary, yet they were not tested for COVID-19.[198] OJJ staff instead checked their temperature, provided them with Tylenol, and instructed them to return to the infirmary if their symptoms worsened.[199] None of these children ever returned to the infirmary.[200] Putative class member T.S. requested a test because he was feeling very sick but was told that he was not eligible.[201]

96.    Defendants admit that every one of the thirty children in OJJ's secure care facilities who has been tested for COVID-19 presented with a fever,[202] and Defendants have not tested any child who presented with any of the other myriad symptoms associated with COVID-19 in the absence of a fever.

97.    For all but one of the 28 COVID-19-positive children in OJJ secure care facilities, OJJ deemed them "recovered" and discharged them from medical isolation without additional testing to confirm that they were no longer positive.[203] For the final, twenty-eighth child who initially tested positive on April 12, OJJ administered additional tests to determine whether to discharge the child from medical isolation.[204] That child tested positive for the second time on April 23, 11 days after his initial positive test. He then tested positive for the third time on April 27, 15 days after his initial positive test. He did not test negative until May 2, 20 days after his initial positive test.[205]

---

[198] D.M. Testimony, June 3 Hearing Tr. Part 1 at 54:3-14, 71:11-72:18.
[199] *Id.*
[200] *Id.* at 72:19-20.
[201] Pls.' Ex. 2, L.P. Decl. at ¶ 8.
[202] Dkt. 51, Stipulated Facts at ¶ 23.
[203] *Id.* at ¶ 39.
[204] *Id.* at ¶ 40.
[205] Pls.' Ex. 21, COVID-19 Test Results.

### iii.    Solitary Confinement as Medical Isolation

98.    OJJ is employing solitary confinement as part of its medical isolation and quarantine strategy. At least one child who tested positive for COVID-19 was placed in an individual room for medical isolation.[206] At least one child who tested positive for COVID-19 was medically isolated in a room previously used for disciplinary solitary confinement.[207]

99.    OJJ has quarantined some children awaiting test results for COVID-19 in SCY Monroe's "Cypress Unit" over the past three months.[208] The Cypress Unit is a block of single-person concrete cells that OJJ historically used to isolate children charged with disciplinary infractions.[209] Additionally, the child who tested positive on April 12 in SCY Monroe was held in isolation in Cypress.[210] Children are also being held in solitary confinement for isolation and quarantine in the three Behavioral Intervention ("BI") rooms at BCCY.[211]

100.    The purpose of BI rooms is to temporarily incapacitate a child who "threatens *immediate risk of harm*" to himself or to others or who is "engag*ing in significant* property destruction."[212] Using a BI room for any other purpose is punitive in nature and conflicts with the strictly rehabilitative purpose of the juvenile justice system in Louisiana.[213] Any child placed in a BI room must be returned to regular programming "*as soon as* he has regained self-control and is no longer engaging in behavior that threatens immediate harm."[214] Ordinary OJJ policy does not permit placement in a BI room for longer than eight hours per incident under any circumstances.[215]

---

[206] Dkt. 51, Stipulated Facts at ¶ 70.
[207] *Id.* at ¶ 72.
[208] Dkt. 51, Stipulated Facts at ¶ 71 ("Some Youth who displayed symptoms associated with COVID-19 and were awaiting results of their COVID-19 test were temporarily housed in a separate wing, known as Cypress.").
[209] D.M. Testimony, June 3 Hearing Tr. Part 1 at 83:1-11.
[210] Pls.' Ex. 21, COVID-19 Test Results.
[211] *Id.*; *see also* Pls.' Ex. 53 at 2.
[212] Pls.' Ex. 57 at 476, Youth Services Policy No. B.2.21 (Behavioral Intervention Rooms) (emphases added).
[213] *See* Section II.B.i, *supra*.
[214] Pls.' Ex. 57 at 478, Youth Services Policy No. B.2.21 (Behavioral Intervention Rooms) (emphases added).
[215] *Id.*

101.    Even if labeled "medical isolation," putting a child alone in a room for an extended period of time, even 48 hours, is deeply harmful, and concern about being placed in isolation can discourage children from reporting symptoms.[216]

102.    OJJ is well aware of the impact that solitary confinement can have on children, and had previously ceased using room confinement, solitary confinement, isolation, or seclusion for punishment, and implemented a "Reduce the Use" campaign to lower the use of room confinement, including by closing the Cypress Unit.[217] Children are only meant to be put in the BI rooms after all reasonable efforts are made to utilize the least restrictive alternatives, and should never be put in BI rooms for discipline, punishment, administrative convenience, retaliation, staffing shortages, or reasons other than a temporary response to behavior that threatens immediate harm to the child or others.[218] For a child who must be temporarily relocated to the BI rooms, staff are required to make visual contact with the child every 15 minutes and document that contact.[219] Use of the BI room for beyond one hour requires approval of the Facility Director or Facility Deputy Director, and "placement in a BI room shall not exceed 8 hours per individual incident."[220]

### iv.    PPE, Cleaning, and Screening

103.    OJJ has not regularly provided the children with masks to wear. While OJJ began providing masks to children in March, it then stopped for more than a month, and only resumed after Plaintiffs filed this lawsuit.[221] Even now, children typically do not wear masks,[222] and OJJ staff does not require they do so.[223] Nor has OJJ instructed the children how to wear the masks

---

[216] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 89:20-90:24; June 5 Hearing Tr. at 65:11-21.
[217] Pls.' Ex. 30, Oversight of Safety in Secure Care Facilities (June 6, 2018) at 14.
[218] Pls.' Ex. 57 at 475, Youth Services Policy No. B.2.21 at 3.
[219] Pls.' Ex. 57 at 477, Youth Services Policy No. B.2.21.VI.G at 5.
[220] Pls.' Ex. 57 at 478, Youth Services Policy No. B.2.21.VI.H at 6.
[221] D.M. Testimony, June 3 Hearing Tr. Part 1 at 52:22-53:3.
[222] *Id.* at 53:16-54:2.
[223] Dkt. 51, Stipulated Facts at ¶ 76 ("Youth in OJJ secure care facilities are not required to wear masks.").

properly.[224] Staff members also do not consistently wear their masks, sometimes taking them off for 10 to 15 minutes at a time even around the children.[225]

104.    OJJ claims to have implemented heightened cleaning policies in light of the pandemic,[226] but children report dirty facilities, and areas that are shared by multiple dorms, such as the gym, are not always cleaned between uses.[227]

105.    Defendants' witnesses testified that all staff are subjected to "screening by taking temperature checks" at the front gate before entering the secure care facilities,[228] but both Dr. Maraynes and Dr. Franco-Paredes testified that temperature checks alone are insufficient to rule out the possibility that a person has COVID-19.[229]

>    **v.    Staffing**

106.    Staffing shortages caused by illness and stress during a pandemic can exacerbate risks to children in facilities, as such shortages prevent the facility from effectively providing rehabilitative programming and can contribute to behavioral issues among children that lead to harmful uses of force.[230]

107.    During the pandemic, probation and parole officers were brought into OJJ's secure care facilities to compensate for the staffing deficiencies caused by COVID-19.[231]

108.    Between March 17 and April 27, 2020, probation and parole officers were authorized to carry pepper spray in OJJ facilities.[232] Staff have used pepper spray on children

---

[224] D.M. Testimony, June 3 Hearing Tr. Part 1 at 53:16-54:2.
[225] *Id.* at 51:23-52:21.
[226] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 17:11-18:10.
[227] D.M. Testimony, June 3 Hearing Tr. Part 1 at 44:5-7, 55:23-56:7.
[228] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 11:23-12:3; Herbert Testimony, June 4 Hearing Tr. Part 2 at 152:2-6; Washington Testimony, June 4 Hearing Tr. Part 2 at 159:10-13.
[229] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 129:3-5; Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 192:16-17.
[230] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 86:12-89:15.
[231] *See* Defs.' Opp'n to TRO, Dkt. 25-2 at 13.
[232] Dkt. 51, Stipulated Facts at ¶ 80.

during the pandemic.[233] As of April 27, pepper spray is still permitted inside the facilities where staff are "given specific directives from the Regional Director for a specific incident."[234] Pepper spray is "dramatically out of favor" and has been entirely eliminated in the vast majority of juvenile justice systems nationally, and where it is permitted there are generally high levels of safety precautions in place to avoid using it on children with underlying medical conditions.[235] Pepper spray is currently prohibited on the premises of any locally-operated juvenile detention center housing pre-adjudicated children in Louisiana, per the licensing requirements for these facilities.[236]

### vi.      Failure to Provide Complete and Accurate Information

109.      For the duration of the pandemic, OJJ has failed to provide children or their parents with complete and accurate information on OJJ's plans for the prevention and management of COVID-19 in the four facilities. Parents have repeatedly demanded such information, but OJJ has provided no substantive response to these requests.[237] Parents have reported that it is difficult to contact anyone at any of the four OJJ facilities and sometimes impossible even to determine who is in charge.[238] Understandably, parents have expressed serious concerns about the health and welfare of their children in OJJ custody.

---

[233] *See* Pls.' Ex. 55, Memo from Ass't Sec. Holderman; *see also* Pls.' Ex. 1, N.H. Decl. at ¶¶ 5-7; Pls.' Ex. 2, L.P. Decl. at ¶ 7; Pls.' Ex. 3, B.B. Decl. at ¶ 4; Pls.' Ex. 5, D.B. Decl. at ¶ 6.
[234] Pls.' Ex. 56, Memo from Sec. Bickham; *see also* Dkt. 51, Stipulated Facts at ¶ 81.
[235] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 42:2-11.
[236] *See* Dep't of Children and Family Services, Juvenile Detention Standards at 44 (revised Feb. 28, 2019), http://www.dss.state.la.us/assets/docs/searchable/Licensing/Residential/2019/JuvenileDetention-revised-2019.2.28.pdf.
[237] *See, e.g.*, Pls.' Ex. 4, A.B. Decl. at ¶¶ 6, 13, 15; Pls.' Ex. 5, D.B. Decl. at ¶¶ 8, 12; Pls.' Ex. 3, B.B. Decl. at ¶¶ 4, 6; Pls.' Ex. 6, S.W. Decl. at ¶¶ 6, 7.
[238] *See, e.g.*, Pls.' Ex. 4, A.B. Decl. at ¶ 6; Pls.' Ex. 2, L.P. Decl. at ¶ 6.

110.    OJJ has provided varying—and sometimes conflicting—information to detained children across the four facilities.[239] OJJ's lack of transparency and failure to implement uniform procedures has caused confusion and has sparked fear among the children and their parents.[240]

111.    OJJ has published "COVID-19 Information" on its website purporting to provide "updated" information about the numbers of COVID-19 positive children and staff, but that information raises troubling questions about what is actually happening in OJJ's facilities. As discussed *supra*, 28 of the 30 children OJJ tested for COVID-19 have tested positive, reflecting a 93.3 percent positivity rate. That information on OJJ's website has remained static since April 21.[241] And despite the high prevalence of the disease, OJJ provided neither parents nor the public any information about its testing policies, including when and how often tests are administered or whether tests are administered to asymptomatic staff and children. Nor did OJJ publish any formal guidance about its procedures, if any, for returning those children who allegedly have recovered to their respective dormitories.

112.    Although OJJ's website states that "[t]he Office of Juvenile Justice is working closely with its medical provider Wellpath and with guidance from the Louisiana Office of Public Health to determine the most appropriate treatment for children who may fall ill in its facilities during this crisis,"[242] parents and the public are completely in the dark as to what remedial measures OJJ has taken or intends to take.

---

[239] *See generally*, Pls.' Ex. 4, A.B. Decl.; Pls.' Ex. 1, N.H. Decl.; Pls.' Ex. 3, B.B. Decl.; Pls.' Ex. 5, D.B. Decl.; Pls.' Ex. 2, L.P. Decl.; Pls.' Ex. 6, S.W. Decl.; Pls.' Ex. 7, W.H. Decl.
[240] *Id.*
[241] *See* Pls.' Ex. 8, Rovner Decl. at ¶ 9.
[242] *See* OJJ COVID-19 Information, LA. OFFICE OF JUVENILE JUSTICE, https://ojj.la.gov/coronaviruscovid-19-information/ (last visited June 10, 2020)

### vii.    Suspension of OJJ's Furlough Program and Family Visitation

113.    In response to COVID-19, OJJ has suspended its furlough program and all in-person visitation.[243] All furloughs have been postponed, and all visitation suspended, since March 16, 2020.[244]

114.    D.M. has been eligible for furloughs since March 2019, and has regularly used them to visit his family for three- to six-day stretches.[245] Additionally, for more than two years, D.M.'s parents visited him nearly every weekend at SCY Monroe.[246] Before the pandemic, furloughs and visitations sustained and improved D.M.'s mental health.[247] They allowed him to physically touch his family members, be "face-to-face up close" for up to eight hours every weekend, and "hug them."[248] But now, OJJ allows neither furloughs nor visitation and, accordingly, their benefits have disappeared.[249]

115.    OJJ's replacements for in-person family contact are inadequate under the circumstances. In lieu of furloughs and visitation, OJJ grants the children up to four free phone calls per week lasting 15 minutes each, as well as chats with family through Zoom conferences once per week for 15 to 20 minutes, for a maximum total of one hour and 15 minutes per week.[250] D.M. testified that these communications are "not enough" and "not the same."[251]

---

[243] Dkt. 51, Stipulated Facts at ¶ 17.
[244] *Id.* at ¶¶ 61, 69.
[245] D.M. Testimony, June 3 Hearing Tr. Part 1 at 83:12-24.
[246] J.P. Testimony, June 3 Hearing Tr. Part 1 at 89:20-90:6.
[247] *Id.* at 91:3-13.
[248] D.M. Testimony, June 3 Hearing Tr. Part 1 at 60:25-61:6.
[249] J.P. Testimony, June 3 Hearing Tr. Part 1 at 91:20-92:2.
[250] Herbert Testimony, June 4 Hearing Tr. Part 2 at 118:7-12, 147:7-148:5.
[251] D.M. Testimony, June 3 Hearing Tr. Part 1 at 60:25-61:3, 74:6-8.

### viii.    Reduction of Rehabilitative and Educational Programming

116.    As of the date of the TRO hearing,[252] OJJ was confining children without the rehabilitative and treatment services to which they are entitled under federal and state law.[253]

117.    Prior to the COVID-19 pandemic, OJJ offered a robust array of rehabilitative services that provided a fully structured day to children in secure care.[254] Children attended vocational programs, high school and college classes, religious services, group counseling sessions, and case manager sessions, in addition to playing sports and exercising.[255] Shortly after the onset of the COVID-19 pandemic, OJJ dramatically reduced education and other rehabilitative services from normal operations, causing the system to become more custodial than rehabilitative.[256]

118.    By the end of March 2020, all live instruction in the facilities had ended. Teachers remained on the payroll, but stayed at home except to replenish worksheet packets. From March 30 to June 7, there was no in-person or remote instruction of any sort by OJJ teachers.[257]

119.    Instead, a "distance learning" plan was put into place. In developing the distance learning plan, OJJ's Director of Education did not speak with other educators in the Louisiana public school system to assess the most effective ways to accomplish that goal.[258]

120.    Under OJJ's distance learning plan for education during the pandemic, there are two ways for children to receive educational services: time in the computer lab using Edgenuity

---

[252] As discussed in Section III.F, *infra*, OJJ represented during the hearing that it planned to reopen its facility schools on June 8, 2020. Mims Testimony, June 4 Hearing Tr. Part 2 at 97:22-25; 99:1-8.
[253] Louisiana Constitution Article V, § 19; Bickham Testimony, June 5 Hearing Tr. at 23:23-24:6.
[254] *See* D.M. Testimony, June 3 Hearing Tr. Part 1 at 45:19-47:11; *see also* Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 33:16-34:1; Mims Testimony, June 4 Hearing Tr. Part 2 at 86:1-87:1.
[255] D.M. Testimony, June 3 Hearing Tr. Part 1 at 47:23-48:15.
[256] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 81:4-7.
[257] Mims Testimony, June 4 Hearing Tr. Part 2 at 87:2-22.
[258] *Id.* at 83:21-23.

software, or worksheet packets. These two methods were intended to be mutually exclusive, with the packets being made available to students unable to go to the computer lab.[259]

121.    The Edgenuity program has no live instruction or prerecorded content from an OJJ instructor, and children may access the program for approximately one hour per day.[260]

122.    The distance learning plans provided through packets did not include any requirement that teachers review, grade, or provide feedback on the worksheet packets that students completed.[261]

123.    All vocational and online college courses also ceased during the period the distance learning plan was in place, as did all the General Education Development (GED) testing.[262]

124.    At least as of June 7, the children confined at SCY Monroe spent the majority of each day sitting in their dormitory, watching television, journaling, reading books, and playing games.[263] According to D.M.'s testimony, at the time of the TRO hearing, OJJ was providing no more than one hour of rehabilitation programming per day, one hour of recreation twice per week, and access to the computer lab for one hour per day—at most, three hours of structured programming per weekday.[264] High school students previously received daily work packets containing problem sets without instructions, all of which required just 30 to 45 minutes to complete.[265] OJJ did not provide work packets to students who had already completed high school, such as D.M., or those planning to take GED test.[266]

---

[259] *Id.* at 78:24-79:10; 80:16-81:5.
[260] *Id.* at 90:3-22.
[261] *Id.* at 94:2-96:2.
[262] *Id.* at 87:23-89:12.
[263] D.M. Testimony, June 3 Hearing Tr. Part 1 at 43:1-45:18.
[264] *Id.*
[265] *Id.* at 78:13-79:3.
[266] *Id.* at 80:22-81:12.

### D.   The Spread of COVID-19 in OJJ's Secure Care Facilities

125.   Louisiana has just 1.4 percent of the nation's population but 7 percent of the positive tests for COVID-19 in juvenile facilities.[267]

126.   Twenty-eight of the thirty children tested for COVID-19 in OJJ's secure care facilities have tested positive, including at least one child from each of the four OJJ secure care facilities.[268] A child at ACY tested positive on March 22.[269] Ten children at BCCY tested positive between March 23 and April 1.[270] Five children at SCY Monroe tested positive between April 6 and April 12.[271] Twelve children at SCY Columbia tested positive between March 30 and April 9.[272] As previously noted, no child has been tested since April 12.[273]

127.   As of June 9, 2020, 50 OJJ staff members from the four secure care facilities have tested positive, with confirmed cases in each of the facilities.[274] The most recent staff case was confirmed on June 3, only one week ago.[275] Staff interact with both children who have tested positive for COVID-19 and those who have not been tested.[276] OJJ does not provide testing for its staff.[277]

128.   Despite Ms. Dandridge's understanding that staff could expose children to COVID-19 and that staff come in close contact with children in their dorms, Ms. Dandridge does not know how many OJJ staff members have been tested, how many have tested positive, how many staff

---

[267] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 27:4-8.
[268] Dkt. 51, Stipulated Facts at ¶¶ 22, 24.
[269] *Id.* at ¶ 33.
[270] *Id.* at ¶ 34.
[271] *Id.* at ¶ 35.
[272] *Id.* at ¶ 36.
[273] *See* Pls.' Ex. 21, COVID-19 Test Results; *see also* Dandridge Testimony, June 4 Hearing Tr. Part 2 at 52:5-9.
[274] OJJ COVID-19 Information, LA. OFFICE OF JUVENILE JUSTICE, https://ojj.la.gov/coronaviruscovid-19-information/ (last visited June 10, 2020).
[275] *See* Herbert Testimony, June 4 Hearing Tr. Part 2 at 149:12-14.
[276] Dkt. 51, Stipulated Facts at ¶ 45.
[277] Bickham Testimony, June 5 Hearing Tr. at 41:11-13; *see also* Dandridge Testimony, June 4 Hearing Tr. Part 2 at 52:23-25.

members OJJ employs, or how frequently staff members test positive.[278] Additionally, as noted above, she had not been consulted on the decision to bring teachers back into the facilities and actually was unaware that in-person education was scheduled to resume on June 8.[279]

129.  Similarly, Shawn Herbert, Interim Director of SCY Monroe and SCY Columbia, stated that she did not know which dorms at SCY Monroe had had confirmed positive COVID-19 cases, despite her admission that such knowledge is "absolutely" important.[280] Ms. Herbert also admitted that she did not know how many, or which, staff members had tested positive in her facilities, nor did she know where those staff members had been working when they tested positive.[281] She was also unaware that a staff member had tested positive as recently as the day before her testimony.[282]

130.  Additional children undoubtedly will soon be transferred into the facilities and exposed to OJJ's potentially rampant asymptomatic outbreak. The courts are gradually re-starting juvenile court proceedings and scheduling disposition hearings that have been suspended since mid-March.[283] Once a child is adjudicated delinquent and has a court disposition to OJJ custody, the juvenile court may issue an order of commitment that requires OJJ to take physical custody of that child within 14 days.[284] Those children will then be transferred from their individual homes or dispersed detention centers into the secure care facilities, where they will come into contact with children already confined in the facilities and with OJJ staff.[285] Additionally, Louisiana's "Raise the Age" law has been in partial effect since March 1, 2019, and when it goes into full effect on

---

[278] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 54:21-24, 53:8-56:20.
[279] *Id.* at 70:19-71:15.
[280] Herbert Testimony, June 4 Hearing Tr. Part 2 at 125:1-126:6.
[281] *Id.* at 126:14-127:10.
[282] *Id.* at 149:12-14.
[283] *See, e.g.*, Matt Sledge, *New Orleans courts announce plans for limited physical reopenings on June 1*, NOLA.COM (May 26, 2020), https://www.nola.com/news/coronavirus/article_cb06a1b2-9fa3-11ea-ad4d-57709ddf38d4.html.
[284] La Ch. Code Article 903(C).
[285] Schiraldi Testimony, June 5 Hearing Tr. at 51:2-15.

July 1, 2020, all children charged with offenses that occurred prior to their eighteenth birthday and adjudicated delinquent will now be within OJJ's jurisdiction.[286] These children represent "a whole [new] category of 17-year-olds who will now be eligible to come in the direction of the department" and be exposed to the existing population and to the staff.[287]

      **E.**    **The Resumption of Programming on June 8**

    131.    OJJ represented during the hearing that it planned to reopen its facility schools on June 8, 2020.[288]

    132.    Yet OJJ has not implemented—and has no plans to implement—any changes in its COVID-19 testing policies in anticipation of the resumption of in-person programming.[289] OJJ's Director of Education Kim Mims did not consult with OJJ's Director of Health Services Denise Dandridge prior to announcing OJJ's plans to resume in-person teaching in OJJ facilities;[290] in fact, Ms. Dandridge gave no indication in her testimony that she was even aware that schooling was scheduled to resume on June 8.[291]

    133.    Defendants presented no evidence at the hearing that OJJ has made any changes to its policies regarding cleaning or PPE availability in anticipation of the resumption of in-person programming, changes Ms. Dandridge testified she would "probably have a discussion" about "if . . . or when the department of education began to resume in-person class."[292] Defendants also presented conflicting testimony as to whether there would be any changes to the staffing models

---

[286] La Ch. Code Article 804(1).
[287] Schiraldi Testimony, June 5 Hearing Tr. at 51:2-15.
[288] Mims Testimony, June 4 Hearing Tr. Part 2 at 97:22-25; 99:1-8.
[289] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 70:19-71:15.
[290] *Id.* at 70:19-71:15.
[291] *Id.* at 70:19-72:10.
[292] *Id.* at 72:1-6.

or schedule in place prior to the pandemic, with the Director of Education testifying there would be no changes.[293]

**F.    Expert Recommendations for COVID-19 Management in OJJ's Secure Care Facilities**

134.    In unrebutted expert testimony, Plaintiffs' experts Dr. Megan Maraynes (expert in Pediatric Emergency Medicine and the Treatment of Pediatric COVID-19), Dr. Carlos Franco-Paredes (expert in Infectious Disease, Epidemiology, and COVID-19 in Prisons and Correctional Facilities), and Mr. Vincent Schiraldi (expert in Juvenile Justice and Justice Policy) provided recommendations to manage COVID-19 in OJJ's secure care facilities.

135.    To effectively respond to a pandemic like COVID-19, juvenile congregate living facilities must simultaneously ensure that they are able to minimize disease spread within the facility and that they can continue to meet the rehabilitative mandate of the juvenile justice system.[294] Many of the tactics a facility might use to control the spread of disease, such as limiting visitation, reducing programming, and using medical isolation, can themselves be very harmful to children.[295]

136.    These recommendations for effective COVID-19 response draw upon the various resources available to facility administrators and agency leadership, including CDC guidance, pediatric resources, and juvenile justice standards.[296]

---

[293] Mims Testimony, June 4 Hearing Tr. Part 2 at 97:22-25; 99:1-8.
[294] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 91:7-92:15 and June 4 Hearing Tr. Part 1 at 4:19-5:3.
[295] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 83:20-84:10.
[296] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 12:7-22.

### i.    Universal Testing

137.    Universal testing is recommended by Dr. Maraynes,[297] and Dr. Franco-Paredes stressed that "testing is critical…especially in a confined setting."[298]

138.    Dr. Franco-Paredes testified that symptomatic cases represent the "tip of the iceberg" and that "a very large number of cases [] have no symptoms during an outbreak."[299] Dr. Maraynes testified that she would administer a test to anyone with exposure to a person who has tested positive, regardless of symptoms.[300] Defendants themselves have admitted that "[t]he majority of infected individuals are asymptomatic or mildly symptomatic" and that "people without symptoms can spread the disease."[301]

139.    Both children and staff are at risk of infection from asymptomatic carriers of the disease. The risk to staff is significant; multiple staff members in juvenile facilities around the country have died from the virus.[302]

140.    Notably, a growing number of facilities and jurisdictions are in fact conducting mass or universal testing of children in juvenile facilities to determine the scope of an outbreak.[303] Some governors have announced such measures, including those of Maryland and New Jersey.[304]

---

[297] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 133:7-15 ("I would think testing everybody makes the most sense. That's really the only way to know who's positive, who's contagious and the only way to, you know, separate or quarantine them appropriately to prevent it from spreading and respreading.").

[298] Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 184:20-22.

[299] Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 40:15-18.

[300] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 120:18-21.

[301] Dkt. 51, Stipulated Facts at ¶ 6.

[302] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 32:4-7.

[303] *Id.* at 13:2-6, 85:7-10.

[304] In Maryland, Governor Larry Hogan announced universal testing in correctional and juvenile facilities on May 20. Press Release, Office of Gov. Larry Hogan, Governor Hogan Announces Universal COVID-19 Testing for Maryland's Correctional and Juvenile Facilities (May 20, 2020) *available at* https://governor.maryland.gov/2020/05/20/governor-hogan-announces-universal-covid-19-testing-for-marylands-correctional-and-juvenile-facilities/.    Governor    Phil Murphy of New Jersey announced in early May that all inmates, residents, and staff at correctional facilities will be tested—a population exceeding 25,000 people. Press Release, Gov. Phil Murphy, New Jersey Department of Corrections to Begin Universal COVID-19 Testing and Launches Non-Congregate Housing Program for First Responders (May 1, 2020), *available at* https://nj.gov/governor/news/news/562020/approved/20200501a.shtml.

As of June 3, Massachusetts had tested all incarcerated and civilly-committed individuals in all sixteen of its Department of Correction facilities.[305] Similar protocols have been implemented at the local level: two facilities in North Carolina have implemented mass testing,[306] and Harris County Jail in Houston has agreed to test every inmate and all new arrestees.[307] Philadelphia has also undertaken testing of its entire juvenile and adult detained population.[308]

141.    In Louisiana itself, state health official Dr. Alex Billioux said in mid-May that phase one of reopening the state "would include a surge in testing to include asymptomatic people at some congregate facilities, like nursing homes and prisons."[309] And when Elayn Hunt Correctional Center in Louisiana implemented universal testing, a staggering 98 percent of the women incarcerated there tested positive.[310] At prison facilities in St. Gabriel and Jetson, "a total of 317 women tested positive, including 210 who were asymptomatic."[311] The Orleans Parish Sheriff's Office also has a goal of universal testing.[312] The federal prison in Oakdale has

---

[305] Press Release, Mass. Dep't of Correction, DOC Meets Universal COVID-19 Testing Goal (June 4, 2020), *available at* https://www.mass.gov/news/doc-meets-universal-covid-19-testing-goal.

[306] AP News, *Mass testing at N.C. prison reveals 30 more COVID-19 cases*, AP NEWS (June 1, 2020), https://apnews.com/a84761282089cb9c457b3d94d1bcd346.

[307] St. John Barned-Smith, *Harris County Sheriff's Office expands COVID-19 testing for jail inmates*, HOUSTON CHRONICLE (May 19, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Sheriff-s-Office-expands-COVID-19-15281852.php.

[308] Press Release, Philadelphia Dep't of Prisons, Philadelphia Department of Prisons Announces Plans to Enter Yellow Phase (June 5, 2020), *available at* https://www.phila.gov/2020-06-05-philadelphia-department-of-prisons-announces-plans-to-enter-yellow-phase/.

[309] WDSU Digital Team, *Majority of COVID-19 cases in Louisiana prisons that mass test are asymptomatic*, WDSU (May 22, 2020), https://www.wdsu.com/article/majority-of-covid-19-cases-in-louisiana-prisons-that-mass-test-are-asymptomatic/32634504.

[310] Janet McConnaughey, *Most women in 1 Louisiana prison dorm have COVID-19*, ASSOCIATED PRESS (May 6, 2020), https://apnews.com/f31d0a19272193a0f461eb96e5c3d23d.

[311] WDSU Digital Team, *supra* note 309.

[312] *Id.*

commenced a "voluntary universal testing" program as well.[313] The need for mass testing in prison settings has been repeatedly recognized in federal courts.[314]

142.    Defendants have admitted that OJJ has the means to implement a universal testing strategy through its contract with Wellpath.[315]

143.    In neglecting to do so, Defendants have relied on the CDC's March 23 Interim Guidance.[316] But, while much has been learned about COVID-19 since March 23, this CDC Interim Guidance has not been updated. Rather, the CDC has issued additional, separate guidance on matters related to testing and treatment of individuals in congregate care settings.[317] As Dr. Franco-Paredes explained, comparatively little was known about the coronavirus on March 23, so the CDC Interim Guidance was based largely on influenza pandemic preparedness.[318] As such, the CDC Interim Guidance is outdated and inappropriate for COVID-19, because influenza is transmitted primarily by symptomatic carriers, and in that respect, differs considerably from COVID-19.[319] Moreover, as Dr. Maraynes explained, tests were not widely available in late March, and the testing guidelines in her emergency room became much broader in April, when tests became readily available.[320]

---

[313] Nicholas Chrastil, *Oakdale federal prison resumes and expands COVID-19 testing*, THE LENS (May 18, 2020), https://thelensnola.org/2020/05/18/oakdale-federal-prison-resumes-and-expands-covid-19-testing/.

[314] *See, e.g.*, *Savino v. Souza*, No. 20-10617-WGY, 2020 U.S. Dist. LEXIS 83371, at *32 (D. Mass. May 12, 2020) ("[A]ll immigration detainees at Bristol County House of Correction and staff who come into contact with them must be tested for COVID-19."); *see also Mays v. Dart*, No. 20 C 2134, 2020 U.S. Dist. LEXIS 62326, at *46 (N.D. Ill. Apr. 9, 2020) (ordering the sheriff to test all symptomatic inmates and inmates exposed to the coronavirus, as well as to consider new detainees in promulgating a testing policy); *Cameron v. Bouchard*, No. 20-10949, 2020 U.S. Dist. LEXIS 89083, at *79 (E.D. Mich. May 21, 2020) (ruling that prison must immediately test those with known symptoms, and create a plan to test all individuals in housing units and those who interact with individuals with access to housing units); *Costa v. Bazron*, No. 19-3185, 2020 U.S. Dist. LEXIS 73944, at *30 (D.D.C. Apr. 25, 2020) (requiring a public psychiatric facility to test symptomatic patients when testing supplies are available).

[315] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 46:20-47:15, 51:6-12.

[316] *See* Pls.' Ex. 27.

[317] *See, e.g.,* Pls.' Ex. 35.

[318] Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 184:2-20.

[319] *Id.*

[320] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 119:1-4.

44

144.    On May 3—over a month ago—the CDC published guidelines for testing that clarified that, while people *with* symptoms are "high priority" for testing, people *without* symptoms are also a priority when there has been "known exposure to an individual who has tested positive" or "the occurrence of . . . transmission within a specific setting/facility."[321] The CDC further states, "Another population in which to *prioritize testing of* minimally symptomatic and *even asymptomatic persons* are *long-term care facility residents*, *especially in facilities where one or more other residents have been diagnosed* with symptomatic or asymptomatic COVID-19."[322] This more up-to-date CDC guidance explicitly contemplates the circumstances under which children are living in OJJ facilities and the risk (or, more likely, fact) of their exposure to COVID-19.

145.    In short, there is "always a risk…until there [are] no cases," which can only be determined through widespread testing.[323]

### ii.    Depopulation

146.    Depopulation is recommended by both Dr. Maraynes and Dr. Franco-Paredes as a means of mitigating the transmission of COVID-19 in OJJ's secure care facilities.[324] Mr. Schiraldi similarly stated that one of the first actions he would take in preparing a juvenile justice facility for a pandemic is appointing someone to focus on "moving the kids out and sort of updating their release plans" and "looking at the populations that seem viable for release" to reduce the population in the facilities.[325]

---

[321] Pls.' Ex. 35.
[322] *Id.* (emphases added).
[323] Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 32:11–13.
[324] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 133:16-19 ("I would decrease crowding. I would send anybody home who didn't really need to be there."); Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 183:20-25 ("The only way to achieve meaningful social distancing is by temporary reductions in the population and I think that's something that is…now well accepted.").
[325] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 93:6-8.

147.    Population reduction is a vital tool in any effective COVID-19 response because it mitigates the issues caused by staffing shortages and allows for more effective social distancing and quarantining without reliance on isolation, while at the same time permitting the facility to maintain its rehabilitative purpose for those children who remain.[326]

148.    Other jurisdictions, including New York and Washington, D.C., reduced their juvenile populations substantially in anticipation of a potential outbreak.[327]

149.    As discussed above, OJJ itself has actually identified—but entirely failed to implement—potentially effective strategies for population reduction that could protect individual children and protect against the spread of the virus.[328] In fact, at the same time that OJJ declined to implement its own population reduction plan, Louisiana became one of the nation's leading hotspots of outbreaks in juvenile facilities, with 28 out of 30 children tested being positive.[329]

150.    The children do not have enough space in the dormitory to comply with social distancing guidelines,[330] and they sleep in bunk beds, placing them well within six feet of each other each night.[331] Moreover, while OJJ staff try to distance themselves from the children, they nevertheless routinely come within six feet of the children in the course of carrying out their job duties.[332]

---

[326] *Id.* at 94:19-96:6; June 4 Hearing Tr. Part 1 at 4:24-5:12.
[327] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 96:10-97:4.
[328] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 21:23-23:24, 75:6-77:10.
[329] Schiraldi Testimony, June 5 Hearing Tr. at 54:3-20.
[330] D.M. Testimony, June 3 Hearing Tr. Part 1 at 50:2-7.
[331] *Id.* at 67:9; Maraynes Testimony, June 3 Hearing Tr. Part 1 at 133:20-24 ("Q: If kids sleep in bunk beds…is it likely that one kid can spread the disease to the other kid just by going to sleep? A: Yeah, sure. You can cough or sneeze or snore in your sleep, yeah.").
[332] D.M. Testimony, June 3 Hearing Tr. Part 1 at 50:11-23.

151.    As discussed *supra* in Section III.B.ii, OJJ has the authority to determine the appropriate placement for a child in its custody,[333] and the law requires OJJ to "periodically" assess whether a child is in the "least restrictive placement most appropriate to their needs and consistent with the circumstances of the case and the protections of the best interests of society and the safety of the public within the state."[334] In fact, OJJ has existing and continuously updated release plans for each child in custody, which could facilitate the implementation of a population reduction strategy.[335]

152.    Furlough is one tool OJJ could easily use to reduce the population in its secure care facilities. OJJ has the sole authority to initiate the furlough process, and it has the ability to recommend furloughs of expanded duration. Allowing children to leave the secure care facilities on furlough would not remove them from OJJ custody.[336] There is no pandemic-related reason that OJJ cannot recommence its now-suspended furlough program, especially since some children who were eligible for furlough in March were already in the process of having their furloughs reviewed by the juvenile court or had already been approved prior to the pandemic.[337] Moreover, some elements of release planning, such as home visits, could be done remotely under pandemic circumstances; other steps may be unnecessary under the circumstances because they have been conducted previously or there are other ways to assess the safety of the home.[338]

---

[333] La Ch. Code Article 908 ("Notwithstanding any other provisions of law to the contrary, the Department of Public Safety and Corrections, office of juvenile justice, shall have sole authority over the placement, care, treatment, or any other considerations deemed necessary from the resources that are available for children judicially committed to the department."); La. Rev. Stat. § 15:901(D)(1) ("Upon commitment to the Department of Public Safety and Corrections, *the department shall have sole custody of the child* and, except as provided for in Children's Code Article 897.1, *shall determine the child's placement*, care, and treatment, and the expenditures to be made therefor, through appropriate examinations, tests, or evaluations conducted under the supervision of the department.").

[334] La. Rev. Stat. § 15:902.3.

[335] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 24:1-25:22; June 5 Hearing Tr. at 52:24-54:1.

[336] La. Rev. Stat. § 15:908(A).

[337] Dkt. 51, Stipulated Facts at ¶ 64.

[338] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 75:11-79:3.

153.    Step down to home placement is another depopulation tool that OJJ could employ. OJJ has the authority to place children in their homes under supervision.[339] OJJ has the ability to step children down from secure care without any court action, and even without notification.[340] Placement at home under supervision is not release; children whom OJJ has placed at home remain in OJJ custody.[341]

154.    Early release—through petition to the juvenile courts for modification of disposition[342]—is yet another depopulation tool available to OJJ. Seven children, including I.B., have less than 60 days remaining on their dispositions, and forty children have less than 180 days remaining on their dispositions.[343]

### iii.    Protecting the Medically Vulnerable

155.    Dr. Franco-Paredes recommends "protecting those that are medically vulnerable to develop more severe disease" as part of a comprehensive COVID-19 response in OJJ's secure care facilities.[344]

156.    It is undisputed that there are medically vulnerable children in OJJ's secure care facilities. Indeed, OJJ maintains a "Chronic Care List" of children in the four secure care facilities with pre-existing medical condition requiring the ongoing care and supervision of a physician.[345]

---

[339] Louisiana law provides that "community placement services[339] shall have authority and responsibilities for children adjudicated delinquent or in need of supervision, including…[t]o place children in the setting most appropriate to their needs." La. Rev. Stat. § 15:901(G)(1). Home confinement is referred to in the Children's Code as "custody." La Ch. Code Article 886(D). And children on furlough are still in OJJ custody: "A temporary furlough as provided herein is not to be considered a release from commitment and does not affect the jurisdiction of the juvenile court or the authority of the department as to the children granted a temporary furlough." La. Rev. Stat. § 15:908.
[340] The only exception is children adjudicated under Article 897.1 of the Children's Code.
[341] Home confinement is referred to in the Children's Code as "custody." La Ch. Code Article 886(D). Furthermore, children on furlough are still in OJJ custody: "A temporary furlough as provided herein is not to be considered a release from commitment and does not affect the jurisdiction of the juvenile court or the authority of the department as to the children granted a temporary furlough." La. Rev. Stat. § 15:908.
[342] La Ch. Code Article 911.
[343] Dkt. 51, Stipulated Facts at ¶¶ 54, 59; Pls.' Ex. 4, A.B. Decl. at ¶ 3 (I.B.'s release date is July 27, 2020).
[344] Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 185:13-14.
[345] Dkt. 51, Stipulated Facts at ¶ 68.

48

As of May 22, 2020, that list had only seventeen names.[346] The list does not include "obesity" as a chronic care condition, despite obesity being recognized as a condition that can lead to worse COVID-19 outcomes.[347] Dr. Maraynes testified that the shortness of the list surprised her, given the general health of children in Louisiana.[348] Only five children on the Chronic Care List were stepped down or transferred in response to the pandemic.[349]

157.    The second child on the Chronic Care List—T.F.—has a condition called IgA Nephropathy (as well as Hypertension).[350] His condition is also known as Berger's Disease.[351] It is an autoimmune disease affecting the kidneys that can cause chronic inflammation, affecting the kidneys' ability to filter blood, and resulting in poor kidney function as compared to a healthier child.[352] Children with Berger's Disease usually have courses of chronic steroids, as well as anti-hypertension medication.[353] T.F. was finally taken to Children's Hospital in New Orleans ("CHNO") just recently—after a year of missing his routine appointments—and his mother was not provided any information as to whether that appointment was routine or an emergency, or whether he was experiencing symptoms of COVID-19.[354] All non-essential medical appointments have been postponed during the COVID-19 pandemic.[355] T.F. was driven four hours from SCY Columbia to CHNO—close to where his mother lives—and then driven four hours back to SCY Monroe for medical isolation.[356] Berger's Disease puts T.F. at increased risk if he contracts

---

[346] Pls.' Ex. 20, Chronic Care List.
[347] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 123:21-24.
[348] *Id.* at 123:21-24.
[349] Bickham Testimony, June 4 Hearing Tr. Part 2 at 191:4-6.
[350] Pls.' Ex. 20, Chronic Care List.
[351] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 124:10-11.
[352] *Id.* at 124:13-18.
[353] *Id.* at 124:19-24.
[354] *Id.* at 125:3-14.
[355] Dkt. 51, Stipulated Facts at ¶ 75.
[356] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 125:16-20.

COVID-19.[357] T.F. should be tested for COVID-19 given his potential exposure to the disease at CHNO. His respiratory status, any onset of cough, shortness of breath, chest pain, hydration status, and fever curve should all be monitored.[358] If he were developing a fever, that could put him at a risk for dehydration, sepsis, shock, or—later on—the onset of PIMS.[359]

### iv.   Virtual Programming

158.   Mr. Schiraldi emphasized the importance of "continuity of programming as much as possible" as part of a juvenile facility's COVID-19 plan.[360]

159.   Maintenance of rehabilitative programming during pandemic circumstances is essential both to meeting the juvenile justice system's rehabilitative aims and to providing the structure needed to minimize potential harmful effects of incarceration, including harsh discipline tactics such as use of pepper spray.[361] Lack of programming and structure, as reflected in the sample schedule provided by OJJ and described by D.M.,[362] would be expected to lead to an increase in the number of fights, use of restraints and other harsh discipline tactics, and amount of room confinement—practices that are damaging to children and further undercut the rehabilitative purpose of the juvenile justice system.[363]

160.   Lack of programming and structure also take a toll on the mental health and emotional state of the children in confinement. D.M. testified that the greatly increased idle time has caused considerable boredom, which has aggravated and caused him a severe amount of

---

[357] *Id.* at 124:25-125:2.
[358] *Id.* at 125:10-20.
[359] *Id.* at 125:20-23.
[360] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 7:6-10.
[361] *Id.* at 8:18-10:11.
[362] Pls.' Ex. 60, SCY Daily Dorm Schedule; D.M. Testimony, June 3 Hearing Tr. Part 1 at 43:1-45:18.
[363] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 38:6-20.

stress.[364] D.M.'s mother, J.P., echoed those sentiments: She notes that he "gets to the point of not caring anymore" and that she has "seen a big difference in him since COVID-19 started."[365] As of late, D.M. has been extremely angry and depressed.[366] D.M.'s mother is concerned about his mental health, and worried what could happen in an environment so confined and lacking in stimulation for such a prolonged period.[367]

161.    But the continuation of robust programming during the pandemic cannot be at the expense of health and safety precautions. Social distancing is necessary to minimize transmission.[368]

162.    Many jurisdictions have successfully maintained rehabilitative programming during the COVID-19 pandemic using techniques such as continuing live education with adequate safety precautions, or providing technology for remote instruction, therapy, or other programming.[369]

### v.    No Solitary Confinement as Medical Isolation

163.    Mr. Schiraldi raised a specific concern regarding OJJ's use of solitary confinement as medical isolation. He clarified that "isolation and solitary confinement are very different in the juvenile and adult contexts," explaining that "room confinement" for children is "measured in hours," not days.[370] Room confinement has "very defined and measurable negative impacts" on

---

[364] D.M. Testimony, June 3 Hearing Tr. Part 1 at 49:9-15 ("It's kind of just stressful because there's not a whole lot you can really do. It puts a lot of stress on you. Kind of like a little aggravated because you're bored. Bored, aggravated. Bored, aggravated, stressed. That's really kind of about it.").
[365] J.P. Testimony, June 3 Hearing Tr. Part 1 at 89:13, 89:19.
[366] *Id.* at 88:16-89:14 ("I've seen a lot of anger, an extreme amount of anger, more-so than ever. When he gets on the phone with us there's been numerous occasions where he has vented. He's vented about how they treat him like a dog. He can't do anything. He's bored. He's not going to school—well, he's not going to trade. He's just—just very angry").
[367] *Id.* at 89:14-18.
[368] *See, e.g.*, How to Protect Yourself and Others, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 10, 2020).
[369] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 10:19-11:18.
[370] Schiraldi Testimony, June 5 Hearing Tr. at 54:24-55:4.

children, including "negative public safety consequences."[371] Even 48 hours or 72 hours in solitary confinement can be harmful to children, and the suicide risk is especially high in the earliest days of solitary confinement.[372]

164.    Under OJJ policy, children who may have been exposed to COVID-19 are placed in medical isolation or quarantine despite the availability of tests that could establish whether they are COVID-19 positive, demonstrating a disregard for the risks posed to children of prolonged isolation.[373]

### vi.    Oversight and Accountability

165.    Mr. Schiraldi emphasized the importance of "central office collection of data and quality assurance" during the pandemic.[374] He stated that OJJ's COVID-19 response "needs to be very data driven" and that there need to be "independent ways of checking on statements made by staff."[375]

166.    Ms. Dandridge, for example, did not visit any of the facilities between late February and May 19[376] and therefore lacks firsthand knowledge of whether staff have adhered to PPE protocols in accordance with OJJ guidelines, whether staff evaluate children for COVID-19 symptoms in accordance with OJJ guidelines, and whether OJJ dorms are kept clean to mitigate the spread of infection.[377]

167.    As discussed above, Mr. Bickham has visited just two of the four OJJ secure care facilities since he stepped in as Interim Director. Moreover, despite serving at the very top of OJJ,

---

[371] *Id.* at 55:7-10.
[372] *Id.* at 65:11-21.
[373] *Id.* at 54:24-56:4.
[374] *Id.* at 49:7-12.
[375] *Id.* at 51:16-23.
[376] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 39:24-40:1, 73:4-16.
[377] *Id.* at 40:8-41:11.

Mr. Bickham testified that he has not "had time to dig off into the weeds of [OJJ's] policies."[378] Mr. Bickham testified further than he generally "defer[s] to Ms. Dandridge" on OJJ's COVID-19 response.[379]

### G. Plaintiffs' Efforts to Exhaust Administrative Remedies

168.     On May 6, 2020, I.B. filed five separate ARPs based on separate complaints related to his incarceration during the pandemic.[380] The ARP Coordinator received all five ARPs and responded to them on May 14.[381] Though neither I.B. nor his parents nor his counsel has received these responses, as indicated on the forms themselves, I.B. has proceeded to step two in the OJJ grievance process.[382]

169.     The Louisiana Administrative Code explicitly allows for attorneys to file ARPs on behalf of youth.[383] On May 8, 2020, Nishi Kumar called SCY Monroe to determine whom to send a Third-Party emergency grievance to via email on behalf of I.B.[384] SCY Monroe staff provided her with the interim facility director's email address.[385] Based on this information, Ms. Kumar filed a Third-Party emergency grievance on behalf of I.B. on May 8, at 4:40 pm.[386] I.B.'s emergency ARP makes several complaints involving his exposure to COVID, OJJ'S denial of education and rehabilitation and access to his parents and family.[387] The grievance included a declaration under penalty of perjury by Counsel for Plaintiffs that counsel represented the parents

---

[378] Bickham Testimony, June 5 hearing Tr. at 24:15-20.
[379] *Id.* at 36:9-14.
[380] Pls.' Ex. 24, I.B. ARP Forms.
[381] *Id. See also* Herbert Testimony, June 4 Hearing Tr. at 138:7-21 (testifying that the signature of Regional Director for the Northern Region Orlando Davis appears on I.B.'s grievances).
[382] *See* Defs.' Ex. 24, OJJ ARP Policies and Procedures, at 8-9 (OJJ Policy No. B.5.3 at § VII.G).
[383] La. Admin. Code tit. 22 § 713(F)(4).
[384] Pls.' Ex. 11, Kumar Decl. at ¶ 2.
[385] *Id.*
[386] *Id.* at ¶ 3; Pls.' Ex. 45, Woods Aff. at 39 (noting that Mr. Kumar represents I.B.'s parents and signs and files the ARP on I.B.'s behalf); *id.* at 40 (Third Party Approval Form on behalf of I.B.).
[387] Pls.' Ex. 45, Woods Aff. at 37-38.

of I.B.[388] Ms. Herbert testified at the TRO hearing that she received I.B.'s ARP and sent it to legal services.[389]

170.    Neither I.B. nor his parents nor his counsel received an initial response to or final decision on the emergency ARPs within either 48 hours or 5 days, as mandated by OJJ's grievance policy.[390]

171.    On May 9, 2020, Nishi Kumar called both BCCY and ACY to determine whom to send a Third-Party emergency grievance to via email.[391] ACY staff provided Ms. Kumar with the facility director's email address, while BCCY staff told her that they could not release that information over the phone.[392] Based on this direction, Ms. Kumar emailed Third-Party emergency grievances on behalf of J.H. to the facility director of ACY and to Yamena Thompson, deputy director, and Shannon Matthews, whom counsel knew to be the facility director at BCCY, on May 9, 2020, at 5:34 pm and 5:37 pm.[393] The grievance included a declaration under penalty of perjury by Counsel for Plaintiffs that counsel represented the parent of J.H.[394]

172.    Neither J.H. nor his parent nor his counsel received an initial response to or final decision on the emergency ARPs within 48 hours or 5 days, as mandated by OJJ's grievance policy.[395]

---

[388] Dkt. 51, Stipulated Facts at ¶ 86. A Third-Party Acknowledgment/Approval Form was attached to the grievance. All in-person visitation at OJJ's secure care facilities has been suspended since March 16, 2020. Id. at ¶ 69. In the location that called for the Youth's signature, the form contained the electronic signature of Counsel for Plaintiffs followed by the type-written statement "on behalf of [I.B.]." The abovementioned declaration stated that I.B.'s parents authorized counsel to sign on I.B.'s behalf. Dkt. 51, Stipulated Facts at ¶ 87.
[389] Herbert Testimony, June 4 Hearing Tr. Part 2 at 142:9-23.
[390] Defs.' Ex. 24, OJJ ARP Policies and Procedures, at 9 (OJJ Policy No. B.D.3 at § VII.I).
[391] Pls.' Ex. 11, Kumar Decl. at ¶ 5.
[392] Id.
[393] Id. at ¶ 6; Pls.' Ex. 26, J.H. Emergency ARP Application.
[394] Dkt. 51, Stipulated Facts at ¶ 89. A Third-Party Acknowledgment/Approval Form was attached to the grievance. All in-person visitation at OJJ's secure care facilities has been suspended since March 16, 2020. Id. at ¶ 69. In the location that called for the Youth's signature, the form contained the electronic signature of Counsel for Plaintiffs followed by the type-written statement "on behalf of [J.H.]." The abovementioned declaration stated that J.H.'s parent authorized counsel to sign on J.H.'s behalf. Dkt. 51, Stipulated Facts at ¶ 90.
[395] Defs.' Ex. 24, OJJ ARP Policies and Procedures, at 9 (OJJ Policy No. B.D.3 at § VII.I).

173.    The most recent report by the Legislative Auditor found that approximately 19 percent of youth grievances were not addressed within even the standard timeframes set in OJJ policy.[396]

## IV.    Proposed Conclusions of Law

### A.    Plaintiffs Satisfied the Requirements of the Prison Litigation Reform Act

174.    To comply with the Prison Litigation Reform Act, ("PLRA"), a grievance must "reasonably indicate a problem" and give officials "fair notice" of that problem.[397] When an emergency grievance procedure exists and the grievance protocol does not direct prisoners that they must also file a regular, non-emergency grievance, the grievance is exhausted once the timeline for the emergency procedure is complete.[398] Moreover, in cases involving juveniles confined to secure care facilities, courts have interpreted grievance procedures generously to avoid findings of non-exhaustion,[399] and none of the law on grievances contemplates the appropriate standards during a pandemic.[400] Finally, Defendants' direction that Plaintiffs email their ARPs to the facility directors, contrary to the plain wording of their grievance rules (and the fact that the identities and contact information for the facility ARP coordinators is not available) makes that process unavailable,[401] and it bars Defendants from arguing that Plaintiffs' actions based on that advice do not constitute exhaustion.[402]

---

[396] Pls.' Ex. 30 at 17 ("According to OJJ policy, facilities have 30 days to address youth grievances. We found that 54.1% were up to 14 days late, 20.7% were 15 to 30 days late, and 25.2% were more than 30 days late.").

[397] *Johnson v. Johnson*, 385 F.3d 503, 518-19 (5th Cir. 2004).

[398] *See Edwards v. DeShields*, 211 Fed. App'x 256, 257 (5th Cir. 2006); *see also Gates v. Cook*, 376 F.3d 323, 331-32 (5th Cir. 2004).

[399] *See Lewis v. Gagne*, 281 F. Supp. 2d 429, 433-35 (N.D.N.Y. 2003) (holding that a mother had made sufficient "reasonable efforts" to exhaust, without explicitly commenting on the juvenile's own status); *see also Troy D. v. Mickens*, 806 F. Supp. 2d 758, 768-69 (D.N.J. 2011) (holding ombudsman procedure was exhausted by an attorney's letter to juvenile institution superintendent); *Moore v. Louisiana Dept. of Public Safety and Corrections*, 2002 WL 1791996, at *4 (E.D. La., Aug. 5, 2002) (declining to enforce 30-day time limit; declaring 30-day delay in filing complaint "not unreasonable" given that the plaintiff was a juvenile in state custody).

[400] *Cf. Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010).

[401] *See Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010).

[402] *See Wright v. Hollingsworth*, 260 F.3d 357, 358 n.2 (5th Cir. 2001).

175.    Counsel for both I.B. and J.H. filed emergency ARPs pursuant to the direction received from staff at ACY and SCY at Monroe. Those staff directed that the ARPs should be filed via email to the facility directors. While OJJ's policy on emergency ARPs (or on attorney or Third-Party ARPs) does not indicate to whom an ARPs should be given to be properly filed, it notes that the ARP Coordinator "shall immediately forward the ARP…to the Facility Director, Regional Director, and IS."[403] At least one facility director confirmed that she received the emergency ARP and sent it to legal services, and that grievance was not responded to within the timeline for emergency—or even non-emergency—grievances.[404]

176.    Similarly, the rules on non-emergency ARPs do not direct to whom an ARP should be given to be properly filed.[405] Rather, they reference the ARP Coordinator as the person who should "screen" the ARP, and they state that an ARP should be placed in the "ARP Box" from which they are collected "on a daily basis" by OJJ staff.[406] To this end, an ARP is considered "filed" upon receipt by the ARP Coordinator.[407] When filed on a weekday, the rules presume this will occur on the same days as placement in the ARP Box.[408]

177.    Both Plaintiffs properly exhausted their grievances according to the facilities' internal rules and the PLRA. Both I.B. and J.H. filed emergency grievances.[409] Defendants did not respond to the emergency grievances within the 48-hour and five-day time frame prescribed by the OJJ's policy.[410]

---

[403] Defs.' Ex. 24, OJJ ARP Policies and Procedures, at 9 (OJJ Policy No. B.D.3 at § VII.I); *see also* Pls.' Ex. 45, Woods Aff. at 18 (OJJ ARP Instructions Booklet) ("[ARP] means that you write to the Facility Director and the Facility Director will have someone try to fix your problem.").
[404] *See* Section III.G, *supra*.
[405] Defs.' Ex. 24, OJJ ARP Policies and Procedures, at 6-8 (§§ VII.F, VII.G).
[406] *Id.* at 6 (§ VII.F.3); *id.* at 3 (§ VII.B).
[407] *Id*. at 4 (§ VII.D.4).
[408] *Id.* (*Compare* § VII.B *with* § VII.D.4.b).
[409] *Id*. at 7 (§ VII.I).
[410] *See* Section III.G, *supra*.

178.    The law governing a situation where a prison does not reply within the time frames imposed by the prison's grievance rules holds that a prisoner may move to the next step in the grievance process.[411] If, however, the prison fails to answer the final step in the grievance process within the timeline, the PLRA allows the prisoner to file their complaint in court.[412] That is the case here where there is not a second step to the emergency grievance procedure.[413] Thus, the person's grievances are properly exhausted (and they may file their complaint in court) when the time frame for responding to it has expired.

179.    Even if the emergency grievances were submitted to the wrong recipients, Defendants are judicially estopped from arguing that Plaintiffs' ARPs are not properly filed because the filing did not conform to the OJJ's grievance policy. Since the attorney who filed the ARPs relied on advice from OJJ staff, the OJJ Defendants cannot benefit from their illegal advice and argue that Plaintiffs did not follow OJJ's rules.

180.    The PLRA's exhaustion requirement is subject to equitable estoppel.[414] Estoppel applies where prison personnel provide inaccurate information about the grievance process.[415]

181.    In short, "[g]iven that Defendants assert failure to exhaust based upon misinformation *they themselves* supplied, and upon which Plaintiffs *reasonably relied*, that defense should be equitably estopped."[416]

---

[411] *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015).

[412] *Wilson*, 776 F.3d at 301; *Edwards*, 211 Fed. App'x. at 257; *see also Gates*, 376 F.3d at 331–32.

[413] OJJ ARP Policies and Procedures, at 7 (§ VII.I).

[414] *Wright v. Hollingsworth*, 260 F.3d 357, 358 n.2 (5th Cir. 2001); *Wendell v. Asher*, 162 F.3d 887, 890 (5th Cir. 1998) (stating that the exhaustion requirement may be subject to certain defenses such as waiver, estoppel, or equitable tolling). *See also Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) (enunciating the four elements for equitable estoppel).

[415] *See Tweed v. Schuetzle*, No. 1:06-cv-032, 2007 WL 2050782, at *8 (D.N.D., July 12, 2007) (officials might be estopped from claiming plaintiffs should have completed the grievance process where they had advised plaintiffs that was not the correct procedure); *Heath v. Saddlemire*, No. 9:96-CV-1998 (FJS/RF), 2002 WL 31242204, at *5 (N.D.N.Y., Oct. 7, 2002) (holding that reliance on officials' representations as to proper procedure estops prison officials from claiming non-exhaustion as to prisoner who followed the representations).

[416] Dkt. 31, Pls.' TRO Reply at 4 (emphasis added).

182.    Moreover, to the extent that counsel and Plaintiffs were given information by Defendants about filing the ARP that derogated from OJJ's policies on filing such grievances, and because counsel and Plaintiffs could not comply with OJJ's policies without provision of information, the internal grievance procedures for emergency ARPs were unavailable according to the PLRA.[417]

183.    To the extent Defendants maintain that the Third-Party Acknowledgment form is necessary for an attorney to file an emergency ARP on behalf of a child, there is an additional reason the grievance process was unavailable to Plaintiffs. Counsel signed the third-party acknowledgement form on behalf of the minor Plaintiffs, as authorized by the minors' parent or parents, and which is within those parents' broad parental authority.[418] OJJ's position is that the youth themselves must sign their forms.[419] However, OJJ suspended all in-person visitation on March 16, 2020.[420] Therefore, to the extent OJJ prohibits counsel from having an in-person meeting to facilitate a signature on a form, the Third-Party grievance procedure is unavailable.[421]

184.    Finally, the Court may pretermit this issue until after the issue is fully played out in discovery. The PLRA's exhaustion requirement is not jurisdictional.[422] Therefore, the Court may reach the merits before addressing the exhaustion argument and deal with the issue at summary judgment.[423]

---

[417] *See Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) (An official giving wrong information on the ARP procedure can make that process 'unavailable.'); *see also Hardy v. Shaikh*, No. 19-1929, 2020 WL 2551046 (3d Cir. May 20, 2020); *Brown v. Croak*, 312 F.3d 109, 112 (3d Cir. 2002) (remedies are unavailable when a prisoner relies "to his detriment on the defendants' erroneous or misleading instructions."). *See also Miller v. Norris,* 247 F. 3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utilizing' is not an 'available' remedy" under the PLRA). *Accord. Custis v. Davis*, 851 F.3d 358, 360, 363 (4th Cir. 2017) (dictum).
[418] *See* La. Civ. Code Ann. arts. 222-223, 232-233.
[419] OJJ Policy No. B.5.3, at 7 (§ VII.F.4).
[420] Dkt. 51, Stipulated Facts at ¶ 69.
[421] *See supra* note 417.
[422] *Woodford v. Ngo*, 548 U.S. 81, 101 (2006).
[423] *Douglas v. Anderson*, CIVIL ACTION 15-445-JJB-RLB, 2017 WL 4052158, at *2 (M.D. La. Sept. 13, 2017); *Nelson v. Abbett*, No. 3:10-CV-1076-WKW, 2013 WL 5493410, at *7 (M.D. Ala. Sept. 30, 2013).

### B.    Class-Wide Emergency Relief Is Appropriate

185.    This Court "need not resolve [P]laintiffs' class certification motion before issuing preliminary injunctive relief" on a class-wide basis because the Court has "general equity powers before deciding the class certification motion."[424] Nevertheless, Federal Rule of Civil Procedure 23(b)(2) "does not restrict class certification to instances when final injunctive relief issues" and permits certification of a conditional class for the purpose of granting preliminary injunctive relief.[425]

186.    As set forth more fully in Plaintiffs' Motion for Class Certification filed on June 2 (Dkt. 60-1), the proposed Class satisfies the requirements of Federal Rule of Civil Procedure 23.[426] The Class is sufficiently numerous, as approximately 220 children are currently confined in OJJ's four secure care facilities.[427] All Class Members share common questions of law and fact "amenable to a common answer" because all class claims arise out of Defendants' inadequate, dangerous, and unconstitutional statewide COVID-19 response (or lack thereof).[428] Named Plaintiffs are typical of the proposed Class: they are members of the Class, have suffered and will suffer the same injuries as the proposed Class Members, and seek relief that will benefit the Class

---

[424] *Carranza v. Reams*, No. 20-cv-00977-PAB, 2020 U.S. Dist. LEXIS 82299, at *18 n.6 (D. Colo. May 11, 2020); *see also McWaters v. FEMA*, 408 F. Supp. 2d 221, 236 (E.D. La. 2005) (issuing an injunction applying to the putative class where "plaintiffs [had] a substantial likelihood of success in establishing the requisites for certification of numerosity, typicality, commonality, and that the class representatives will fairly and adequately protect the interests of the parties"); *Mays v. Dart*, No. 20 C 2134, 2020 U.S. Dist. LEXIS 62326, at *5 (N.D. Ill. Apr. 9, 2020); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification."); *Howe v. Varity Corp.*, 896 F.2d 1107, 1112 (8th Cir. 1990).

[425] *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

[426] *Lewis v. Cain*, 324 F.R.D. 159 (M.D. La. 2018)

[427] *In re Nissan Radiator/Transmission Cooler Litigation*, 2013 WL 4080946, at *18 (S.D.N.Y. May 30, 2013) (noting that courts have found numerosity satisfied by classes composed of forty or more members).

[428] *Jones v. Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013); *see also J.D. v. Nagin*, 255 F.R.D. 406, 415 (E.D. La. 2009) (children confined in the juvenile justice system and "subject to the same policies, practices, and conditions of confinement" that raise identical legal issues satisfy commonality).

as a whole.[429] Finally, named Plaintiffs and their counsel will adequately and vigorously represent the Class.[430]

187.    The proposed Class also satisfies the requirements of Rule 23(b)(2) because Defendants are creating and maintaining conditions that put the Class at imminent risk of contracting COVID-19, and they have "acted or refused to act on grounds that apply generally to the class."[431] Alternatively, the proposed Class satisfies the requirements of Rule 23(b)(1)(A) because individual adjudication of Class Members' claims would risk creating inconsistent decisions that would establish varying standards to which Defendants would have to adhere in responding to COVID-19.[432] Temporary class-wide relief is therefore appropriate.

## C.    Named Plaintiffs Have Standing to Seek the Requested Relief

188.    Named Plaintiffs J.H. and I.B. have standing to seek relief because they have shown actual injury that is traceable to Defendants and likely to be redressed by a favorable judicial decision.[433] I.B. tested positive for COVID-19 and is at risk of future medical complications, including PIMS; J.H. has been exposed to COVID-19 and has not been tested, creating a "substantial risk" that he has an asymptomatic, undetected case of COVID-19.[434] Federal courts across the country have found that the risk of exposure to COVID-19 for those in congregate

---

[429] *J.D.*, 255 F.R.D. at 415 (plaintiffs met typicality where "the legal theories advanced"—violations of First, Sixth, Eighth, and Fourteenth Amendment rights by conditions of confinement, lack of medical care, and excessive use of isolation—"and relief sought by the named Plaintiffs and putative class members are the same").

[430] FED. R. CIV. P. 23(a)(4).

[431] FED. R. CIV. P. 23(b)(2); *J.D.*, 255 F.R.D. at 415 (claims requiring defendants to address policies relating to the provision of medical and mental health care to youth in detention satisfy the requirements of Rule 23(b)(2)).

[432] *Evans v. Sterling Chems. Inc.*, 2008 WL 11389418, at *6 (S.D. Tex. Nov. 19, 2008) (Rule 23(b)(1)(A) certification appropriate where injunction is predominant relief sought and "there is a need to conclude or adjudicate all potential claims in one suit").

[433] *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).

[434] An allegation of future injury supports standing where "the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)).

settings is an injury which confers standing.[435] These injuries are traceable to the facilities insofar as the facilities completely control the conditions of confinement, and such claims are redressable by the Court.[436]

189.    J.H. and I.B. have standing on behalf of the class to seek all the relief requested. OJJ could step both J.H. and I.B. down from secure care to a less restrictive setting, including placement at home under supervision;[437] OJJ could recommended both for extended furloughs;[438] OJJ could recommend both for motions to modify their dispositions;[439] J.H. has been exposed and not yet tested for COVID-19,[440] and I.B. has not been re-tested;[441] both J.H. and I.B. have actually injured been and are threatened with future injury as a result of OJJ's continued use of dormitory confinement and solitary confinement for medical isolation and quarantine;[442] both J.H. and I.B.

---

[435] *See, e.g.*, *Coreas v. Bounds*, Civil Action No. TDC-20-0780, 2020 U.S. Dist. LEXIS 59211, at *18 (D. Md. Apr. 3, 2020) ("The imminence of the injury facing Petitioners is accentuated by the growing number of COVID-19 cases in detention facilities and the widespread havoc the virus can wreak once inside these facilities."); *Savino v. Souza*, No. 20-10617-WGY, 2020 U.S. Dist. LEXIS 61775, at *13 (D. Mass. Apr. 8, 2020) ("[T]he government cannot credibly argue that the Detainees face no 'substantial risk' of harm (if not 'certainly impending') from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe."); *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 U.S. Dist. LEXIS 62019, at *24 (W.D. Wash. Apr. 8, 2020) (holding that an injury was sufficiently alleged where "current detention conditions make it 'exceedingly difficult, if not impossible' to exercise distancing and hygiene measures"); *Fofana v. Albence*, No. 20-10869, 2020 U.S. Dist. LEXIS 65941, at *21 (E.D. Mich. Apr. 15, 2020) ("Petitioners do not need to allege that the jails currently have confirmed COVID-19 cases or that they have contracted the virus to demonstrate standing. It is well documented that detention facilities increase the risk of contracting infectious diseases because of the inherent nature of confinement."); *Urdaneta v. Keeton*, No. CV-20-00654-PHX-SPL (JFM), 2020 U.S. Dist. LEXIS 83551, at *24 (D. Ariz. May 11, 2020) ("Petitioners need not have sustained a serious illness, contracted the disease, much less await the escalation of COVID-19 in their detention facilities to demonstrate standing. They need only demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.") (internal quotation marks omitted); *see also Ochoa v. Kolitwenzew*, No. 20-cv-2135, 2020 U.S. Dist. LEXIS 96295, at *20 (C.D. Ill. June 1, 2020) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id*. The risk of exposure to COVID-19 constitutes exactly the type of "unsafe, life-threatening condition" that "need not await a tragic event" in order to be remedied. *Id*. at 33-34.") (citing *Helling v. McKinney*, 509 U.S. 25 (1993).

[436] *See, e.g., Urdaneta*, U.S. Dist. LEXIS 83551, at *24 ("Petitioners do not ask the Court to enjoin their exposure to COVID-19. They ask that they not be involuntarily detained under conditions which unreasonably increase the likelihood that they will be exposed. That is redressable by this Court."); *Ochoa*, U.S. Dist. LEXIS 96295, at *22-23.

[437] *See* Section III.B.ii.b, *supra*.

[438] *See* Section III.B.ii.d, *supra*.

[439] *See* Section III.B.ii.c, *supra*.

[440] Pls.' Ex. 1, N.H. Decl. at ¶¶ 4, 6.

[441] *See* Pls.' Ex. 21, COVID-19 Test Results.

[442] *See* Pls.' Ex. 41, Dandridge Aff. at ¶¶ 28-29, 33; Pls.' Ex. 4, A.B. Decl. at ¶¶ 8-11.

have actually been injured and are threatened with future injury as a consequence of OJJ's failure to establish a means of providing structured educational and rehabilitative programming during outbreaks;[443] J.H. has actually been injured by the use of pepper spray on multiple occasions,[444] and both J.H. and I.B. are threatened with future injury from the continued prospect of parole and probation officers using pepper spray on them.[445]

**D.    This Court's Authority to Order the Depopulation of OJJ's Secure Care Facilities**

190.    Federal courts across the country already have ordered the release of incarcerated and detained individuals in light of the unprecedented and increasing risks of COVID-19 infection in correctional settings.[446] This Court similarly has the authority to order the depopulation of OJJ's secure care facilities through both transfers under 42 U.S.C. § 1983 and federal habeas authority.

---

[443] Pls.' Ex. 1, N.H. Decl. at ¶ 10; Pls.' Ex. 4, A.B. Decl. at ¶ 17.

[444] Pls.' Ex. 1, N.H. Decl. at ¶¶ 6-7.

[445] *See* Pls.' Ex. 56, April 27 Memo.

[446] *See, e.g.*, *In re Request to Commute or Suspend Cnty. Jail Sentences*, No. 084230, 2020 N.J. LEXIS 663 (N.J. Mar. 22, 2020) (ordering the release of low-risk offenders in county jails); *see also NJ Order to Release People in County Jails Breaks New Ground in Covid-19 Pandemic*, AM. CIV. LIBERTIES UNION, https://www.aclu-nj.org/news/2020/03/23/nj-order-release-people-county-jails-breaks-new-ground-covid (Mar. 23, 2020) (estimating that around 1,000 low-level offenders will be released in New Jersey); *Basank v. Decker*, 2020 U.S. Dist. LEXIS 53191, at *21 (S.D.N.Y. Mar. 26, 2020) (requiring the release of ten ICE detainees); *Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 U.S. Dist. LEXIS 53954, at *30 (S.D.N.Y. Mar. 27, 2020) (ordering the release of seven ICE detainees); *United States v. Kennedy*, No. 18-20315, 2020 U.S. Dist. LEXIS 53359, at *13 (E.D. Mich. Mar. 27, 2020) (releasing a pretrial detainee); *Castillo v. Barr*, No. CV 20-00605 TJH (AFMx), 2020 U.S. Dist. LEXIS 54425, at *17 (C.D. Cal. Mar. 27, 2020) (approving the release of two ICE detainees); *Thakker v. Doll*, No. 1:20-cv-480, 2020 U.S. Dist. LEXIS 59459, at *28 (M.D. Pa. Mar. 31, 2020) (demanding the release of thirteen ICE detainees); Savino v. Souza, No. 20-cv-10617-WGY, 2020 U.S. Dist. LEXIS 70405, at *1-2, *4 (D. Mass. Apr. 4, 2020) (ordering the release of three ICE detainees, and proposing to review ten additional petitions for bail per day); *Malam v. Adducci*, No. 20-10829, 2020 U.S. Dist. LEXIS 59407, at *4 (E.D. Mich. Apr. 5, 2020) (granting an ICE detainee's petition for release for the duration of the COVID-19 crisis); *Ortuño v. Jennings*, No. 20-cv-02064-MMC, 2020 U.S. Dist. LEXIS 62030, at *15 (N.D. Cal. Apr. 8, 2020) (releasing ICE detainees with certain medical conditions); *People ex rel. Stoughton v. Brann*, No. 451078/2020, 2020 WL 1679209, at *4-5 (N.Y. Sup. Ct. Apr. 6, 2020) (ordering the release of eighteen medically vulnerable inmates on the basis that "this judge does not believe that release can be denied even to those charged with violent crimes if they are at substantial risk of death or other serious physical injury"); *Barrera v. Wolf*, No. 4:20-CV-1241, 2020 U.S. Dist. LEXIS 67640, at *26 (S.D. Tex. Apr. 17, 2020) (issuing a preliminary injunction to release an ICE detainee with a body mass index (BMI) which places her at elevated risk from COVID-19); *Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCx), 2020 U.S. Dist. LEXIS 72080, at *33 (C.D. Cal. Apr. 23, 2020) (implementing a preliminary injunction to, *inter alia*, release a provisionally certified class of ICE detainees); *Dada v. Witte*, No. 1:20-CV-00458 SEC P, 2020 U.S. Dist. LEXIS 90600, at *8-9 (W.D. La. May 22, 2020) (directing the release of fourteen ICE detainees); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 U.S. Dist. LEXIS 94038, at *9 (D. Conn. May 29, 2020) (ruling that a prison must release to home confinement certain medically vulnerable inmates approved for community placement).

i.       **Authority to Order Transfer Under 42 U.S.C. § 1983**

191.    This Court has authority under 42 U.S.C. § 1983 to order defendants to transfer Plaintiffs out of secure care facilities and into other custodial placement at home or another less restrictive setting. Plaintiffs do not challenge either the fact or duration of their custody with OJJ. They merely seek to be transferred out of unsafe and non-rehabilitative secure care facilities and placed, at least temporarily, in the safety of their homes.[447] Plaintiffs also do not seek any relief that obligates either the juvenile courts to act or Defendants to make decisions otherwise reserved for the courts. Rather, Plaintiffs seek only to ensure that Defendants take all steps *within their* authority to protect children under their supervision and to move them to more appropriate, safer placements during this unprecedented pandemic.[448]

192.    Federal courts have the authority to order transfers, including transfers to non-correctional settings, to protect the health of individuals in custody.[449] Indeed, transfer to a different setting is the appropriate remedy when an individual's rights cannot be vindicated in a specific correctional setting. Thus, district courts have repeatedly "used their broad equitable powers to order the transfer of inmates to facilities better equipped to provide for their medical needs."[450]

---

[447] Because Plaintiffs are neither challenging the fact nor duration of their confinement, but rather the dangerous conditions of their confinement during the COVID-19 pandemic, § 1983 is the proper vehicle to provide the requested relief. *See Preiser v. Rodriguez*, 411 U.S. 475, 484, 498 (1973) (distinguishing federal civil rights actions under § 1983 which are directed to "conditions" of custody from habeas corpus actions that involve the "fact or duration" of custody).

[448] *See* Section III.B.ii, *supra*. OJJ recently used its plenary authority to step down approximately five children on its chronic care list. Bickham Testimony, June 4 Hearing Tr. Part 2 at 191:22-192:5.

[449] *See, e.g.*, *United States v. Wallen*, 177 F. Supp. 2d 455, 459 (D. Md. 2001) (ordering an individual released from jail and placed in an infirmary or hospital and noting that the court "no doubt has the inherent authority to enter orders necessary to protect persons detained by its authority from the potentially life-threatening consequences of poor medical care.").

[450] *Reaves v. Dep't of Correction*, 392 F. Supp. 3d 195, 210 (D. Mass. 2019) (ordering the transfer of an inmate with quadriplegia when his facility failed to provide appropriate medical care); *see also Johnson v. Harris,* 479 F. Supp. 333, 338 (S.D.N.Y. 1979) (ordering prison to either transfer inmate to a facility that could provide appropriate diet for his diabetes or to ensure that he receives such a diet in the current facility); *Wallen*, 177 F. Supp. at 459 (ordering

193.    In the context of the juvenile justice system, in particular, the state's obligation to ensure that the child is in the "least restrictive placement"[451] highlights the appropriateness of considering placement as a condition of confinement. Moreover, when the transfer to the home is related to medical risks, the case is appropriately considered a § 1983 challenge to conditions of confinement.[452]

194.    Because plaintiffs seek injunctive relief through 42 U.S.C. § 1983, they must satisfy the requirements for such relief under the PLRA.[453] The first requirement under §3626 is that the prospective relief requested extend "no further than necessary to correct the violation of the Federal right."[454] Plaintiffs' requested relief is narrowly tailored. Plaintiffs are not seeking to be, and will not be, released from the custody and control of OJJ, and placement in their homes will not last any longer than necessary to eliminate the threat and risks of the pandemic from the secure care facilities.

195.    The second requirement is that the prospective relief not require Defendants to exceed their authority granted by state and local law.[455] The relief requested here does not do so; rather, it merely requires Defendants to act within their established authority under the Children's Code and Revised Statutes. As discussed in Section III.B.ii, *supra*, Defendants "have sole authority over the placement, care, treatment, or any other considerations deemed necessary from the resources that are available for children judicially committed to the department."[456] State courts

---

[451] La. Rev. Stat. § 15:902.3.

[452] *See supra* note 450. In contrast, if Plaintiffs were petitioning for release simply to address their level of supervision under normal circumstances, and not because of the medical and psychological risks posed by a pandemic, the issue would be best decided under the Court's authority to issue a writ of habeas corpus. *See* Section IV.D.ii, *infra*.

[453] 18 U.S.C. § 3626 (setting forth the "Appropriate remedies with respect to prison conditions.").

[454] 18 U.S.C. § 3626 (a)(1)(A).

[455] 18 U.S.C. § 3626(a)(1)(B).

[456] La Ch. Code Article 908.

transfer from a jail to a hospital or infirmary when the jail failed to provide needed medication on schedule); ABA Standards for Criminal Justice, 23-6.2 (3d ed. 2011) ("A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care.").

have confirmed Defendants' authority, finding that "the legislature has bestowed upon [OJJ] the plenary power to make decisions with respect to those juveniles committed to its custody" including "the plenary power to decide the appropriate care and treatment for the child and the expenditures to be made therefor after considering availability and costs."[457] Defendants have the obligation "[t]o place children in the setting most appropriate to their needs"[458] and to regularly assess whether children are in the "least restrictive placement most appropriate to their needs and consistent with the circumstances of the case and the protections of the best interests of society and the safety of the public within the state."[459]

196.    Beyond their considerable authority to oversee the placement and care of Plaintiffs, Defendants can recommend furloughs for all children under their supervision and care.[460] Specifically, Louisiana law states that the Secretary of the Department of Public Safety and Corrections "may authorize a temporary furlough to deserving students of any juvenile institution . . . as a rehabilitative tool to assist the child in maintaining family and community relations during his period of commitment."[461] The legislature does not set limits on the duration of furloughs. Furlough "is not to be considered a release from commitment and does not affect the jurisdiction of the juvenile court or the authority of the department" over the child.[462] Given Defendants' broad statutory responsibility and authority to oversee the placement and care of children in its custody,

---

[457] *State in Interest of C.M.,* 14-0088 (La. App. 4 Cir. 4 Cir. 5/28/14); 141 So. 3d 921, 923; *see also* La. Rev. Stat. § 15:901(D)(1).
[458] La. Rev. Stat. § 15:901(G)(1)(e).
[459] La. Rev. Stat. § 15:902.3.
[460] At least one child has been sent home on furlough for quarantine since the official furlough program was suspended. Pls.' Ex. 21, COVID-19 Test Results; Pls.' Ex. 53, Dandridge March 31 Memo, at 2 ("Bridge City currently has 73 youth with one on furlough for quarantine because of COVID symptoms.").
[461] La. Rev. Stat. § 15:908(A).
[462] *Id.*

the relief requested here would not require Defendants to violate or exceed state and local law,[463] nor would it require this Court to exceed its own authority.

### ii.    Authority to Order Release Under 28 U.S.C. § 2241

197.    Under federal habeas authority, this Court may order a Petitioners' "release from physical confinement in prison," including release to parole or supervised custody, based on a determination that the fact or duration of confinement is unconstitutional.[464] If success on the merits entitles Plaintiffs to release, rather than simply enhancing eligibility for release, the action can be considered a *habeas* petition.[465]

198.    The Supreme Court has not addressed whether conditions of confinement might be addressed through habeas release.[466] But the Western District of Louisiana recently held in *Dada v. Witte* that when a placement is unconstitutionally punitive in violation of the Fourteenth Amendment, the claim is sufficiently tied to the condition of confinement such that *habeas* relief is appropriate.[467] In *Dada*, because the petition raised a fact claim that targeted confinement, the

---

[463] Moreover, because Plaintiffs seek a change in placement but not a release from OJJ custody, this is not a "prisoner release order" that would trigger requirements for a three-judge panel under the PLRA, as that requirement applies only in overcrowding cases. 18 U.S.C. §3626(a)(3)(B). In *Cameron v. Bouchard*, 2020 WL 2569868, at *28, —– F. Supp.3d —— (E.D. Mich. May 21, 2020), a district court in Michigan concluded that release to limit the risk of COVID-19 was not a "prisoner release order" under the PLRA because §3626 did not apply "to an order to transfer inmates out of a prison to correct the violation of a constitution right where overcrowding is not the primary cause of the violation." *Id.* at *27-28. This is consistent with numerous district court holdings that transfer to a different setting under continued supervision is not a "prisoner release order" under the PLRA. *See Plata v. Brown*, 427 F. Supp. 3d 1211, 1222-24 (N.D. Cal. 2013) (distinguishing the case from one involving overcrowding that would require a three judge panel under the Prison Litigation Reform Act); *see also Reaves v. Dep't of Corr.*, 404 F. Supp. 3d 520, 522-24 (D. Mass. 2019); *Mays*, —– F. Supp. 3d at ——, 2020 WL 1987007, at *31 (indicating that the "conclusion seems correct" in *Plata* and *Reaves*, but finding that overcrowding was the primary basis for the plaintiffs' request); *Money v. Pritzker*, —– F. Supp. 3d ——, ——, 2020 WL 1820660, at *12 n.11 (N.D. Ill. Apr. 10, 2020) (suggesting that single-judge courts can order prisoner transfers for reasons other than crowding).

[464] *Coleman v. Dretke*, 409 F.3d 665, 669 (5th Cir. 2005).

[465] *See, e.g.*, *Carson v. Johnson*, 112 F.3d 818, 820-21 (5th Cir. 1997) (finding §1983 provided the proper course of action for a suit challenging unconstitutional parole procedures that "would *merely enhance* eligibility for accelerated release.") (quoting *Cook v. Tex. Dep't of Criminal Justice Transitional Planning Dep't, S. Region Institutional Div.*, 37 F.3d 166, 167 (5th Cir. 1994)).

[466] *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. … A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately….").

[467] *Dada v. Witte*, 2020 U.S. Dist. LEXIS 90911, at *11-13 (W.D. La. Apr. 30, 2020).

court allowed the petitioners' request for release from immigration detention due to the pandemic to proceed as a § 2241 petition for a writ of habeas corpus.[468]

199.    When seeking habeas relief for confinement in state custody, an incarcerated person generally must exhaust state remedies or show that exceptional circumstances existed.[469] The COVID-19 pandemic is precisely the type of exceptional circumstance that makes exhaustion of state remedies infeasible.[470]

200.    Furthermore, to the extent that the relief requires Defendants to use their furlough authority or their pandemic response plan to reduce population, there is no state-level appeal process for these decisions, and thus no available state remedy to exhaust.[471]

## E.    The Resumption of Classes Does Not Moot Plaintiffs' Claims Related to the Reduction of Rehabilitative Programming

201.    Although Defendants have presented testimony indicating that regular programming would resume on June 8,[472] Plaintiffs' claims related to this issue are not moot because (1) Defendants provided no detail about the renewed programming, including number of teachers, opportunities for social distancing, number of hours of education per day or other aspects of renewed treatment services; (2) Defendants are purportedly resuming regular programming

---

[468] *Id.* at 15 ("Petitioners reference 'conditions' associated with their detention only to establish that the fact of detention is no longer 'reasonably related to a legitimate government objective' — in other words, to establish that their detention is 'punitive' under the circumstances, and therefore, unconstitutional.").

[469] *Carmichael v. White*, 163 F.3d 1044, 1045 (8th Cir. 1998); *see also Rose v. Lundy*, 455 U.S. 509, 516 (1982) (quoting *Ex parte Hawk*, 321 U.S. 114, 117 (1944) (the exhaustion requirement will be waived "'in rare case[s] where exceptional circumstances of peculiar urgency are shown to exist.'").

[470] *Cameron v. Bouchard*, 2020 U.S. Dist. LEXIS 89083, at *37-38 (E.D. Mich. May 21, 2020) ("A federal habeas court may consider unexhausted claims where 'unusual' or 'exceptional' circumstances" exist. The Court can conceive of few more unusual or exceptional circumstances than the current pandemic. In fact, the Court imagines that judges in the future will use this pandemic as the quintessential example of when unusual and exceptional circumstances exist.") (citations omitted). Furthermore, putative class members have exhausted their remedies in state court. *See, e.g.*, *In the Interest of H.C.*, 2020-CK-83 (La. April 9, 2020); *In the Interest of M.B.*, 2020-CK-422 (La. May 7, 2020). Named Plaintiff I.B.'s writ to the appellate court was denied on May 6, 2020, before this lawsuit was filed, and discretionary writ has been pending before the Louisiana Supreme Court. Defs.' Ex. 28.

[471] *See Cameron* 2020 U.S. Dist. LEXIS 89083, at *37-38 (when there is no "remedy for inmates to pursue" because the decision to release is not based on an applicable state statute or provides no procedure for prisoners to use, state prisoners need not exhaust state remedies.).

[472] *See* Section III.E, *supra*.

without imposing or undertaking any additional health and safety precautions, and (3) Defendants have presented no evidence that they are prepared to maintain robust programming in a virtual format if the reopening results in a spike of COVID-19 infections in the facilities or if the pandemic resurges later in the year (or at any time).

202.    First, at the time of the hearing, Defendants did not dispute that education and other rehabilitative programming had been substantially reduced. In-person instruction had entirely ceased and had been replaced by time in the computer lab or worksheets—activities that consumed at most roughly an hour per day.[473] GED testing, vocational programs, and online college courses were not operational.[474] The example schedule Defendants provided revealed days dominated by unstructured time and "journaling."[475] Although Defendants represented at the hearing that these conditions were expected to change and that school would reopen, they did not introduce any written plans for that reopening, could not provide key details about the new plan for education, and offered conflicting information on details as basic as the anticipated school schedule. More to the point—school had not in fact reopened, and there is therefore no evidence currently before the court that the anticipated changes described by Defendants have in fact come to pass.

203.    Second, OJJ's failure to ensure adequate health and safety measures prior to resuming in-person schooling ignores the balance between safety and rehabilitation described by Plaintiffs' expert Vincent Schiraldi and required by the Constitution.[476] OJJ has not implemented—and has no plans to implement—any changes in its COVID-19 testing policies, cleaning practices, or PPE availability in anticipation of the resumption of in-person

---

[473] *See* Section III.C.viii, *supra*.
[474] *Id.*
[475] Pls.' Ex. 60.
[476] *See* Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 84:4-7.

programming.[477] OJJ's Director of Health Services Denise Dandridge gave no indication in her testimony that she was even aware that schooling was scheduled to resume on June 8.[478]

204.    Finally, in the likely event that OJJ's resumption of schooling leads to increased infections in the facilities, or if the general pandemic infection rates rise again at a later date, OJJ presented no plan for maintaining robust programming in a virtual format. For this reason, Plaintiffs' right to rehabilitation will not be adequately protected absent an order from this Court.[479] Given that it is not "absolutely clear that the [reduction of programming] could not reasonably be expected to recur,"[480] this Court retains authority to rule on these claims. While the "heavy burden" of showing that the reduction in programming will not recur is somewhat lessened for governmental cessations,[481] Defendants have not met that burden, as they have presented *no* evidence that they are prepared or preparing to provide virtual programming if live classes need to be canceled again.

205.    In short, Defendants have failed to demonstrate that they can satisfy *either* of their constitutional obligations, let alone both. When concerned that a potential outbreak was underway in its facilities, OJJ responded by eliminating most of the rehabilitative services that form the only constitutional basis for maintaining custody—yet cases continued to rise. Now, seemingly convinced that the pandemic is over, or reflexively seeking to remediate the constitutional deficiencies identified by the instant lawsuit, OJJ has represented that it plans to resume schooling without putting any necessary health precautions in place, thereby risking the health and safety of all of the children under its care, as well as OJJ's teachers and other staff. Defendants' slap-dash

---

[477] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 70:19-71:15.
[478] *Id.* at 70:19-72:10.
[479] *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[I]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).
[480] *Id.*
[481] *Id.*

plans to resume schooling on June 8 therefore amplify, rather than moot, the significant constitutional violations at issue in this case.

###### F.      The Applicable Legal Standard for Children in OJJ Confinement

206.      Unlike adults who are in prison, Plaintiffs' claims regarding the conditions of their confinement are subject to the liability standards of the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment.[482]

207.      While the Supreme Court has never explicitly stated which standard applies in juvenile justice facilities, the Court has made clear that the Eighth Amendment "was designed to protect those convicted of crimes,"[483] and therefore is not the appropriate standard for reviewing the conditions of confinement for those in non-punitive contexts, such as individuals held involuntarily for mental health treatment,[484] in jail pre-trial,[485] or students in school.[486]

208.      Although the Fifth Circuit has not resolved the issue of which standard applies in juvenile justice settings,[487] many federal courts have followed the Supreme Court's direction and concluded that when "[t]he chief objects of [a juvenile justice system] are educational and reformatory," as they are in Louisiana,[488] the "system is noncriminal and nonpenal," and "the [F]ourteenth [A]mendment applies to conditions of confinement."

---

[482] Defendants concede this. *See* Defs.' Opp'n to TRO, Dkt. 25-2, at 22 n.19 ("To the extent Plaintiffs are attempting to make a 'conditions of confinement' allegations, the liability test for such claims is whether 'a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective.'").

[483] *Ingraham v. Wright*, 430 U.S. 651, 664 (1977).

[484] *Youngberg v. Romeo*, 457 U.S. 307, 325 (1982).

[485] *Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

[486] *Ingraham*, 430 U.S. at 664.

[487] The Fifth Circuit case *Morales v. Turman* did not resolve the question of which constitutional standard applies to conditions of confinement in a juvenile facility (concluding only that the conditions at issue could be addressed under the Eighth Amendment standard, and thus that the Court need not consider the issue under the Fourteenth). 562 F.2d 993, 998-99 (5th Cir. 1977). It also predated the Supreme Court's holding in *Youngberg* that the Fourteenth Amendment standard applies to conditions of confinement cases for individuals confined for non-punitive reasons.

[488] Pursuant to Louisiana Constitution Article V, § 19, the nature of the juvenile justice system is a non-criminal "focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody." *In re C.B.*, 708 So. 2d at 397. Defendants' argument that Plaintiffs'

209.    Under the Fourteenth Amendment standard addressing "constitutional challenges to conditions, practices, rules, or restrictions" rather than "episodic acts or omissions," the governing test is whether "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective."[489]

210.    This "reasonable relationship" test is appropriate here because this case relates to "systemic failures" applying to all individuals in the facility.[490] Plaintiffs are not required to prove Defendants' subjective state of mind; the Fourteenth Amendment inquiry is an objective one.[491]

211.    In the juvenile justice context, the legitimate governmental objective relevant to the Fourteenth Amendment test is *rehabilitation*. This is particularly true in states such as Louisiana that expressly identify rehabilitation as the *sole* purpose of the juvenile justice system.[492]

212.    To pass constitutional muster, therefore, the conditions of confinement to which Plaintiffs are subjected must be reasonably related to the goal of rehabilitation, because "due process requires that the nature . . . of commitment bear some reasonable relation to the purpose for which the individual is committed."[493]

---

references to the Louisiana Constitution are irrelevant because there are no state law claims in this case misunderstands federal constitutional law; rights created by state law trigger protections under the U.S. Constitution. *See, e.g.*, *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that where state law creates a "legitimate claim of entitlement," that entitlement is protected by procedural due process rights under the U.S. Constitution).

[489] *Hare v. City of Corinth*, 74 F.3d 633, 640, 643 (5th Cir. 1996) (en banc); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). *See also Bell v. Wolfish*, 441 U.S. 520, 539 (1979) ("[I]f a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.").

[490] *Guillory v. Louisiana Dep't of Health & Hosps.*, 2018 WL 1404277, at *9, *23 (M.D. La. Mar. 20, 2018).

[491] *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73, 2475 (2015).

[492] *In re C.B.*, 708 So. 2d 391, 397 (La. 1998).

[493] *Alexander S. v. Boyd*, 876 F. Supp. 773, 796 n.43 (D.S.C. 1995) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *see also Morgan v. Sproat*, 432 F. Supp. 1130, 1135 (S.D. Miss. 1977) ("First, where, as in Mississippi, the purpose of incarcerating juveniles in a state training school is treatment and rehabilitation, due process requires that the conditions and programs at the school must be reasonably related to that purpose."). *See also State ex rel. S.D.*, (La. App. 4 Cir. 11/6/02); 832 So. 2d 415, 433 (quoting *Jackson*).

213.     Children in the juvenile justice system also have a "right under the [Fourteenth] Amendment due process clause to rehabilitative treatment."[494]

214.     Thus, the relevant questions here are whether Defendants' failures to (a) test more broadly for COVID-19, (b) mitigate the spread of contagion, (c) depopulate the facilities, and (d) provide adequate rehabilitative and educational programming and activity during the pandemic are reasonably related to the goal of rehabilitation.

215.     Although Defendants also have an obligation to protect the health and safety of the youth in their care, this duty does not erase or decrease their constitutional obligation under the Fourteenth Amendment to ensure that confinement continues to serve a rehabilitative purpose. Indeed, ensuring that youth in state custody are safe and protected from harm, in accordance with the State's *parens patriae* duties, is a necessary predicate to satisfying the State's rehabilitative mandate.

### G.     Plaintiffs Have Satisfied the Elements for Granting a TRO

216.     Plaintiffs are entitled to emergency injunctive (TRO) relief because they have established "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."[495]

---

[494] *Nelson v. Heyne*, 491 F.2d 352, 360 n.12 (7th Cir. 1974) ("Since we have today determined that the federal Constitution affords juveniles a right to treatment, any interpretation of [state law] which would find no such right to exist would itself be unconstitutional."); *see also Pena v. N.Y. State Div. for Youth*, 419 F. Supp. 203, 207 (S.D.N.Y. 1976) ("[T]his court finds that the detention of a youth under a juvenile justice system absent provision for the rehabilitative treatment of such youth is a violation of due process rights guaranteed under the Fourteenth Amendment.") (emphasis in original); *Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1364 (D.R.I. 1972) ("[D]ue process in the juvenile justice system requires that the post-adjudicative stage of institutionalization further this goal of rehabilitation.").

[495] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted); *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-cv-23-SDD-EWD, 2018 WL 4701849, at *2 (M.D. La. Jan. 30, 2018) (standard for temporary restraining order same as standard for preliminary injunction).

### i.    Plaintiffs Are Likely to Succeed on the Merits

217.    Plaintiffs have a substantial likelihood of success on the merits because they "present a *prima facie* case."[496]

### a.    Violation of Fourteenth Amendment Rights

218.    Plaintiffs have a substantial likelihood of success on the merits of their Fourteenth Amendment Due Process claim because Defendants' actions and inactions in response to the COVID-19 pandemic are not reasonably related to the goal of rehabilitation.

### 1.    OJJ's Testing Policy for Children Is Not Reasonably related to Rehabilitation and Undermines Health and Safety

219.    As established above, Defendants' actions in failing to test children for COVID-19 are not reasonably related to the goal of rehabilitation, and failing to test children directly undermines Defendants' interest in ensuring health and safety in the facilities.

220.    Plaintiffs' unrebutted experts uniformly concluded that OJJ's policy of testing only children who present with fever is insufficient to monitor and manage the spread of COVID-19 in the secure care facilities.[497]

221.    Mr. Schiraldi testified that an effective testing strategy must depend on the particular circumstances at issue, such as availability of tests, percent of positive tests among children, whether staff have tested positive, and whether there is an expected influx of new people into the facility.[498] Each of these individual considerations weighs heavily in favor of universal testing in OJJ's secure care facilities.

---

[496] Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995); *see also Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011) (noting that plaintiffs are "not required to prove [their] entitlement to summary judgment" to show likelihood of success on the merits).
[497] *See* Section III.F.i, *supra*.
[498] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 13:2-12, 27:9-15, 29:3-32:1, 90:1-11.

222.    Tests are widely available and have been since April.[499] Defendants cannot, therefore, justify their unreasonably stringent testing criteria by claiming that they are unable to test more children. In fact, Ms. Dandridge testified that OJJ currently has nearly 150 test kits,[500] and OJJ has had these test kits since May.[501] Ms. Dandridge further testified that OJJ is free to order as many test kits as it needs.[502] OJJ has thus conceded that it has sufficient tests available for widespread testing.

223.    The percent of positive tests among children in OJJ's secure care facilities who have been tested thus far is 93 percent[503]—an extremely high percentage that Dr. Maraynes found "shock[ing]."[504] The alarmingly high percent of positive tests militates in favor of more robust testing practices.

224.    As of June 9, 2020, 50 OJJ staff members from the four secure care facilities have tested positive, with confirmed cases in each of the facilities.[505] The fact that the number of confirmed positive cases among the staff is so much higher than confirmed cases among the children indicates that "there are also still kids who would be testing positive."[506]

225.    Finally, as discussed above, there is also an expected influx of new staff and children into the facility. OJJ's Director of Education Kim Mims testified that in-person programming was scheduled to resume on Monday, June 8.[507] More children will be arriving as

---

[499] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 119:1-4.
[500] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 46:11-13.
[501] Dkt. 51, Stipulated Facts at ¶ 20.
[502] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 51:6-12.
[503] *See* Pls.' Ex. 21, COVID-19 Test Results (28 positives out of 30 tests = 93.33%).
[504] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 129:23-24.
[505] OJJ COVID-19 Information, LA. OFFICE OF JUVENILE JUSTICE, https://ojj.la.gov/coronavirus-covid-19-information/ (last visited June 10, 2020).
[506] *See* Maraynes Testimony, June 3 Hearing Tr. Part 1 at 161:8-15; *see also* Franco-Paredes Testimony, June 3 Hearing Tr. Part 2 at 14:7-11 (agreeing with Dr. Maraynes' conclusion); D.M. Testimony, June 3 Hearing Tr. Part 1 at 81:19-21 (testifying that staff go between dorms).
[507] Mims Testimony, June 4 Hearing Tr. Part 2 at 84:14-20.

the courts re-open.[508] If new teachers and children are being introduced and re-introduced to the facilities following weeks of closure, it is essential to test the current population to determine whether the virus is still spreading, and how best to contain it.

226.    Because most pediatric cases of COVID-19 are asymptomatic, failing to test children who do not have fevers results in a failure to mitigate spread through: a failure to identify which children are positive for the virus and should therefore be monitored for decompensation; a failure to implement appropriate isolation and quarantine of positive cases; a failure to protect staff from infection; and a failure to reduce the risk of transmitting the virus to the outside community through staff. In all these ways, OJJ's testing policies create conditions that are unsafe and unhealthy, and in *no* way is this disregard for basic identification of positive cases related to the goal of rehabilitation.

### 2.    OJJ's Failure to Depopulate Is Not Reasonably related to Rehabilitation and Undermines Health and Safety

227.    Defendants' actions in failing to depopulate the facilities are not reasonably related to the goal of rehabilitation, and failing to depopulate directly undermines Defendants' interest in ensuring health and safety in the facilities.

228.    As discussed *supra* in Section III.F.ii, all three of Plaintiffs' credible, unrebutted experts testified that reducing the population in OJJ's secure care facilities is a threshold strategy for controlling the risk of COVID-19 transmission in the facilities, ensuring a safe staff-to-child ratio, keeping robust rehabilitative programming operating in a safe way, and protecting vulnerable children.[509]

---

[508] *See* Section III.D, *supra*.

[509] Maraynes Testimony, June 3 Hearing Tr. Part 1 at 133:16-19 ("I would decrease crowding. I would send anybody home who didn't really need to be there."); Franco-Paredes Testimony, June 3 Hearing Tr. Part 1 at 183:20-25 ("The only way to achieve meaningful social distancing is by temporary reductions in the population and I think that's

229.     Defendants' suspension of OJJ's furlough program during the pandemic is not reasonably related to the goal of rehabilitation. Furloughs further rehabilitative treatment.[510] Ordinarily, OJJ strives to increase furlough opportunities for as many children in custody as possible.[511] Refusing even to recommend any children for furlough (including those it had previously approved), let alone consider expanding furlough for the physical and psychological wellbeing of children during the pandemic, undermines rehabilitation by causing children to backslide in their rehabilitative progress and to experience additional unnecessary anxiety and agitation.[512]

230.     Refusing to consider stepping children down to home confinement or petitioning the courts for modifications of dispositions to obtain early release is not reasonably related to the goal of rehabilitation. Almost half of the children currently in OJJ's secure care facilities have already spent more than a year in placement, and recidivism research has shown little to no additional rehabilitative benefit to confinements lasting longer than 13 months.[513] Therefore, no recognized, legitimate rehabilitative purpose is served by continuing to hold these children in the secure care facilities under these extremely precarious pandemic conditions when safer, less restrictive placements are available.

something that is…now well accepted."); Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 94:19-96:6, June 4 Hearing Tr. Part 1 at 4:24-5:12 ("This kid with asthma could get sick and die. That's an individual determination, and I would balance that against the risk of that kid going out into the community. And then fewer kids is better because it reduces the density in the Facility; it spreads my staff across your kids; it gives me more options as to being able to quarantine the kids.").

[510] Pls.' Ex. 62, OJJ Strategic Plan at 7; Bickham Testimony, June 5 Hearing Tr. at 32:6-18.

[511] Bickham Testimony, June 5 Hearing Tr. at 32:19-22.

[512] *See, e.g.*, J.P. Testimony, June 3 Hearing Tr. Part 1 at 91:20-24 ("Q: But since the furloughs and visits have stopped, have those benefits disappeared—progress disappeared? A: Absolutely, yeah. We got back to the anger and depression and just bored.").

[513] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 19:16-21:14; *see also* Pls.' Ex. 22, Current Secure Care Youth.

### 3.    OJJ's Failure to Provide Adequate Programming Is Not Reasonably related to Rehabilitation

231.    Defendants' actions in failing to provide adequate rehabilitative and educational programming and activity during the pandemic[514] are not reasonably related to the goal of rehabilitation, and Defendants' interest in ensuring health and safety in the facilities does not justify the failure to provide adequate programming under the circumstances.

232.    Defendants could reasonably have been expected to adjust their programming in the face of a pandemic. In fact, the pandemic necessitates certain changes in the day-to-day activities of children in secure care facilities. But Defendants are obligated to provide alternative programming even during outbreaks, and if they cannot provide adequate alternatives to in-person programming in such times, they are constitutionally obligated to depopulate the facility.

233.    Defendants' decision to curtail education to only one or two hours a day is not reasonably related to the goal of rehabilitation. Educational services are a core component of the rehabilitative mission of the juvenile justice system.[515]

### 4.    OJJ's Additional Actions Related to Its Pandemic Response Are Not Reasonably related to Rehabilitation and Undermines Health and Safety

234.    Defendants' use of solitary confinement as medical quarantine is not reasonably related to the goal of rehabilitation. Plaintiffs' unrebutted expert Vincent Schiraldi testified that placing children in solitary confinement for even 48 or 72 hours has "very defined and measurable negative impacts" on children and could even lead to suicide.[516] Moreover, fear of solitary confinement discourages children from reporting symptoms,[517] which increases the likelihood that

---

[514] *See* Section IV.E, *supra*.
[515] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 85:14-86:8; Mims Testimony, June 4 Hearing Tr. Part 2 at 100:15-23.
[516] Schiraldi Testimony, June 5 Hearing Tr. at 55:7-10, 65:11-21.
[517] Schiraldi Testimony, June 3 Hearing Tr. Part 2 at 89:20-90:24.

COVID-19 cases will remain undetected even among symptomatic children. Nothing about this harmful practice relates to rehabilitation.

235. Defendants' decision to limit free phone or video visitation to fifteen-minute conversations during a pandemic is not reasonably related to rehabilitation. Access to family and visitation are core components of the rehabilitative purpose of the juvenile justice system, as they help ensure that the child is able to thrive once they return to the community.[518] Drastically limiting family access therefore undermines, and is not reasonably related to, the goal of rehabilitation.

236. Exposing children to pepper spray, especially during a pandemic involving a disease that affects the respiratory system, is clearly also not reasonably related to rehabilitation. Pepper spray is "dramatically out of favor" in juvenile justice systems nationally.[519] Indeed, allowing pepper spray to be used on children under any circumstances causes physical and psychological harm that can only frustrate the rehabilitative purpose of confinement.

### b.  Violation of Eighth Amendment Rights

237. While the Fourteenth Amendment standard is the proper one to apply to the children detained in OJJ's secure care facilities, the result would be the same under the Eighth Amendment.

238. A challenged conduct is cruel and unusual punishment under the Eighth Amendment if undertaken with deliberate indifference—that is, if officials knew of and disregarded a serious risk of harm—taking into account that a risk of harm that may not be found unconstitutional for an adult may be considered so for a child.[520] This analysis is further supported by the Supreme Court's repeated recognition that Constitutional standards must be calibrated to

---

[518] *Id.* at 84:16-85:10.

[519] Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 42:2-11.

[520] *See V.W. v. Conway*, No. 9:16-CV-1150, 2017 WL 696808, at *19 (N.D.N.Y. Feb. 22, 2017) (punitive solitary confinement of youth in the adult system violates the Eighth Amendment, in light of the "broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults.").

take into account the realities of adolescent development and must account for the fact that children are more vulnerable, more susceptible to pressure, and more capable of change than adults.[521]

239.    More specifically, the Eighth Amendment standard must take into account that children may be uniquely vulnerable to psychological harm.[522]

240.    Defendants testified that they have concern for the children in OJJ custody, and that concern appeared genuine. Concern, however, does not satisfy the prevailing constitutional standard. Rather, the question is whether Defendants were aware of and consciously disregarded a known risk.[523]

241.    The evidence overwhelmingly demonstrates that Defendants are subjectively aware of the substantial risk of COVID-19 and that their actions and inactions represent an unreasonable and insufficient response to the COVID-19 pandemic.

242.    Defendants themselves admit that most COVID-19 cases are asymptomatic and that asymptomatic people can spread the disease.[524] It is *obvious* that if most cases are asymptomatic, and OJJ *does not test* any asymptomatic children,[525] positive cases among the children will go undetected. This obviousness is sufficient to establish Defendants' subjective knowledge that their testing policy would result in undetected COVID-19 cases among the children in its secure care facilities.[526]

---

[521] *See, e.g.*, *Roper v. Simmons,* 543 U.S. 551 (2005) (imposing the death penalty on adolescents violates the Eighth Amendment because, as a class, youth are less culpable, more impulsive, and more susceptible to change); *see also Graham v. Florida,* 560 U.S. 48 (2010) (imposing certain life without parole sentences on adolescents violates the Eighth Amendment because of these same characteristics, and noting that the distinctions are based not only in developmental research, but also in recent studies of the adolescent brain).

[522] *See Miller v. Alabama,* 567 U.S. 560 (2012) (observing that youth "is a moment and condition of life when a person may be most susceptible to influence and to psychological damage").

[523] *See Farmer v. Brennan,* 511 U.S. 825 (1994); *see also V.W. v. Conway*, No. 9:16-CV-1150, 2017 WL 696808, at *19 (N.D.N.Y. Feb. 22, 2017).

[524] Dkt. 51, Stipulated Facts at ¶ 6.

[525] *See id.* at ¶ 25 ("Youth in OJJ's secure care facilities who are not exhibiting symptoms of COVID-19 are not being tested for COVID-19.").

[526] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

243.     Indeed, it is puzzling Defendants so readily admit that most COVID-19 cases are asymptomatic, particularly in children, and that OJJ is not testing *any* asymptomatic children, even though the children live in a congregate setting, often in the same open dorms with children who have tested positive;[527] share toilets, sinks and showers;[528] and interact with staff who are also interacting with confirmed COVID-19 patients.[529] The only logical explanation is that *it does not matter* to Defendants if there are undetected cases of COVID-19 among the children in OJJ's secure care facilities. This is the very definition of deliberate indifference.

### ii.     Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief

244.     The overall risk of infection remains high enough that Defendants' failure to identify all positive cases of COVID-19 among the children in OJJ's secure care facilities continues to expose all 213 children to a substantial risk of infection.

245.     The spread of COVID-19 in OJJ's secure care facilities is particularly concerning given that additional children, who will become members of the putative class upon their transfer into the secure care facilities, will soon be exposed to OJJ's potentially rampant asymptomatic outbreak.[530]

246.     According to OJJ's own representatives, if a child or staff member developed serious complications or died of COVID-19, "the event alone would cause everyone involved to re-evaluate" OJJ's current policies.[531] But if a child develops serious complications or dies of COVID-19, it will be too late to prevent irreparable harm. The Supreme Court has long recognized that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-

---

[527] Dkt. 51, Stipulated Facts at ¶ 48.
[528] *Id.* at ¶ 46.
[529] *Id.* at ¶ 45.
[530] *See* Section III.D, *supra*.
[531] Dandridge Testimony, June 4 Hearing Tr. Part 2 at 69:4-11.

threatening condition in their prison on the ground that nothing yet had happened to them. . . . [A] remedy for unsafe conditions need not await a tragic event."[532]

### iii.   Defendants Will Not Be Harmed by Issuance of Emergency Relief

247.   As shown above, the requested relief will actually lessen the burden on OJJ and better protect its staff. Furloughs and releases will mean fewer children to care for, which will help maintain an appropriate staff ratio without an over-reliance on probation and parole officers who are not appropriately trained to work in OJJ facilities. Providing appropriate, virtual structured programming, or preparing adequate policies to address the risks inherent to a return to live in-person programming, would also not overly burden Defendants. Other juvenile justice facilities have adapted their curricula to a virtual setting[533] or have continued programming with effective preventative measures just as schools and universities in the outside community have been forced to do. Finally, OJJ already has as many as 150 COVID-19 tests and, by their own admission, would not be unduly burdened by administrating those tests to children—or by requesting additional tests. Identifying all positive cases among the children would allow the facilities to implement appropriate releases, isolations, and quarantines and reduce the risk of transmission to other children and to staff. OJJ cannot simply ignore the possibility of rampant infection by refusing to test in order to keep the number of confirmed cases artificially low. This reckless tactic audaciously contravenes the public interest.

---

[532] *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("It is also important to note that [an] inmate need not show that death or serious illness has [already] occurred.").
[533] *See* Schiraldi Testimony, June 4 Hearing Tr. Part 1 at 10:19-11:18.

### iv.    Emergency Relief Will Serve the Public Interest

248.    The protection of Plaintiffs' constitutional rights serves the public interest because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."[534] Because "confidence in the humane application of the governing laws of the State must be in the public's interest,"[535] public interest considerations weigh strongly in favor of relief.

### v.    No Security Is Required Under Rule 65(c)

249.    Because Plaintiffs seek to enforce fundamental rights in which there is a substantial public interest, the security bond is waived.[536]

## V.    Proposed Order for Relief

250.    For the reasons set forth above, and those demonstrated at the evidentiary hearing held on June 3 to 5, 2020, this Court hereby orders Plaintiffs' Emergency Motion for TRO **GRANTED**. Defendants are hereby ordered to:

- Consult with Plaintiffs' experts to develop a comprehensive COVID-19 response plan that will strike the necessary balance between protecting the health and safety of the children confined in OJJ's secure care facilities (as well as the staff in those facilities) and ensuring that the children are not deprived of their constitutional right to rehabilitation during this pandemic, including during any future outbreaks;

- Administer COVID-19 tests to all children confined in OJJ's secure care facilities within one week, prioritizing, if necessary, medically vulnerable children and any children with known exposure to positive cases;

- Develop and implement a depopulation plan, or fully implement all phases of the existing depopulation plan, prioritizing the removal of medically

---

[534] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)); *accord, e.g.*, *June Medical Servs., LLC v. Caldwell*, No. 14-cv-525-JWD-RLB, 2014 WL 4296679, at *8 (M.D. La. Aug. 31, 2014).

[535] *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004).

[536] *See Elliott v. Kieswetter*, 98 F.3d 47, 60 (3rd Cir. 1996) (court may waive bond requirement of Fed. R. Civ. P. 65(c) when balance of equities weighs overwhelmingly in favor of party seeking injunction); *see also Temple Univ. v. White*, 941 F.2d 201, 220 (3rd Cir. 1991) (district court waiver of bond was affirmed where the plaintiff hospital had "pursued a course of litigation clearly in the public interest, *i.e.*, it seeks to preserve its role as a community hospital serving a disproportionate share of low income patients"); *Pharmaceutical Soc. of State of New York, Inc. v. New York State Dept. of Social Services*, 50 F.3d 1168, 1175 (2nd Cir. 1995) (affirming approval of bond waiver).

vulnerable children from the secure care facilities and children within 180 days of their release dates;

- Reinstate OJJ's furlough program and allow children to go home on furlough;

- Expand the furlough program to contemplate extended furloughs during this pandemic, including during any future outbreaks;

- Discontinue the use of solitary confinement, or room confinement, for the purposes of medical isolation or quarantine;

- Deauthorize and ban the use of chemical spray in OJJ's secure care facilities under all circumstances;

- Produce a detailed plan for resumption of programming that provides details on the program features—staffing, location, curricula, hours, and any other relevant educational aspects—as well as all newly-instated or updated health and safety policies; and

- Develop a plan for virtual educational and rehabilitative programming to be used during this pandemic, including during any future outbreaks.

Respectfully submitted this 10th day of June, 2020.

*/s/ Mercedes Montagnes*

Mercedes Montagnes, La. Bar No. 33287
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, *pro hac vice*
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Stuart Sarnoff, *pro hac vice*
Lisa Pensabene, *pro hac vice*
Laura Aronsson, *pro hac vice*
Mariam Kamran, *pro hac vice*
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000

Marsha Levick, *pro hac vice*
Jessica Feierman, *pro hac vice*
Karen U. Lindell, *pro hac vice*
JUVENILE LAW CENTER
1800 JFK Boulevard, Suite 1900A
Philadelphia, PA 19103
Telephone: (215) 625-0551
Email: mlevick@jlc.com

Brandon Amash, *pro hac vice*
O'MELVENY & MYERS LLP
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Email: bamash@omm.com

83

Email: ssarnoff@omm.com

John Adcock
La. Bar No. 30372
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Telephone: (504) 233-3125
Email: jnadcock@gmail.com

Benjamin Singer, *pro hac vice*
Jason Yan, *pro hac vice*
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Email: bsinger@omm.com

David Lash, *pro hac vice*
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6000
Email: dlash@omm.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Nishi Kumar, an attorney, hereby certify that on June 10, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system.

/s/ *Nishi Kumar*
Nishi Kumar, La. Bar No. 37415