## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

J.H., by and through his mother and next
friend, N.H., ET AL.

VERSUS

JOHN BEL EDWARDS, in his official
capacity as Governor of Louisiana, ET AL.

CIVIL ACTION

NO. 20-293-JWD-EWD

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court on the *Plaintiffs' Emergency Motion for Temporary Restraining Order Seeking Immediate Furlough* ("*Plaintiffs' TRO*"), Doc. 7. Defendants, the Louisiana Office of Juvenile Justice, Edward Dustin Bickham, James Woods, Shannon Matthews, Shawn Herbert, and Rodney Ward, filed a response, Doc. 34, which Defendant Governor John Bel Edwards adopted and incorporated by reference, Doc. 26. Plaintiffs have filed a reply. Doc. 31. Both sides have submitted evidence and filed proposed findings of fact and conclusions of law. Docs. 73, 77–79. On June 3, 2020, through June 5, 2020, the Court held an evidentiary hearing online via Zoom. Docs. 67, 70, 72. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court enters these Findings of Fact and Conclusions of Law. If any finding is in truth a conclusion of law, or if any conclusion stated is in truth a finding of fact, it shall be deemed so.

# TABLE OF CONTENTS

I.    FINDINGS OF FACT ................................................................................................. 1

  A.    Introduction .................................................................................................... 1

  B.    COVID-19 and Children Generally ................................................................ 5

  C.    Impact of COVID-19 Within the OJJ Secure Facilities ................................. 8

  D.    Likelihood of Substantial or Irreparable Harm to Youth in OJJ's Secure Care Facilities
from COVID-19 ...................................................................................................... 12

  E.    OJJ's Powers and Responsibilities Generally ................................................ 13

  F.    OJJ's Response to COVID-19 ........................................................................ 13

    i.    Generally ................................................................................................... 13

    ii.    Pre-Pandemic Planning ............................................................................ 15

    iii.    Restricting Access to Secure Care Facilities, Monitoring People Who Enter the
Secure Care Facilities, and Suspending the Furlough Program ............................ 17

    iv.    Virtual Visitation ...................................................................................... 19

    v.    "Reverse Isolation" of Youth in Secure Care Facilities ........................... 20

    vi.    Testing Protocol ....................................................................................... 21

    vii.    Quarantine and Medical Isolation Protocols ........................................... 26

    viii.    Changes to Educational Services and Rehabilitation Programing ............ 30

  G.    Depopulation of Secure Care Facilities ......................................................... 38

    i.    OJJ's Plan for Depopulation .................................................................... 40

    ii.    The Furlough Policy ................................................................................. 43

    iii.    Furlough Eligibility for Named Plaintiffs and Testifying Youth .............. 46

    iv.    Sentence Modifications and Non-Furlough Release ................................. 47

  H.    Other Concerns Stemming from OJJ's Response to COVID-19 .................... 49

    i.    Alleged Ancillary Consequences ............................................................. 49

    ii.    Likelihood of Alleged Harm from Ancillary Consequences of OJJ's COVID-19
Response ................................................................................................................ 52

  I.    Administrative Remedy Procedure ................................................................ 53

II.    CONCLUSIONS OF LAW ..................................................................................... 57

  A.    Standard for Temporary Restraining Orders and Preliminary Injunctions ...... 57

  B.    Substantial Likelihood of Success on the Merits ........................................... 58

    i.    Appropriate Standard ............................................................................... 58

ii.    Fourteenth Amendment Analysis ............................................................... 62

iii.   Eighth Amendment Analysis ..................................................................... 74

iv.   Other Issues ............................................................................................. 77

C.   Substantial Threat of Irreparable Injury ............................................................. 83

D.   Weighing Harm to the Defendants and the Public Interest .............................. 87

E.   Preliminary Injunction ........................................................................................ 91

III.   Conclusion ................................................................................................................ 92

## I.    FINDINGS OF FACT

### A.  Introduction

1.  COVID-19 is a global pandemic caused by a novel coronavirus that has infected more than 5.7 million people and killed more than 355,000 to date. *Joint Statement of Stipulated Facts* ("*Stipulations*") ¶ 1, Doc. 51.

2.  Louisiana alone has more than 38,000 confirmed cases and more than 2,700 deaths as of May 30, 2020. *Stipulations* ¶ 2, Doc. 51.

3.  However, of the confirmed cases of COVID-19 in Louisiana, there have been 925 cases and 2 deaths of individuals under the age of 18 as of May 30, 2020. *Stipulations* ¶ 3, Doc. 51. OJJ also houses individuals between the ages of 18 and 21. *Id.*

4.  COVID-19 is an acute respiratory syndrome. *Stipulations* ¶ 4, Doc. 51. Common symptoms of COVID-19 include cough, fever, and shortness of breath. *Id.* Additional symptoms of COVID-19 include chest pain, headache, loss of smell, abdominal pain, rash, diarrhea, aches, and vomiting. *Id.* In the most severe cases, it can cause pneumonia, respiratory failure, heart failure, sepsis, and death. *Id.*

5.  There is an increased risk of serious complications in patients infected with COVID-19 who also suffer from certain co-morbidities, including asthma, hypertension, diabetes, Human immunodeficiency virus (HIV) infection, and other immunocompromising conditions. *Stipulations* ¶ 5, Doc. 51.  Obesity is also a risk factor for developing complicated clinical courses. *Id.*

6.  The majority of infected individuals are asymptomatic or mildly symptomatic, and people without symptoms can spread the disease. *Stipulations* ¶ 6, Doc. 51.

1

7.  This is a class action brought by youths who have been adjudicated delinquent and are currently confined in secure care facilities operated by the Louisiana Office of Juvenile Justice. *Class Action Complaint for Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus* ("*Complaint*") ¶ 1, Doc. 1.

8.  Plaintiffs filed their *Complaint* on May 14, 2020. *Compl.*, Doc. 1.

9.  Plaintiffs generally allege that Defendants' actions and failures to act with respect to the COVID-19 pandemic constitute violations of Plaintiffs' constitutional rights under the Eighth and Fourteenth Amendments. *See generally Compl.*, Doc. 1.  Plaintiffs bring the action pursuant to 22 U.S.C. § 2241, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201, 2202, for relief from both detention and conditions of confinement for these alleged constitutional violations. *Id.* ¶ 10.

10.  Plaintiff J.H. is a minor currently confined at Acadiana Center for Youth who was previously housed at Bridge City Center for Youth. *Compl.* ¶ 15, Doc. 1.  J.H.'s mother, N.H., brings this suit on his behalf. *Id.*

11.  Plaintiff I.B. is a minor currently confined at Acadiana Center for Youth. *Compl.* ¶ 16, Doc. 1.  His parents are A.B. and I.B., and they bring this suit on his behalf. *Id.*

12.  Defendants in this action are:

    a.  Governor John Bel Edwards ("Governor Edwards");

    b.  the Louisiana Office of Juvenile Justice ("OJJ");

    c.  Edward Dustin Bickham ("Bickham"), Interim Deputy Secretary of OJJ;[1]

    d.  James Woods ("Woods"), Director of the Acadiana Center for Youth ("Acadiana");

---

[1] Deputy Secretary Bickham testified that he had recently been confirmed by the Senate as Deputy Secretary of OJJ. Bickham Tr. (6/5/20) at 33–34.

e. Shannon Mathews ("Matthews"), former Director of the Bridge City Center for Youth ("Bridge City"), though this position is now held by Cassandra Washington ("Washington"), Interim Director of Bridge City;

f. Shawn Herbert ("Herbert"), Interim Director of the Swanson Center for Youth at Monroe ("Swanson Monroe"); and

g. Rodney Ward ("Ward"), Deputy Director of the Swanson Center for Youth at Columbia ("Swanson Columbia"). *Compl.* ¶¶ 17–23, Doc. 1.

13. Plaintiffs' *Complaint* seeks a preliminary injunction and permanent injunction, including but not limited to the release of juvenile offenders (the "Youth") through the duration of the COVID-19 pandemic. *Compl.*, Doc. 1 at 42–46.

14. On May 15, 2020, *Plaintiffs' TRO* was filed. Doc. 7.

15. In the motion, Plaintiffs seek an order enjoining Defendants from:

a. continuing to confine all children who are currently within 180 days of their release dates;

b. continuing to confine children who are presumptively eligible for release, including all children (i) who have contracted COVID-19; (ii) who have pre-existing medical conditions that the Centers for Disease Control ("CDC") has determined puts them at significantly higher risk of developing COVID-19 complications; (iii) who are currently eligible for furlough in accordance with OJJ's polices; and (iv) who can be safely returned to their communities;

c. failing to test children for COVID-19;

d. using "Behavioral Intervention Rooms" (i.e., isolation rooms) for any child who tests positive for COVID-19 or displays symptoms of the disease;

e. confining children to their dormitories for lengthy periods of time;

f. using pepper spray on children; and

g. continuing the suspension of structured educational and rehabilitative programs in OJJ facilities. *Pls.' TRO,* Doc. 7 at 1–2.

3

16. Plaintiffs further moved this Court to "order Defendants-Respondents to develop, within 48 hours, an effective COVID-19 response plan governing the state's four children's detention centers that fully conforms to CDC guidelines." *Pls.' TRO,* Doc. 7 at 2.

17. Plaintiffs also submitted briefing with the *Pls.' TRO. See Mem. in Support of [Pls.' TRO]* ("*Pls.' TRO Mem.*"), Doc. 7-1.

18. The Court conducted a status conference on May 20, 2020. *Min. Entry,* Doc. 21. During the status conference, the Court ordered Defendants to submit their written response in opposition to *Plaintiffs' TRO* by no later than May 26, 2020, and Plaintiffs to submit their reply brief by no later than May 27, 2020. *Id.* at 2. The Court also set *Plaintiffs' TRO* for hearing via the digital online Zoom platform, to start on June 3, 2020. *Id.* at 2.

19. Defendants timely submitted their response to *Plaintiffs' TRO*, and Plaintiffs timely submitted their reply *See generally La. Office of Juvenile Justice Defs.' Resp. to [Pls.' TRO]* ("*Defs.' TRO Resp.*"), Doc. 34;[2] *Reply Mem. in Support of [Pls.' TRO]* ("*Pls.' TRO Reply*"), Doc. 31.

20. The Court conducted a full hearing on *Plaintiffs' TRO* on June 3, 2020 through June 5, 2020. *Min. Entries*, Docs. 67, 70, 72. During the course of the hearing, Plaintiffs called six witnesses (including three expert witnesses) for live testimony, and Defendants called five witnesses for live testimony. *Min. Entries*, Docs. 67, 70, 72. Plaintiffs called one of their experts on rebuttal. *Min. Entry*, Doc. 72.

21. On June 10, 2020, the parties timely submitted proposed findings of fact and conclusions of law. *Pls.-Pets. Proposed Findings of Fact and Conclusions of Law for TRO Hr'g Held*

---

[2] Governor Edwards submitted a separate response adopting and incorporating his co-defendants' response. *See generally Mem. in Resp. to [Pls.' TRO]*, Doc. 26.

4

*June 3–5, 2020* ("*Pls' PFFCL*"), Doc. 77; *La. Office of Juvenile Justice Defs.' Proposed Findings of Fact and Conclusions of Law Regarding Pls.' Mot. for TRO* ("*OJJ's PFFCL*"), Doc. 78.[3]

22. The parties filed their findings of fact and conclusions of law before any official transcript was completed and filed into the record.  All record citations by the parties to a transcript are to an unofficial version provided by the court reporters.  If the Court cites to a transcript, it is to that unofficial transcript.

23. The Court has carefully considered all of the evidence and parties' submissions in rendering these findings of fact and conclusions of law.  All evidence and arguments have been considered, even if not directly mentioned herein.

**B.  COVID-19 and Children Generally**

24. Though children can become infected with COVID-19 and can develop symptoms because of the virus, Plaintiffs' two medical experts agree that COVID-19 primarily affects older adults, that most children who become infected with COVID-19 will experience either no symptoms or only minor symptoms, and that the more serious symptoms caused by or associated with COVID-19 are extremely rare in children.

25. Plaintiffs called two witnesses as medical experts—Megan Maraynes, M.D. and Carlos Franco-Paredes, M.D. Dr. Maraynes is a pediatric emergency room physician who practices at Ochsner Medical Center in New Orleans, Louisiana. Maraynes Tr. at 117.  She was qualified as an expert in pediatric emergency medicine and the treatment of pediatric COVID-19. Maraynes Tr. at 120. Dr. Franco-Paredes is an infectious disease doctor who

---

[3] Governor Edwards again submitted a separate findings of fact and conclusions of law adopting and incorporating his co-defendants' ones. *See generally [Governor Edwards'] Proposed Findings of Fact and Conclusions of Law Regarding Pls' Mot. for TRO*, Doc. 79.

practices at the University of Colorado. *See* Franco-Paredes Tr. (6/3/20 Part 1) at 172–73. He was accepted as an expert in the fields of infectious disease, epidemiology, and COVID-19, including with respect to prisons and correctional facilities. Franco-Paredes Tr. (6/3/20 Part 1) at 169–171, 182.

26. Dr. Franco-Paredes testified that COVID-19 primarily impacts the adult population clinically. Franco-Paredes Tr. (6/3/20 p.m.) at 21. Similarly, Dr. Maraynes testified that there has been a much higher frequency or rate of severe respiratory illness requiring intubation from COVID-19 in the adult population versus the youth population. Maraynes Tr. at 137.

27. Dr. Maraynes testified that less than ten percent of all COVID-positive patients are pediatric patients. Maraynes Tr. at 139. She further said, "that just may be related to the fact that because they're asymptomatic they're not being tested as much[.]" *Id.*

28. Many children who are diagnosed with COVID-19 have no symptoms or nonspecific, vague symptoms that could easily be confused with any number of other conditions. Maraynes Tr. at 128–29. Both Dr. Maraynes and Dr. Franco-Paredes agreed that most or the large percentage of minors and children who contract COVID-19 either present with no symptoms or with mild symptoms such as fever, cough, and sore throat. Franco-Paredes Tr. (6/3/20 p.m.) at 22; Maraynes Tr. at 138. In fact, Dr. Franco-Paredes testified that the largest percentage of children who contract COVID-19 are asymptomatic; the next greatest percentage of youth who contract COVID-19 are those who experience mild symptoms like cough, fever, and sore throat. Franco-Paredes Tr. (6/3/20 p.m.) at 23-24.

29. Dr. Maraynes agreed that there are "a lot of asymptomatic youth and child COVID positive patients out there and the smaller percentage would be the ones who are actually symptomatic and experiencing medical reaction or clinical reaction." Maraynes Tr. at 139.

30. Dr. Franco-Paredes testified that an even smaller percentage of children who contract COVID-19 will develop potentially serious complications, such as respiratory failure, severe damage to lung tissue, neurological damage, deep venous thrombosis and other coagulopathies like bleeding disorders, COVID-19 induced asthmas, Gillian Barr Syndrome, myocarditis and inflammatory multi-organ dysfunction. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 22, 55–59.

31. While there are no tests that can predict the course of a COVID-19 patient's illness, *Stipulations* ¶ 7, Doc. 51, for a person diagnosed with COVID-19, the average number of days from infection until the person is no longer infectious is approximately ten days. Franco-Paredes Tr. (6/3/20 p.m.) at 24–26.

32. Dr. Maraynes conceded that, though there is a risk of prolonged lung function problems in youth who both contract COVID-19 and require intubation and mechanical ventilation, the risk of prolonged lung function problems is "not all that prevalent" and "pretty remote." Maraynes Tr. at 150–51. "It's possible and it's happened, but it's not the norm." *Id.* at 151.

33. Again, of the confirmed cases of COVID-19 in Louisiana, there have only been 925 cases and 2 deaths of individuals under the age of 18 as of May 30, 2020. *Stipulations* ¶ 3, Doc. 51.

34. Dr. Maraynes similarly testified she was aware of only two deaths in Louisiana involving pediatric patients diagnosed with COVID-19 as of May 30, 2020. Maraynes Tr. at 140.

Both of those deaths were related to pediatric inflammatory multi-system disorder, or PIMS, which is a rare toxic-shock-like system-wide reaction. *Id.* at 127, 140.

35. If a child contracts COVID-19, it is "far, far more likely" that youth will not develop PIMS versus the likelihood that the youth will develop PIMS; "[v]ery few youths and minors and children have actually developed PIMS[]" from COVID-19. Maraynes Tr. at 146.

### C. Impact of COVID-19 Within OJJ Secure Facilities

36. OJJ maintains four secure care facilities housing approximately 220 Youth. *Stipulations* ¶ 10, Doc. 51

37. Thirty youth in OJJ secure care facilities have been tested for COVID-19. *Stipulations* ¶ 22, Doc. 51.  Twenty-eight of them tested positive for the virus. *Id.*

38. While COVID-19 can present without a fever, Maraynes Tr. at 121, all thirty Youth in OJJ secure care facilities who have been tested for COVID-19 presented with fevers, *Stipulations* ¶ 23, Doc. 51.

39. All 28 Youth who tested positive for COVID-19 have fully recovered and have been discharged from medical isolation. *See Stipulations* ¶¶ 37–40, Doc. 51.

40. All Youth who contracted COVID-19 exhibited only mild symptoms. Def. Ex. 45, Dandridge Aff. ¶ 41. Most Youth had only a fever for a few days. *Id.*  Some had mild respiratory symptoms similar to a seasonal cold. *Id.*  No Youth who tested positive for coronavirus required hospitalization. *Id.*  None of the COVID-19-positive Youth experienced any of the more serious COVID-19 complications such as respiratory failure, severe damage to lung tissue, neurological damage, deep venous thrombosis and other coagulopathies like bleeding disorders, COVID-19 induced asthmas, Gillian Barr

Syndrome, myocarditis, inflammatory multi-organ dysfunction, and PIMS. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 56-60; Maraynes Tr. at 140.

41. COVID-19-positive Youth were treated with standard over-the-counter medication such as fever-reducers (acetaminophen or ibuprofen), cough medications, and salt-water gargles for sore throats. Def. Ex. 45, Dandridge Aff. ¶ 42.

42. No Youth has died of COVID-19. *See* Maraynes Tr. at 140; Franco-Paredes Tr. (6/3/20 p.m.) at 52.

43. Defendants presented testimony that none of the Youth in OJJ's secure care facilities have complained of symptoms suggestive of COVID-19 since April 12, 2020. Def. Ex. 45, Dandridge Aff. ¶¶ 38 ("[T]he last positive COVID-19 test of a newly-symptomatic youth was on April 12, 2020…."), 43 ("There are currently no Youth within the OJJ secure care facilities with a confirmed case of COVID-19, and there currently are no Youth within the OJJ secure care facilities complaining of symptoms associated with COVID-19.").

44. Plaintiffs note that the COVID-19 test results indicate that there was a positive test result as of April 27, 2020. *Pls.' PFFCL* ¶ 97, Doc. 77;  Pl. Ex. 21, *COVID-19 Test Results at OJJ facilities* ("*COVID-19 Test Results*").   This does not undermine Dandridge's testimony. *See* Def. Ex. 45, Dandridge Aff. ¶ 38 ("[T]he last positive COVID-19 test of a *newly-symptomatic youth* was on April 12, 2020…." (emphasis added)).  Further, the test results from that Youth from May 2, 2020 are negative, and there is insufficient evidence to conclude that there has been a positive case of COVID-19 since May 2, 2020. *See* Pl. Ex. 21, *COVID-19 Test Results*.

45. Plaintiffs complain that OJJ relies on children to self-report symptoms, *see Pls.' PFFCL* ¶ 94, Doc. 77, but the Court finds this response reasonable under the circumstances.

46. Plaintiffs presented evidence that a testifying Youth named D.M. had a headache and sore throat and that he did not report it to staff. D.M. Tr. at 73.  However, the Court does not give much weight to this testimony because (a) it was unclear from D.M.'s account when he had these symptoms, as he simply said he had them "around April," *id*. at 81–82; (b) there was no indication that D.M. had fever like the other cases of COVID-19 in OJJ's secure facilities, *see Stipulations* ¶ 23, Doc. 51; (c) Plaintiffs did not establish more likely than not that D.M. in fact had coronavirus (as opposed to some other issue like a cold or allergies), *see* Maraynes Tr. at 121 (stating that one cannot "tell . . . too easily . . .the difference between a symptom of COVID-19 and regular allergies"); and (d) given the fact that most people with COVID-19 typically recover in ten days, Franco-Paredes Tr. (6/3/20 p.m.) at 26, and given that D.M. allegedly had these symptoms "around April," it is more probable than not that, if D.M. had COVID-19, he no longer has it, has fully recovered, and is no longer contagious.

47. Plaintiffs also note that Hebert testified that a child did not admit to "not feeling well until Ms. Herbert pressed him," *Pls.' PFFCL* ¶ 94, Doc. 77, but this testimony actually undermines Plaintiffs' position.  Ms. Herbert was asked, "In your interaction with the Youth did you ever observe symptoms of COVID in any of the Youth," and she responded:

> Yes, sir.  Actually, the young man who subsequently had some medical issues at [Acadiana], during a visit on the dormitory we were playing cards and he just did not seem to be himself.  He was very, very quiet and this young man was actually very hyperactive in most cases.  So I asked him if he was feeling okay and he said that he was and I told him that he just didn't really look like he was feeling like himself and then he admitted that he really wasn't.  So I said well let's go ahead and go to the infirmary and have you evaluated, so I actually escorted him to the infirmary myself.

Herbert Tr. at 115–16.  The Court finds that this candid testimony demonstrates that dedicated staff at OJJ facilities like Ms. Herbert were very concerned about the well-being

of the Youth and did in fact monitor them for COVID-like symptoms, even if they did not perform temperature checks or ask formal lists of questions based on symptoms.

48. Finally, the Court does not find credible D.M.'s testimony that three children at Swanson Monroe reported cold-like symptoms but were turned away. *See* D.M. Tr. at 71–72. As Defense counsel pointed out, D.M. did not go to the infirmary with those Youth, talk to the treating nurses, or know the Youths' temperatures. *Id.* This testimony flies in the face of the other testimony presented at trial which showed that OJJ workers appeared highly dedicated and proficient at their jobs. In any event, D.M. said that this occurred around the beginning or middle of April, so, even if this were true (which the Court does not find to be the case), any effects of this would have long-since passed.

49. The Court similarly finds L.P.'s testimony on this issue unbelievable and vague, for the same reasons stated above. *See* Pl. Ex. 2, L.P. Decl. ¶ 8 (stating that her son was "feeling really sick at one point" and "was told he wasn't eligible.").

50. Plaintiffs' experts also complain that it would be "surprising" if in fact no child complained of symptoms since April 12, Maraynes Tr. at 132, that one had "doubts[]" that no child had symptoms, *id.* at 159, and that the other found it "hard to believe" that the children had no symptoms, Franco-Paredes Tr. (6/3/20 p.m.) at 44. However, the Court finds these assessments speculative, and they certainly do not establish, more probable than not, that a child currently has COVID-19 or any corresponding symptoms.

51. Further, Plaintiffs' medical expert admitted that there is no evidence that any Youth in OJJ's four facilities currently has COVID-19 or has symptoms of COVID-19. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 29 (stating that he does not have information to confirm), 30 (stating that he "do[es]n't know of any – any minors having symptoms at this point.").

### D. Likelihood of Substantial or Irreparable Harm to Youth in OJJ's Secure Care Facilities from COVID-19

52. Plaintiffs' experts, Dr. Franco-Paredes and Dr. Maraynes, testified that COVID-19 is "highly transmittable," Maraynes Tr. at 132; Franco-Paredes Tr. (6/3/20 p.m.) at 34, particularly in congregate settings like correctional facilities, *see* Franco-Paredes Tr. (6/3/20 Part 1) at 184.

53. However, Plaintiffs' medical expert, Dr. Franco-Paredes, admitted that he had no evidence of an incarcerated youth offender in any location in the world having died of COVID-19 or even having experienced serious COVID-19 complications such as respiratory failure, severely damaged lung tissue, neurological damage, deep venous thrombosis and other coagulopathies like bleeding disorders, COVID-19 induced asthmas, or Gillian Barr Syndrome. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 52, 57, 59.

54. Further, Plaintiffs' two medical experts admitted that they have no evidence to calculate the probability or even approximate the likelihood that a Youth in OJJ's secure care facilities will die due to COVID-19 or will develop serious COVID-19 complications such as respiratory failure, severely damaged lung tissue, neurological damage, deep venous thrombosis and other coagulopathies like bleeding disorders, COVID-19 induced asthmas, Gillian Barr Syndrome, myocarditis, inflammatory multi-organ dysfunction, or PIMS. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 52, 57, 59–60; Maraynes Tr. at 142–43 (stating there is insufficient data to calculate the probability or likelihood of a person developing PIMS); *see also* Maraynes Tr. at 156 (admitting that the likelihood of any Youth developing PIMS "would be pretty remote at this point[,] 50 days later").

### E. OJJ's Powers and Responsibilities Generally

55. It is the public policy of the state of Louisiana that commitment of a juvenile to the care of OJJ "is not punitive nor is it in any way to be construed as a penal sentence, but as a step in the total treatment process toward rehabilitation of the juvenile[.]" La. Rev. Stat. Ann. § 15:906(B).

56. As the Louisiana Supreme Court has stated:

> Thus, the unique nature of the juvenile system is manifested in its non-criminal,  or "civil," nature, its focus on rehabilitation and individual treatment rather than retribution, and the state's role as parens patriae in managing the welfare of the juvenile in state custody. See *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971); *Santosky v. Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *In re T.M.,* 742 P.2d 905, 907 (Colo. 1987). Consequently, there has been recognized in the juvenile system a "quid pro quo" under which juveniles who are placed in adult facilities without the safeguards of due process that are enjoyed by adults will receive in return rehabilitative treatment rather than mere punitive incarceration. *Doe v. McFaul,* 599 F. Supp. 1421, 1428 (N.D. Ohio, 1984); *Baker v. Hamilton,* 345 F. Supp. 345, 352 (W.D. Ky. 1972); *Osorio v. Rios,* 429 F. Supp. 570, 574 (D.C. Puerto Rico, 1976).

*In re C.B.*, 97-2783 (La. 3/4/98); 708 So. 2d 391, 396–97.

57. "[W]hen [a child who is adjudicated for a delinquent act] is removed from the control of his parents, the court shall secure for him care as nearly as possible equivalent to that which the parents should have given him." La. Child. Code art. 801.

### F. OJJ's Response to COVID-19

#### i. Generally

58. OJJ engaged in a multi-faceted response to the COVID-19 pandemic in an effort to prevent/reduce the introduction of COVID-19 into its secure care facilities and to reduce the risk of transmission of the disease if/when it entered the facilities.

59. On March 23, the CDC released *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* ("*CDC Interim Guidance*"). *Stipulations* ¶ 37, Doc. 51; Def. Ex. 11, *CDC Interim Guidance*.

60. Denise Dandridge, OJJ's medical director, testified by affidavit and at the hearing. The Court finds that Dandridge, like all of the other OJJ witnesses, gave highly credible testimony and presented themselves as dedicated and enthusiastic public officials.

61. Dandridge stated that she has kept abreast of CDC Guidelines and Louisiana Department of Health ("LDH") recommendations and procedures for evaluation, testing, medical isolation, quarantine, hygiene, cleaning, and other precautionary and reactionary measures to address COVID-19. Def. Ex. 45, Dandridge Aff. ¶ 8. She has monitored the CDC guidelines specific to correctional and detention facilities, and OJJ has followed this guidance in its response to COVID-19 wherever practicable. *Id.*

62. Dr. Franco-Paredes admitted that OJJ was following CDC guidance in its COVID-19 response. *See, e.g.,* Franco-Paredes Tr. (6/3/20 p.m.) at 62-63. The essence of his testimony was that OJJ should go beyond what the CDC recommended and that the CDC guidance was inadequate. *See id.*

63. Plaintiffs highlight that there is other guidance available, including from the American Academy of Pediatrics, Pl. Ex. 32, and from the Physicians for Criminal Justice Reform, Pls. Ex. 33. *See Pls.' PFFCL* ¶¶ 56–57, Doc. 77. However, they fail to identify a constitutional duty requiring OJJ to abide by these standards.

64. Plaintiffs' expert in juvenile justice, Vincent Schiraldi explained that various juvenile justice organizations are promulgating standards to reduce the spread of COVID-19 within facilities, but he conceded that "they don't always agree with each other." Schiraldi Tr.

14

(6/4/20) at 11–12.  Schiraldi said that these guidance documents create a "Venn Diagram,"
but he also conceded that "[t]here's no one size fits all approach to this" and that, at the
end of the day, the agency "need[]s to come up with a plan that works for [its] place." *Id.*
at 11–12, 59.  Schiraldi said this is typically left to the discretion of the State's OJJ, unless
that runs afoul of the case law or jeopardizes the kids in a way that requires "intervention."
*Id.* at 59–60.

65. Critically, Mr. Schiraldi also testified about the competing policies that OJJ must balance
in crafting its response to COVID-19 and the difficulties in doing so.  He said:

> So there is a tension between some of the things you'd want to do from a
> public health standpoint and some of the things you'd want to do from a
> best practices youth justice standpoint.  And so it's very difficult to find the
> sweet spot that allows you to carry out your mission while not endangering
> the kids and the staff.

Schiraldi Tr. (6/3/20) at 84.  He further testified:

> You can't just keep the public health stuff going and neglect the
> rehabilitation and *you can't just do the rehabilitation stuff and neglect the
> public health* and you can't just release the kids and neglect the cleaning
> and the safety and all of the stuff the doctors talked about.

*Id.* at 92 (emphasis added)).

### ii.  Pre-Pandemic Planning

66. OJJ's planning and preparations for the potential impact of COVID-19 began before the
State of Louisiana had its first confirmed case of COVID-19.

67. In the last week of February 2020, leadership from the OJJ, including OJJ's medical
director Ms. Dandridge, participated in a meeting of the Unified Command Group
("UCG") led by Governor Edwards with participants from leadership from all state
agencies. Def. Ex. 45, Dandridge Aff. ¶ 9.  On the call, Governor Edwards called upon

15

state agencies to be proactive in creating and implementing plans for prevention and mitigation of the risks associated with the COVID-19 pandemic. *Id.*

68. Following this initial UCG call, OJJ conducted an agency-wide meeting to discuss prevention and preparedness for the coronavirus on March 2, 2020. Def. Ex. 45, Dandridge Aff. ¶ 10. At this meeting, Ms. Dandridge encouraged all facilities to prepare for potential major disruptions due to the coronavirus and asked that all departments and facilities review their Continuity of Operations ("COOP") plans and inventory their available cleaning supplies, hygiene supplies, and personal protective equipment ("PPE"). *Id.*

69. Louisiana's first presumptive positive case of coronavirus was announced on March 9, 2020. Def. Ex. 45, Dandridge Aff. ¶ 11.

70. On March 11, 2020, Governor Edwards declared COVID-19 a Public Health Emergency, which remained in effect through at least the end of May 2020. Def. Ex. 45, Dandridge Aff. ¶ 12.

71. On or about March 11, 2020, the OJJ Deputy Secretary began to participate in daily UCG meetings held by the Governor. Def. Ex. 45, Dandridge Aff. ¶ 13. Ms. Dandridge also attended several of these UCG meetings with the Deputy Secretary. *Id.*

72. A second internal agency-wide OJJ meeting was conducted on March 12, 2020, to discuss coronavirus prevention and preparedness, as well as existing and updated policies. Def. Ex. 45, Dandridge Aff. ¶ 14. Each facility reported on their steps in preparation for the coronavirus, including a report regarding their inventories of supplies. *Id.* All facilities had at least a two-month supply of food, cleaning supplies, hygiene supplies, and PPE. *Id.*

73. In addition to holding department-wide meetings, OJJ began working with its contract provider of health care services, Wellpath, to ensure Wellpath had contingency plans in

place consistent with CDC Guidance to provide uninterrupted services within OJJ secure care facilities throughout the pandemic. Def. Ex. 45, Dandridge Aff. ¶ 15.

74. Throughout the planning, preparations, and response to COVID-19, OJJ consulted with the Governor, LDH, the Louisiana Department of Education, and Wellpath and relied on the CDC Guidance. *See* Dandridge Tr. at 9–12; Def. Ex. 45, Dandridge Aff. ¶¶ 8, 9, 15; Def. Ex. 43, Mims Aff. ¶¶ 9–10.

      **iii.  Restricting Access to Secure Care Facilities, Monitoring People Who Enter the Secure Care Facilities, and Suspending the Furlough Program**

75. On March 16, 2020, new guidelines took effect. Def. Ex. 45, Dandridge Aff. ¶¶ 22–23. The new policy required screening for all persons entering secure facilities, suspended youth visitation, postponed furloughs (while increasing telephone contact with family), and postponed all off-campus group activities. *Id.* ¶ 23. Additionally, only OJJ staff and emergency visitors would be allowed on campus, and attorney visits would be held by phone call. *Id.* Only contractors working on repairs essential to the safety of the facilities, as determined on a case-by-case basis, would be allowed to enter the campus, and only after screening. *Id.* Finally, to the extent possible, deliveries to facilities would be intercepted at the front gate to minimize the need for outside individuals to interact with staff and residents at the facility. *Id.*; *see also* Dandridge Tr. at 15–17.

76. Phrased another way, in response to COVID-19, OJJ suspended in-person visitation, volunteering, escorted absences, furloughs, and non-essential off-campus outings, events, and non-essential medical appointments. *Stipulations* ¶ 17, Doc. 51.

77. Similarly, everyone coming into a secured facility was screened at the gate before entry with a temperature check and a COVID screening tool, which included questioning about

whether the individuals had visited specific areas or had any type of symptoms. Dandridge Tr. at 11–12, 14–16, The screening was done each time the person left and came back to the facility, even if it was in the same day. Dandridge Tr. at 15. There were no exceptions to this policy. Hebert Tr. at 129.

78. Thus, as the parties stipulated, (1) OJJ's procedure is to screen staff upon arrival at the facility after each time he or she has left the facility and returned, and (2) OJJ's procedure is that the staff screening should include both a temperature check and a verbal confirmation that the staff member is not experiencing COVID-like symptoms. *Stipulations* ¶¶ 43–44, Doc. 51.

79. Plaintiffs' expert Schiraldi complained about OJJ's management having a lack of oversite over lower level workers, but the Court disagrees.

80. First, this testimony was largely rebutted by Herbert and Washington, who provided a "boots on the ground" description of what was going on at their respective facilities. *See, e.g,* Herbert Tr. at 105 (testifying that Youth were actually getting and doing their educational work packets); 107 (testifying that kids were going to the computer lab); 113–14 (describing the facility's monitoring of symptoms); 118–19 (describing cleaning and hygiene procedures),[4] 159–60 (describing monitoring of symptoms at front gate and for children and cleaning).

81. Second, OJJ's reliance on staff was reasonable, particularly under the circumstances of the COVID-19 pandemic and the need to reduce the number of people traveling unnecessarily to and from the facilities.

---

[4] The Court notes that Hebert's testimony about the extensive cleaning procedures by OJJ directly rebuts D.M.'s testimony that the facilities were dirty. *See* D.M. Tr. at 44, 55–56. The Court found Herbert more credible on this (and nearly all other) issues.

82. And third, while Schiraldi testified that, in his experience, staff could not always be counted on to perform their duties, Plaintiffs failed to present sufficient, credible evidence that, at these particular OJJ facilities, the lower-level staff were negligent in carrying out policy and directives. *See* Herbert Tr. at 129–30 (stating that she checked the front gate every day; explaining her need to trust the assistant director, shift commanders, group leaders, and medical professionals;  and saying that she has "not had one single report that anyone has gotten through the gate without being checked, including [herself].");  152 (stating that her staff at the front gate is responsible; that she monitors the PPE inventory to ensure that protocols are being followed; and that, in her experience and observation, her staff has been "diligent in this process.").

83. As will be discussed in greater detail below, by statute, the OJJ can recommend to the state juvenile courts for Youth to be temporarily released from secure care as part of a furlough program.  *See* La. Rev. Stat. Ann. § 15:908(A).  Pursuant to CDC Guidance, all Youth furloughs have been postponed since March 16, 2020. *Stipulations* ¶ 61, Doc. 51.  *See also* Def. Ex. 11, *CDC Interim Guidance*.

### iv.  Virtual Visitation

84. Due to restrictions on in-person visitation necessitated by the COVID-19 pandemic, OJJ increased the number of free phone calls available to the Youth from one phone call to two calls per week to family. Herbert Tr. at 110. Each phone call is fifteen minutes. Herbert Tr. at 147.

85. The Youth also received one to two free video conferencing calls per week in order to provide comfort in maintaining contact with family members during the pandemic. Herbert Tr. at 110; *see also Stipulations* ¶ 18, Doc. 51 ("Since suspending in-person visitation,

some parents and Youth have been able to have one video visit per week."). This was handled by OJJ case managers. Herbert Tr. at 110.  These video calls are also fifteen minutes each. Herbert Tr. at 147.

86. Plaintiffs complain that these replacements are "inadequate under the circumstances," *Pls.' PFFCL* ¶ 115, Doc. 77, and that Youth like D.M. say they are "not enough" and "not the same," D.M. Tr. at 60–61, 74.  The Court agrees that these calls are "not the same," but the Court strongly disagrees that they are "inadequate under the circumstances."  Given the heightened need for OJJ to prevent the spread of COVID-19 to the Youth and the community, the Court finds that OJJ's policy of increasing the number of phone calls and use of video conferencing calls to be very reasonable under the circumstances.

### v.  "Reverse Isolation" of Youth in Secure Care Facilities

87. OJJ employed a plan for all Youth referred to as "reverse isolation." Def. Ex. 45, Dandridge Aff. ¶ 48.

88. OJJ secure care facilities have dormitory style living, with up to 12 Youth sleeping in one large room. *Stipulations* ¶ 48, Doc. 51.

89. During "reverse isolation" each dorm was self-contained and did not interact with Youth from other dorms. Def. Ex. 45, Dandridge Aff. ¶ 48.

90. This "reverse isolation" was intended to prevent cross-contamination between dorms and ensured that any occurrence of coronavirus could be contained within a single dorm. Def. Ex. 45, Dandridge Aff. ¶ 48.  Reverse isolation also served to prevent the need for "contact tracing" across dorms to determine additional Youth who may have been exposed to a Youth who became symptomatic or tested positive for coronavirus. *Id.*

91. Youth were able to get masks and were encouraged to wear the masks. Dandridge Tr. at 21.

92. Even the testifying Youth D.M., who complained that OJJ was not giving masks after initially providing them, testified that "they had started back giving us masks again, they give us masks everyday[.]" D.M. Tr. at 53–54.

93. Plaintiffs also complain that "Youth in OJJ secure care facilities are not required to wear masks," *Stipulations* ¶ 76, Doc. 51, but it is also stipulated that "at least one mask is available to all Youth," *id.*

94. OJJ's "reverse isolation" strategy is compliant with LDH guidance as discussed on UCG calls with Governor Edwards and LDH officials.  Def. Ex. 45, Dandridge Aff. ¶ 48.

### vi.  Testing Protocol

95. All Youth that exhibited any type of symptom that could have been deemed as a coronavirus symptom or even  flu or strep throat symptom were brought to the infirmary where the nurse would give them a flu test for influenza A and influenza B.  Dandridge Tr. at 23.  If the Youth had a sore throat, they would also get a strep throat test.  *Id.*  Results of these tests were available immediately at point of service. *Id.*  If the flu and strep tests were negative, the doctor was called to let him know that the Youth was showing certain symptoms, and the doctor would order a COVID-19 test. *Id.*

96. OJJ has maintained this testing protocol throughout the COVID-19 pandemic. Def. Ex. 45, Dandridge Aff. ¶ 44.  OJJ is not performing universal testing of all Youth within its care.  *Id.*  The protocol is to test Youth who are exhibiting symptoms consistent with COVID-19. *Id.*

97. Plaintiffs and their experts advocate for "universal testing" of Youth, which essentially means "testing everybody," including those who are not exhibiting symptoms associated with COVID-19. *See, e.g.,* Maraynes Tr. at 133.

98. Dr. Maraynes admitted though that, if the CDC Guidance said to prioritize testing in congregating care settings if symptomatic, then it would not be a fair interpretation of the document to say, "test everybody." Maraynes Tr. at 166–67. In that case, "it means to have a relatively low threshold for testing." *Id.* at 167.

99. Plaintiffs' expert in juvenile justice, Mr. Schiraldi, testified that other juvenile detention/correction centers in the United States are typically employing one of three strategies: (1) "universal testing"; (2) "contact testing," or testing youth who have been in contact with someone that is COVID positive; and (3) testing the Youth with symptoms of COVID-19. Schiraldi Tr. (6/4/20) at 12–13, 61. Schiraldi said, "It's kind of all over the map." *Id.* at 13. However, all three of those strategies are going on at various facilities in the country. *Id.* at 61.

100.     The only jurisdiction which Mr. Schiraldi remembered as doing universal testing was Missouri, and he was not 100% certain that Missouri did universal testing in their facilities. Schiraldi Tr. (6/4/20) at 60–62.

101.     Schiraldi acknowledged that Louisiana is testing those who have symptoms, and, critically, he conceded that "many, if not most of the states have employed that as their testing strategy[.]" Schiraldi Tr. (6/4/20) at 61–62.

102.     Importantly, Schiraldi also conceded that the Louisiana OJJ's testing strategy is compliant with CDC guidance for correctional institutions. Schiraldi Tr. (6/4/20) at 62.

103.    Plaintiffs' medical expert, Dr. Maraynes, further agrees that if a correctional and detention facility is implementing efforts to prevent the spread of COVID-19, such as social distancing, use of PPE, increased sanitization, and isolation strategies, universal testing is not necessary. Maraynes Tr. at 148–49; 167.  Dr. Maraynes simple did not believe that OJJ was implementing proper social distancing and other strategies. *Id.* at 148–49.

104.    Plaintiffs complain that the *CDC Interim Guidance* is from March 23, 2020, and is thus outdated, *see Pls' PFFCL* ¶ 143, Doc. 77, but OJJ's testing protocol is also consistent with other, more recent CDC recommendations. Plaintiffs entered into evidence a CDC document dated May 3, 2020, titled *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)* ("*May CDC Guidance*") as Pl. Ex. 35. This document lists certain "Priorities for COVID-19 Testing" and states that a "High Priority" should be "Residents in long-term care facilities or other congregate living settings, including prisons and shelters, *with symptoms.*" *Id.* at 1 (emphasis in original).

105.    Plaintiffs point to other parts of the *May CDC Guidance* in support of their case, but the Court finds that these do not undermine Defendants' position.  The *May CDC Guidance* provides, "Other considerations that may guide testing are epidemiologic factors such as known exposure to an individual who has tested positive for SARS-CoV-2, and the occurrence of local community transmission or transmission within a specific setting/facility (e.g., nursing homes) of COVID-19." Pl. Ex. 35, *May CDC Guidance* at 2. But the fact that these considerations "may guide testing" does not mean that such testing is a "High Priority," as listed above.  Further, Plaintiffs point to the fact that the *May CDC Guidance* states, "Another population in which to prioritize testing of minimally symptomatic and even asymptomatic persons are long-term care facility residents,

especially in facilities where one or more other residents have been diagnosed with symptomatic or asymptomatic COVID-19." *Id.* But the *May CDC Guidance* distinguishes between "long-term care facilities" and "other congregate living settings, including prisons." *See id.* (describing under "High Priority" for testing, "Residents in long-term care facilities *or other congregate living settings*, including prisons and shelters, with symptoms." (emphasis added)). OJJ secure care facilities are congregate-living settings rather than long-term care facilities. Dandridge Tr. at 61–62 ("I agree that [OJJ facilities] are congregate-living settings."). In any event, Plaintiffs fail to rebut Defendants' position that the CDC only makes as a "High Priority" for testing those in congregate settings *with symptoms*.

106.     Plaintiffs cite to a number of news articles describing various facilities across the country that have implemented universal testing. *See Pls.' PFFCL* ¶¶ 140–41 & nn.305–313, Doc. 77. Most were written after *Pls.' TRO Reply. Compare Pls.' PFFCL ¶¶* 140–41 & nn.305–313, Doc. 77, *with Pls.' TRO Reply*, Doc. 31 at 13 n.66. Thus, Defendants have not had an opportunity to respond to most of these articles. Further, none of these articles were introduced at the hearing, and none were discussed by any of Plaintiffs' witnesses. The Court will not consider any of them (though, even if the Court did, these articles would not change the Court's findings or conclusions).

107.     As of May 29, 48 staff members have tested positive. *Stipulations* ¶ 30, Doc. 51. Each of the four OJJ secure care facilities has had staff members who have tested positive. *Id.*

108.     Plaintiffs complain that Dandridge and Herbert did not, *inter alia*, know how many staff had been tested, had tested positive,  or where staff were that tested positive. *See Pls.'*

24

*PFFCL* ¶¶ 128–29, Doc. 77.  However, the Court finds that the failure of these witnesses to recall this specific information at the time of the hearing does not alter the Court's decision, for several reasons.

109.    First, Dandridge testified that, if individual staff members displayed symptoms or signs of COVID-19 (e.g., high temperatures), then OJJ is not testing those staff members but is rather referring them to their primary care doctor to receive a test. Dandridge Tr. at 52–53.  The Court finds this procedure reasonable under the circumstances.

110.    Second, Dandridge also said that, while she did not know the above information, she did know that employees who contracted COVID-19 returned to work only after OJJ ensured that they received two negative test results through their primary care doctor and occupational health center. Dandridge Tr. at 53–54.  She also explained that, if a staff tests positive, OJJ ensures that the "entire dorm would be put on quarantine," and she cited an example from a few weeks ago.  *Id.* at 54–56.  This procedure too is reasonable under the circumstances.

111.    Third, while Herbert said it was "absolutely" important to find out where guards were who tested positive "because we need to make sure that we are taking appropriate measures to keep everyone safe," when Plaintiffs' counsel asked, "but you haven't been doing that?", Herbert replied, "I didn't say that." Herbert Tr. at 127.  The Court agrees with Herbert's testimony (as well as the other OJJ officials) that OJJ's testing protocol was reasonable under the circumstances. *Id.*

112.    Lastly, Plaintiffs argue that "[a]dditional children undoubtedly will soon be transferred into the facilities and exposed to OJJ's potentially rampant asymptomatic outbreak." *Pls.' PFFCL* ¶ 130.  Plaintiffs base this in part on Mr. Schiraldi's testimony that

teachers will soon be returning to the facility, that juvenile courts will open, and that other factors will take place that will result in "more kids and staff com[ing] in" which will mean "some portion of them are likely to bring" the virus with them. Schiraldi Tr. (6/5/20) at 51. However, the Court finds that Plaintiffs' assertion that all of this will lead to an "outbreak"—either by exposing kids in the facility to those outside or by exposing those outside to the "rampant asymptomatic outbreak" within—is wildly speculative. Plaintiffs fail to adequately explain how OJJ's existing procedures will be inadequate to the task of combating the pandemic (as it has up until this point), much less to establish that OJJ's procedures are unconstitutional.

### vii. Quarantine and Medical Isolation Protocols

113.    The *CDC Interim Guidance* discusses recommended practices for isolation and quarantining individuals to prevent the spread of COVID-19 in the correctional facility setting. Dandridge Tr. at 14.

114.    OJJ implemented additional medical isolation and quarantine strategies consistent with CDC Guidance. Dandridge Tr. at 19.

115.    If a Youth left a secure facility, when he came back, he had to be quarantined for 14 days based on the guidance. Dandridge Tr. at 17. The quarantine area would be different than the Youth's dorms. *Id.* at 22. These Youth would also receive temperature checks twice daily from nursing staff, and they would also be asked twice a day if they were having any symptoms of COVID-19. *Id.* at 22–23

116.    If a Youth came into contact with a COVID-19-positive individual (either a staff member or another Youth), the Youth and his entire dorm would be placed in quarantine. Dandridge Tr. at 19. The Youth and all other Youth in his dorm would be quarantined in

their dorm for a period of 14 days. *Id.* at 22. OJJ nursing staff would administer a temperature check twice daily to each Youth in quarantine and would, twice a day, speak with the Youth to ask him if he had any symptoms of COVID-19. *Id.*

117.    If a Youth reported or exhibited symptoms associated with COVID-19, he would be tested according to the protocol described *supra*.

118.    While awaiting results of the COVID-19 test, the Youth would to be placed in medical isolation, accompanied by security staff, where symptoms would be monitored and treated by nursing staff per medical protocols. Dandridge Tr. at 24, 26.

119.    Early in the COVID-19 response period, OJJ did not have access to COVID-19 tests and thus would transport Youth to Ochsner Medical Center emergency room in New Orleans, La. for COVID-19 testing. Dandridge Tr. at 23–24.  During this period, test results could take in excess of 72 hours. *Id.* at 25.

120.    Later, as the supply of test kits became more readily available, OJJ gained immediate access to COVID-19 tests and has since administered such tests on site. Dandridge Tr. at 24–25.  Since transitioning to on-site testing, test results are received in a period between 48 and 72 hours. *Id.* at 25.

121.    While awaiting test results, Youth are medically isolated in the facilities' infirmary. Def. Ex. 42, Herbert Decl. ¶ 33. During the COVID-19 response, there were times when all infirmary rooms were full, and some Youth were medically isolated in rooms that were previously used for behavioral intervention. *Id.* These behavioral intervention rooms were used for only a limited duration and only until space became available in another medical isolation area or the test results indicated the Youth should be moved to a different quarantine or medical isolation area. *Id.* ¶ 34. When a Youth was placed in a behavioral

intervention room for purposes of medical isolation, the Youth was provided his schoolwork and writing materials and was given the opportunity to make phone calls. *Id.* ¶ 35. Additionally, the Youth was specifically informed that he was being placed in the behavioral intervention room for non-punitive reasons and that he would be transferred as soon as space opened up elsewhere. *Id.*

122.    With respect to room confinement and solitary confinement, Mr. Schiraldi said these have "very defined and measurable negative impacts." Schiraldi Tr. (6/5/20) at 55. He quoted the "Louisiana auditor" as saying that these have "negative public safety consequences: does not reduce violence, may actually increase recidivism and the facilities that use minimal room Confinement are safer and have healthier staff-to-youth relationships." *Id.*  He also said that 48 hours or 72 hours of confinement is harmful because "most often, when they commit suicide, they commit it early on because they're so depressed about the situation." *Id.* at 65.

123.    However, Mr. Schiraldi testified that, to his knowledge, no one is currently in medical isolation in the four secure care facilities. Schiraldi Tr. (6/5/20) at 63.  He also had no reason to believe that this was being done for punitive purposes. *Id.*  The Court agrees with both of these points.

124.    Further, while Mr. Schiraldi said that suicide "most often" happens early on in confinement, he provided no credible evidence that it was likely to happen to any of the Youth in this case who were confined for non-punitive reasons and were told as such.

125.    If a Youth placed in isolation awaiting COVID-19 test results receives a negative COVID-19 test result, the Youth is quarantined for a seven-day monitoring period to ensure no development of latent COVID-19 symptoms that need to be treated or assessed.

Dandridge Tr. at 28.  The Youth is then returned to his dorm after the quarantine period. *Id.*

126.      If a Youth placed in isolation awaiting COVID-19 test results receives a positive COVID-19 result, the Youth is placed in medical isolation for 14 days from the onset of symptoms and 72 hours without fever without any medication. Dandridge Tr. at 28–29. This OJJ practice exceeds the CDC Guidance's "non-testing strategy" recommendation of seven days. *Id.*

127.      Plaintiffs complain that ordinarily, under OJJ policy, (a) children are to be placed in the behavioral intervention rooms because of behavior that "threatens immediate risk of harm to himself, other youth, or engaging in significant property destruction;" (b) Youth must be returned "as soon as they are no longer at risk of harming others"; and (c) children cannot be placed in these rooms for longer than eight hours. *See Pls.' FFCL* ¶ 100 (citing Pl. Ex. 57, *Youth Services Policy: Behavioral Intervention Rooms* ("*OJJ BI Room Policy*") at 476-78).  However, the Court finds that the very temporary and relatively minor modification of these policies in response to the emergency of the COVID-19 pandemic is reasonable under the circumstances, particularly given the critical need to medically isolate those Youth who were awaiting test results.

128.      The *CDC Interim Guidance* suggests two different methods to determine when to discontinue medical isolation: a "testing strategy" and a "non-testing strategy." *Stipulations* ¶ 38, Doc. 51.

129.      OJJ employed the "non-testing strategy" from the March 22, 2020 (the date of its first confirmed case of COVID-19) through April 23, 2020. Def. Ex. 45, Dandridge Aff. ¶¶ 35–37.  The "non-testing strategy" suggests that an individual should not be discharged

from medical isolation until at least 7 days following the positive COVID-19 test, and the individual should have (1) no fever for at least 72 hours without the use of fever-reducing medications, and (2) improvement of other COVID-19 symptoms. *Stipulations* ¶ 38, Doc. 51.

130.    OJJ exceeded the CDC's "non-testing strategy;" OJJ consulted with its facility medical directors to conclude that OJJ would implement a fourteen-day isolation period, in excess of the seven-day isolation period recommended in the *CDC Interim Guidance* for those Youth testing positive for COVID-19, in an effort to be "on the cautious side." Dandridge Tr. at 28–29.

131.    OJJ employed the "testing strategy" beginning on April 23, 2020. Def. Ex. 45, Dandridge Aff. ¶ 36. The "testing strategy" suggests ensuring that the individual has (1) no fever for at least 72 hours without the use of fever-reducing medications, (2) improvement of other COVID-19 symptoms; and (3) two consecutive negative COVID-19 tests at least 24 hours apart. *Stipulations* ¶ 38, Doc. 51.

132.    For 27 of the 28 COVID-19-positive Youth in OJJ secure care facilities, OJJ implemented the non-testing strategy for measuring recovery and discharging Youth from medical isolation. *Stipulations* ¶ 39, Doc. 51.

133.    Upon the direction of officials from LDH, OJJ implemented the testing strategy for measuring recovery and discharging Youth for isolation for the final, twenty-eighth COVID-19-positive Youth in its secure care facilities. *Stipulations* ¶ 40, Doc. 51.

### viii.  Changes to Educational Services and Rehabilitation Programing

134.    As Plaintiffs' expert Mr. Schiraldi conceded, during the pandemic, OJJ continued to provide some rehabilitation and educational services to the Youth in its care.

### a. Distance Learning Plan

135.    OJJ has an on-campus school at each of its four secure care facilities. Mims Tr. at 75–76.  They are four alternative schools that are approved by the Board of Elementary and Secondary Education ("BESE"), and they must abide by the guidelines of BESE as well as the Louisiana Department of Education ("LDOE"). *Id.*

136.    Prior to the pandemic, Youth received in-classroom education and training. Mims Tr. at 77–78.  In addition to high school and high school equivalency classes, students could take trade classes like welding, carpentry, culinary, and electrical training as well as college classes. Mims. Tr. at 75; D.M. Tr. at 47–48.

137.    On March 13, 2020, Governor Edwards issued an order that all public schools would be closed. Mims Tr. at 78; Def. Ex. 43, Mims Aff. ¶ 6.  Based on subsequent orders, the schools remained closed through the end of the 2019–2020 school year. Def. Ex. 43, Mims Aff. ¶ 6.

138.    OJJ secure care facilities continued in-person educational programming for two weeks longer than statewide public schools during the COVID-19 pandemic. *Stipulations* ¶ 77, Doc. 51.

139.    At the beginning of OJJ's COVID-19 response, OJJ created a written distance learning plan for education throughout the pandemic, which has been updated in writing since its creation. Mims Tr. at 81–82.  All superintendents and charter leaders received guidance from the LDOE to implement a distance learning plan if they chose to do so, which OJJ did. *Id.* at 82.  OJJ's plan aligns with the standards and guidance provided by LDOE. *Id.* at 82–84.

140.    After in-person educational programming was discontinued, Youth in OJJ secure care facilities were provided with pre-printed work packets of educational materials. Mims Tr. at 78–79. Later on, Youth in some facilities were given approximately an hour of dorm-specific time in the computer lab. *Stipulations* ¶ 78, Doc. 51. If a student, for whatever reason, was not able to attend the computer lab, he still had the work packets, which consisted of teacher-initiated work materials given for OJJ's Tier-One curriculum that it had implemented. Mims Tr. at 78–79. The same teachers who were normally in the classroom with the Youth before the pandemic put the packets together. *Id.* at 80.

141.    In the computer lab, OJJ used a software called Edgenuity that OJJ normally used with its students for credit recovery or even for new learning. Mims Tr. at 80. They were placed on virtual tutor courses that would align with the state standards and benchmarks that align with OJJ's Tier-One curriculum. *Id.*

142.    All the Youth in the OJJ facilities were given access either to the educational package or the computer lab throughout the pandemic. Mims Tr. at 81.

143.    Director Mims's *Update for Distance Learning/Telecommuting for OJJ Schools* ("*Distance Learning Update*") states that, for the three weeks following April 27, 2020, teacher activities includes "finalizing grades for seniors and K-11 students according to the guidelines provided by LDOE." Def. Ex. 23, *Distance Learning Update*. Director Mims testified that live feedback to the students was not possible during the pandemic, but the "work packets would be used for the summer session in order to give that type of feedback[.]" Mims Tr. at 94–96.

144.    Twenty-four (24) of OJJ's students completed certification for a high school diploma during the COVID-19 pandemic, based in part on work done before the pandemic

and based in part on the results of the work packets and computer lab work done during the pandemic. Mims Tr. at 92–93.

145.     Plaintiffs' juvenile justice expert, Mr. Schiraldi, admitted that OJJ has continued to provide some level of educational service throughout the course of the COVID-19 pandemic. Schiraldi Tr. (6/4/20) at 46–47.  He admitted that OJJ has not ceased all educational services for the youth in its care. *Id.*

146.     Plaintiffs complain that "OJJ's Director of Education did not speak with other educators in the Louisiana public school system to assess the most effective ways to accomplish" the goal of distance learning. *Pls.' PFFCL* ¶ 119, Doc. 77 (citing Mims. Tr. at 83).  However, the Court rejects Plaintiffs' complaint for two reasons.

147.     First, Mims testified immediately after that statement that "all of the superintendents and charter leaders received the same guidance.  So I believe that to be just aligned with the standards and the guidance that was given by the LDOE." Mims Tr. at 83.  The Court finds Mims' testimony on this issue reasonable and believable.

148.     Second, and perhaps more importantly, Mr. Schiraldi admitted that he had no evidence or information to indicate that the educational services that were being provided at OJJ's secure care facilities during the pandemic were any different than the educational services that were being provided to Louisiana's public-school students. Schiraldi Tr. (6/4/20) at 56.

149.     Plaintiffs also make other complaints about the inadequacy of the educational program, including (1) the fact that Edgenuity had no live instruction or prerecorded content, Mims Tr. at 90, (2) that all vocational, GED, and online college courses ceased while the distance learning plan was in place, *id.* at 86-89, and (3) the fact that, according

33

to D.M., Youth only receive "at most, three hours of structured programing per weekday," *Pls. PFFCL* ¶ 124 (citing D.M. Tr. at 43–45).

150.      However, the Court rejects these criticisms.  Mims testified that Edgenuity was "interactive" and that the "students can receive feedback from the virtual tutor." *Id.* at 90. Further, Mims made clear that work packets were still provided in relation to vocational work, *id.* at 87-88, and that all students are still considered high school students and a part of that program, even if they intend to take a GED test, *id.* at 88–89.  Moreover, Plaintiffs' claim that recreation only occurs twice a week was contradicted by Herbert and Washington, who said that recreation occurs twice daily in addition to two hours of education, Herbert Tr. at 107, 146; Washington Tr. at 155, aside from the time spent in rehabilitation which will be discussed below.  Lastly, as will be explained below, the question is not whether the educational services provided by OJJ are ideal; the question is only whether they are constitutional.

151.      Additionally, and critically, OJJ officials testified that in-person educational services were scheduled to resume on Monday, June 8, 2020. Mims Tr. at 84.

152.      OJJ will instruct the students on proper PPE, proper cleaning, and social distancing within the classrooms. Mims Tr. at 84; Bickham Tr. (6/5/20) at 20.[5]  There will be an "A Day" and a "B Day," with only fifty percent capacity to ensure social distancing. Bickham Tr. (6/5/20) at 20.

153.      Plaintiffs make various complaints about the resumption of in-person educational services, such as the lack of any changes to OJJ's COVID-19 testing policy, lack of other health and safety precautions, the fact that Director Mims did not coordinate with Director

---

[5] The Court notes that this makes moot Plaintiffs' claim that Youth are not instructed how to wear masks. *See Pls.' PFFCL* ¶ 103, Doc. 77 (citing D.M. Tr. at 53–54).).

Dandridge, the lack of detail about OJJ's renewed classes, and the lack of a contingency plan in the event of a spike in COVID-19 cases. *See Pls.' PFFCL ¶¶* 132–33, 201, Doc. 77.

154.    However, (a) Plaintiffs cannot deny that classes will in fact resume on June 8, 2020, *see Pls.' PFFCL* ¶ 131, Doc. 77; (b) the Court finds that Plaintiffs' plan for resumption of classes outlined above, *when combined with the protocols already in place* (as detailed in these findings), are reasonable under the circumstances, (c) it is *Plaintiffs'* burden to provide detail of how the resumed classes are constitutionally deficient, not the other way around, and (d) even assuming there had been constitutional violations with respect to the provision of educational services (which, as will be explained below, there were not), none of this demonstrates that Plaintiffs sustained their burden of proving that there remains a *substantial* threat of irreparable harm on this issue; the threat of a spike in cases and the potential consequences of that spike is speculative.

### b. Rehabilitation Programing

155.    Through the COVID-19 response, OJJ continued to provide all mental health services to the Youth. Def. Ex. 45, Dandridge Aff. ¶ 65.   Typically, mental health group counseling is provided to the Youth in a dorm setting; those services continued to be provided in the dorms because the services could be provided while practicing social distancing. *Id.*   Some treatment groups were limited in size to groups of three. *Id.* Where treatment groups consisted of Youth from multiple dorms, the treatment continued through individual sessions in each dorm to maintain the "reverse isolation" strategy. *Id.*

156.     Dr. Franco-Paredes conceded that OJJ implemented some form of social distancing consistent with CDC guidelines. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 62–63.    Dr. Franco-Paredes said that this was "insufficient to stop interruption of outbreaks" *Id.*

157.     During the hearing on *Plaintiffs' TRO*, the Court received testimony from Shawn Herbert (Interim Director of OJJ's Swanson Monroe, acting Director of the Swanson Columbia, and Program Manager and Emergency Preparedness Coordinator for OJJ) and from Cassandra Washington (the Interim Director of OJJ's Bridge City). Both Ms. Herbert and Ms. Washington testified at length regarding the rehabilitation services being provided to the Youth in their respective facilities. Like Ms. Dandridge, the Court found Ms. Herbert and Ms. Washington to be highly credible and impressive public servants.

158.     All Youth receive (1) group services called Thinking for a Change once weekly, and (2) group services for anger management once weekly. Herbert Tr. at 108. OJJ Social Services staff case managers are individually assigned to each dorm to provide these services. *Id.*

159.     Youth with a qualifying mental health diagnosis were seen by a psychiatrist and/or psychologist on a regular basis. Herbert Tr. at 108.

160.     The Youth participated in social skills groups three times weekly, conducted by a group leader who is also individually assigned to a specific dorm. Herbert Tr. at 108.

161.     Social workers conducted substance abuse groups, as well as individual sessions with the Youth once weekly and family sessions via phone conference throughout the pandemic response. Herbert Tr. at 109–10.

162.     Treatment duty officers have also worked after-hours, evening and weekend shifts throughout the pandemic. Washington Tr. at 156.

163.    Additionally, as part of OJJ's transition to a therapeutic model of care, facility staff conduct a weekly group service called "Weekly Wrap-Up," where facility staff talk with the Youth if the Youth are having problems, process the past week's activities, and set goals for the upcoming week. Herbert Tr. at 110–11. Through this program, the Youth may take advantage of weekly incentives by dorm and by individual to encourage the Youth to meet certain identified milestones in order to participate in incentive activities such as sporting events. *Id.* at 111–12. Incentives during the COVID-19 response included extra swimming pool time, basketball challenges between the dorm-specific Youth and staff, and "Huddle Up," which recently allowed some Youth to participate through Zoom video conferencing with members of the Baltimore Ravens NFL football team. Washington Tr. at 156.

164.    Recreational activities also continued throughout the pandemic, though the activities were restricted to dorm-specific participation to allow for proper reverse isolation and social distancing. *See* Herbert Tr. at 112. Youth were also provided increased opportunities to watch television and play video games, to partially compensate for the restricted movement required by the COVID-19 response within the facilities. *Id.* at 112–13. Dorms also have movie night each Friday night. Washington Tr. at 156.

165.    Though Mr. Schiraldi testified that he personally would like to see more structure and additional rehabilitation programming during the COVID-19 response, *see* Schiraldi Tr. (6/4/20) at 9–10, he conceded that OJJ did continue to provide some level of rehabilitation services to the Youth throughout the course of the COVID-19 pandemic. *Id.* at 45.

166.     Mr. Schiraldi testified generally that when programming decreases, behavioral issues among incarcerated youth offenders tend to rise. Schiraldi Tr. (6/4/20) at 9–10, 71. He admitted, however, that he had done no research to compare the pre-pandemic rate of behavioral incidents to the post-pandemic rate of behavioral incidents at the OJJ secure care facilities. Schiraldi Tr. (6/4/20) at 72.

### G. Depopulation of Secure Care Facilities

167.     The OJJ supervise approximately 2,500 youth offenders.  Bickham Tr. (6/4/20) at 176.  Of those, approximately 1,800 are in community-based parole supervision, 300 are in non-secure custody such as a group home, and only 220 (which are those housed at the four OJJ facilities at issue) are in secure custody based on the crimes committed such as armed robbery, aggravated rape, murder, and other relatively serious crimes. Bickham Tr. (6/4/20) at 176; Pl. Ex. 22 (redacted list of Youth in secure care including underlying crime for which they were adjudicated delinquent).

168.     Plaintiffs, through their expert witnesses, argued that the OJJ should seek to depopulate the four secure care facilities to reduce density and to increase the opportunity for social distancing. Schiraldi (6/4/20) at 3–5, 15, 17. Plaintiffs' experts admitted, however, that they did not know the current density level of the four secure care facilities. Schiraldi Tr. (6/4/20) at 55–56. Schiraldi had no evidence concerning the density level (percentage of capacity the population constitutes) of any of the four OJJ facilities prior to or during the COVID-19 pandemic, Schiraldi Tr. (6/4/20) at 56:6-11.

169.     Plaintiffs have argued that OJJ should prioritize the release of Youth who have chronic pre-existing medical conditions that increase the risk of serious complications from COVID-19. *Pls.' TRO Mem.*, Doc. 7-1 at 2 & n.6.

170.    OJJ and Plaintiffs' experts agree that the recommendation to release any Youth requires an individualized assessment of that particular Youth. Plaintiffs' juvenile justice expert, Mr. Schiraldi, testified that before releasing any Youth, the agency should consider (1) the safety of the Youth upon release, (2) whether the agency can deliver on its mission of rehabilitation by maintaining the Youth in custody, and (3) the viability to the release plan for the Youth. Schiraldi Tr. (6/4/20) at 47–48.

171.    However, Secretary Bickham testified that recommendations regarding release or furlough of Youth from the four OJJ facilities at issue must also include consideration of public safety and potential recidivism. Bickham Tr. (6/4/20) at 176–78.  As Secretary Bickham said, "rehabilitation is the name of the game[,] and . . . for them to go out unrehabilitated . . . would raise a recidivism risk[.]" Bickham Tr. (6/4/20) at 177–78. Plaintiffs' juvenile justice expert agreed that such recommendations should also consider "the likely influences within the community that may lead the youth to recidivism." Schiraldi Tr. (6/4/20) at 51.

172.    The individualized analysis should include information on the home environment into which the Youth would be released, including the level of supervision provided to the Youth by the adults residing in the home, the likely influence within the community that may lead to recidivism, and the likelihood of drug, alcohol or physical abuse. Schiraldi Tr. (6/4/20) at 50–51. This evaluation is typically done by the agency making in-person visits to the Youth's home and conducting in-person interviews with the adults with whom the Youth will come into contact. *Id.* at 51–52.

173.    The individualized analysis should also include an assessment of the Youth's experience in custody, such as disciplinary problems. Schiraldi Tr. (6/4/20) at 52.

174.    Prior to recommending a potential release or transfer of any Youth from the OJJ facility, it is important to know the circumstances of the environment into which the Youth is being released to determine the opportunities for effective social distancing (such as identifying the size of the home and number of occupants), medical monitoring, and access to testing, medical care, and personal protective equipment (PPE). Maraynes Tr. at 154–55; Franco-Paredes Tr. (6/3/20 p.m.) at 70–72.

175.    There is little record evidence establishing the home circumstances upon potential release of any of the OJJ Youth, except as to D.M. and W.H. *See* Maraynes Tr. at 154.

176.    Even with respect to D.M. and W.H., home conditions are not perfect.  For example, if J.P.'s son, D.M., were released, he would only be tested if he displayed symptoms. *See* J.P. Tr. at 93.  This is the exact protocol that OJJ employs—testing those who display symptoms. Def. Ex. 45, Dandridge Aff. ¶ 44.  Similarly, W.H. testified that she "go[es] out and about in [her] community" and that her husband works outside the home in an office "with five other offices inside of it." W.H. Tr. at 110–11.

177.    More importantly, even putting this aside, there is little credible record evidence establishing that the home circumstances of D.M. and W.H. are typical or characteristic of the home circumstances of any of the other OJJ Youth. Phrased another way, Plaintiffs have not established beyond speculation that the home lives presented by D.M. and W.H. in any way resemble the home lives of the other 220 Youth in OJJ secure care facilities.

### i.    OJJ's Plan for Depopulation

178.    The OJJ *Covid-19 Custody Depopulation Plan* (the "*Depopulation Plan*") was drafted prior to OJJ's confirmation of the clinical impact of COVID-19 within the facilities, and was created as an adaptable, scaled contingency plan depending upon the effectiveness

of the OJJ's efforts to contain COVID-19. Bickham Tr. (6/4/20) at 185–86; Bickham Tr. (6/5/20) at 12–13.

179.    The contingency plan contained three phases.  Def. Ex. 15, *Depopulation Plan*

180.    As part of Phase One of the proposed Depopulation Plan, Secretary Bickham directed staff to identify all potential Youth candidates who had medical issues that required chronic care (i.e., those Youth particularly susceptible to COVID-19) for potential recommendation for furlough or early release. *See* Bickham Tr. (6/4/20) at 186:22-187:16; Def. Ex. 15, *Depopulation Plan*.

181.    As part of Phase Two of the proposed *Depopulation Plan*, Secretary Bickham directed staff to identify all potential Youth candidates with non-violent, non-sex offenses that met eligibility for furlough or release. Bickham Tr. (6/5/20) at 9; Def. Ex. 15, *Depopulation Plan*.

182.    As part of Phase Three of the proposed *Depopulation Plan*, Secretary Bickham directed staff to identify all potential Youth candidates with violent, non-sex offenses that met eligibility for furlough or release. Bickham Tr. (6/4/20) at 188–89; Def. Ex. 15, *Depopulation Plan*.

183.    The Youth identified as part of Phases One, Two, and Three of the proposed *Depopulation Plan* were only identified as potentially eligible; additional factors would be applied prior to recommending any of these identified Youth to the state juvenile courts for extended furlough or release, including behavioral issues, length of sentence, time served, and others. Bickham Tr. (6/5/20) at 9–12.  Because these furloughs would be extended rather than standard, Bickham planned to "go deeper into the weeds" if OJJ decided to implement the plan. *Id.*

184.    OJJ elected to implement Phase One of its Depopulation Plan but decided not to implement Phase Two or Phase Three of the Depopulation Plan. Bickham Tr. (6/4/20) at 193.

185.    As of May 22, 2020, there were 17 Youth confined in the four OJJ secure care facilities whose names were placed on OJJ's "Chronic Care List," meaning these Youth had pre-existing medical conditions requiring the ongoing care and supervision of a physician. *Stipulations* ¶ 68, Doc. 51.[6]

186.    In response to the Phase One directive of the *Depopulation Plan*, staff identified nine Youth as potential candidates for furlough or early release, and that list was further narrowed based on other relevant considerations such as behavioral issues. Bickham Tr. (6/4/20) at 189–90.

187.    Based on balancing each Youth's medical condition against his eligibility for release, some of the nine Youth identified as potential candidates for furlough or early release through Phase One of the *Depopulation Plan* were recommended to the state juvenile court for status change, including for early release and extended furlough. Bickham Tr. (6/4/20) at 190–92.

188.    OJJ's decision not to proceed with Phases Two and Three of the *Depopulation Plan* was based upon analysis of the limited and controlled clinical impact of COVID-19 on OJJ's four facilities. Bickham Tr. (6/5/20) at 6–8.

189.    Within approximately three weeks of its implementation of COVID-19 response procedures, OJJ received no further complaints of symptomatic Youth within the facilities;

---

[6] Plaintiffs complain that the list does not include "obesity," even though obesity is a condition that can lead to worse COVID-19 outcomes and that "Dr. Maraynes testified that the shortness of the list surprised her, given the general health of children in Louisiana." *Pls.' PFFCL* ¶ 156, Doc.77 (citing Maraynes Tr. at 123). Neither objection is material to the Court's ruling.

thus, Secretary Bickham concluded that OJJ's COVID-19 response plan was proving effective and that Phases Two and Three of the *Depopulation Plan* were unnecessary. Bickham Tr. (6/5/20) at 8, 14. This decision was reasonable under the circumstances.

190.    The Depopulation Plan remains available to the extent implementation is required due to a sufficient increase in the clinical impact of COVID-19 in the OJJ facilities. Bickham Tr. (6/5/20) at 8.

191.    Plaintiffs' expert agreed that OJJ's *Depopulation Plan* was well conceived. Schiraldi Tr. (6/4/20) at 14–15. Schiraldi's objection was that Phases Two and Three of the *Depopulation Plan* were not implemented. *See id.* at 16.

### ii.  The Furlough Policy

192.    Plaintiffs specifically ask the Court to enter an order directing Defendants to grant furloughs to certain Youth, including granting extended furloughs for up to 180 days or until the global pandemic has subsided. *Pls.' TRO Mem.*, Doc. 7-1 at 2-3.

193.    Further, in the *Youth Services Policy: Furlough Process* ("*Furlough Policy*"), OJJ has provisions to determine whether a Youth qualifies for a furlough recommendation. *See generally* Def. Ex. 20, *Furlough Policy*.

194.    The Structured Assessment of Violence Risk in Youth ("SAVRY") Scale is "[a]n assessment and summary risk rating for violence and delinquency completed by Community Based Services (CBS) upon a youth's admission into secure care." Def. Ex. 20, *Furlough Policy* at 3.

195.    One of the criteria for determining a Youth's eligibility for furlough is his qualification as "low" or "moderate" risk on the SAVRY Scale. Def. Ex. 20, *Furlough Policy* at 4.

196.     Youth who are deemed "high risk" may qualify for furlough if they meet additional criteria such as making progress on treatment needs. *Stipulations* ¶ 63, Doc. 51.

197.     The *Furlough Policy* provides for standard furloughs of eight (8) hours to 14 consecutive days. Def. Ex. 20, *Furlough Policy* at 6.

198.     The parties stipulate that, prior to the pandemic, the majority of furloughs lasted for only a couple of days, usually over a weekend. *Stipulations* ¶ 65, Doc. 51.  Though Youth can qualify for multiple furloughs in a given year, furloughs are normally limited to no more than 30 days in a calendar year. *Id.*

199.     OJJ policy permits furloughs of up to 90 days in certain circumstances. *Stipulations* ¶ 66, Doc. 51.

200.     The criteria for extended furloughs are more restrictive than the criteria for standard furloughs, given the longer duration of the extended furlough. Bickham Tr. (6/5/20) at 10.

201.     Secretary Bickham understands that when OJJ recommends that a Youth be granted furlough, the furlough must be approved by the state juvenile court. Bickham Tr. (6/5/20) at 12.  He said, "I do not have the authority to let any of them out.  The Youth Court has to give that approval for that." *Id.*   He continued, "The Court has the total authority to grant either the furlough or the early release.  We do not - - OJJ does not have that authority or power." Bickham Tr. (6/5/20) at 13.

202.     Bickham also stated that the D.A. has an opportunity to oppose a furlough, in which case the Court has a contradictory hearing. Bickham Tr. (6/5/20) at 13.

203.     Bickham's understanding is in line with OJJ Policy.  OJJ's furlough policy provides that, if a furlough is approved by the Deputy Secretary or his designee, that official "shall provide written notice of plans to furlough the youth to the Court and District Attorney for

'objection' or 'no objection', by forwarding the 'Notice to Court and District Attorney.' "
Def. Ex. 20, *Furlough Policy* at 16–17.

204.    The written notice must include, among other things, (1) "[r]eference to La. R. S.
15:908 regarding the authority designed to [Youth Services] to authorize a temporary
furlough;" and (2) a "[s]tatement that the furlough shall not be authorized over the
objection of the Court or if the District Attorney objects, until the conclusion of a
contradictory hearing[.]" Def. Ex. 20, *Furlough Policy* at 16–17. "Written notice shall be
furnished to the Court upon approval of the furlough." *Id*. at 17.

205.    Bickham's testimony and the *Furlough Policy* are also consistent with Louisiana
law.

206.    Plaintiffs highlight how, a*s a general rule*, OJJ has the authority to determine the
appropriate placement for a child in its custody. *See* La. Child. Code art. 908(A).
("*Notwithstanding any other provisions of law to the contrary*, the Department of Public
Safety and Corrections, office of juvenile justice, shall have sole authority over the
placement, care, treatment, or any other considerations deemed necessary from the
resources that are available for children judicially committed to the department." (emphasis
added)); La. Rev. Stat. Ann. § 15:901(D)(1) ("Upon commitment to the Department of
Public Safety and Corrections, the department shall have sole custody of the child and,
except as provided for in Children's Code Article 897.1, shall determine the child's
placement, care, and treatment, and the expenditures to be made therefor, through
appropriate examinations, tests, or evaluations conducted under the supervision of the
department.").

207.    However, there are exceptions.  Specifically, Louisiana Revised Statute § 15:908 provides in relevant part:

> The secretary for the Department of Public Safety and Corrections may authorize a temporary furlough to deserving students of any juvenile institution, *unless, after receiving notification of the proposed furlough, the juvenile court having jurisdiction or the district attorney notifies the department of its objection*. If the district attorney objects, the court shall set the matter for a contradictory hearing. The temporary furlough is to serve as a rehabilitative tool to assist the child in maintaining family and community relations during the period of his commitment. A temporary furlough as provided herein is not to be considered a release from commitment and does not affect the jurisdiction of the juvenile court or the authority of the department as to the children granted a temporary furlough.

La. Rev. Stat. Ann. § 15:908(A) (emphasis added).

208.    Ms. J.P., the parent of D.M., even conceded that an OJJ recommendation for granting a furlough goes to the juvenile court for approval and that the "Judge has to approve the furlough." J.H. Tr. at 97.

209.    Similarly, Plaintiffs concede that "OJJ normally does not have authority to unilaterally authorize a furlough[.]" *Pls.' PFFCL* ¶ 75, Doc. 77.  Plaintiffs argue that, "Since the normal furlough program has been suspended, at least one child has been furloughed home for quarantine without any indication that OJJ sought court or DA approval." *Id.*, Doc. 77 at n.143 (citing Pl. Ex. 53).  The Court finds that this is not a reasonable inference from this exhibit and rejects this conclusion based on the above testimony and law.

### iii.  Furlough Eligibility for Named Plaintiffs and Testifying Youth

210.    Neither of the named Plaintiffs, I.B. or J.H., currently qualify for a furlough recommendation under the criteria in OJJ's *Furlough Policy*. *Stipulations* ¶ 67, Doc. 51.

211.     The Court heard testimony from D.M. and his mother at the hearing and from the

mother of H.C. Neither D.M. nor H.C. are eligible for a recommendation for extended

furlough. Bickham Tr. (6/5/20) at 11.

### iv.  Sentence Modifications and Non-Furlough Release

212.     In addition to the furlough policy, Youth may also directly seek a modification of

their sentence from the juvenile court.

213.     Specifically, La. Child. Code art. 909 provides in relevant part:

> Except as provided for in Article 897.1, after the entry of any order of
> disposition, *the court retains the power to modify it*, including changing the
> child's legal custody, suspending all or part of any order of commitment,
> discharging conditions of probation, or adding any further condition
> authorized by Article 897(B) or 899(B). It may also terminate an order of
> disposition at any time while it is still in force.

La. Child. Code art. 909 (emphasis added).[7]  The Children's Code further explains that "[a]

*motion* filed by the Department of Public Safety and Corrections seeking the release of a

child from its custody *shall be tried contradictorily* against the district attorney, unless the

district attorney files in the record an affidavit averring no opposition to the motion." La.

Child. Code art. 911 (emphasis added).

214.     Similarly, while OJJ may recommend to the committing court the release of a

Youth, and while the juvenile court must give "careful consideration" to OJJ's

recommendation, that authority ultimately lies with the court. *See* La. Rev. Stat. Ann. §

15:906(A) ("[T]he Department of Public Safety and Corrections may *recommend to the*

*committing court* the release of any juvenile committed to its care, who, in the opinion of

---

[7] Article 897.1 deals with certain serious offenses like murder, rape, and robbery, and these still require a motion and
contradictory hearing under Article 910 *et seq.* along with a finding that "the child poses a reduced risk to the
community" based on certain factors. La. Child. Code art. 897.1(E).

the department, is ready to be returned to his own home, or to a substitute home. *Such juvenile may be discharged by the court* without supervision or may be placed under supervision until further orders of the court.." (emphasis added)).

215.    I.B. sought a modification of his sentence and early release due to the COVID-19 pandemic. Def. Ex. 41, Bickham Aff. ¶ 30.  The juvenile court denied I.B.'s motion. *Id.* I.B. subsequently appealed that denial to the Louisiana Fourth Circuit of Appeals, which affirmed the juvenile court's denial. *Id.*

216.    D.M. sought a modification of his sentence and early release from the juvenile court, and the court denied that request as a matter of law. J.P. Tr. at 92, 94–95, 97.

217.    H.C. sought a modification of his sentence, and the juvenile court denied that request. W.H. Tr. at 112.  On appeal, the Louisiana Supreme Court affirmed the denial. *Id.*

218.    Plaintiffs claim that OJJ also has the authority to "step children down from secure care without any court action, and even without notification." *Pls.' PFFCL* ¶ 153, Doc. 77. However, they provide no citation to this point of law in their brief.

219.    Plaintiffs cite La. Rev. Stat. Ann § 15:901(G)(1) and La. Child. Code art. 886 for the proposition that "OJJ has the authority to place children in their homes under supervision." *Pls.' PFFCL* ¶  153, Doc. 77. Section 15:901(G)(1)(e) states:

> Community placement services shall have authority and responsibilities for children adjudicated delinquent or in need of supervision, including but not limited to the following: . . . [t]o place children in the setting most appropriate to their needs, including any nonresidential, community-based residential, and institutional programs operated by the Department of Public Safety and Corrections, as well as programs operated by other public or private agencies with which the department enters into contractual or purchase of services arrangements.

La. Rev. Stat. Ann. § 15:901(G)(1)(e). But this broad provision, *raised for the first time in Plaintiffs' PFFCL*, does not address the issue of whether OJJ can unilaterally place Youth

who are in secure care facilities in home confinement.  Nor does Article 886(D), which provides, "If the child is held in custody, the *court* may place him in a juvenile detention center, in a public or private facility for juveniles, in a private home subject to the supervision of the court, or in any other suitable facility for juveniles authorized by the court." La. Child. Code art. 886(D) (emphasis added).

**H.  Other Concerns Stemming from OJJ's Response to COVID-19**

220.    Preliminarily, Mr. Schiraldi generally had positive things to say about OJJ's pre-pandemic operation of its secure care facilities, including the level of rehabilitative and educational programming offered. Schiraldi Tr. (6/4/20) at 44–45 (testifying that it was his "understanding" and "general sense of the feeling" that OJJ's secure care facilities "are doing a good job in relation to rehabilitative services pre-pandemic"), 45 (stating that OJJ is "providing a lot of [educational services]" to the Youth pre-pandemic), 46 (testifying that the "the number of hours [of educational services] seemed very good").

221.    However, Mr. Schiraldi testified regarding a number of "concerns" that he had about ancillary consequences of OJJ's COVID-19 response. *See*, *e.g.*, Schiraldi Tr. (6/4/20) at 89.

**i.  Alleged Ancillary Consequences**

**a.  Staffing levels during COVID-19 response**

222.    Mr. Schiraldi raised concerns about the staffing levels at the OJJ facilities during the COVID-19 response.  Mr. Schiraldi opined that the COVID-19 pandemic would result in regular staff members failing to report to work because the staff became infected with COVID-19, a family member of the staff became infected with COVID-19, or the staff

stayed away from work due to fear of contracting COVID-19. Schiraldi Tr. (6/4/20) at 40–41.

223.     First, Mr. Schiraldi stated that the OJJ facilities were understaffed before the COVID-19 pandemic. Schiraldi Tr. (6/4/20) at 40–41. He conceded, however, that, other than the declaration of Glenn Holt, who left OJJ in 2019, and a 2018 state audit, he had no specific information about the staffing levels at the OJJ secure care facilities in March 2020 before the commencement of the pandemic. *Id.* at 66.

224.     Second, Mr. Schiraldi testified that the staffing levels became "much, much worse" since the start of the pandemic. Schiraldi Tr. (6/4/20) at 40–41. Mr. Schiraldi based this opinion on the fact that OJJ maintained a 2:1 staffing ratio (i.e., that OJJ sought to schedule two people to work every one shift) and that OJJ was using probation and parole officers to fill shifts. *Id.* at 66–67. But Mr. Schiraldi admitted that he did not know whether the 2:1 staffing ratio was in place before the commencement of the pandemic or after. *Id.* at 67.

225.     Mr. Schiraldi noted some OJJ staff had contracted COVID-19, but he admitted, however, that he did not know the roles of the staff who were absent. Schiraldi Tr. (6/4/20) at 68–69 ("I know that a number have gotten sick and gone out, but I do not know whether they were secretaries or what."). Nor did he know whether the staff that were out had roles or responsibilities interacting with the Youth. *Id.* at 69.

226.     Mr. Schiraldi also did not know how many parole and probation officers were being used to fill shifts at the secure care facilities, what roles those parole and probation officers were playing within the secure care facilities, or the level of experience and training those parole and probation officers had for their work inside the secure care facilities. Schiraldi Tr. (6/4/20) at 68.

### b. Lack of transparency

227.     Plaintiffs generally complain about a lack of transparency on the part of OJJ in providing information to children and parents about OJJ's response to the COVID-19 crisis. *See Pls.' PFFCL* ¶¶ 109–12, Doc. 77.

228.     However, the Court finds that these arguments were credibly rebutted by Secretary Bickham's testimony.  Specifically, Secretary Bickham said that he had reached out to fifty-three parents and guardians, and the "overwhelming response" was that OJJ's response was "wonderful" and its "communication is great." Bickham Tr. (6/5/20) at 18.

229.     Further the Court finds this testimony generally unbelievable given the numerous upper-level OJJ officials that testified, none of whom struck the Court as the type to stone-wall parents and prevent them from obtaining information about the COVID-19 crisis.

230.     Finally, even if OJJ were failing to provide adequate information to parents about OJJ's COVID-19 procedures, the Court finds that this is not one of the constitutional violations alleged by Plaintiffs.

### c. Temporary authorization to carry pepper spray

231.     Mr. Schiraldi testified that he was concerned about the fact that between March 17, 2020 and April 27, 2020, certain OJJ employees were allowed to carry pepper spray into the facilities. Schiraldi Tr. (6/4/20) at 41; *see also Stipulations* ¶ 80, Doc. 51.

232.     Mr. Schiraldi admitted, however, that under current directives, no OJJ employee— be it a regular staff member or a parole or probation officer—is allowed to carry pepper spray into the secure care facilities unless there is a specific directive from OJJ's Regional Director in relation to a specific incident. Schiraldi Tr. (6/4/20) at 69–71.

233.     Mr. Schiraldi's testimony is consistent with a memorandum from then Interim Deputy Secretary Bickham dated April 27, 2020, which states in relevant part, "<u>Effective today, Probation and Parole staff will not be permitted to bring in chemical spray to any OJJ secure facilities when covering post</u>.  The memorandum dated March 17, 2020, authorizing this practice is hereby rescinded."  Pl. Ex. 56, *April 27, 2020, Mem. from Bickham re; Use of Chemical Agents in Secure Facilities* ("*April 27, 2020, Chemical Agent Memorandum*").  The memorandum continues, "unless given specific directives from the Regional Director for a specific incident, chemical spray will not be permitted inside the secure facilities." *Id.*

234.     In short, as the parties have stipulated, since April 27, 2020, "chemical spray will not be permitted inside the secure facilities," "unless given specific directives from the Regional Director for a specific incident." *Stipulations* ¶ 81, Doc. 51.

### ii.  Likelihood of Alleged Harm from Ancillary Consequences of OJJ's COVID-19 Response

235.     Little credible evidence or testimony was offered regarding the harm that purportedly has occurred or will occur as a result of these ancillary consequences.

236.     J.P, mother of OJJ Youth D.M., explained that, since OJJ implemented its response to COVID-19, D.M.'s attitude has worsened, including increased anger, boredom, and depression. J.P Tr. at 88–89

237.     W.H., mother of OJJ Youth H.C., explained that, since OJJ implemented its response to COVID-19, H.C. has been "very withdrawn" and "very depressed." W.H. Tr. at 104.

238.     Through his testimony, Mr. Schiraldi generally noted that things such as substitute staff members, decreases in educational or rehabilitation programming, medical isolation,

and a lack of structure can generally lead to feelings of depression and stress among the Youth and that these feelings may manifest themselves in the form of behavioral incidents, such as fighting, picking on staff, and hassling. *See* Schiraldi Tr. (6/3/20) at 90; Schiraldi Tr. (6/4/20) at 9–10.

239.    Other than these general references, Mr. Schiraldi did not identify any specific harms that the Youth in OJJ's secure care facilities are at risk of experiencing. *See* Schiraldi Tr. (6/4/20) at 42.

> Q. In light of these concerns, and you just mentioned kind of the compounding effects of some of them, what is your assessment of the current risks to young people, to the kids who are confined in OJJ facilities?
>
> A. I would say there's substantial risks of harm to the kids and the staff. I don't want to leave the staff out of this and the staff in the facilities.

*Id.*

240.    Thus, Mr. Schiraldi offered little detail regarding the alleged harm for which the Youth are at risk. He did not demonstrate that any of the Youth faced a substantial risk of irreparable harm from OJJ's response to the COVID-19 virus.

241.    Further, Plaintiffs presented little evidence, much less substantial evidence, that there was immediate, imminent threat that chemical spray would be used against any Youth, including the named Plaintiffs, in any secured care facility.

### I. Administrative Remedy Procedure

242.    OJJ maintains an Administrative Remedy Procedure ("ARP") to process internal grievances, such as those addressed in Plaintiffs' complaint. *See* Def. Ex. 24, *Youth Services Policy: Administrative Remedy Procedure* ("*ARP Policy*").

243.     Under the *ARP Policy*, a Youth must, as a general rule, fully exhaust a two-step

grievance process before seeking judicial review. *See* Def. Ex. 24, *ARP Policy* at 1-14. The

Youth normally initiates the process by filing an ARP form, deemed filed upon "receipt"

by an ARP Coordinator. *Id.* at 4. The ARP Coordinator typically screens the form and

sends it to a facility director, who must respond within 30 days. *Id*. at 7-8. If the Youth is

dissatisfied with the director's response, he has 15 days to seek review from the Deputy

Secretary of Youth Services. *Id*. at 8-9. The Deputy Secretary must render a final decision

within 21 days of receiving the request for review, and the entire process must be completed

within 51 days of the original filing of the Youth's grievance form. *Id*. If the Youth is

dissatisfied with the response, he may then seek judicial review. *Id*. at 9.

244.     If the Youth's ARP form contains statements which indicate that he believes he is

at immediate risk of harm and that any delay in responding to the grievance would subject

him to immediate personal injury or other serious irreparable harm, the ARP coordinator

must "immediately forward the ARP" to the regional director, who must "provide an initial

response within 48 hours and issue a final decision within five[] calendar days." Def. Ex.

24, *ARP Policy* at 9.

245.     Neither of the named Plaintiffs has completed the non-emergency ARP process

through the two levels of review. *Stipulations*, ¶ 84, Doc. 51.

246.     Nishi Kumar, counsel for the minor children I.B. and J.H., contacted Swanson

Monroe on May 8, 2020, and Bridge City and Acadiana on May 9, to ascertain to whom to

send a Third-Party emergency grievance via email. Pl. Ex. 11, Kumar Decl. ¶¶ 2, 5.   Staff

at Swanson Monroe gave Kumar Ms. Herbert's email address. *Id.* ¶ 2.  Staff at Acadiana

provided her with Mr. Wood's email address, and Bridge City said they could not provide the information. *Id.* ¶ 5.

247.    Counsel for Plaintiffs sent a Third-Party emergency grievance on behalf of I.B. on May 8, 2020 (six days before filing the underlying suit on May 14, 2020), via email to Shawn Herbert, Interim Facility Director for the Swanson Monroe. *Stipulations* ¶ 85, Doc. 51; *see Complaint*, Doc. 1.  OJJ had no prior records indicating that Counsel for Plaintiffs represented I.B. *Stipulations* ¶ 85, Doc. 51.

248.    Ms. Herbert testified at the hearing that she received I.B.'s ARP and sent it to legal services. Herbert Tr. at 142.  She forwarded it there because, to her knowledge, Plaintiffs' counsel was not I.B.'s attorney or guardian. *Id.*

249.    The grievance included a declaration under penalty of perjury by Counsel for Plaintiffs that counsel represented the parents of I.B. *Stipulations* ¶ 86, Doc. 51.  An electronic signature for Counsel for Plaintiffs' name was included on the declaration, and the declaration was not notarized. *Id.*

250.    A Third-Party Acknowledgment/Approval Form was attached to the grievance. *Stipulations* ¶ 87, Doc. 51. The Third-Party Acknowledgment/Approval Form did not contain I.B.'s signature or the signature of I.B.'s parents. *Id.* In the location that called for the Youth's signature, the form contained the electronic signature of Counsel for Plaintiffs followed by the type-written statement "on behalf of [I.B.]." *Id.*  The abovementioned declaration stated that I.B.'s parents authorized counsel to sign on I.B.'s behalf. *Id.*

251.    I.B.'s attorney did not receive an initial response to or final decision on the emergency ARP within either 48 hours or 5 days, as mandated by OJJ's *ARP Policy*. Pl. Ex. 11, Kumar Decl. ¶ 7.

252.     Counsel for Plaintiffs sent a Third-Party emergency grievance on behalf of J.H. on May 9, 2020, (five days before filing the underlying suit on May 14, 2020), via email to the facility director at Acadiana and via email to Yamena Thompson and Shannon Matthews at Bridge City. *Stipulations* ¶ 88, Doc. 51; *See Complaint*, Doc. 1.  OJJ had no prior records indicating that Counsel for Plaintiffs represented J.H. *Stipulations* ¶ 88, Doc. 51.

253.     N.H.'s attorney did not receive an initial response to or final decision on the emergency ARP within either 48 hours or 5 days, as mandated by OJJ's *ARP Policy*. Pl. Ex. 11, Kumar Decl. ¶ 7.

254.     Named Plaintiff I.B. filed five ARPs on May 6, 2020 concerning COVID-19. The Step One responses to his ARPs are each dated May 14, 2020.  *Stipulations* ¶ 91, Doc. 51.

255.     Named Plaintiff N.H. completed an online form through OJJ's website on May 12, 2020 (two days before the underlying suit was filed), which contacts OJJ. *Stipulations* ¶ 92, Doc. 51; *see Compl.*, Doc. 1.  The stated purpose of the contact, as required through the online portal, was "Request a call from the Family Liaison." *Stipulations* ¶ 92, Doc. 51. In the "message" portion of the form, N.H. stated that she was "filling a grievance on behalf of my son and the children placed in custody of office of Juvenile Justice." *Id.* N.H. later stated that "This is an emergency and urgent grievance [sic]." *Id.*

256.     The grievance included a declaration under penalty of perjury by Counsel for Plaintiffs that counsel represented the parents of J.H.. *Stipulations* ¶ 89, Doc. 51.  An electronic signature for Counsel for Plaintiffs' name was included on the declaration, and the declaration was not notarized. *Id.*

257.    A Third-Party Acknowledgment/Approval Form was attached to the grievance. *Stipulations* ¶ 90, Doc. 51. The Third-Party Acknowledgment/Approval Form did not contain J.H.'s signature or the signature of J.H.'s parents. *Id.* In the location that called for the Youth's signature, the form contained the electronic signature of Counsel for Plaintiffs followed by the type-written statement "on behalf of [J.H.]." *Id.* The abovementioned declaration stated that J.H.'s parent authorized counsel to sign on J.H.'s behalf. *Id.*

## II.    CONCLUSIONS OF LAW

### A.    Standard for Temporary Restraining Orders and Preliminary Injunctions

258.    "[I]njunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) (citing *Allied Mktg. Group, Inc. v. C.D.L. Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)); *see also Sacal-Micha v. Longoria*, --- F. Supp. 3d ----, No. 1:20-cv-37, 2020 WL 1518861, at *2 (S.D. Tex. March 27, 2020) (same).

259.    "Injunctive relief is an extraordinary remedy, to be granted only if Plaintiffs clearly demonstrate (1) a substantial likelihood of success on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the Defendants, and (4) that granting the preliminary injunction will not disserve the public interest." *Gumns v. Edwards*, No. CV 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (citing *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted); *Justin Indus. v. Choctaw Sec., L.P.*, 920 F.2d 262 (5th Cir. 1990)). "Failure to establish any of these elements results in the denial of the motion for

injunctive relief." *Sacal-Micha*, 2020 WL 1518861, at *2 (citing *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003)).

260.        "The purpose of a temporary restraining order is to 'preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing, and no longer.'" *Gumns*, 2020 WL 2510248, at *3 (quoting *RW Dev., LLC v. Cuningham Grp. Architecture, Inc.*, 2012 WL 3258782, at *2 (S.D. Miss. Aug. 8, 2012) (citing *Granny Goose Food, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974); *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

261.        "Additionally, in accordance with the Prison Litigation Reform Act ('PLRA'), preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm." *Gumns*, 2020 WL 2510248, at *3 (citing *Hood v. Vessel*, No. 13-303, 2013 WL 12121562, at *1 (M.D. La. May 14, 2013) (citing 18 U.S.C. § 3626(a))).

## B.  Substantial Likelihood of Success on the Merits

### i.  Appropriate Standard

262.        The parties dispute the relevant standard to be applied in this motion.

263.        Defendants argue that the Eighth Amendment deliberate indifference standard applies, even for actions against juveniles.  There is support in the Fifth Circuit for this position; indeed, the Fifth Circuit expressly said in *Morales v. Turman,* 562 F.2d 993 (5th Cir. 1977),"The [E]ighth [A]mendment applies to juvenile detention centers as well as to adult prisons." *Id.* at 998 n.1.  One reported district court decision within this circuit also followed *Morales. Vega v. Parsley*, 700 F. Supp. 879, 883 (W.D. Tex. 1988) ("The Fifth

58

Circuit has held that the Eighth Amendment applies to juvenile detention centers." (citing *Morales*, *supra*)).

264.     Further, while Plaintiffs urge that the "objectively unreasonable" or "rational relationship" test discussed by *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), applies, Defendants are correct that the Fifth Circuit has limited *Kingsley*' "objectively unreasonable" standard to cases involving excessive force against pretrial detainees. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 & n.4 (5th Cir. 2017) (applying the deliberate indifference standard in failure to protect/episodic acts or omissions case and rejecting concurring judge's call to revisit deliberate indifference standard in light of *Kingsley*); *Guillory v. Louisiana Dep't of Health & Hosps.*, No. CV 16-787-JWD-RLB, 2018 WL 1404277, at *8 (M.D. La. Mar. 20, 2018) ("the deliberate indifference standard remains a subjective one as set out in *Hare* despite the intervening case of *Kingsley*," with respect to episodic acts or omissions claims involving patient involuntarily committed to state hospital).

265.     Moreover, Defendants urge that this case is more akin to a failure to protect or failure to provide basic needs case, *OJJ's PFFCL* at 50 n.9.  Defendants point to, *inter alia*, *Polk v. Det. Ctr. of Natchitoches Par.*, 32 F. App'x 128 (5th Cir. 2002) (per curiam), which stated:

> "The State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm during their confinement." *Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir. 1996) (en banc). A prison official is not liable under § 1983 unless the prisoner shows that the official exhibited deliberate indifference to his conditions of confinement or serious medical needs. *Farmer v. Brennan,* 511 U.S. 825, 837-43, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The prisoner must show that the official: (1) was aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be

59

> drawn; (2) drew an inference that such potential for harm existed; and (3) disregarded that risk by failing to take reasonable measures to abate it. *Id.* at 837, 847. A pretrial detainee's claim based upon a jail official's "episodic act or omission" is also evaluated under the standard of subjective deliberate indifference enunciated in *Farmer. Hare* 74 F.3d at 648.

*Id. See also Krause v. Leonard*, 352 F. App'x 933, 936 (5th Cir. 2009) (applying deliberate indifference standard in failure to protect and failure to provide adequate medical care case).

266.    Defendants also cite certain cases from around the country where courts have evaluated facilities' responses to COVID-19, and these courts have applied the deliberate indifference standard. *See Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (applying deliberate indifference standard for Eighth and Fourteenth Amendment claims and staying district court's issuance of a preliminary injunction against jail facility); *Archilla v. Witte*, No. 420-CV-00596-RDP-JHE, 2020 WL 2513648, at *13 n.20 (N.D. Ala. May 15, 2020) (noting, in action by ICE detainees, that "the standard for providing adequate medical care to pretrial detainees under the Due Process Clause is the same standard required for convicted persons under the Eighth Amendment"); *Sacal-Micha v. Longoria*, No. 1:20-CV-37, 2020 WL 1518861, at *4 (S.D. Tex. Mar. 27, 2020) ("A detainee can establish a constitutional violation based on inadequate conditions of his confinement. But to do so, he must demonstrate that the officials acted with deliberate indifference to his medical needs or his safety." (citing, *inter alia*, *Baughman v. Garcia*, 254 F. Supp. 3d 848, 868–69 (S.D. Tex. 2017)), *aff'd sub nom. Baughman v. Seale*, 761 F. App'x 371 (5th Cir. 2019) (applying the deliberate indifference standard to Fourteenth and Eighth Amendment claim for denial of medical care)); *Mohammed S. v. Tritten*, No. 20-CV-793 (NEB/ECW), 2020 WL 2750836, at *22 (D. Minn. Apr. 28, 2020) (stating, in denying motion for TRO brought

60

by ICE detainee in response to COVID-19, that "the deliberate indifference test, not the freedom from punishment test, applies to a claim challenging the adequacy of precautionary measures to reduce the risk of infection: 'The governmental duty to protect at issue in this case is not based on a pretrial detainee's right to be free from punishment but is grounded in principles of safety and general well-being.' (citing *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006)), *report and recommendation adopted,* No. 20-CV-783 (NEB/ECW), 2020 WL 2750109 (D. Minn. May 27, 2020)

267.    Plaintiffs, on the other hand, urge that their claims are more appropriately analyzed under the Fourteenth Amendment.  Plaintiffs maintain that *Morales* was decided before *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S. Ct. 2452, 2462, 73 L. Ed. 2d 28 (1982), which stated that conditions of confinement for the mentally ill must comport with the purposes of the individual's confinement.  Plaintiffs urge that, in light of *Youngberg*, the conditions of confinement for juvenile offenders—who, like the mentally ill, are not confined to punish—must comport with the purpose of the confinement, which, under Louisiana law, are rehabilitation and individual treatment.  *See In re C.B.*, 708 So. 2d at 396–97.  Case law supporting this position also explains:

> This standard [under the Fourteenth Amendment] is more protective in that "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." [*Ingraham v. Wright*, 430 U.S. 651, 671 n.40, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)]. "Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id*.

*Reed v. Palmer*, 906 F.3d 540, 550 (7th Cir. 2018).

268.     Plaintiffs also urge that this is a conditions of confinement case under the Fourteenth Amendment, not an episodic acts or omissions case, so Plaintiffs need only satisfy the "rational relationship" test, not the deliberate indifference" test.

269.     There is a split in the case law in the circuits on the issue of whether juvenile offenders are judged under the Fourteenth or Eighth Amendments. *See Reed*, 906 F.3d at 550 (collecting cases); *Alexander S. By & Through Bowers v. Boyd*, 876 F. Supp. 773, 795 (D.S.C. 1995), *as modified on denial of reh'g* (Feb. 17, 1995) (collecting cases). The Fifth Circuit's position in *Morales* appears to be the minority. *See Reed*, *Alexander*, *supra*. However, the Fifth Circuit has not overruled *Morales* or revisited the issue.  Thus, while undermined, *Morales* appears to be the correct standard in this circuit.

270.     Further, *Swain*, *Archilla*, *Mohammed, Sacal-Micha,* and *Polk* are strong authority that the Court should apply the deliberate indifference standard for claims brought in response to the threat of COVID-19, even for those brought under the Fourteenth Amendment.

271.     Ultimately, however, the Court need not resolve this question.  Regardless of which standard to apply—the Eighth Amendment's deliberate indifference standard or the Fourteen Amendment's "reasonably related to a legitimate interest" standard—the Court finds that the Plaintiffs have failed to meet their burden of clearly demonstrating a substantial likelihood of success on the merits.

### ii.  Fourteenth Amendment Analysis

272.     In *Shepherd v. Dallas Cty.*, 591 F.3d 445 (5th Cir. 2009), the Fifth Circuit summarized the standard for a conditions-of-confinement claims for pretrial detainees, which the Court finds most appropriate by analogy.  *Shepherd* explained:

> If the plaintiff has properly stated a claim as an attack on conditions of confinement, he is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish because, as discussed below, intent may be inferred from the decision to expose a detainee to an unconstitutional condition. A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc. *See Scott v. Moore,* 114 F.3d 51, 53 n. 2 (5th Cir. 1997) (en banc) (listing cases deemed to state challenges to conditions of confinement). In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Hare,* 74 F.3d at 645. Proving a pattern is a heavy burden, one that has rarely been met in our caselaw.

*Id.* at 452.

273.    Critically, *Shepherd* also stated, "Further, to constitute impermissible punishment, the condition must be one that is 'arbitrary or purposeless' or, put differently, 'not reasonably related to a legitimate goal.' " *Shepherd*, 591 F.3d at 452 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S. Ct. 1861, 1874, 60 L. Ed. 2d 447 (1979)).

274.    *Shepherd* continued:

> "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell,* 441 U.S. at 537, 99 S. Ct. at 1873. "[T]he effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention." *Id.* at 540, 99 S. Ct. at 1875. Detainment itself, however, requires that the State provide for inmates' basic human needs:

>> When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

> *Hare,* 74 F.3d at 639 (quoting *DeShaney v. Winnebago County Department of Soc. Serv.,* 489 U.S. 189, 200, 109 S. Ct. 998, 1005–06, 103 L. Ed. 2d 249 (1989)). *Thus, isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. . . . Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.*

*Shepherd*, 591 F.3d at 453–54 (emphasis added).

275.     Plaintiffs assert that, under Louisiana law, the "legitimate goals" in play are "rehabilitation and individual treatment," *see In re C.B.*, 708 So. 2d at 396–97, and other cases have certainly looked to state law to determine the goals related to juvenile justice, *See J.S.X. Through D.S.X. v. Foxhoven*, 361 F. Supp. 3d 822, 832 (S.D. Iowa 2019) ("Given the expressly non-penal, non-criminal nature of Iowa juvenile delinquency adjudications and dispositions, the Court finds Plaintiffs' Eighth and Fourteenth Amendment claims more appropriately arise under the Fourteenth Amendment only."); *Alexander,* 876 F. Supp. at 796 ("Numerous district courts have relied upon the rationale employed by the Supreme Court in *Jackson* to hold that where, as in South Carolina, the purpose of incarcerating juveniles in a state training school is treatment and rehabilitation, the Due Process Clause 'requires that the conditions and programs at the school must be reasonably related to that purpose.' " (citations omitted)).  The Court agrees with Plaintiffs that these are important policies to consider.

276.     But, Plaintiff's entire motion rests on the false premise that rehabilitation is the *only* policy goal that the State can have. *See Pls.' PFFCL* ¶¶ 211–12, Doc. 77 ("To pass constitutional muster, therefore, the conditions of confinement to which Plaintiffs are

64

subjected must be reasonably related to the goal of rehabilitation[.]").  But this position

flies in the face of Fifth Circuit precedent and the testimony from the hearing.

277.    First, the law in this circuit is that the OJJ can also consider as a policy objective

the need to protect the Youth and the community from the perils of the COVID-19 virus.

*See In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) ("*Jacobson* instructs that *all*

constitutional rights may be reasonably restricted to combat a public health emergency");

*cf. Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (explaining that district court's

issuance of TRO caused "particularly acute" harm to state agency charged with

administering prisons because it hampered the state's ability to respond to the COVID-19

crisis); *Shepherd*, 591 F.3d at 453 ("[T]he effective management of the detention facility .

. . is a valid objective that may justify imposition of conditions and restrictions of pretrial

detention." (quoting *Bell*, 441 U.S. at 540, 99 S. Ct. at 1875)).

278.    Second, the testimony from the hearing demonstrated that there are other policy

factors in the Court's analysis. Plaintiffs' own expert recognized the importance of public

health to OJJ's approach to COVID-19. *See* Schiraldi Tr. (6/3/20) at 84 ("So there is a

tension between some of the things you'd want to do from a public health standpoint and

some of the things you'd want to do from a best practices youth justice standpoint.  And so

it's very difficult to find the sweet spot that allows you to carry out your mission while not

endangering the kids and the staff."); 92 ("You can't just keep the public health stuff going

and neglect the rehabilitation and *you can't just do the rehabilitation stuff and neglect the*

*public health* and you can't just release the kids and neglect the cleaning and the safety and

all of the stuff the doctors talked about." (emphasis added)).

279.    Similarly, Secretary Bickham testified that, when considering furloughs, public safety and potential recidivism were also considerations, even though "rehabilitation [was] the name of the game[.]" Bickham Tr. (6/4/20) at 176–78.  This is consistent with Louisiana law.  *See* La. Rev. Stat. Ann. § 15:902.3(A) ("The legislature hereby finds that in order to improve our juvenile justice system it is necessary that every juvenile in the custody of the Department of Public Safety and Corrections be reviewed periodically in order to determine whether the juvenile is placed in the least restrictive placement most appropriate to their needs and *consistent with the circumstances of the case and the protection of the best interests of society and the safety of the public within the state*." (emphasis added)).

280.    In sum, having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court finds that Plaintiffs have not clearly demonstrated a substantial likelihood of success on any Fourteenth Amendment claim.  To the contrary, the record is exceedingly clear that OJJ's COVID-19 response strategy of testing, screening, isolation, reverse isolation, quarantine, social distancing, and its corresponding scaled reduction in programing was and is rationally related to the legitimate interests of rehabilitation and public health and safety.  The Court will address each part of Plaintiffs' desired relief in turn.

### a.  Continuing to confine all children who are currently within 180 days of their release dates

281.    Plaintiffs have failed to clearly demonstrate a substantial likelihood of success on the merits on this claim.

282.    OJJ's decision to continue to confine all children who are currently within 180 days of their release date is rationally related to legitimate government objectives.

283.     First, and most obvious, OJJ's decision to release some Youth into the community and not others relates to the legitimate goals of protecting the children and the community from the spread of COVID-19.  OJJ crafted the *Depopulation Plan* as a contingency plan depending on OJJ's efforts to contain COVID-19.  Bickham Tr. (6/4/20) at 185–86; Bickham Tr. (6/5/20) at 12–13.  Bickham's decision to implement Phase One and recommend the release of certain eligible Youth with chronic medical conditions who had a heightened susceptibility to COVID-19 was certainly reasonable and based on legitimate objectives. Bickham Tr. (6/4/20) at 189–92.  Moreover, Bickham's decision not to proceed with Phases Two and Three was rationally based on his analysis of the limited and controlled clinical impact of COVID-19 in OJJ's four facilities. Bickham Tr. (6/5/20) at 6–8.

284.     Second, Bickham's decisions with respect to the *Depopulation Plan* were also reasonably related to the goals of rehabilitation.  Bickham Tr. (6/4/20) at 177.   For example, Bickham also evaluated release of those with chronic conditions based in part on certain considerations like behavioral issues.  Bickham Tr. (6/4/20) at 189–90.

285.     Third, Bickham also testified that public safety was a consideration in evaluating potential release, including the protection of victims. Bickham Tr. (6/4/20) at 177.

286.     Additionally, for the reasons articulated above, Plaintiffs have failed to demonstrate that OJJ can release Youth from custody without the consent of the juvenile court. *See* Bickham Tr. (6/5/20) at 12–13 ("I do not have the authority to let any of them out.  The Youth Court has to give that approval for that. . . . The Court has the total authority to grant either the furlough or the early release.  We do not - - OJJ does not have that authority or power."); La. Rev. Stat. Ann. § 15:908(A) ("The secretary for the Department of Public

Safety and Corrections may authorize a temporary furlough to deserving students of any juvenile institution, *unless, after receiving notification of the proposed furlough, the juvenile court having jurisdiction or the district attorney notifies the department of its objection.*" (emphasis added)); La. Rev. Stat. Ann. § 15:906(A) ("the Department of Public Safety and Corrections may *recommend to the committing court* the release of any juvenile committed to its care, who, in the opinion of the department, is ready to be returned to his own home, or to a substitute home. *Such juvenile may be discharged by the court* without supervision or may be placed under supervision until further orders of the court." (emphasis added)).  Since the juvenile court is not a party to this action (and since, even if it were, this Court has considerable doubts about its authority to order the juvenile court to take certain action), this Court cannot afford Plaintiffs the relief they seek.  Plaintiffs cite a number of cases in which Courts have ordered release of inmates throughout the country, *Pls.' PFFCL ¶* 190 n.446, but none of these descriptions involve Youth under the continuing jurisdiction of a state juvenile court.

287.    For this additional reason, Plaintiffs have not clearly demonstrated a substantial likelihood of success on the merits.

> **b. Continuing to confine children who are presumptively eligible for release, including all children (i) who have contracted COVID-19; (ii) who have pre-existing medical conditions that the Centers for Disease Control has determined puts them at significantly higher risk of developing COVID-19 complications; (iii) who are currently eligible for furlough in accordance with OJJ's polices; and (iv) who can be safely returned to their communities**

288.    Plaintiffs have failed to clearly demonstrate a substantial likelihood of success on the merits on these issues, largely for the reasons articulated in the previous section.

289.    No children have currently tested positive for COVID-19, so this issue is moot.

290.     Additionally, the Court adds that neither of the named Plaintiffs, I.B. or J.H., currently qualify for a furlough recommendation under the criteria in OJJ's *Furlough Policy*. *Stipulations* ¶ 67, Doc. 51.  Further, neither D.M. nor H.C. are eligible for a recommendation for extended furlough. Bickham Tr. (6/5/20) at 11.

291.     Further, Plaintiffs' medical experts testified that, prior to recommending a potential release or transfer of any Youth from the OJJ facility, it is important to know the circumstances of the environment into which the Youth is being released to determine the opportunities for effective social distancing (such as identifying the size of the home and number of occupants), medical monitoring, and access to testing, medical care, and personal protective equipment (PPE). Maraynes Tr. at 154–55; Franco-Paredes Tr. (6/3/20 p.m.) at 70–72.  Mr. Schiraldi similarly testified that individualized assessments should be conducted which include the level of supervision provided to the Youth by the adults residing in the home, the likely influence within the community that may lead to recidivism, and the likelihood of drug, alcohol or physical abuse. Schiraldi Tr. (6/4/20) at 50–51.  Here, there is little record evidence establishing the home circumstances upon potential release of any of the OJJ Youth, except as to D.M. and W.H. *See* Maraynes Tr. at 154.    Moreover, there is little credible record evidence establishing that the home circumstances of D.M. and W.H. are typical or characteristic of the home circumstances of any of the other 220 OJJ Youth  in OJJ secure care facilities.  The issue is not whether OJJ has such information available; the question is whether Plaintiffs have clearly established a substantial likelihood of success on the merits on this issue at this stage.  They have not.

### c. Failing to test children for COVID-19

292.    Plaintiffs have failed to clearly demonstrate that they are substantially likely to prevail on the merits on this issue.

293.    Specifically, OJJ's decision to test only symptomatic youth is rationally related to the legitimate objective of public health.  The Court bases this on all the evidence laid out above, but particularly on the following facts.

294.    First, after acknowledging that Louisiana is testing those who have symptoms, Mr. Schiraldi conceded that "many, if not most of the states have employed that as their testing strategy[.]" Schiraldi (6/4/20) at 61–62.

295.    Second, if J.P.'s son, D.M., were released, he would only be tested if he displayed symptoms. *See* J.P. Tr. at 93.  This is the exact protocol that OJJ employs—testing those who display symptoms. Def. Ex. 45, Dandridge Aff. ¶ 44.

296.    Third, even Plaintiffs' expert conceded that OJJ generally complied with CDC guidance on testing. *See* Schiraldi (6/4/20) at 62.

297.    In sum, the Court declines to find that OJJ committed a constitutional violation when they are following the same testing policy of most of the jurisdictions in this country and the same policy endorsed by the CDC.

### d. Using "Behavioral Intervention Rooms"(i.e., isolation rooms) for any child who tests positive for COVID-19 or displays symptoms of the disease

298.    Plaintiffs failed to clearly demonstrate a substantial likelihood of success on the merits on this issue.

299.     Specifically, OJJ's decision to temporarily use behavioral intervention rooms for Youth who are awaiting test results is rationally related to the legitimate objective of public health.

300.     Herbert testified that the behavioral intervention rooms were used only when all infirmary rooms were full and only for only a limited duration and only until space became available in another medical isolation area or the test results indicated the Youth should be moved to a different quarantine or medical isolation area. Def. Ex. 42, Herbert Decl. ¶¶ 33–34. Students were provided schoolwork and writing materials and given an opportunity to make phone calls. *Id.* ¶ 35. Additionally, the Youth was specifically informed that he was being placed in the behavioral intervention room for non-punitive reasons and that he would be transferred as soon as space opened up elsewhere. *Id.*

301.     Test results for COVID-19 now only take 48–72 hours. Dandridge Tr. at 24–25,

302.     Critically, Mr. Schiraldi had no reason to believe that this was being done for punitive purposes. Schiraldi Tr. (6/5/20) at 63.

303.     Given the extremely important need to quarantine Youth who were awaiting test results, the relatively short amount of time it now takes to obtain test results for COVID-19, the fact that the behavioral intervention rooms were only used when infirmary rooms were full, the Court cannot say that OJJ's decision to use these rooms was not rationally related to legitimate objectives.

### e. Confining children to their dormitories for lengthy periods of time

304.     Plaintiffs have failed to clearly demonstrate a substantial likelihood of success on the merits on this issue.

305.    Specifically, OJJ's decision to "reverse isolate" the Youth in their dorms is rationally related to the legitimate objective of keeping the Youth and community safe from COVID-19.

306.    Additionally, the evidence shows that the Youth are *not* confined to their dorms for extended lengths of time.  As Washington testified, the Youth get "at least two hours" of recreation during the day, and they go to the dining hall outside their dorm three times a day. Washington Tr. at 155.  Further, as Herbert testified, the Youth go to the computer lab an hour daily. Herbert Tr. at 107.  And this does not even take into account the fact that classes resumed June 8, 2020, with classes running at 50% capacity. Mims Tr. at 84; Bickham Tr. (6/5/20) at 20.  Considering the important need to prevent the spread of the COVID-19 pandemic, the Court finds that OJJ's actions related to this issue are clearly rationally related to a legitimate objective.

### f.  Using pepper spray on children

307.    Plaintiffs have failed to clearly demonstrate that a substantial likelihood of success on the merits on this issue.

308.    While Plaintiffs certainly presented evidence that the use of pepper spray is disfavored, this issue has essentially been rendered moot by Pl. Ex. 56, *April 27, 2020, Chemical Agent Memorandum*.  As the parties have stipulated, since April 27, 2020, "chemical spray will not be permitted inside the secure facilities," "unless given specific directives from the Regional Director for a specific incident." *Stipulations* ¶ 81, Doc. 51. Plaintiffs fail on this issue.

### g. Continuing the suspension of structured educational and rehabilitative programs in OJJ facilities

309.    Plaintiffs have failed to clearly establish a substantial likelihood of success on the merits on this issue.

310.    Even assuming that the Fifth Circuit recognized these rights, *see Morales*, 562 F.2d at 997–98, OJJ's efforts with respect to educational and rehabilitative services during the pandemic were rationally related to legitimate government interests of public health and rehabilitation.  Mims testified that OJJ followed the same guidelines that LDOE implemented with respect to public schools. Mims Tr. at 81–84.  Students were provided with work packets put together by the regular teachers during the pandemic. Mims Tr. at 78–80.  Children also had access to the computer lab. *Id.*  Further, OJJ has issued updates to its distance learning plan to adapt to the pandemic, Def. Ex. 23, *Distance Learning Update*,  and it scheduled to resume live in-person services on Monday, June 8, 2020, with social distancing implemented and instruction on PPE and other safety issues. Bickham Tr. (6/5/20) at 20.  While not ideal, the Court cannot say that OJJ's efforts to provide educational services to the Youth during the enormous strain of the pandemic was not rationally elated to legitimate objectives.

311.    As for rehabilitation efforts, all Youth continued to receive group services weekly, and Youth with mental health diagnosis were seen by a psychiatrist and/or psychologist on a regular basis. Hebert Tr. at 108.  Youth participated in social skills groups three times weekly, and social workers conducted substance abuse groups and individual sessions once weekly (including with remote family sessions). *Id.* at 108–10.  Youth participated in the "Weekly Wrap-Up" as well, as detailed above. *Id.* at 110–12.  Recreational activities continued throughout the pandemic, among other activities. *See id.* at 112–13; Washington

Tr. at 156. Even Mr. Schiraldi agreed that OJJ continued some level of rehabilitation to the Youth throughout the pandemic. Schiraldi Tr. (6/4/20) at 45. The Court finds that OJJ's robust provision of services in these areas is certainly rationally related to legitimate objectives.

312.     Thus, the Court finds that Plaintiffs have failed to demonstrate a substantial likelihood of success for any Fourteenth Amendment claim with respect to the deprivation of educational and rehabilitative services.

> **h. Order Defendants-Respondents to develop, within 48 hours, an effective COVID-19 response plan governing the state's four children's detention centers that fully conforms to CDC guidelines.**

313.     For all the reasons articulated above, Plaintiffs' request for relief is denied on this issue. As amply demonstrated, and as Plaintiffs' experts concede, OJJ's plan conforms to CDC guidelines. *See* Schiraldi (6/4/20) at 62; Franco-Paredes Tr. (6/3/20 p.m.) at 62-63. Further, it is beyond reasonable.

314.     For all these reasons, the Court finds that Plaintiffs have failed to meet their burden of clearly demonstrating a substantial likelihood of success on the merits of any Fourteenth Amendment claim. On this ground alone, the Plaintiffs' motion could be denied.

### iii. Eighth Amendment Analysis

315.     In *Valentine v. Collier*, the Fifth Circuit articulated the appropriate standard to apply for an Eighth Amendment conditions of confinement claim:

> In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry. *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." *Ibid.* To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970). The "incidence of diseases or infections, standing alone," do not "imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009). Instead, the plaintiff must show a denial of "basic human needs." *Ibid.* "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).

*Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

316.     *Valentine* continued by explaining that, "[i]n *Farmer v. Brennan*, the Supreme Court held that deliberate indifference requires the defendant to have a subjective 'state of mind more blameworthy than negligence,' *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970, akin to criminal recklessness, *id*. at 839–40, 114 S. Ct. 1970." *Valentine*, 956 F.3d at 802.  The question is not " 'whether [the Defendants] reasonably abate[d] the risk' of infection." *Id*. Inadequate measures alone are not dispositive of the Defendants' mental state; "[s]uch an approach resembles the standard for civil negligence, which *Farmer* explicitly rejected." *Id*.

317.     Additionally, in criticizing the district court's granting of injunctive relief, the Fifth Circuit stated:

> Though the district court cited the Defendants' general awareness of the dangers posed by COVID-19, it cited no evidence that they subjectively believe the measures they are taking are inadequate. To the contrary, the evidence shows that TDCJ has taken and continues to take measures— informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus. . . . Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference.

*Id.* at 802–03 (citations omitted).

318.     Having carefully considered the matter, even assuming that OJJ was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and

actually drew the inference (which, as will be evident from the next section, is highly unlikely), the Court finds that Plaintiffs have not met their burden of proving a substantial likelihood that OJJ disregarded the risk of COVID-19.  For all the reasons given in the Fourteenth Amendment section, the Court finds that OJJ consulted early and often with the Governor's task force, LDH, LDOE, and Wellpath to formulate and implement its COVID-19 strategy.  Further, that strategy was consistent with the *CDC Interim Guidance* for managing and reducing the spread of COVID-19 in congregate settings like OJJ's secure care facilities, including by monitoring the CDC for updates to that guidance. *See Valentine*, 956 F.3d at 802 ("Plaintiffs have cited no precedent holding that the CDC's recommendations are insufficient to satisfy the Eighth Amendment.").

319.    OJJ officials also testified to the actions taken under the COVID-19 response plan.  According to the testimony of the OJJ officials, they have consistently tested and monitored Youth complaining of COVID-19 symptoms, temporarily eliminated non-essential visitors within the four OJJ facilities, screened all remaining visitors, recommended confinement modifications for qualifying Youth with pre-existing conditions, suspended contact visits and furlough programs to reduce community transfer, coordinated with the LDH for testing efforts, and provided programming and education services (albeit reduced in some respects) to Youth, all while instituting a quarantine and medical isolation program.

320.    *Valentine* and *Farmer* make clear that deliberate indifference requires "a subjective 'state of mind more blameworthy than negligence,' *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970, akin to criminal recklessness, *id*. at 839–40, 114 S. Ct. 1970." *Valentine*, 956 F.3d at 802.  Again, the question is not " 'whether [the Defendants] reasonably abate[d] the risk' of infection." *Id*. Inadequate measures alone are not dispositive of the Defendants' mental

state; "[s]uch an approach resembles the standard for civil negligence, which *Farmer* explicitly rejected." *Id*. "Although the district court might do things differently, mere 'disagreement' with [OJJ's] medical decisions does not establish deliberate indifference." *Id.* at 803 (quoting *Cadena*, 946 F.3d at 729).

321.     Plaintiffs' contention that "[t]he only logical explanation [for OJJ's refusal to adopt universal testing of asymptomatic children] is that *it does not matter* to Defendants if there are undetected cases of COVID-19 among the children in OJJ's secure care facilities" is totally unfounded and baseless, for all the reasons provided in this opinion.

322.     In sum, OJJ's response has simply not been deliberately indifferent.  Plaintiffs have not established that OJJ has been grossly negligent or even negligent, much less that it acted with criminal recklessness. All of Plaintiffs' criticism strikes the Court as the very kind of "disagreements" which *Valentine* rejected as a basis for a constitutional claim. Thus, for these additional reasons, Plaintiffs have failed to clearly demonstrate that they are substantially likely to succeed on the merits of an Eighth Amendment claim, so their motion can be denied on this ground as well.

### iv.  Other Issues

### a.  Exhaustion

323.     Defendants contend that Plaintiffs did not fully exhaust their administrative remedies.  They urge, *inter alia*, that (a) while Plaintiffs filed an emergency grievance, they did not complete the standard two-step procedure thereafter; and (b) they did not file their grievance with the ARP coordinator.

324.     Plaintiffs reply that (a) the emergency ARP procedure is sufficient by itself without the standard two-step procedure; (b) the ARP process was unavailable because OJJ gave

incorrect information to Plaintiffs' counsel and because the Youth Plaintiffs were in

quarantine and thus could not sign the ARP form; and (c) in any event, the Court can defer

ruling on the exhaustion issue until after discovery.

325.        The parties agree that the PLRA applies to this action. *See Pls.' PFFCL* ¶¶ 174–84,

Doc. 77; *OJJ's PFFCL* ¶¶ 228–42, Doc. 78.

326.        The Fifth Circuit has explained the following about exhaustion of remedies under

the PLRA:

> The PLRA requires inmates to exhaust "such administrative remedies as are
> available" before filing suit in federal court to challenge prison conditions.
> 42 U.S.C. § 1997e(a). This exhaustion obligation is mandatory—there are
> no "futility or other [judicially created] exceptions [to the] statutory
> exhaustion requirements ...." *Booth v. Churner*, 532 U.S. 731, 741 n.6, 121
> S. Ct. 1819, 149 L. Ed. 2d 958 (2001). So long as the State's administrative
> procedure grants "authority to take *some* action in response to a complaint,"
> that procedure is considered "available," even if it cannot provide "the
> remedial action an inmate demands." *Id.* at 736, 121 S. Ct. 1819 (emphasis
> added); *see also id.* at 739, 121 S. Ct. 1819 ("Congress meant to require
> procedural exhaustion regardless of the fit between a prisoner's prayer for
> relief and the administrative remedies possible.").
>
> By contrast, a remedy is not "available"—and exhaustion is not required—
> when:
>
>> 1. The procedure "operates as a simple dead end" because "the
>> relevant administrative procedure lacks authority to provide any
>> relief," or "administrative officials have apparent authority, but
>> decline ever to exercise it."
>>
>> 2. The "administrative scheme [is] so opaque that ... no reasonable
>> prisoner can use them."
>>
>> 3. Or when "prison administrators thwart inmates from taking
>> advantage of a grievance process through machination,
>> misrepresentation, or intimidation."
>
> *Ross v. Blake*, —— U.S. ——, 136 S. Ct. 1850, 1859–60, 195 L.Ed.2d 117
> (2016) (quotation omitted).

*Valentine*, 956 F.3d at 804.

327.    As the Fifth Circuit has further explained:

> Under our strict approach, we have found that mere "substantial compliance" with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly. *See Wright,* 260 F.3d at 358; *Spurlock,* 260 F.3d at 499. However, our strict approach does not absolutely foreclose the possibility that prison officials' statements concerning administrative remedies can render such remedies unavailable. We have long recognized the importance of ensuring that inmates have avenues for discovering the procedural rules governing their grievances, *see Alexander v. Tippah County,* 351 F.3d 626, 630 (5th Cir.2003) (per curiam) (premising ruling that remedies were available on prisoner's knowledge of grievance procedures); *Ferrington v. La. Dep't of Corrs.,* 315 F.3d 529, 532 (5th Cir.2002) (per curiam) (premising ruling that remedies were available on fact that prisoner "was well aware of the general procedural requirements described in the inmate handbook"), as has the Eighth Circuit. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir.2005) (premising ruling that remedies were available on prisoners' admission of receipt of prisoner guidebook and guidebook's explanation of "the applicable grievance procedure and its application to all aspects of inmate life"). When a prisoner has no means of verifying prison officials' claims about the administrative grievance process, incorrect statements by officials may indeed make remedies unavailable.

*Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010).

328.    Additionally, in *Wilson v. Epps*, the Fifth Circuit described how a prisoner is able

to sue if the prison failed to respond to the ARP:

> Section 1997e's exhaustion requirement is satisfied only if the prisoner "pursue[s] the grievance remedy to conclusion." *Wright v. Hollingsworth,* 260 F.3d 357, 358 (5th Cir. 2001). This requirement does not fall by the wayside in the event that the prison fails to respond to the prisoner's grievance at some preliminary step in the grievance process. Instead, the prison's failure to timely respond simply entitles the prisoner to move on to the next step in the process. Thus, it is only if the prison fails to respond at the *last* step of the grievance process that the prisoner becomes entitled to sue, because then there is no next step (save filing a lawsuit) to which the prisoner can advance. This is true both under the terms of the Program, *see* [*Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004)] ("[E]xpiration of response time limits without receipt of a written response shall entitle the offender to move on to the next step in the process." (internal quotation marks omitted)), and as a matter of the law of this circuit. *See Taylor v. Burns,* 371 Fed .Appx. 479, 481 (5th Cir.2010) (unpublished) ("The expiration of the time for the prison to respond ... result[s] in exhaustion only if [the prisoner] ... timely pursue[s] his grievance at each step of the

process." (citing *Wright,* 260 F.3d at 358)); *see also, e.g., Ryan v. Phillips,* 558 Fed. Appx. 477, 478 (5th Cir. 2014) (unpublished); *Mesquiti v. Gallegos,* 427 Fed. Appx. 377, 378 (5th Cir. 2011) (unpublished); *Hicks v. Garcia,* 372 Fed. Appx. 557, 558 (5th Cir. 2010) (unpublished).

*Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015).

329.     Thus, in *Gates*, the court found that the prisoner exhausted his administrative remedies when he filed an emergency grievance when ninety days expired between when he initiated the process and when he filed suit (the time period allowed for the entire ARP process) and when the commissioner (at the highest level of the ARP process) provided no written response to his ARP after forty days, the timeframe for the facility responding to an emergency ARP. *Gates*, 376 F.3d at 330–31.  This allowed the inmate to "move on to the next step in the process, and, since the commissioner was the highest level, plaintiff could then file suit. *Id.*

330.     The Court finds that Plaintiffs have clearly established a substantial likelihood of success on the merits on the exhaustion issue.

331.     First, while Plaintiffs did not send the ARP form to the ARP Coordinator, Plaintiffs' counsel did call the secure care facilities and ask who the proper persons were to whom to send the letters, and she was apparently given incorrect information. *See* Pl. Ex. 11, Kumar Decl. ¶¶ 2, 5.  Under these circumstances, there is a substantial likelihood at this stage that Plaintiffs have established that the ARP process was unavailable.

332.     Second, the *ARP Policy* does not appear to require Youth to exhaust the standard two-step procedure after they have filed an emergency procedure. Specifically, that policy provides:

        I. Emergency Grievance.

If a youth's ARP contains statements which indicate he believes he is at immediate risk of harm and any delay in responding to the grievance would subject the youth to substantial risk of immediate personal injury or cause other serious or irreparable harm, the ARP Coordinator shall immediately forward the ARP, or that portion of the ARP which alleges substantial risk of imminent personal injury or cause serious or irreparable harm, to the Facility Director, Regional Director, and IS.   The Regional Director shall provide an initial response with 48 hours and *issue a final decision with five (5) calendar days*.

Def. Ex. 24, *ARP Policy* at 11 (emphasis added).

333.    Further, the ARP instructions given to Youth provide the following:

**Is it an Emergency ARP?**

If you file an ARP with statements that make the ARP Coordinator think you are at immediate risk of personal injury or harm or make statements that might put other youth at immediate risk or harm, the ARP Coordinator will immediately send a copy of the ARP to the Facility Director, the Regional Director, and the Investigative Services (also known as IS) at the facility.

The Regional Director will be the person who will respond to you within 48 hours [two (2) calendar days], and will also be the person to make a final decision about the ARP within five (5) calendar days.

Def. Ex. 44, Woods Aff.  ¶ 4; Def. Ex. 25, *Administrative Remedy Procedure (ARP) (How to Complain About Your Problem)* ("*Youth ARP Instructions*") at 5.

334.    Thus, both the *ARP Policy* and the *Youth ARP Instructions* indicate that the Emergency ARP results in a "final decision," which would logically mean that the Youth could proceed to the "next step" of filing suit.

335.    This is bolstered by language in the standard ARP procedure of the *ARP Policy*. Specifically, the standard ARP procedure speaks of the Deputy Secretary providing a "final decision" after the Step Two of the ordinary, non-emergency procedure. Def. Ex. 24, *ARP Policy* at 11. Thus, the use of "final decision" in both places indicate the end of the ARP process.

336.     Further, the *ARP Policy* concludes its discussion of a standard, non-emergency ARP by stating that, "Absent an extension with notification to the youth, expiration of time limits without a response shall be considered by the youth to be a denial at that level and entitles the youth to move on to the next step in the process." Def. Ex. 24, *ARP Policy* at 12.  Thus, Defendants' failure to timely respond to the emergency procedure with a "final decision" leads to the conclusion that Plaintiffs could then go to the "next step" after the ARP process, filing suit. *See Gates*, 376 F.3d at 330–31; Def. Ex. 24, *ARP Policy* at 11.

337.     Finally, to the extent Defendants claim that exhaustion was not satisfied by Plaintiffs' counsel's failure to obtain the Youths' or parents' signature on the Third-Party Acknowledgment/Approval Form, the Court agrees that, due to the circumstances of the pandemic and the state-wide shelter-in-place, this part of the ARP process was "unavailable."

338.     For these reasons, the Court finds that Plaintiffs have established a substantial likelihood of success on the merits on the issue of exhaustion.

### b.  Habeas

339.     Plaintiffs argue, "Under federal habeas authority, this Court may order a Petitioners' 'release from physical confinement in prison,' including release to parole or supervised custody, based on a determination that the fact or duration of confinement is unconstitutional." *Pls.' PFFCL* ¶ 197, Doc. 77 (citing *Coleman v. Dretke*, 409 F.3d 665, 669 (5th Cir. 2005).

340.     Defendants counter that Plaintiffs have not exhausted their remedies in state court, and Plaintiffs respond that (a) the COVID-19 pandemic is "precisely the type of exceptional circumstance that makes exhaustion of state remedies infeasible[,]" and (b)

there is no available remedy for the relief requiring Defendants to reduce the population. *Pls.' PFFCL ¶¶* 199–200, Doc. 77.

341.    Given the Court's findings above that Plaintiffs have clearly failed to demonstrate any viable constitutional claim against OJJ or the other Defendants, the Court declines to rule on this exhaustion issue.

### C. Substantial Threat of Irreparable Injury

342.    Again, Plaintiffs must also clearly demonstrate a substantial threat that they will suffer irreparable injury if the injunction is not granted. *Gumns*, 2020 WL 2510248, at *3 (citations omitted).

343.    "Irreparable harm requires a showing that: (1) the harm to Plaintiffs is imminent (2) the injury would be irreparable and (3) that Plaintiffs have no other adequate legal remedy." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 608 (N.D. Tex. 2006) (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)).

344.    "[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co.,* 777 F.2d at 997 (citing *Carter v. Heard*, 593 F.2d 10, 12 (5th Cir. 1979).

345.    Here, the Court finds that Plaintiffs have failed to clearly demonstrate a substantial threat of imminent, irreparable injury.

346.    Again, Plaintiffs' medical expert, Dr. Franco-Paredes, admitted that he had no evidence of an incarcerated youth offender in any location in the world having died of COVID-19 or even having experienced serious COVID-19 complications such as respiratory failure, severely damages lung tissue, neurological damage, deep venous

thrombosis and other coagulopathies like bleeding disorders, COVID-19 induced asthmas, or Gillian Barr Syndrome. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 52, 57, 59.

347.    Further, Plaintiffs' two medical experts admitted that they have no evidence to calculate the probability or even approximate the likelihood that a Youth in OJJ's secure care facilities will die due to COVID-19 or will develop serious COVID-19 complications such as respiratory failure, severely damaged lung tissue, neurological damage, deep venous thrombosis and other coagulopathies like bleeding disorders, COVID-19 induced asthmas, Gillian Barr Syndrome, myocarditis, inflammatory multi-organ dysfunction, or PIMS. *See* Franco-Paredes Tr. (6/3/20 p.m.) at 57, 59–60; Maraynes Tr. at 142–43 (stating there is insufficient data to calculate the probability or likelihood of a person developing PIMS); *see also* Maraynes Tr. at 156 (admitting that the likelihood of any Youth developing PIMS "would be pretty remote at this point[,] 50 days later").

348.    Both Dr. Maraynes and Dr. Franco-Paredes agreed that most or the large percentage of minors and children who contract COVID-19 either present with no symptoms or with mild symptoms such as fever, cough, and sore throat. Franco-Paredes Tr. (6/3/20 p.m.) at 22; Maraynes Tr. at 138.  This is consistent with what took place in OJJ's facilities, where most Youth who contracted the virus exhibited only mild symptoms; most had fever for a few days, and some had mild respiratory symptoms similar to a seasonal cold. Def. Ex. 45, Dandridge Aff. ¶ 41.  All were treated with standard-over-the-counter medication. *Id.* ¶ 42.

349.    Further, no Youth has complained of symptoms suggestive of COVID-19 since April 12, 2020. Def. Ex. 45, Dandridge Aff. ¶¶ 38, 43.  And all youth that tested positive have fully recovered. *See Stipulations* ¶¶ 37–40, Doc. 51.

350.     Given this testimony, the Court finds that Plaintiffs have only demonstrated what *could* happen in OJJ's secured care facilities in the absence of universal testing, furloughs, and their other measures.  They have not demonstrated beyond speculation a *substantial* threat of imminent, irreparable harm to the Youth in these facilities.

351.     The Court agrees with Defendants that *Sacal-Micha v. Longoria*, is strong support for their case.  There, Plaintiff argued, "[i]n essence, . . . that a high likelihood exists that many detainees in the Port Isabel Detention Center will contract COVID-19, and that for those who are elderly or suffer from underlying medical conditions that render them prone to the more serious aspects of the virus, the risk of death is significant." *Sacal-Micha*, 2020 WL 1518861, at *5.  Rejecting, this argument, the district court explained that plaintiff "offer[ed] no evidence to support these propositions other than conclusions extrapolated from general information" and that "accepting [his] reasoning would logically require the release of all individuals currently detained who are elderly or suffer from certain underlying medical conditions." *Id.*  The district court continued:

> The law does not require such a generalized result. The decisions by other district courts considering similar requests demonstrate the fact-specific nature of the analysis. *See Vasif "Vincent" Basank, et al., v. Thomas Decker, et al.*, No. 20 Civ. 2518, —— F.Supp.3d ——, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020), ECF No. 11 (ordering release of ten immigration detainees held in a county jail with confirmed cases of COVID-19); *Calderon Jimenez v. Wolf*, No. 18 Civ. 10225 (D. Mass. Mar. 26, 2020), ECF No. 507 (ordering release of a detained immigrant held in a county jail with a confirmed case of COVID-19); *United States of America v. Barry Allen Gabelman*, No. 2:20-CR-19 JCM (NJK), 2020 WL 1430378, at *1 (D. Nev. Mar. 23, 2020) (denying motion to reconsider: "The court acknowledges that the spread of COVID-19 may be acutely possible in the penological context, but the court cannot release every detainee at risk of catching COVID-19 because the court would be obligated to release every detainee."); *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *3 (W.D. Wash. Mar. 19, 2020) (denying request for temporary restraining order: "Plaintiffs do not show that 'irreparable injury is likely in

the absence of an injunction.' [ ] The 'possibility' of harm is insufficient to warrant the extraordinary relief of a TRO.").

The Court recognizes that the COVID-19 pandemic presents an extraordinary and unique public-health risk to society, as evidenced by the unprecedented protective measures that local, state, and national governmental authorities have implemented to stem the spread of the virus. And it is possible that despite ICE's best efforts, Sacal may be exposed and contract the virus. Moreover, Sacal's age and medical condition render him particularly vulnerable to serious complications from the virus. But the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994) ("Prison officials must provide humane conditions of confinement and must take reasonable measures to guarantee the safety of inmates."). Sacal has not demonstrated his likelihood of proving that ICE has failed to take reasonable measures to guarantee his safety.

*Id.*, 2020 WL 1518861, at *5–6.

352.     The same reasoning applies here.  The Court cannot issue a blanket order releasing all Youth based on the speculative, "remote" chance that they could die or develop severe symptoms.  As amply demonstrated above, Plaintiffs have not met their burden on this issue.

353.     Many of Plaintiffs' other claims also fail for lack of a substantial threat of imminent, irreparable harm.

354.     Mr. Schiraldi testified that, to his knowledge, no one is currently in medical isolation in the four secure care facilities.  Schiraldi Tr. (6/5/20) at 63.  Plaintiffs also failed to present any evidence that there is a substantial threat that the infirmary will fill up and that OJJ will need to use these behavioral intervention rooms again.

355.     Regarding the use of pepper spray, Plaintiffs presented little evidence, much less substantial evidence, that there was immediate, imminent threat that chemical spray would be used against any Youth, including the named Plaintiffs, in any secured care facility.

86

356.     With respect to the claims related to educational and rehabilitative services, the resumption of classes renders this claim moot as well. Again, Plaintiffs complain about a lack of detail with respect to these policies, but they have the burden of proving that they are inadequate. They have failed to do so. Plaintiffs' claim of another spike in cases is also speculative.

357.     Lastly, as detailed above, Plaintiffs have failed to demonstrate a substantial threat of imminent, irreparable harm with respect their complaints about staffing, a lack of transparency, and the other ancillary consequences of OJJ's COVID-19 response. Plaintiffs only describe general feelings of depression and stress and things that *could* happen with respect to behavioral incidents like fighting, picking on staff, and hassling. Schiraldi Tr. (6/3/20) at 90; Schiraldi Tr. (6/4/20) at 9–10, 42.

358.     For all these reasons, Plaintiffs have failed to meet their burden of clearly establishing a substantial threat of imminent, irreparable harm. On this additional ground, Plaintiffs' motion should be denied.

### D. Weighing Harm to the Defendants and the Public Interest

359.     Again, Plaintiffs can obtain the extraordinary remedy of injunctive relief only by clearly demonstrating "that the threatened injury outweighs the threatened harm to the Defendants," and "that granting the preliminary injunction will not disserve the public interest." *Gumns*, 2020 WL 2510248, at *3 (citations omitted).

360.     Concerning the harm to the Defendants, " '[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.' " *Valentine*, 956 F.3d at 803 (quoting *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers) (quoting *New Motor*

*Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S. Ct. 359, 54 L.Ed.2d
439 (1977) (Rehnquist, J., in chambers))).

361.     Just as, in *Valentine*, where "[t]he Texas Legislature assigned the prerogatives of
prison policy to [Texas Department of Criminal Justice (TDCJ)]," here, the Louisiana
Legislature has assigned the prerogatives of juvenile justice, rehabilitation, and education
to the OJJ. Similarly, the Legislature assigned the roll of dealing with the COVID-19
pandemic to the Governor, who has exercised that power through the declaration of a
Public Health Emergency and use of the UCG. Def. Ex. 45, Dandridge Aff. ¶¶ 9–12;
Proclamation     No.     25     JBE     2020     (March     11,     2020),
https://gov.louisiana.gov/assets/Proclamations/2020/modified/25-JBE-2020-Public-
Health-Emergency-COVID-19.pdf . Thus, as in *Valentine*, any injunction could "prevent[]
the State from effectuating the Legislature's choice and hence impose[] irreparable injury."
*Valentine*, 956 F.3d at 803 (citation omitted).

362.     In staying the district court's injunction, the *Valentine* court also discussed the
"particularly acute" harm that the TDCJ would suffer because of the lower court's issuance
of an injunction." *Valentine*, 956 F.3d at 803. The Fifth Circuit explained that "the district
court's order interferes with the rapidly changing and flexible system-wide approach that
TDCJ has used to respond to the pandemic so far." *Id.* After discussing the rapid
successive changes by the TDCJ in its response to COVID-19, the appellate court then
explained:

> TDCJ's ability to continue to adjust its policies is significantly hampered
> by the preliminary injunction, which locks in place a set of policies for a
> crisis that defies fixed approaches. *See, e.g., Jacobson v. Massachusetts*,
> 197 U.S. 11, 28–29, 25 S. Ct. 358, 49 L. Ed. 643 (1905); *In re Abbott*, 954
> F.3d 772, 792 (5th Cir. 2020) (describing COVID-19 as a "massive and
> rapidly-escalating threat"). And it prevents TDCJ from responding to the

> COVID-19 threat without a permission slip from the district court. That constitutes irreparable harm.

*Id.* at 803–804.

363.     The same reasoning applies here; any injunction by this Court would "significantly hamper" OJJ's ability to "to adjust its policies" to a "crisis that defies fixed approaches." *Id. See also Gumns*, 2020 WL 2510248, at *15 ("For the same reasoning and analysis articulated by the Fifth Circuit [in *Valentine*], the Court finds that the second factor weighs in Defendants' favor. Plaintiffs have failed to demonstrate that the requested injunction will not cause irreparable harm to Defendants and potentially to inmates and pre-trial detainees throughout . . . Louisiana.").

364.     As to the harm to the Plaintiffs, "[t]here is no doubt that COVID-19 poses risks of harm to all Americans, including those in the [OJJ facilities]. But the question is whether Plaintiffs have shown that they will suffer irreparable injuries *even afte*r accounting for the protective measures" by the OJJ. *Valentine*, 956 F.3d at 804; *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *4 (5th Cir. Apr. 27, 2020) (quoting *Valentine*).  As amply demonstrated above, Plaintiffs have failed to do so here.

365.     Plaintiffs are certainly right that there is a public interest in preventing the violation of constitutional rights, *see Pls.' PFFCL* ¶ 248, Doc. 77, but this is not the only interest at play.

366.     "Because the State is the appealing party, its interest and harm merge with that of the public." *Valentine*, 956 F.3d at 804 (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L.Ed.2d 550 (2009))); *see also Marlowe,* 2020 WL 2043425, at *4 (quotations omitted).

367.    Finally, two parts of *Gumns* and *Valentine* are particularly significant here.  Chief

Judge Dick stated in *Gumns*:

> [T[he existence of an alternative plan – even a better plan - is not evidence that the challenged plan is unconstitutional or illustrative of deliberate indifference. Whether the Plaintiffs' proffered alternative plan . . .  is feasible and better than Defendants' plan is not the inquiry. Plaintiffs must offer evidence that the challenged plan is unconstitutional, and they have not done so. The Court finds that the balance of the harms and the public interest weigh against the issuance of the requested TRO or preliminary injunction.

*Gumns*, 2020 WL 2510248, at *15.  Similarly, as the Fifth Circuit has explained with

respect to a state's response to this pandemic:

> "[I]f the choice is between two reasonable responses to a public crisis, the judgment must be left to the governing state authorities. 'It is no part of the function of a court or a jury to determine which one of two modes [i]s likely to be the most effective for the protection of the public against disease.' ... Such authority properly belongs to the legislative and executive branches of the governing authority."

*Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *3 n.4 (5th Cir. Apr. 27, 2020)

(quoting *In re Abbott*, 954 F.3d 772, 792 (5th Cir. 2020) ((second alteration in original)

(quoting *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30, 25 S. Ct. 358,

363, 49 L. Ed. 643 (1905)))).

368.    The Court agrees with the analysis from *Marlowe* and *Gumns*.  The question is not

whether Plaintiffs can offer a better plan for the OJJ.  The sole question is whether Plaintiffs

have demonstrated that OJJ's COVID-19 response is unconstitutional.  They have not done

so.  OJJ's response has been reasonable, so the Court must defer to the state legislative and

executive branches.

369.     In sum, the Court finds, as in *Gumns*, "that the balance of the harms and the public interest weigh against the issuance of the requested TRO or preliminary injunction." *Gumns*, 2020 WL 2510248, at *15.

370.     Thus, Plaintiffs have failed to establish any of the necessary elements of injunctive relief, so their motion must be denied.

### E. Preliminary Injunction

371.     Defendant urges that the Court treat *Plaintiffs' TRO* as a motion for a preliminary injunction as well and deny the requested relief.

372.     There is authority in the Fifth Circuit for the proposition that, for purposes of appellate jurisdiction, the denial of a temporary restraining order is appealable "when entered after a hearing in which all interested parties had an opportunity to participate, thus allowing for full presentation of all relevant facts." *Turner v. Epps*, 460 F. App'x 322, 326 (5th Cir. 2012) (quoting *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. 1981). "As the Supreme Court has explained, in cases 'where an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified.' " *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 87, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974). *See also Marlowe v. LeBlanc*, 2020 WL 2043425, at *1 n.1 ("Plaintiff contends that the district court's order is a TRO, governed by Fed. R. Civ. P. 65(b) and normally unappealable. However, precedent makes clear that when a court holds a hearing on a preliminary motion and the motion is strongly contested, its resulting order constitutes an injunction appealable under 28 U.S.C. § 1291(a)(1)." (citations omitted)).  Thus, for purposes of appeal, this motion shall be treated as a preliminary injunction.

373.     But, for purposes of the proceedings in this Court, the Court represented to the parties before the hearing that Plaintiffs would have another opportunity to file a preliminary injunction after a further opportunity for discovery.  Thus, the Court is unwilling at this point to permanently prohibit Plaintiffs from seeking another preliminary injunction should discovery reveal material that alter the Court's findings and conclusions and could substantiate their claim.

374.     However, the Court must strongly caution Plaintiffs of their Rule 11 obligations.  The Court has found throughout this opinion that Plaintiffs did not come close to satisfying their burden, under either constitutional standard, or for any of element of injunctive relief standard (regardless of what it is called).  Thus, Plaintiffs should not file another motion for a preliminary injunction unless circumstances have substantially changed and unless they have a good faith basis in law or fact to do so.  The Court will consider an award of attorneys' fees if it finds that a second preliminary injunction motion was brought frivolously.

## III.   Conclusion

375.     The Court does not mean to downplay the difficulty Plaintiffs, the class members, and their families have experienced as a result of the COVID-19 pandemic.  But these are sacrifices that all members of society have had to make in response to this crisis.  Grandparents have been unable to hug their grandchildren.  Many sons and daughters cannot communicate with their parents in nursing homes, except by telephone or FaceTime.  People have been unable to attend funerals of loved ones.  And people have been separated from their friends, family, coworkers, fellow students, churches, and other communities.

376.    On the whole, the Court finds that OJJ's job in responding to the COVID-19 pandemic has been commendable.  As stated throughout this opinion, the Court was highly impressed with the OJJ witnesses who testified, all of whom seemed like highly dedicated workers who were doing the best they could under harrowing and unprecedented circumstances.  All of their actions were rationally related to legitimate objectives, and OJJ was certainly not deliberately indifferent in responding to the crisis.  As Defendants said in their opening statement, "this is not even a close call." Tr. (6/3/20) at 37.  The Court agrees.

377.    Accordingly,

**IT IS ORDERED** that *Plaintiffs' Emergency Motion for Temporary Restraining Order Seeking Immediate Furlough,* Doc. 7 is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>June 24, 2020</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**